1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     BRUCE A. ERICSON (SBN 76342)
2    bruce.ericson@pillsburylaw.com
     JEFFREY S. JACOBI (SBN 252884)
3    jeffrey.jacobi@pillsburylaw.com
     50 Fremont Street
4    Post Office Box 7880
     San Francisco, California 94120-7880
5    Telephone:  (415) 983-1000
     Facsimile:  (415) 983-1200
6
     Attorneys for Defendants
7    CENTURY ALUMINUM COMPANY,
     LOGAN W. KRUGER, MICHAEL A. BLESS, STEVE
8    SCHNEIDER, JOHN C. FONTAINE, JACK E.
     THOMPSON, PETER C. JONES, JOHN P. O'BRIEN,
9    WILLY R. STROTHOTTE, JARL BERNTZEN, WAYNE
     R. HALE, ROBERT E. FISHMAN and CATHERINE Z.
10   MANNING

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14  |                              | No. C-09-1001-SI
    |                              | [Consolidated with Nos. C-09-1103-SI, C-
15  | In re CENTURY ALUMINUM COMPANY| 09-1162-SI, C-09-1205-SI]
    | SECURITIES LITIGATION         |
16  |                              | **CENTURY DEFENDANTS' MOTION
    |                              | TO DISMISS CONSOLIDATED
17  |                              | CLASS ACTION COMPLAINT**

18    This document relates to all actions.     Date:        March 5, 2010
                                                Time:        9 a.m.
19                                              Courtroom:   10, 19th Floor
                                                Included Documents:
20                                              1.  Notice of motion and motion
                                                2.  Statement of issues to be decided
21                                              3.  Supporting memorandum

22                                              Filed separately:
                                                1.  Request for judicial notice
23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3
NOTICE OF MOTION AND MOTION ................................................................1

4
STATEMENT OF ISSUES TO BE DECIDED ...................................................1

5
SUPPORTING MEMORANDUM ......................................................................2

6
I.      INTRODUCTION AND SUMMARY OF ARGUMENT .................................2

7
II.     STATEMENT OF THE CASE ...............................................................5

8
        A.      Century and the primary aluminum business ..............................5

9
        B.      Century's hedges with Glencore .................................................5

10
        C.      The termination of the Hedges and Century's related disclosures ................7

11
        D.      The third-quarter interim financials .............................................8

12
        E.      The secondary shelf offering of January 2009 ..........................9

13
        F.      The SEC filings of March 2, 2009, including the restatement ....................10

14
        G.      The claims asserted by the Complaint .......................................11

15
III.    ARGUMENT .......................................................................................12

16
        A.      The Court should dismiss the '34 Act claims.............................12

17
                1.      Standards applicable to '34 Act claims .........................12

18
                2.      The allegations of scienter do not suffice ......................13

19
                3.      The restatement of cash flows was immaterial................18

20
                4.      The allegations of loss causation do not suffice ............20

21
        B.      The Court should dismiss the '33 Act claims.............................20

22
                1.      Standards applicable to '33 Act claims .........................20

23
                2.      Plaintiffs lack standing to assert a Section 12(a)(2) claim ..............22

24
                3.      The Century Defendants were not statutory sellers........................23

25
                4.      The restatement of cash flows was immaterial................24

26
        C.      The control person claims do not suffice ...................................25

27
IV.     CONCLUSION ...................................................................................25

28

701989755v2

1                      **TABLE OF AUTHORITIES**

2                                                 **Page**

3                               **Cases**

4

5
*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ........................................................... 21

6
*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ...................................................... 21, 24

7

8
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................. 4, 21, 22

9
*Craftmatic Sec. Litig. v. Kraftsow,*
    890 F.2d 628 (3d Cir. 1989) .............................................. 24

10

11
*Dartley v. Ergobilt,*
    No. CIV. A. 398CV1442M, 2001 WL 313964 (N.D. Tex. Mar. 29,
    2001) ............................................................................... 22

12

13
*DeMaria v. Andersen,*
    153 F. Supp. 2d 300 (S.D.N.Y. 2001) .............................. 23

14
*DSAM Global Value Fund v. Altris Software, Inc.,*
    288 F.3d 385 (9th Cir. 2002) ............................................ 14

15

16
*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) .......................................................... 22

17
*Hertzberg v. Dignity Partners, Inc.,*
    191 F.3d 1076 (9th Cir. 1999) .......................................... 22

18

19
*In re Atlas Mining Co., Sec. Litig.,*
    No. 07-428-N-EJL, 2009 WL 3151135 (D. Idaho Sept. 25, 2009) .......................... 18

20
*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................ 21

21

22
*In re Cylink Sec. Litig.,*
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................ 19

23
*In re Daou Systems, Inc.,*
    411 F.3d 1006 (9th Cir. 2005) ................................ 19, 20, 21

24
*In re Fidelity/Apple Sec. Litig.,*
    986 F. Supp. 42 (D. Mass. 1997) ...................................... 24

25
*In re Fuwei Films Sec. Litig.,*
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) .............................. 22

26

27
*In re Harmonic, Inc. Sec. Litig.,*
    No. C 00-2287 PJH, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ...................... 24

28

*In re Hypercom Corp. Sec. Litig.*,
    No. CV-05-0455-PHX-NVW, 2006 WL 1836181 (D. Ariz. July 5,
    2006) ....................................................................................................... 14

*In re Infonet Servs. Sec. Litig.*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................ 13, 23

*In re Invision Techs., Inc. Sec. Litig.*,
    No. C04-03181 MJJ, 2006 WL 538752
    (N.D. Cal. Jan. 24, 2006) ......................................................................... 14

*In re K-Tel Int'l Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ................................................................... 14

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) .............................................. 22, 24

*In re Metawave Communications Corp.*
    *Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ............................................ 18

*In re Musicmaker.com Sec. Litig.*,
    No. CV 00-2018, 2001 U.S. Dist. LEXIS 25118 (C.D. Cal. June 4,
    2001) ....................................................................................................... 23

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ................................................................. 24

*In re PMI Group, Inc. Sec. Litig.,*
    Nos. C-08-1405 SI, C-08-1406 SI, 2009 WL 1916934 (N.D. Cal.
    July 1, 2009) ............................................................................................ 25

*In re Prestige Brands Holding, Inc.,*
    2006 U.S. Dist. LEXIS 46667 (S.D.N.Y. July 10, 2006) ........................ 22

*In re SeeBeyond Techs. Corp. Secs. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................. 23

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................ 13, 16

*In re Software Toolworks Inc.*,
    50 F.3d 615 (9th Cir. 1994) ..................................................................... 14

*In re Stac,*
    89 F.3d 1399 (9th Cir. 1996) ................................................................... 13

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ................................................. 14

*J & R Marketing, SEP v. General Motors Corp.*,
    No. 06-10201, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007) ................ 18

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ................................................................. 25

Century's Motion to Dismiss
Case No. C 09-1376 (SI)

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................................... 20

*Morgan v. AXT, Inc.*,
    No. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125 (N.D. Cal.
    Sept. 23, 2005) .......................................................................................... 14, 20

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) .................................................................................. 21

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) .................................................................................... 24

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .................................................................................. 25

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .................................................................................. 23

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006) .................................................................. 25

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ................................................................................ 13

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) .................................................................................................. 14

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ................................................................................ 13

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) ...................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................. 1, 4, 13, 18

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522 (1979) ................................................................................................ 14

*Twinde v. Threshold Pharms. Inc.*,
    No. C 07-4972 CW, 2008 WL 2740457 (N.D. Cal. July 11, 2008) ........................ 25

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ................................................................................ 13

*Zucco Partners v. Digimarc*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................. 14

## Statutes and Codes

Securities Act of 1933
    Section 12(a)(2) ............................................................................................. passim
    Section 15 ............................................................................................... 11, 25

701989755v2

Century's Motion to Dismiss
Case No. C 09-1376 (SI)

Securities Exchange Act of 1934
Section 10(b) ........................................................................................... passim
Section 20(a) ........................................................................................... 11, 25

United States Code
Title 15, section 771(a)(2) ....................................................................... 21

**Rules and Regulations**

Code of Federal Regulations
Title 17, Section 230.405 ......................................................................... 11

Federal Rules of Civil Procedure
Rule 8(a) .................................................................................................. 1
Rule 9(b) .................................................................................................. 1, 12
Rule 12(b)(1) ........................................................................................... 1, 2
Rule 12(b)(6) ........................................................................................... 1, 2

Rules of the Securities and Exchange Commission
Rule 10b-5 ................................................................................................ passim

**Other Authorities**

Securities and Exchange Commission,
'33 Act Rules Compliance and Disclosure Interpretation (Jan. 2009) .................... 11

Century's Motion to Dismiss
Case No. C 09-1376 (SI)

1  **NOTICE OF MOTION AND MOTION**

2  TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that on Friday, March 5, 2010, at 9:00 a.m., or as soon

4  thereafter as counsel may be heard, in Courtroom 10 of this Court, located at 450 Golden

5  Gate Avenue, 19th Floor, San Francisco, California 94102, before the Honorable Susan

6  Illston, United States District Judge, defendants CENTURY ALUMINUM COMPANY

7  ("Century Aluminum"), LOGAN W. KRUGER, MICHAEL A. BLESS, STEVE

8  SCHNEIDER, JOHN C. FONTAINE, JACK E. THOMPSON, PETER C. JONES, JOHN

9  P. O'BRIEN, WILLY R. STROTHOTTE, JARL BERNTZEN, WAYNE R. HALE,

10 ROBERT E. FISHMAN and CATHERINE Z. MANNING (the "Individual Defendants")

11 (Century Aluminum and the Individual Defendants are collectively referred to as the

12 "Century Defendants") will and hereby do move this Court to dismiss, with prejudice, all

13 purported claims asserted against them in Plaintiffs' Consolidated Class Action Complaint

14 filed November 17, 2009 (Doc. 51) (the "Complaint" or "Compl.").

15        This motion is made under Rules 8(a), 9(b), 12(b)(1) and 12(b)(6) of the Federal

16 Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), on

17 the grounds that the Complaint fails to state a claim against the Century Defendants.

18        This motion is based on this notice of motion and motion, the memorandum that

19 follows, the request for judicial notice filed herewith ("RJN"), the Underwriters' motion

20 filed herewith, and all pleadings and records on file in this consolidated action.

21                          **STATEMENT OF ISSUES TO BE DECIDED**

22        1.        Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange

23 Act of 1934 (the "'34 Act") and Rule 10b-5 should be dismissed pursuant to Rule 12(b)(6)

24 because the Complaint fails to allege facts creating a strong inference of scienter, as

25 required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

26        2.        Whether Plaintiffs' claim under Section 10(b) of the '34 Act and Rule 10b-5

27 should be dismissed pursuant to Rule 12(b)(6) because the Complaint fails to allege facts

28 showing that a presentation error in an interim statement of cash flows amounts to a

1    material misstatement or omission.

2        3.    Whether Plaintiffs' claim under Section 10(b) of the '34 Act and Rule 10b-5

3    should be dismissed pursuant to Rule 12(b)(6) because the Complaint fails to allege facts

4    showing loss causation.

5        4.    Whether Plaintiffs' claim under Section 12(a)(2) of the Securities Act of

6    1933 (the "'33 Act") should be dismissed pursuant to Rule 12(b)(1) for lack of subject

7    matter jurisdiction and/or Rule 12(b)(6) because the Complaint fails to allege that Plaintiffs

8    purchased Century Aluminum common stock in the secondary "shelf" offering of January

9    2009 (the "Shelf Offering") and because Plaintiffs' own certificates constitute judicial

10   admissions that they did not purchase in the Shelf Offering, but in the aftermarket.

11       5.    Whether Plaintiffs' claim under Section 12(a)(2) of the '33 Act should be

12   dismissed pursuant to Rule 12(b)(6) because the Complaint does not allege facts showing

13   that the Individual Defendants were statutory "sellers."

14       6.    Whether Plaintiffs' claim under Section 12(a)(2) of the '33 Act should be

15   dismissed pursuant to Rule 12(b)(6) because the Complaint fails to allege facts showing

16   that a presentation error in an interim statement of cash flows amounts to a material

17   misstatement or omission.

18                          **SUPPORTING MEMORANDUM**

19   **I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

20        The gist of this case, say Plaintiffs, is that Century portrayed itself as "cash rich"

21   (Compl. ¶ 83) when in fact it was cash poor and flirting with disaster. But what prospectus

22   are Plaintiffs reading? It is only by selective excising of quotations, and stopping before

23   page 2 of the prospectus, that Plaintiffs can ignore Century's chilly warning that even with

24   the cash it hoped to raise through the Shelf Offering, it might not survive 2009:

25        ***Financial Position and Liquidity: Our financial position and liquidity have
          been and will continue to be materially adversely affected by declining
26        aluminum prices. If prices remain at current levels or continue to decline,
          we will have to take additional action to reduce costs, including significant
27        curtailment of our operations, in order to have the liquidity required to
          operate through 2009, and there can be no assurance that these actions
28        will be sufficient.***

1    RJN Ex. 22, at 829 (bold and italics in original).  Of course, Century did survive 2009 —

2    the stock it sold for $4.50 in the Shelf Offering now trades at over $16.  RJN. Ex. 62.

3           Plaintiffs' Complaint, despite its 53 pages, is a one-trick pony.  The only thing

4    Plaintiffs really allege is that, in March 2009, Century restated its interim statement of cash

5    flow for the third quarter of 2008, decreasing cash flows on one line, "Due to affiliates"

6    while increasing cash flows (by the same amount) on another line, "Issuance of preferred

7    stock."  RJN Ex. 30, at 1063-64.  This change in presentation, the result of a technical

8    accounting error, had not one cent's effect on Century's assets, liabilities, shareholders'

9    equity, net income (or loss), or beginning or ending cash position.  RJN Ex. 30, at 1063-64.

10   Not surprisingly, nobody cared.

11          Plaintiffs claim Century's stock dropped almost $7 in response to the restatement; in

12   fact, if there was any drop at all, it was only pennies.  And not one single analyst even

13   mentioned the restatement, even though the previous summer many had commented on the

14   underlying transaction — a transaction that Century disclosed in detailed disclosures, none

15   of which this Complaint challenges.  In short, Plaintiffs are complaining about a technical

16   presentation error of no practical significance that misled no one.  Among other defects,

17   their Complaint falls woefully short of alleging an actionable misstatement, or scienter, or

18   loss causation, or standing to sue under the '33 Act.

19          In July 2008, Century terminated certain hedge agreements for primary aluminum

20   that it had with its largest shareholder, a commodity trader.  Century fully disclosed the

21   terms of the termination, attaching copies of all the deal documents to an 8-K, and

22   describing in detail each element of the transaction, which terminated the hedges in return

23   for cash and preferred stock.

24          Plaintiffs do not challenge these disclosures, not in the slightest.  Instead, they allege

25   that in its earnings release and 10-Q for Q3, Century presented one aspect of the

26   termination on the wrong part of the statement of cash flows.  Plaintiffs do not challenge

27   any other aspect of Century's financial statements.  Instead, they allege the cash-flow

28   statement was somehow misleading because it presented a portion of the cash flows relating

701989755v2

Century's Motion to Dismiss
Case No. C 09-1376 (SI)

1    to the termination as an "operating activity" rather than a "financing activity."

2         In January 2009, Century sold common stock through the Shelf Offering.  The

3    prospectus for the Offering incorporated by reference both the 10-Q of November 2008 and

4    the termination documents from July 2008.  Plaintiffs argue the technical accounting error

5    in the 10-Q made investors think Century was "cash rich" when it was not.  But Plaintiffs'

6    argument disregards the prospectus itself and Century's other disclosures, and ignores the

7    market context in which the Shelf Offering occurred.  In fact, the prospectus fully, clearly

8    and unequivocally disclosed that Century had a substantial Q4 operating loss, faced a likely

9    worse loss in the next quarter, had a negative operating cash flow, would be taking an

10   impairment charge to all or a portion of its goodwill, had to write down inventories, had

11   worsening liquidity problems, was making the offering because it needed cash and — even

12   if the offering succeeded — still might lack the liquidity needed to operate through 2009.

13        All this occurred against the backdrop of the Wall Street meltdown and a historic

14   crash in aluminum prices.  The spot price of aluminum, which had peaked at over $3,200 a

15   metric ton in the summer of 2008, fell to roughly $1,400 by January 2009, a price that

16   analysts had said was 30% below Century's cost of production; the price fell further in

17   February.  Meanwhile Century made its Shelf Offering at $4.50, even though its stock had

18   traded as high as $79.51 within the previous 52 weeks.  To suggest, as Plaintiffs do, that

19   Century was painting a rosy picture of its economic situation by deliberately misplacing

20   one item on an interim statement of cash flows not only fails the *Tellabs* strong inference

21   standard; it also fails the *Twombly* plausibility standard.  Truly, it makes no sense.

22        Plaintiffs assert claims under Rule 10b-5 and Section 12(a)(2), as well as control

23   person claims.  None has merit.  Plaintiffs have not stated a 10b-5 claim because they have

24   not alleged facts raising a strong inference of scienter, or an actionable misrepresentation,

25   or loss causation.  Plaintiffs have not stated a Section 12(a)(2) claim because they did not

26   buy in the January offering, and thus have no standing to sue (an infirmity that no

27   amendment can remedy), and because they have not alleged an actionable misstatement.

28   This case should be dismissed.

1   **II.      STATEMENT OF THE CASE**

2   **A.      Century and the primary aluminum business**

3          Century was formed in 1995 by Glencore International ("Glencore"), a supplier and

4   trader of commodities, as a holding company for its aluminum-producing assets.  Compl.

5   ¶¶ 5, 32.  Century became publicly owned in April 1996.  RJN Ex. 32, at 1194.  As of

6   February 2009, Glencore or its affiliates beneficially own about 38.1% of Century's

7   common stock (up from 28.5% in 2008) and have an overall 48.9% economic ownership of

8   Century.  Compl. ¶ 62; RJN Ex. 32, at 1138.

9          Century produces primary aluminum (that is, pure aluminum, as opposed to alloys)

10  in facilities here and abroad.  RJN Ex. 32, at 1194.  Primary aluminum is traded

11  internationally and produced in many countries.  The benchmark price is determined by

12  spot and futures trading on the London Metal Exchange ("LME").  RJN Ex. 32, at 1101.  In

13  recent years, the LME price for primary aluminum has been highly volatile.  *See* RJN Ex.

14  61.  From July 7, 2008 to March 3, 2009, for example, the LME spot price fell 61%, from

15  $3,259.25 to $1,279.50.  RJN Ex. 61; Compl. ¶ 61.  From March 3, 2009 (the day after the

16  end of the class period) to January 13, 2010, the LME spot price  rose from $1,279.25 to

17  $2,250.25.  RJN Ex. 61, at 1516-18.  The period of the Shelf Offering and the restatement

18  (January to March 2009) is the only time in the last half decade when the LME spot price

19  ever fell below $1,300; it did so on 13 days during that period, including March 2 and 3:

20  the very same time Century issued the restatement at issue.  RJN Ex. 61, at 1514-18.

21  **B.      Century's hedges with Glencore**

22          Century has long sought to protect itself against market volatility.  For years it did

23  so by entering into forward contracts, or hedges, usually with Glencore, pursuant to which

24  it partially hedged against big drops in aluminum prices.  RJN Ex. 1, at 76; Ex. 32, at 1153.

25  In November 2004 and again in June 2005, Century entered into two hedges with Glencore

26  (the "Hedges").  RJN Ex. 1, at 76.  Century and Glencore terminated the Hedges in July

27  2008.  RJN Ex. 32, at 1153.  Plaintiffs do not challenge the disclosure of that termination

28  but instead challenge only one technical aspect of the accounting for that termination.

1    The Hedges worked this way:  For each year starting in 2006 and continuing

2    through 2015, the Hedges set a minimum price and a maximum price, and specified two

3    quantities of primary aluminum (expressed in metric tons), "Tonnage 1" and "Tonnage 2."

4    There was a possible cash settlement each month.  If the average LME spot price for the

5    month was below the *minimum*, Glencore paid Century the difference between the LME

6    spot price and the minimum, multiplied by the quantity of Tonnage 1.  If, however, the

7    average LME spot price for the month was above the *maximum*, Century paid Glencore the

8    difference between the LME spot and the maximum, multiplied by the sum of the quantities

9    of Tonnage 1 + Tonnage 2.  If the average LME spot price for the month was between the

10   minimum and the maximum, neither party paid the other anything.  All settlements were in

11   cash; neither side actually delivered aluminum to the other as a result of the Hedges.

12   Century disclosed the Hedges upon entering into them and, each quarter, marked

13   them to market, disclosing in its 10-Qs and 10-Ks the change in their market value.  RJN

14   Ex. 2, at 132.  This involved calculating, using LME futures prices, how much cash Century

15   expected to pay or receive under the Hedges for the rest of their lives, and then discounting

16   those sums back to present value.  The discounted present value of those sums represented

17   the market value of the asset (if the discounted sums were positive) or the liability (if the

18   discounted sums were negative).  The change in market value (realized and unrealized)

19   since the last quarter was then prominently reflected on Century's books as an adjustment

20   to "Net Income" ("Net loss on forward contracts") on the statement of operations; the non-

21   cash (unrealized) portion was reflected as an adjustment to "Cash Flows From Operating

22   Activities" ("Unrealized net loss on forward contracts") on the statement of cash flows.

23   RJN Ex. 2, at 117-18, 132-34.

24   By early 2008, after three years of steady losses under the Hedges, thanks to steadily

25   increasing aluminum prices, Century management felt Century would be better off without

26   the Hedges, and it entered into protracted negotiations with Glencore to terminate them.

27   RJN Ex. 32, at 1153.  These negotiations led to a set of agreements entered into in July

28   2008, which is where the Complaint begins its story.

- 6 -

1    **C.       The termination of the Hedges and Century's related disclosures**

2            The Complaint alleges that "in mid-2008" Century owed "commodities trading

3    conglomerate Glencore Ltd." "over **three quarters of a billion dollars**" on certain

4    "forward financial sales contracts."  Compl. ¶¶ 8, 62 (emphasis in original).[1]  Glencore

5    allegedly owned "28.5% of Century Aluminum's shares at that time" and "could have

6    either forced Century Aluminum into bankruptcy and/or taken over the Company outright

7    via a tender offer or proxy contest."  Compl. ¶ 8.  "In July, Century Aluminum announced

8    that they had mollified Glencore."  Compl. n. 2.  The Complaint alleges Century and

9    Glencore agreed to terminate the Hedges "upon the payment by Century to Glencore Ltd of

10   $730.2 million and upon the issuance by Century to Glencore Investment Pty Ltd of

11   160,000 shares of a non-voting Series A Convertible Preferred Stock."  Compl. ¶ 63

12   (quoting RJN Ex. 3, at 165-66).  "Of the [$730.2 million] cash payment, Century ha[d]

13   deferred payment of $505.2 million until August 31, 2008."  Compl. ¶ 63.  The Complaint

14   alleges that "[t]he total cash outlay to Glencore under the agreement amounted to the

15   equivalent of $1.65 billion."  Compl. ¶ 64.

16           On a motion to dismiss we are, of course, required to accept well-pleaded

17   allegations as true.  But we are not required to accept them as complete.  Plaintiffs are long

18   on insinuation but omit any mention of Century's very thorough disclosures about this

19   transaction — disclosures that cover every aspect of the transaction, every element that

20   Plaintiffs allege.

21           On July 7, 2008, Century signed the documents terminating the Hedges.  The next

22   day it:  (1) held a conference call with analysts and investors, with a slideshow, to explain

23   the transaction (RJN Ex. 5-6); (2) filed an 8-K announcing that it and Glencore had agreed

24   _____

25   [1] This is disingenuous, if insignificant.  The mark-to-market valuation was not a current
        obligation, due upon demand; it was an estimate, based on estimated cash flows
26      discounted to present value, of what Century would have to pay Glencore through 2015
        (when the Hedges expired) if aluminum prices stayed where they were as of the estimate.
27      RJN Ex. 1, at 76.  If aluminum prices fell below the Hedges' maximum, Century would
        have no liability.  And if aluminum prices fell below the Hedges' minimum, Glencore
28      would owe Century money.

1   to terminate the Hedges via the contemporaneous execution of four agreements, *each of*

2   *which were attached in their entirety to the 8-K* (RJN Ex. 3, at 186-260); and (3) filed a

3   13D/A detailing Glencore's purchase of preferred stock from Century, including all the

4   cash that changed hands as part of this transaction (RJN Ex. 4, at 276-80).

5          Two things are striking about these disclosures:

6          *First*, the disclosures cover all aspects of the transaction alleged in the Complaint —

7   the discharge of liabilities created by the Hedges, the payment of cash, the giving of a

8   promissory note and the sale of preferred stock.  Thus, Century advised the public that:

9   •  Glencore discharged $1.832 billion of liabilities associated with the Hedges.  RJN Ex.

10     5, at 295; Ex. 17, at 721.

11   •  Century made a cash payment of $225 million and gave Glencore a note for the

12     deferred settlement amount of $505.2 million.  RJN Ex. 3, at 188-89; Ex. 4, at 280; Ex.

13     7, at 354, 356; Ex. 8, at 412-14; Ex. 17, at 721-23, 752, 771; Ex. 22, at 847.

14   •  Century issued to Glencore 160,000 shares of non-voting perpetual preferred stock,

15     convertible into 16,000,000 shares of common stock.  RJN Ex. 3, at 165, 175-76;

16     Ex. 17, at 771.

17   •  Glencore paid Century, in cash, the purchase price of the preferred stock:

18     $1,090,259,200, which sum Century immediately paid back to Glencore in partial

19     settlement of Century's liabilities associated with the Hedges (we refer to this as the

20     "touch-pass" payment).  RJN Ex. 3, at 165, 175-76, 188-89, 200; Ex. 4, at 276, 280; Ex.

21     17, at 721.[2]

22          *Second*, the Complaint does not allege that any aspect of these disclosures was false

23   or misleading — the Complaint's accusations pertain solely to the technical presentation of

24   the "touch-pass" payment in the Q3 interim statement of cash flow, filed four months later.

25   **D.**     **The third-quarter interim financials**

26          Century's next periodic disclosures occurred after the third quarter.  As usual,

27

   [2]  The preferred stock had a fair market value, net of certain costs, of $929,480,000.  The

28      settlement resulted in a net gain to Century $161,976,000 after transactions costs.  *Id.*

1  Century made an earnings release (filed as an 8-K), held a conference call with a slideshow,

2  and then several weeks later, filed its 10-Q.  RJN Ex. 13-18.  The 10-Q incorporated by

3  reference the agreements that terminated the Hedges.  RJN Ex. 17, at 786-87.

4         The Complaint challenges only one aspect of these financials — the technical

5  presentation of certain cash elements of the transaction on the interim unaudited

6  consolidated statement of cash flows.  The Complaint does not say that the cash at the start

7  of the reporting period was wrong, or that the cash at the end of the reporting was wrong, or

8  that the net changes in cash were wrong (nor could the Complaint say this, as the

9  restatement changed none of these things).  Rather, the Complaint alleges that certain cash

10 flows associated with the transaction should have been shown as "Cash Flows From

11 Financing Activities," as opposed to "Cash Flows From Operating Activities," and argues

12 that this misled investors into thinking that Century was "cash rich."  Compl. ¶¶ 10, 13, 76-

13 78, 83.  That nothing of substance changed can be seen most clearly by looking at the 8-K

14 announcing the March 2, 2009 restatement.  It provides a revised statement of cash flows

15 showing the movement of the $929,480,000 from operating to financing, without any

16 bottom line effects.  RJN Ex. 30, at 1064.

17 **E.     The secondary shelf offering of January 2009**

18        September 2008 saw Wall Street melt down, and the fourth quarter brought

19 disruption in the aluminum market too, as the recession really started to take hold.  As

20 noted above, the LME spot price fell precipitously after July 2008 (Compl. ¶ 7; RJN Ex.

21 61) and, as a result, Century made a doleful series of announcements (via 8-K), including

22 big operating losses, and a plant curtailment and layoffs.  Compl. ¶¶ 9, 65-69; RJN Ex. 19-

23 20.  Throughout this period, the price of Century's common stock fell precipitously, from

24 over $60 in July to under $10 in December.  RJN Ex. 62.

25        On January 28, 2009, Century made the Shelf Offering of common stock at $4.50.

26 The offering was dilutive; Century's stock dropped from $7.35 to $4.60.  Throughout

27 February, Century's stock price continued downward, starting the month at $3.70 and

28 ending the month at $2.22.  RJN Ex. 62, at 1525.

Century's Motion to Dismiss
Case No. C 09-1376 (SI)

1    **F.      The SEC filings of March 2, 2009, including the restatement**

2          On Monday, March 2, 2009, Century made three SEC filings; the Complaint

3    mentions only one.  The three filings were:  an 8-K containing the announcement of a

4    restatement (accepted by EDGAR at 11:51 am Eastern); a prospectus supplement seeking to

5    register more common stock, possibly in advance of another dilutive stock offering

6    (accepted by EDGAR at 2:38 pm Eastern); and Century's 10-K for 2008 (accepted by

7    EDGAR after the market had closed, at 5:14 pm Eastern).  RJN Ex. 30-32.

8          The 8-K announced the restatement of the Q3 interim statement of cash flows and

9    said the old interim cash-flow statement "should no longer be relied upon."  Compl. ¶¶ 12-

10   13; RJN Ex. 30, at 1063.  Plaintiffs allege that, as a result of the restatement, "the

11   Company's shares on NASDAQ fell to $1.06, a 87% drop from the January 2009 Offering

12   price of $8.00 slightly more than one month earlier."  Compl. ¶¶ 12, 13, 119.  The Court

13   may take judicial notice of stock price tables, which show this allegation is not even

14   approximately true.  To start, the "January 2009 Offering price" was $4.50, not $8.  RJN

15   Ex. 22, at 824.  The closing price on the last trading day before the alleged "curative

16   disclosure" was $2.22, not $8.  RJN Ex. 62, at 1525.  And the close after the disclosure was

17   $1.68, not $1.06.  *Id.*  Thus, we have a 54 cent stock drop based on the daily closing prices,

18   not a $6.94 stock drop, as the Complaint alleges.  Compl. ¶¶ 12-13, 119.

19         If we look at intra-day trading, the stock drop shrinks even more.  EDGAR accepted

20   the 8-K announcing the restatement at 11:51 am Eastern.  A few minutes before that time,

21   Century's stock had fallen from $2.22 (the close on Friday, February 27) to $1.86.  RJN Ex.

22   63.  In the hours after the alleged "curative disclosure," the price fell less than another 20

23   cents, closing at $1.68.  Indeed, on average the stock fell less rapidly after the "curative

24   disclosure" than before.  *Id.*  Later that day Century made two additional SEC filings.  At

25   2:38 pm Eastern, Century filed a prospectus supplement seeking to register more common

26   stock, possibly in advance of another dilutive stock offering (a so-called POSASR).  RJN

27

28

701989755v2

1   Ex. 31.[3]  Then at 5:14 pm Eastern, after the markets closed, Century filed its 10-K for 2008.

2   RJN Ex. 32.

3          When the market opened the next day, March 3, 2009, Century stock fell again,

4   closing at $1.41.  RJN Ex. 63.  But the Complaint alleges no facts suggesting that the

5   further fall had anything to do with the restatement, as opposed to the POSASR, or the 10-

6   K, or the LME spot price, or broader market factors, or anything else.

7          What we can say is that Century's stock, after bottoming at $1.06 on March 9, has

8   steadily headed up ever since, and on January 13, 2010 closed at $16.63.  RJN Ex. 62.

9   What we also can say is that the analysts who commented on Century in the weeks

10  following March 2 talked about a number of things, but never once did any analyst who

11  follows Century comment on the restatement.  RJN Ex. 54-60 (these are all analyst reports

12  written between March 2, 2009 and late July 2009).  For analysts, and investors, and indeed

13  everyone except plaintiffs' class action lawyers, the restatement was a non-event.

14  **G.      The claims asserted by the Complaint**

15         The Complaint asserts four counts:  (1) Section 10(b) of the '34 Act and Rule 10b-5;

16  (2) Section 20(a) of the '34 Act; (3) Section 12(a)(2) of the '33 Act; and (4) Section 15 of

17  the '33 Act.

18         The '34 Act claims are brought "on behalf of a Class composed of all holders of

19  Century Aluminum common stock from October 21, 2008 and March 2, 2009."  Compl.

20  _____

21  [3] Century filed the prospectus supplement because the market decline had caused it (like
    many other companies) to lose its "WKSI" status.  WKSI, which is an acronym standing

22  for "Well-known seasoned issuer" (*see* definition in 17 C.F.R. § 230.405), which permits
    automatic shelf registration statements allowing the registration of an unlimited amount

23  of securities, with filing fees to be paid on a "pay as you go" basis.  One test for WKSI
    status is having a market cap in excess of $700 million.  *Id.*  As Century's stock price fell,

24  its market cap fell, and it lost its WKSI status.  In January, the SEC had told issuers what
    to do so that they could continue to offer and sell securities off of automatic shelf

25  registration statements pending conversion to an non-automatic shelf registration
    statement (required because of the loss of WKSI status).  *See* answer to question 198.06

26  in the SEC's '33 Act Rules Compliance and Disclosure Interpretation (Jan. 2009).  The
    process involved filing this POSASR before the 10-K, and then filing another one after

27  the 10-K.  Therefore, Century did this.  The filing may have suggested to the market that
    Century might be making another offering of common stock in the near future; investors

28  might have viewed this as dilutive, as the January 2009 offering had been dilutive.

1   ¶ 121.  The gravamen of the '34 Act claims is that "to create and/or maintain artificial

2   inflation of the price of Century's common stock," Defendants Century plus all 12

3   Individual Defendants (collectively, the "'34 Act Defendants") "undertook a fraudulent

4   scheme to raise money by inflating the Company's stated cash-in-hand in violation of

5   Generally Accepted Accounting Principles ('GAAP')."  Compl. ¶¶ 4, 10, 45, 59.  The

6   alleged fraud is presenting cash flows associated with the termination of the Hedges as

7   "operating activity" rather than "financing activity."

8       The '33 Act claims are based on substantially the same facts.  They allege that

9   defendants Century, plus 11 of the 12 Individual Defendants (all except Hale), and

10  underwriters Credit Suisse Securities (USA) LLC, and Morgan Stanley & Co. (collectively,

11  the "'33 Act Defendants") "issued a false and misleading registration statement which

12  induced Plaintiffs and other parties to purchase shares of Century Aluminum common

13  stock" pursuant to the Shelf Offering.  Compl. ¶¶ 11, 16.  (This is really the same alleged

14  misdeed, because all the prospectus for the Shelf Offering did was incorporate by reference

15  the statement of cash flows from the November 2008 10-Q.  Compl. ¶¶ 79, 80.  By

16  incorporating by reference that 10-Q, it also incorporated by reference the agreements that

17  terminated the Hedges.  RJN Ex. 22, at 893.)  The '33 Act claims are brought "on behalf of

18  a Class composed of all those who purchased or otherwise acquired Century Aluminum

19  common stock pursuant and/or traceable to the Company's January 2009 Secondary

20  Offering, and who were damaged thereby," excluding "Defendants."  Compl. ¶ 127.

21  **III.   ARGUMENT**

22  **A.   The Court should dismiss the '34 Act claims**

23  1.   **Standards applicable to '34 Act claims**

24      The standards for pleading a Section 10(b) claim are well established:

25      To prevail on a section 10(b) claim, a plaintiff must prove "(1) a material
        misrepresentation or omission of fact, (2) scienter, (3) a connection with the
26      purchase or sale of a security, (4) transaction and loss causation, and (5)
        economic loss."  *Daou,* 411 F.3d at 1014.  At the pleading stage, a complaint
27      stating claims under section 10(b) and Rule 10b-5 must satisfy the dual
        pleading requirements of Federal Rule of Civil Procedure 9(b) and the
28      PSLRA.  Thus, a plaintiff must plead falsity with particularity: a plaintiff

must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1). Unlike Rule 9(b), the PSLRA also requires a plaintiff to plead scienter with particularity: a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

*Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1164 (9th Cir. 2009).

To satisfy the scienter requirement, a plaintiff must "plead with particularity facts that give rise to a 'strong'- i.e., a powerful or cogent-inference" which "must be more than merely 'reasonable' or 'permissible'— it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  This means that Plaintiffs "must plead, in great detail, facts that constitute circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999).  "[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

Plaintiffs cannot satisfy their pleading obligations by mischaracterizing documents. If the documents contradict the Complaint, the documents — not the Complaint's mischaracterization of them — control.  *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003); *In re Infonet Servs. Sec. Litig.,* 310 F. Supp. 2d 1080, 1087-88 (C.D. Cal. 2003). Allegations that conflict with the documents are therefore disregarded.  *See, e.g., id.; In re Stac,* 89 F.3d 1399, 1405 (9th Cir. 1996).

2. **The allegations of scienter do not suffice**

*GAAP vs. scienter:*  The Complaint alleges only a technical GAAP violation.  But glib attempts to equate a GAAP violation with scienter, as Plaintiffs make here, are not sufficient.  GAAP is "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d

1   881, 890 (8th Cir. 2002) (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544

2   (1979)).  Indeed, "[t]here are [nineteen] different GAAP sources, any number of which

3   might present conflicting treatments of a particular accounting question." *Shalala v.*

4   *Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  Accordingly, GAAP standards "tolerate a

5   range of 'reasonable' treatments, leaving the choice among alternatives to management." *K-*

6   *Tel Int'l*, 300 F.3d at 890 (quoting *Thor Power Tool*, 439 U.S. at 544).

7       "'[T]he mere publication of inaccurate accounting figures, or a failure to follow

8   GAAP, without more, does not establish scienter.'" *DSAM Global Value Fund v. Altris*

9   *Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*,

10   50 F.3d 615, 627 (9th Cir. 1994)).  "[T]he mere publication of a restatement is not enough

11   to create a strong inference of scienter." *Zucco Partners v. Digimarc*, 552 F.3d 981, 1000

12   (9th Cir. 2009).[4]  This is so, even if the GAAP violations are "significant" or "require large

13   or multiple restatements." *See In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063,

14   1073 (N.D. Cal. 2002).  "Rather, to plead fraudulent intent based on GAAP violations,

15   plaintiffs must allege facts showing that: (1) specific accounting decisions were improper;

16   and (2) the defendants knew specific facts at the time that rendered their accounting

17   determinations fraudulent." *Morgan*, 2005 WL 2347125, at *14  (citing *DSAM*, 288 F.3d at

18   390-91).

19       ***No strong inference of scienter:***  The Complaint offers six pages of scienter

20   allegations.  Compl. ¶¶ 90-102, at 34-40.  All are conclusory or formulaic:  long-winded

21   variations on the theme that 'you must have known the accounting was wrong, because you

22   are directors and senior officers.'  Stripped of this boilerplate, what the Complaint really

23   alleges is that there must be scienter because the mistake involved a lot of money.  *Id.*

24   ¶ 102.  But as a matter of law, that is wrong.  *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F.

---

25   [4]  Nor does the signing of quarterly certifications of financial statements, as mandated by
26   the Sarbanes-Oxley Act (Compl. ¶ 75), without more, support an inference of scienter.
     *See In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 1836181,
27   at *11 (D. Ariz. July 5, 2006); *In re Invision Techs., Inc. Sec. Litig.*, No. C04-03181 MJJ,
     2006 WL 538752, at *7 n. 3 (N.D. Cal. Jan. 24, 2006); *Morgan v. AXT, Inc.*, No. C 04-
28   4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125, at *15 (N.D. Cal. Sept. 23, 2005).

1    Supp. 2d at 1073.  And as applied to the Complaint here, it makes no sense.

2         Defendants disclosed — in truthful disclosures that the Complaint does not

3    challenge — all salient aspects of the transaction terminating the Hedges.  *See* part II.D

4    above.  Century publicly disclosed all the deal documents and explained all the deal terms,

5    including the cash later misplaced on the Q3 statement of cash flows.  Nobody made any

6    attempt to hide the cash flows, and why would they?  The cash was of no practical

7    significance because Century immediately applied it in full toward Century's obligation to

8    the counterparty from which it had just been received — Glencore.  Thus, the impact of the

9    movement on the Net Change in Cash on the statement of cash flows was exactly zero.  The

10   restatement did not change the bottom line — not assets, not liabilities, not shareholders'

11   equity, not net income (or loss), not cash at the opening of the period, and not cash at the

12   end of the period.  To use a basketball analogy, Century's handling of the cash was only a

13   touch-pass.  Only by exalting form over substance, or to generate an unfounded lawsuit,

14   could one get excited about moving an amount of cash — itself fully disclosed — where

15   that movement had no effect on the opening amount of cash, the closing amount of cash or

16   the Net Change in Cash.

17        Consider two alternative ways of structuring the preferred stock portion of the

18   termination transaction:  (1) Century could simply have issued the preferred stock to

19   Glencore, in partial payment of the settlement of the liability created by the Hedges.  No

20   cash changes hands.  (2) Century could have issued the preferred stock to Glencore in

21   return for $1.09 billion in cash.  A second after receipt of this $1.09 billion in cash, Century

22   could have wired every cent of that $1.09 billion back to Glencore in partial payment of the

23   settlement of the liability created by the Hedges.  There is no substantive difference

24   between the two structures.  Either way, Glencore ends up with the preferred stock, and

25   Century is $1.09 billion closer to ridding itself of the Hedges.  Surely nobody would say

26   that Century's cash position is materially affected because, under structure (2), it held $1.09

27   billion for one second, during which second it had a contractual obligation to return the

28   money.  Yet for GAAP and GAAP alone, that made all the difference.  Had Century

1  employed structure (1), Century's presentation in the Q3 interim statement of cash flows

2  would have been correct under GAAP.  But because Century in fact employed structure (2),

3  the cash received for the preferred stock technically should have been shown under "Cash

4  Flows From Financing Activities," rather than "Operating Activities."  Why?  Because in

5  form (not substance) Century received some of the cash in payment for preferred stock,

6  even though the cash Century received was part of a transaction that settled an operating

7  liability — a liability for which associated cash flows until then had been accounted for as

8  an operating activity.  RJN Ex. 2, at 117-18, 132-34.

9        Plaintiffs have not alleged, and cannot allege, specific facts indicating "deliberately

10  reckless or conscious misconduct."  *In re Silicon Graphics,* 183 F.3d 974.  The only

11  reasonable inference is that the auditors spotted this issue a few days before finishing their

12  annual audit at the end of February 2009, and Century promptly corrected the technical

13  error through the restatement.  The contrary inference — that Century recklessly or

14  intentionally hid this until March and then voluntarily made a restatement — makes no

15  sense.  Where's the motive?  The cash payments themselves had been disclosed the day

16  after the termination itself, back in July 2008.  RJN Ex. 4, at 276.  And the agreements that

17  disclosed the cash payment were incorporated by reference into the Q3 10-Q.  RJN. Ex. 17,

18  at 786-87.  There was no attempt to pretend that Century's operations had somehow

19  generated cash out of nowhere, as Plaintiffs allege, which explains why Plaintiffs ignore all

20  of Century's disclosures that directly address the termination transaction.

21        As the LME crashed from over $3,200 in July 2008 to under $1,300 in February

22  2009, Century started losing lots of money, and Century made no attempt to pretend

23  otherwise.  To the contrary, throughout Q4 of 2008 and Q1 of 2009, Century repeatedly

24  filed dreary 8-Ks detailing the downward trajectory of its operations.  Compl. ¶¶ 65-69.  On

25  December 17, 2008, Century announced that it might curtail its entire Ravenswood plant,

26  (the source of 22% of its production capacity), had already shut down one of the four

27  potlines at the plant and had given WARN Act notices to all its workers.  The press release

28  revealed that the WARN notice "specifies that the plant could be curtailed unless the LME

1   selling price for aluminum stabilizes and the company is able to materially reduce costs and

2   stem monthly losses."  RJN Ex. 19, at 805.  Two days later, on December 19, 2008,

3   Century announced that it was terminating 13% of its salaried workforce:  "'Given the

4   unprecedented recent decline in aluminum prices, we had no choice but to aggressively

5   explore every opportunity to reduce our costs across the company,' said Century president

6   and chief executive officer Logan Kruger."  RJN Ex. 20, at 814.

7          Late in January 2009, Century made the dilutive Shelf Offering.  The prospectus for

8   that Offering (which, as noted, saw the stock drop from $7.35 to $4.60) is like a prolonged

9   cold shower.  RJN Ex. 22.  The summary, right up front in the prospectus, notes that while

10  the year-end financials have yet to be finalized, Century expects Q4 operating losses of $60

11  million to $74 million, with worse results yet forecast for Q1 2009 because of the continued

12  drop in aluminum prices.  *Id.* at 827.  After noting several expected charges for impairment

13  of assets and the like, the prospectus states that U.S. operations are "**not cash flow positive**

14  **at recent aluminum prices**" (*id.* at 829) (emphasis added) and then, in bold type, said (in

15  the words quoted on page 2 above) that it might not have the liquidity to make it through

16  2009 (*id.* at 829, 874).  It reiterated this point later, saying "If primary aluminum prices

17  were to remain on average at or around recent levels for the entirety of 2009, or were to

18  decline further, **our liquidity would be at risk**."  *Id.* at 852 (emphasis added).  Two pages

19  later, it said:  "**we cannot be certain that funding for our operating or capital needs will**

20  **be available from the credit and capital markets if needed and to the extent required,**

21  **or on acceptable terms**."  *Id.* at 854 (emphasis added).  "**None of our U.S. smelting**

22  **capacity is profitable on a cash basis at recent primary aluminum prices**."  Id. at 858

23  (emphasis added).  And in case someone missed the point:  "The market price of our

24  common stock has declined significantly, may continue to be volatile, and may decline

25  further."  *Id.* at 855.  Century followed this up with several more 8-Ks in February

26  announcing the closure of the remainder of the Ravenswood plant, and net charges

27  associated with that shut-down.  RJN Ex. 24-25.  Analysts also questioned Century's

28  liquidity.  While some thought the situation more serious than others, all thought Century's

1   operations were cash-flow negative and all saw liquidity as an issue.  *E.g.*, RJN Ex. 48, at

2   1404 ("we estimate the company could be burning through $20mm+ of cash each month.");

3   Ex. 49, at 1411-12 ("Liquidity concerns paramount, maintain Underperform … Earnings

4   and cash flow are at risk as three of four smelters are currently operating at a loss.

5   Liquidity and balance sheet is under stress as cash burn is accelerating."); Ex. 50, at 1419

6   ("this [liquidity concern] is what happens when the price of the product drops 30% below

7   the cost of making that product."); Ex. 51, at 1429 ("The big issue remains liquidity");

8   Ex. 52, at 1446 ("We estimate cash burn rate of close to $300mm in 2009").

9          In short, the inference that Plaintiffs urge  — that the Century defendants were

10  portraying Century as "cash rich" (Compl. ¶ 83) — is belied by even a cursory look at what

11  Century actually said and what analysts actually saw.  Plaintiffs' inference of scienter is at

12  best pitifully weak and cannot satisfy *Tellabs*; the only reasonable inference is that Century

13  did not know of the immaterial accounting error until immediately before it forthrightly

14  corrected that error.

15  3.     **The restatement of cash flows was immaterial**

16         To be sure, there was a restatement, but that changes are material from an

17  accounting perspective does not merit a finding that the changes are also material within the

18  meaning of the federal securities law.  *See J & R Marketing, SEP v. General Motors Corp.*,

19  No. 06-10201, 2007 WL 655291, at *12 (E.D. Mich. Feb. 27, 2007) (holding that while a

20  restatement "may have been material from an accounting perspective, Plaintiffs' brief is

21  bereft of any legal authority to support its attempted alchemy of transforming an accounting

22  standard into a principle of federal securities law, so this argument is without merit."), *aff'd,*

23  519 F.3d 552 (6th Cir. 2008); *In re Atlas Mining Co., Sec. Litig.*, No. 07-428-N-EJL, 2009

24  WL 3151135, at *3 (D. Idaho Sept. 25, 2009) (rejecting the contention that an announced

25  intention to restate financial statements is an admission of materiality).[5]  Rather, a plaintiff

26  _____

27  [5] *See, e.g., In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1079
    (W.D. Wash. 2003) (finding "Plaintiffs' contention that [the company's GAAP]

28  restatement is an admission that Defendants issued false and misleading financial reports
    (continued…)

1    must allege enough to allow a court to "'discern whether the alleged GAAP violations were

2    minor or technical in nature, or whether they constituted widespread and significant

3    inflation of revenue.'"  *In re Daou Systems, Inc.,* 411 F.3d 1006, 1017 (9th Cir. 2005).  A

4    plaintiff must plead with particularity how the accounting errors "affected the company's

5    financial statements and whether they were material in light of the company's overall

6    financial position."  *Id.* at 1018.

7          Here, Plaintiffs have alleged that Century's statement of cash flows was not

8    GAAP-compliant because the touch-pass was presented as an "operating activity" rather

9    than a "financing activity."  But this alleged error was of no real significance; it merely

10   decreased cash flows on one line, "Due to affiliates," and increased cash flows (by the same

11   amount) on another line, "Issuance of preferred stock," and thus had no effect on Century's

12   Net Change in Cash.  RJN Ex. 30, at 1064.  Likewise, it had no effect on Century's assets,

13   liabilities, shareholders' equity, net income (or loss), or beginning or ending cash position.

14   Century disclosed that the cash came in from Glencore; Century disclosed that the cash

15   immediately went back to Glencore.  This GAAP violation was thus "minor or technical in

16   nature," rather than widespread and significant, as required by *Daou*, 411 F.3d at 1017.

17         Century fully disclosed the terms of the termination transaction and then some.

18   Century disclosed all the contracts from the termination transaction and explained all the

19   deal terms, including these cash payments; Plaintiffs do not allege that any of these

20   disclosures were false or misleading in any way.  Throughout Q4 of 2008 and Q1 of 2009,

21   Century also repeatedly filed 8-Ks detailing the downward trajectory of its operations and

22   the fact that its operations were in the red.  The prospectus likewise disclosed that Century

23   was losing money, was experiencing negative cash flow from operations and faced liquidity

24   problems — including the risk (disclosed in boldface type and italics on page 2) that, unless

25

----

26   (...continued)
     is without merit.").  *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001)
27   is distinguishable:  plaintiffs in that case alleged multiple accounting misstatements
     amounting to "a widespread and significant inflation of revenue."  The restatement here
28   had no effect on revenue, earnings or any other important metric.

1   aluminum prices increased, Century would lack the liquidity to get through the remainder

2   of 2009.  RJN Ex. 22, at 829, 874.  No investor who read Century's disclosures would have

3   thought that Century was "cash rich" (Compl. ¶ 83), as Plaintiffs allege.

4          Accordingly, it is no surprise that when Century publicly announced the restatement

5   to correct a technical presentation error, no analyst commented.  There was no appreciable

6   change in the trajectory of the stock price, because no one cared about the error.

7   4.       **The allegations of loss causation do not suffice**

8          As shown above, while Plaintiffs allege the restatement caused a $6.94 stock price

9   drop (from $8.00 to $1.06), this is disingenuous, and in fact on March 2 the stock dropped

10  less than 20 cents after the restatement (from $1.86 to $1.68).

11         The drop from $8.00 to $1.86 occurred before any alleged curative disclosure, and

12  thus is not actionable, pure and simple.  The Ninth Circuit so ruled in *In re Daou,* 411 F.3d

13  at 1027.  *Accord, Morgan v. AXT, Inc.,* No. C 04-4362-MJJ, C 05-5106-MJJ, 2005 WL

14  2347125, at *16 (N.D. Cal. Sept. 23, 2005).

15         The remaining drop, from $1.86 immediately before the restatement to $1.68 at the

16  close of that trading day, is too trivial to state a claim, especially where, as here, the stock

17  soon recovered and since has risen to over $16.  *See Metzler Inv. GMBH v. Corinthian*

18  *Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) (affirming dismissal on loss causation

19  grounds of 10b-5 claim because defendants showed a "stock recover[y] very shortly after

20  the modest 10% drop that accompanied" a corrective disclosure); *Teamsters Local 617*

21  *Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 820-21 (D. Ariz.

22  2009).  Even if this case could somehow survive a motion to dismiss, this puny drop shows

23  the 10b-5 claim to be essentially worthless — a waste of this Court's time.

24  **B.      The Court should dismiss the '33 Act claims**

25  1.       **Standards applicable to '33 Act claims**

26         To state a claim under section 12(a)(2), the Complaint must allege: "(1) an offer or

27  sale of a security; (2) by the use of any means of interstate commerce; (3) through a

28  prospectus or oral communication; (4) which includes an untrue statement of material fact."

1   *Rubke v. Capitol Bancorp Ltd.,* 460 F. Supp. 2d 1124, 1133 (N.D. Cal. 2006).  To plead

2   element (1), a direct offer/sale, "a plaintiff must allege that the defendants did more than

3   simply urge another to purchase a security; rather, the Plaintiff must show that the

4   defendants solicited purchase of the securities for their own financial gain."  *In re Daou,*

5   411 F.3d at 1029; 15 U.S.C. § 77*l*(a)(2).  To plead element (4), a material misstatement,

6   "'there must be a substantial likelihood that the disclosure of the omitted fact would have

7   been viewed by the reasonable investor as having significantly altered the 'total mix' of

8   information made available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  Here, the

9   Complaint fails to plead elements (1) and (4), and it shows Plaintiffs lack standing.

10          Assuming *arguendo* that Rule 8 applies,[6] a plaintiff must allege "enough facts to

11   state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S.

12   544, 555-56, 570 (2007) (emphasis added); *see also Moss v. U.S. Secret Serv.,* 572 F.3d

13   962, 969 (9th Cir. 2009).  This requires facts that add up to "more than a sheer possibility

14   that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949, 173 L. Ed.

15   2d 868 (2009).  While courts do not require "heightened fact pleading of specifics," a

16   plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the

17   elements of a cause of action will not do."  *Id.* at 1965.  A complaint asserting allegations

18   that are merely consistent with liability is insufficient because "'it stops short of the line

19   between possibility and plausibility of entitlement to relief.'" *Moss,* 572 F.3d at 969

20   (quoting *Twombly,* 550 U.S. at 557).  And "the tenet that a court must accept as true all of

21   the allegations contained in a complaint is inapplicable to legal conclusions. . . .

22   '[including] legal conclusion[s] couched as [] factual allegation[s].'"  *Iqbal,* 129 S. Ct. at

23   1949-50 (citation omitted); *see also Moss,* 572 F.3d at 969.[7]

24   _____

25   [6] The '33 Act allegations sound in fraud, because the Complaint alleges the Century
     Defendants "knew of, or in the exercise of reasonable care should have known of, the
26   misstatements and omissions contained in the Prospectuses, as set forth herein."  Compl.
     ¶ 146.
27
     [7] Careful scrutiny at the motion to dismiss stage is required because the "practical
28   significance" of permitting "a largely groundless claim" to go forward is "to take up the
                                                                                (continued…)

701989755v2                                                    Century's Motion to Dismiss
                                                               Case No. C 09-1376 (SI)

1      **2.**        **Plaintiffs lack standing to assert a Section 12(a)(2) claim**

2          To maintain a Section 12(a)(2) claim against a particular defendant, a plaintiff must

3  allege facts showing that the plaintiff purchased securities in a public offering (as opposed

4  to the secondary market) directly from that defendant, or at the solicitation of that

5  defendant. *Gustafson v. Alloyd Co.,* 513 U.S. 561, 571, 577-78 (1995); *Hertzberg v.*

6  *Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999) ("Section 12, by contrast [to

7  Section 11], permits suit against a seller of a security by prospectus only by 'the person

8  purchasing such security from him,' thus specifying that a plaintiff must have purchased the

9  security directly from the issuer of the prospectus."); *In re Levi Strauss & Co. Sec. Litig.,*

10  527 F. Supp. 2d 965, 983 (N.D. Cal. 2007); *In re Fuwei Films Sec. Litig.,* 634 F. Supp. 2d

11  419, 445 (S.D.N.Y. 2009).   The Complaint does not meet this standard.

12          The Complaint does not allege that any Plaintiff purchased stock in the Shelf

13  Offering from *anyone* (and indeed they did not, *see* the Underwriters' motion, filed

14  herewith).  All the Complaint alleges is that Plaintiffs purchased their Certificates "pursuant

15  or traceable to the defective Prospectuses."  Complaint ¶ 147; *see also id.* ¶¶ 16, 28-31, 148.

16  That allegation does not establish a purchase in the Shelf Offering — it could equally well

17  refer to a purchase in the aftermarket, which is not actionable under Section 12(a)(2).  In

18  recognition of this ambiguity, courts have repeatedly rejected such allegations as

19  insufficient to establish standing.  *In re Prestige Brands Holding, Inc.,* 2006 U.S. Dist.

20  LEXIS 46667, at *27 (S.D.N.Y. July 10, 2006) ("to the extent that shareholders allege, as

21  here, merely that they bought shares 'traceable to' or 'in connection with' an IPO, they lack

22  standing, and the Complaint is to that extent dismissed"); *Dartley v. Ergobilt,* No. CIV. A.

23  398CV1442M, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) (allegation that plaintiffs

24  _____

25  (...continued)
    time of a number of other people, with the right to do so representing an in terrorem

26      increment of the settlement value." *Twombly,* 550 U.S. at 557-58 (internal quotations
    omitted).  Only "by taking care to require" sufficiently detailed and plausible allegations

27      can the courts "hope to avoid the potentially enormous expense of discovery in cases with
    no reasonably founded hope that the discovery process will reveal relevant evidence" of

28      wrongdoing.  *Id.* at 559 (internal quotations omitted).

1    "purchased shares 'pursuant to and traceable to' the Prospectus" insufficient).

2         This is no mere carelessness in pleading.  Instead, Plaintiffs have judicially admitted

3    facts showing they bought in the aftermarket, not the Shelf Offering.  Their certificates,

4    filed under oath and attached to their Complaint, show their purchases were either not on

5    the date of the Shelf Offering or, if on that date, were not at the offering price of $4.50.

6    Thus, all were aftermarket purchases, and Plaintiffs have no Section 12(a)(2) claims against

7    anyone.  Plaintiffs having judicially admitted facts showing they bought in the aftermarket,

8    their claim cannot be saved by amendment, and thus must be dismissed with prejudice.

9         Because this failing goes to subject matter jurisdiction as well, the Section 12(a)(2)

10   claim also must be dismissed pursuant to Rule 12(a)(1).  On this point the Century

11   Defendants are content to rely on, and incorporate by reference, the motion and

12   memorandum of the Underwriters, filed herewith.

13   3.        **The Century Defendants were not statutory sellers**

14        Even assuming Plaintiffs had purchased in the Shelf Offering, which they did not, a

15   defendant can be liable under section 12(a)(2) only if (1) title to the securities passes

16   directly from him or her to the plaintiff (a direct sale) or if (2) he or she solicits the

17   purchase, motivated in part by his or her own financial interests (a direct solicitation).[8]  The

18   Complaint does not allege any direct act of solicitation by any defendant; all it says is that

19   the individuals signed the prospectus supplement and then offers the unsupported legal

20   conclusion that each defendant "was an offeror, seller or solicitor of a security in the

21   Secondary Offering."  Complaint ¶ 142.  The majority view is that signing does not amount

22   to solicitation for Section 12(a)(2) purposes, and all courts of appeals that have resolved the

23   issue have so ruled.  *See Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871 (5th Cir. 2003)

24   (rejecting the contention that "signing the registration statement suffices for solicitation");

---

25   [8] *In re Infonet Services Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100-02 (C.D. Cal. 2003);

26   *see also In re SeeBeyond Techs. Corp. Secs. Litig.*, 266 F. Supp. 2d 1150, 1171 (C.D. Cal. 2003) (Section 12 claims need to "be premised on direct purchases"); *In re*

27   *Musicmaker.com Sec. Litig.*, No. CV 00-2018, 2001 U.S. Dist. LEXIS 25118, at **50-52 (C.D. Cal. June 4, 2001); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307 (S.D.N.Y.

28   2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003).

1   *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 636 (3d Cir. 1989) ("purchaser must

2   demonstrate direct and active participation in the solicitation of the immediate sale to hold

3   the issuer liable as a § 12(2) seller"); *In re Harmonic, Inc. Sec. Litig.,* No. C 00-2287 PJH,

4   2006 WL 3591148, at *13 (N.D. Cal. Dec. 11, 2006) (collecting cases).

5   4.      **The restatement of cash flows was immaterial**

6           It is not enough that a statement is false or incomplete, if the misrepresented fact is

7   insignificant. *Basic,* 485 U.S. at 238; *In re Levi Strauss & Co. Sec. Litig.,* 527 F. Supp. 2d

8   at 974-78 (finding alleged misstatements and omissions immaterial on motion to dismiss).

9   If a stock trades in an efficient market (as is alleged here, Compl. ¶ 109), a failure of the

10  market to react to the disclosure of news is an indicator that the news is not material. *In re*

11  *NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *Oran v. Stafford,* 226 F.3d 275,

12  282-83 (3d Cir. 2000); *In re Fidelity/Apple Sec. Litig.*, 986 F. Supp. 42, 48 (D. Mass. 1997).

13          For the reasons stated in part III.A.3 above, the Complaint does not adequately

14  plead materiality as to the Section 12(a)(2) claim any more than it pleads materiality as to

15  the Rule 10b-5 claim. Century fully disclosed all salient aspects of the termination of the

16  Hedges, including the cash flows involved. At most, Century made a technical error in

17  presenting its Q3 interim statement of cash flows. The error did not affect Century's

18  reported assets, liabilities, shareholders' equity, net income (or loss), total cash at the

19  beginning of the quarter or total cash at the end of the quarter . The portion of the

20  transaction that necessitated the change in presentation (the "touch-pass" payment) was of

21  no economic significance to Century and thus of no concern to its investors. Century's

22  financial position at all times would be exactly the same had the transaction been structured

23  to omit the touch-pass altogether. Nor was the presentation error of any significance; the

24  amount of cash Century had did not change one cent, and nobody could have been led to

25  believe that, at the time, Century was doing anything but operating at a substantial loss, as

26  Century and every analyst was saying throughout the first quarter. In that regard, it is

27  significant that no analyst writing after the restatement thought the restatement even worth

28  mentioning (RJN Ex. 54-60) and the market basically yawned (*id.* Ex. 63).

701989755v2                                           Century's Motion to Dismiss
                                                      Case No. C 09-1376 (SI)

1  **C.    The control person claims do not suffice**

2      "[T]o prevail on their claims for violations of § 20(a) . . . plaintiffs must first allege

3  a violation of § 10(b) or Rule 10b-5." *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027,

4  1035 n. 15 (9th Cir. 2002); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151,

5  1161 (9th Cir. 1996); *In re PMI Group, Inc. Sec. Litig.,* Nos. C-08-1405 SI, C-08-1406 SI,

6  2009 WL 1916934, at *12 (N.D. Cal. July 1, 2009). The same is true for a claim under

7  Section 15 of the '33 Act: plaintiffs must first allege a primary violation of Section

8  12(a)(2). *Twinde v. Threshold Pharms. Inc.,* No. C 07-4972 CW, 2008 WL 2740457, at

9  *16 (N.D. Cal. July 11, 2008); *Rubke v. Capitol Bancorp Ltd.,* 460 F. Supp. 2d 1124, 1151

10  (N.D. Cal. 2006). As Plaintiffs have not adequately alleged a primary violation of Section

11  10(b) or Section 12(a)(2), the Court should dismiss their control person claims as well.

12  **IV.    CONCLUSION**

13      For each of the foregoing reasons, the Court should dismiss the Consolidated Class

14  Action Complaint with prejudice.

15      Dated: January 15, 2010.

16                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                     BRUCE A. ERICSON
17                    JEFFREY S. JACOBI
                     50 Fremont Street
18                    Post Office Box 7880
                     San Francisco, California 94120-7880
19
                     By /s/ Bruce A. Ericson
20                        Bruce A. Ericson

21                    Attorneys for Defendants
                     CENTURY ALUMINUM COMPANY,
22                    LOGAN W. KRUGER, MICHAEL A. BLESS,
                     STEVE SCHNEIDER, JOHN C. FONTAINE,
23                    JACK E. THOMPSON, PETER C. JONES, JOHN
                     P. O'BRIEN, WILLY R. STROTHOTTE, JARL
24                    BERNTZEN, WAYNE R. HALE, ROBERT E.
                     FISHMAN and CATHERINE Z. MANNING

25

26

27

28