1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON (SBN 76342)
2   bruce.ericson@pillsburylaw.com
    JEFFREY S. JACOBI (SBN 252884)
3   jeffrey.jacobi@pillsburylaw.com
    50 Fremont Street
4   Post Office Box 7880
    San Francisco, California 94120-7880
5   Telephone:  (415) 983-1000
    Facsimile:  (415) 983-1200
6
    Attorneys for Defendants
7   CENTURY ALUMINUM COMPANY,
    LOGAN W. KRUGER, MICHAEL A. BLESS, STEVE
8   SCHNEIDER, JOHN C. FONTAINE, JACK E.
    THOMPSON, PETER C. JONES, JOHN P. O'BRIEN,
9   WILLY R. STROTHOTTE, JARL BERNTZEN, WAYNE
    R. HALE, ROBERT E. FISHMAN and CATHERINE Z.
10  MANNING

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

| 14 | | No. C-09-1001-SI |
|---|---|---|
| 15 | In re CENTURY ALUMINUM COMPANY SECURITIES LITIGATION | [Consolidated with Nos. C-09-1103-SI, C-09-1162-SI, C-09-1205-SI] |
| 16 | | **CENTURY DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| 17 | | |
| 18 | This document relates to all actions. | |
| 19 | | Date:          April 16, 2010 Time:          9 a.m. Courtroom:   10, 19th Floor |
| 20 | | Included Documents: |
| 21 | | 1. Notice of motion and motion 2. Statement of issues to be decided |
| 22 | | 3. Supporting memorandum |
| 23 | | Filed separately: 1. Request for judicial notice, Doc. 61 2. Supplemental request for judicial notice |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1

**TABLE OF CONTENTS**

2

**Page**

3   NOTICE OF MOTION AND MOTION ................................................................1

4   ISSUES TO BE DECIDED ..............................................................................1

5   SUPPORTING MEMORANDUM .....................................................................2

6   I.     INTRODUCTION AND SUMMARY OF ARGUMENT ....................................2

7   II.    STATEMENT OF THE CASE ...................................................................5

8         A.    Century and the primary aluminum business ..................................5

9         B.    Century's hedges with Glencore ..................................................5

10        C.    The termination of the Hedges and Century's related disclosures ................7

11        D.    The third-quarter interim financials ..............................................8

12        E.    The secondary shelf offering of January 2009 ..............................9

13        F.    The SEC filings of March 2, 2009, including the restatement .....................9

14        G.    The claims asserted by the FAC ...............................................11

15   III.    ARGUMENT ...................................................................................12

16        A.    The Court should dismiss the Exchange Act claims ..................................12

17            1.    Standards applicable to Exchange Act claims..................................12

18            2.    The allegations of scienter do not suffice.........................................13

19            3.    The allegations of falsity do not suffice ..........................................16

20             4.    The allegations of loss causation do not suffice ..............................19

21         B.    The Court should dismiss the Securities Act claims ..................................19

22            1.    Standards applicable to Securities Act claims..................................19

23            2.    The allegations of falsity do not suffice ..........................................21

24            3.    Plaintiffs lack standing to assert Section 11 or Section 12(a)(2) claims.......................................................................23

25

26            4.    The Century Defendants were not statutory sellers.........................24

         C.    The control person claims do not suffice ...................................24

27

28   IV.    CONCLUSION ...............................................................................25

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1

# TABLE OF AUTHORITIES

2
**Page**

3
**Cases**

4

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) .................................................................. 20

5

6

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ...................................................................... 21

7

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................ 4, 20, 21

8

9

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) ...................................................................... 11

10

*Craftmatic Sec. Litig. v. Kraftsow,*
890 F.2d 628 (3d Cir. 1989) ......................................................... 24

11

12

*DeMaria v. Andersen,*
153 F. Supp. 2d 300 (S.D.N.Y. 2001),
*aff'd*, 318 F.3d 170 (2d Cir. 2003).............................................. 24

13

*DSAM Global Value Fund v. Altris Software, Inc.,*
288 F.3d 385 (9th Cir. 2002).......................................................... 13

14

15

*In re Atlas Mining Co., Sec. Litig.,*
No. 07-428-N-EJL, 2009 WL 3151135 (D. Idaho Sept. 25, 2009) ......................... 16

16

17

*In re Charles Schwab Corp. Sec. Litig.,*
257 F.R.D. 534 (N.D. Cal. 2009) ................................................... 22

18

*In re Cylink Sec. Litig.,*
178 F. Supp. 2d 1077 (N.D. Cal. 2001) .......................................... 16

19

20

*In re Daou Systems, Inc.,*
411 F.3d 1006 (9th Cir. 2005) ................................................ 16, 17, 19, 20

21

*In re Fidelity/Apple Sec. Litig.,*
986 F. Supp. 42 (D. Mass. 1997).................................................... 21

22

23

*In re Harmonic, Inc. Sec. Litig.,*
No. C 00-2287 PJH, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ....................... 24

24

*In re iAsia Works, Inc. Sec. Litig.,*
No. C-01-3224-SI, 2002 WL 1034041 (N.D. Cal. May 15, 2002) ........................ 21

25

26

*In re Infonet Servs. Sec. Litig.,*
310 F. Supp. 2d 1080 (C.D. Cal. 2003)..................................... 12, 24

27

*In re Itel Sec. Litig.,*
89 F.R.D. 104 (N.D. Cal. 1981) ..................................................... 20

28

*In re K-Tel Int'l Inc. Sec. Litig.,*
    300 F.3d 881 (8th Cir. 2002) .................................................................. 13

*In re Metawave Commc'ns Corp. Sec. Litig.,*
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) .............................................. 16

*In re Musicmaker.com Sec. Litig.,*
    No. CV 00-2018, 2001 U.S. Dist. LEXIS 25118 (C.D. Cal. June 4,
    2001)........................................................................................................ 24

*In re NAHC, Inc. Sec. Litig.,*
    306 F.3d 1314 (3d Cir. 2002) ................................................................. 21

*In re SeeBeyond Techs. Corp. Sec. Litig.,*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................. 24

*In re Software Toolworks Inc.,*
    50 F.3d 615 (9th Cir. 1994) .................................................................... 13

*In re Stac Elecs. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) .................................................................. 20

*In re U.S. Aggregates, Inc. Sec. Litig.,*
    235 F. Supp. 2d 1063 (N.D. Cal. 2002)............................................ 13, 14

*In re Verifone Holdings, Inc. Sec. Litig.,*
    No. C-07-6140-MHP, 2009 WL 1458211 (N.D. Cal. May 26, 2009) ..................... 22

*J & R Marketing, SEP v. General Motors Corp.,*
    No. 06-10201, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007),
    *aff'd,* 519 F.3d 552 (6th Cir. 2008) ....................................................... 16

*Lilley v. Charren,*
    936 F. Supp. 708 (N.D. Cal. 1996)......................................................... 20

*McCasland v. FormFactor Inc.,*
    No. C-07-5545-SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008) .......................... 13

*McCasland v. FormFactor Inc.,*
    No. C-07-5545-SI, 2009 WL 2086168 (N.D. Cal. July 14, 2009) ......... 12, 14, 15, 16

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ................................................................ 19

*Moss v. U.S. Secret Serv.,*
    572 F.3d 962 (9th Cir. 2009) .................................................................. 20

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.,*
    07-cv-5756-FMC (FFMx), 2009 WL 3112574 (C.D. Cal. Sept. 25,
    2009)........................................................................................................ 23

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000) ................................................................... 21

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ........................................................................ 24

*Rubke v. Capitol Bancorp Ltd.,*
    460 F. Supp. 2d 1124 (N.D. Cal. 2006)......................................... 20, 21, 25

*Rudolph v. UTStarcom,*
    560 F. Supp. 2d 880 (N.D. Cal. 2008).................................................. 13, 25

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) ...................................................................................... 13

*Steckman v. Hart Brewing, Inc.,*
    143 F.3d 1293 (9th Cir. 1998) .................................................................... 12

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.,*
    633 F. Supp. 2d 763 (D. Ariz. 2009) .......................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ............................................................................ 1, 4, 16

*Thor Power Tool Co. v. Comm'r,*
    439 U.S. 522 (1979) .................................................................................... 13

*Twinde v. Threshold Pharms. Inc.,*
    No. C 07-4972-CW, 2008 WL 2740457 (N.D. Cal. July 11, 2008)........................ 25

*Warren v. Fox Family Worldwide, Inc.,*
    328 F.3d 1136 (9th Cir. 2003) .................................................................... 12

*Zucco Partners v. Digimarc,*
    552 F.3d 981, 990 (9th Cir. 2009) ........................................................ 12, 13

**Statutes and Codes**

Private Securities Litigation Reform Act of 1995 ................................................ 1

Securities Act of 1933
        Section 11 ............................................................................ passim
        Section 12(a)(2) ................................................................... passim
        Section 15 .................................................................................. 11, 25

Securities Exchange Act of 1934
        Section 10(b) ....................................................................... passim
        Section 20(a) ............................................................................. 11, 24

United States Code
        Title 15, Section 77z-2(c)(1) .................................................. 22
        Title 15, Section 78u-5(c)(1) .................................................. 17

**Rules and Regulations**

Code of Federal Regulations
        Title 17, Section 230.405.......................................................... 10

Federal Rules of Civil Procedure
    Rule 8(a) .................................................................................................... 1, 20
    Rule 9(b) ........................................................................................................ 1
    Rule 12(b)(1) ................................................................................................. 1
    Rule 12(b)(6) .............................................................................................. 1, 2

Rules of the Securities & Exchange Commission
    Rule 10b-5 ............................................................................................. passim

**Other Authorities**

Securities and Exchange Commission,
    '33 Act Rules Compliance and Disclosure Interpretation (Jan. 2009) ..................... 10

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   **NOTICE OF MOTION AND MOTION**

2   TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3         PLEASE TAKE NOTICE that on Friday, April 16, 2010, at 9:00 a.m., or as soon

4   thereafter as counsel may be heard, in Courtroom 10 of this Court, located at 450 Golden

5   Gate Avenue, 19th Floor, San Francisco, California, before the Honorable Susan Illston,

6   United States District Judge, defendants CENTURY ALUMINUM COMPANY

7   ("Century"), LOGAN W. KRUGER, MICHAEL A. BLESS, STEVE SCHNEIDER, JOHN

8   C. FONTAINE, JACK E. THOMPSON, PETER C. JONES, JOHN P. O'BRIEN, WILLY

9   R. STROTHOTTE, JARL BERNTZEN, WAYNE R. HALE, ROBERT E. FISHMAN and

10  CATHERINE Z. MANNING (the "Individual Defendants") (Century and the Individual

11  Defendants are collectively referred to as the "Century Defendants") will and hereby do

12  move this Court to dismiss, with prejudice, all purported claims asserted against them in

13  Plaintiffs' First Amended Consolidated Class Action Complaint deemed filed February 1,

14  2010 (Doc. 66, Ex. B) ("FAC").

15        This motion is made under Rules 8(a), 9(b), 12(b)(1) and 12(b)(6) of the Federal

16  Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), on

17  the grounds that the FAC fails to state a claim against the Century Defendants and that

18  Plaintiffs lack standing to pursue a claim under Section 12(a)(2) of the Securities Act.

19        This motion is based on this notice of motion and motion, the memorandum that

20  follows, the request for judicial notice filed January 15, 2010, Doc. 61 ("RJN"), the

21  supplemental request for judicial noticed filed herewith ("Supp. RJN"), the Underwriters'

22  Motion filed herewith, and all pleadings and records filed in this action.

23        **ISSUES TO BE DECIDED**

24        1.     Should Plaintiffs' claim under Section 10(b) of the Securities Exchange Act

25  of 1934 (the "Exchange Act") and Rule 10b-5 be dismissed because the FAC fails to allege

26  facts creating a strong inference of scienter, as required by *Tellabs, Inc. v. Makor Issues &*

27  *Rights, Ltd.*, 551 U.S. 308, 324 (2007)?

28        2.     Should Plaintiffs' claim under Section 10(b) and Rule 10b-5 be dismissed

702057208v3

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   because the FAC fails to allege facts showing that a presentation error in an interim

2   statement of cash flows, coupled with a forward-looking statement that even in hindsight is

3   accurate, amounts to a material misstatement or omission?

4         3.      Should Plaintiffs' claim under Section 10(b) and Rule 10b-5 be dismissed

5   because the FAC fails to allege facts showing loss causation?

6         4.      Should Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities

7   Act of 1933 (the "Securities Act") be dismissed because the FAC fails to allege facts

8   showing that a presentation error in an interim statement of cash flows, coupled with a

9   forward-looking statement that even in hindsight is accurate,  amounts to a material

10   misstatement or omission?

11         5.      Should Plaintiffs' claims under Section 11 be dismissed because the FAC

12   shows they did not buy stock in or traceable to the secondary "shelf" offering of January

13   2009 (the "Shelf Offering")?

14         6.      Should Plaintiffs' claim under Section 12(a)(2) be dismissed because the

15   FAC shows they did not buy stock in the Shelf Offering?

16         7.      Should Plaintiffs' claim under Section 12(a)(2) be dismissed because the

17   FAC does not allege facts showing that the Century Defendants were "statutory sellers"?

18         8.      Should Plaintiffs' control person claims be dismissed because Plaintiffs have

19   not stated any claims of primary violations?

20                  **SUPPORTING MEMORANDUM**

21   **I.**       **INTRODUCTION AND SUMMARY OF ARGUMENT**

22         The gist of this case, say Plaintiffs, is that Century portrayed itself as "liquid and

23   cash-rich, when – in reality – it was not."  FAC ¶ 18.  But what prospectus are Plaintiffs

24   reading?  It is only by selective excising of quotations, and stopping before page 2 of the

25   prospectus, that Plaintiffs can ignore Century's chilly warning that even with the cash it

26   hoped to raise through the Shelf Offering, it might not survive 2009:

27           *Financial Position and Liquidity: Our financial position and liquidity have*
             *been and will continue to be materially adversely affected by declining*

28            *aluminum prices. If prices remain at current levels or continue to decline,*

1    ***we will have to take additional action to reduce costs, including significant
     curtailment of our operations, in order to have the liquidity required to
2    operate through 2009, and there can be no assurance that these actions
     will be sufficient.***

3

4    RJN Ex. 22, at 829 (bold and italics in original); *see also id.* at 827-33, 852-54, 856-57,

5    871-74.  Century did survive 2009 – the stock it sold for $4.50 in the Shelf Offering has

6    consistently traded for over $10 since late last year.  Supp. RJN Ex. 65.  Yet, incredibly, the

7    FAC alleges Century's warning that it might not survive 2009 was somehow *too optimistic*.

8         In July 2008, Century terminated certain hedge agreements for primary aluminum

9    that it had with its largest shareholder, a commodity trader.  Century fully disclosed the

10   terms, attaching all deal documents to an 8-K, and describing in detail each element of the

11   transaction, which terminated the hedges in return for cash and preferred stock.  Plaintiffs

12   do not challenge these disclosures in the slightest.  Instead, they allege that months later, in

13   its earnings release and 10-Q for Q3, Century presented one aspect of the termination on the

14   wrong part of the interim statement of cash flows, as an "operating activity" rather than a

15   "financing activity."  In March 2009, Century restated this interim statement, decreasing

16   cash flows on one line, "Due to affiliates" while increasing cash flows (by exactly the same

17   amount) on another line, "Issuance of preferred stock."  RJN Ex. 30, at 1063-64.  This

18   change in presentation – fixing a technical accounting error – had not one cent's effect on

19   Century's assets, liabilities, shareholders' equity, net income (or loss), or beginning or

20   ending cash position.  RJN Ex. 30, at 1063-64.  Not surprisingly, nobody cared.

21        Plaintiffs allege this technical accounting error led Century to make a false forward-

22   looking statement:  "'Based upon … price forecasts, and taking into account our current

23   balance of cash and short-term investments … we would expect to have sufficient liquidity

24   to fund our operations for approximately the next 18 months.'"  FAC ¶ 76 (quoting RJN

25   Ex. 22, at 829).  But Plaintiffs do not plead facts showing, even in hindsight, that anything

26   about this forecast was false.  Thirteen months later, Century has plenty of liquidity.

27   Plaintiffs do not allege otherwise.

28        Plaintiffs also allege Century falsely presented itself as "cash rich" and said it "had

- 3 -

1   enough cash coming in from operations to 'weather the economic storm'."  FAC ¶ 76; *see*

2   *also id.* ¶¶ 17-19, 64, 70, 73, 116.  But this assertion also rests solely on selective and

3   incomplete quotes.  The paragraph of the prospectus the FAC selectively quotes starts with

4   these words (which Plaintiffs omit):  "Because our U.S. operations are not cash flow

5   positive at recent aluminum prices and our Icelandic operations are breaking even at recent

6   prices, we will need sources of liquidity other than our operations to fund operations and

7   investments."   RJN Ex. 22, at 829.  And the very sentence the FAC quotes says – in words

8   the FAC omits – that Century may need "[its] revolving credit facility and the anticipated

9   proceeds of this offering" to remain liquid.  *Id.*  Elsewhere, the prospectus fully, clearly and

10  unequivocally discloses that Century suffered a substantial Q4 operating loss, stood to lose

11  even more the next quarter, had a negative operating cash flow, would be taking an

12  impairment charge to its goodwill, had to write down inventories, had worsening liquidity

13  problems, had its credit rating downgraded by Moody's, was making the offering because it

14  needed cash, and – even if the offering succeeded – still might lack the liquidity needed to

15  last 18 months.  *Id.* at 827, 831, 833, 852-54, 856-57, 871-74.

16        All this occurred against the backdrop of the Wall Street meltdown and a historic

17  crash in aluminum prices.  The spot price of aluminum, which had peaked at over $3,200 a

18  metric ton in the summer of 2008, fell to roughly $1,400 by January 2009, a price that

19  analysts had said was 30% below Century's cost of production; the price fell further in

20  February.  Meanwhile Century made its Shelf Offering at $4.50, even though its stock had

21  traded as high as $79.51 within the previous 52 weeks.  To suggest, as Plaintiffs do, that

22  Century was painting a rosy picture of its economic situation by deliberately or negligently

23  misplacing one item on an interim statement of cash flows not only fails the *Tellabs* strong

24  inference standard; it also fails the *Twombly* plausibility standard.  The FAC makes no

25  sense at any level and fails to allege all the key elements of its purported claims – scienter,

26  falsity and loss causation under Section 10(b), falsity and traceability under Section 11, and

27  falsity, standing and "statutory seller" under Section 12(a)(2).  The FAC should therefore

28  be dismissed without leave to amend.

1    **II.      STATEMENT OF THE CASE**

2    **A.      Century and the primary aluminum business**

3         Century was formed in 1995 by Glencore International ("Glencore"), a supplier and

4    trader of commodities, as a holding company for Glencore's aluminum-producing assets.

5    FAC ¶¶ 5, 32.  Century became publicly owned in April 1996.  RJN Ex. 32, at 1194.  As of

6    February 2009, Glencore or its affiliates beneficially owned about 38.1% of Century's

7    common stock (up from 28.5% in 2008) and had an overall 48.9% economic ownership of

8    Century.  FAC ¶¶ 8, 55; RJN Ex. 32, at 1138.

9         Century produces primary aluminum (that is, pure aluminum, as opposed to alloys)

10   in facilities here and abroad.  RJN Ex. 32, at 1194.  Primary aluminum is produced in many

11   countries.  The benchmark price is determined by spot and futures trading on the London

12   Metal Exchange ("LME").  RJN Ex. 32, at 1101.  In recent years, the LME price for

13   primary aluminum has been highly volatile.  *See* Supp. RJN Ex. 64.  From July 8, 2008 to

14   March 2, 2009, for example, the LME spot price fell 60%, from $3,219.00 to $1,270.25.  *Id.*

15   at 1532-33; FAC ¶ 54.  From March 3, 2009 (the day after the end of the class period) to

16   February 25, 2010, the LME spot price  rose from $1,285.25 to $2,062.25.  Supp. RJN Ex.

17   64, at 1533-35.  The period of the Shelf Offering and the restatement (January to March

18   2009) is the only time in the last half decade when the LME spot price ever fell below

19   $1,300; it did so on 13 days during that period, including March 2 and 3, 2009:  the very

20   same time Century issued the restatement.  *Id.* at 1533.

21   **B.      Century's hedges with Glencore**

22        Century has long sought to protect itself against market volatility by entering into

23   forward contracts, or hedges, usually with Glencore, pursuant to which it partially hedged

24   against large drops in aluminum prices.  RJN Ex. 1, at 76; Ex. 32, at 1153.   In November

25   2004 and June 2005, Century entered into two hedges with Glencore (the "Hedges").  RJN

26   Ex. 1, at 76.  Century and Glencore terminated the Hedges in July 2008.  FAC ¶¶ 8, 56-57;

27   RJN Ex. 32, at 1153.  Plaintiffs do not challenge the disclosure of that termination but

28   instead challenge only one technical aspect of the related accounting.

1   The Hedges worked this way:  For each year starting in 2006 and continuing

2   through 2015, the Hedges set a minimum price and a maximum price, and specified two

3   quantities of primary aluminum (expressed in metric tons): "Tonnage 1" and "Tonnage 2."

4   There was a possible cash settlement each month.  If the average LME spot price for the

5   month was below the *minimum*, Glencore paid Century the difference between the LME

6   spot price and the minimum, multiplied by the quantity of Tonnage 1.  If, however, the

7   average LME spot price for the month was above the *maximum*, Century paid Glencore the

8   difference between the LME spot and the maximum, multiplied by the sum of the quantities

9   of Tonnage 1 + Tonnage 2.  If the average LME spot price for the month was between the

10  *minimum* and the *maximum*, neither party paid the other anything.  All settlements were in

11  cash; neither side actually delivered aluminum to the other as a result of the Hedges.

12  Century disclosed the Hedges upon entering into them.  Each quarter thereafter,

13  Century marked the Hedges to market, disclosing in its 10-Qs and 10-Ks the change in their

14  market value.  RJN Ex. 2, at 132.  This involved calculating, using LME futures prices, how

15  much cash Century expected to pay or receive under the Hedges for the rest of their lives,

16  and then discounting those sums back to present value.  The discounted present value of

17  those sums represented the market value of the asset (if the discounted sums were positive)

18  or the liability (if the discounted sums were negative).  The change in market value

19  (realized and unrealized) since the last quarter was then prominently reflected on Century's

20  books as an adjustment to "Net Income" ("Net loss on forward contracts") on the statement

21  of operations; and the non-cash (unrealized) portion was reflected as an adjustment to

22  "Cash Flows From Operating Activities" ("Unrealized net loss on forward contracts") on

23  the statement of cash flows.  RJN Ex. 2, at 117-18, 132-34.

24  By early 2008, after three years of steady losses under the Hedges as a result of

25  steadily increasing aluminum prices, Century management felt Century would be better off

26  without the Hedges, and it entered into protracted negotiations with Glencore to terminate

27  them.  RJN Ex. 32, at 1153.  These negotiations led to a set of agreements entered into in

28  July 2008, which is where the FAC begins its story.

1    **C.       The termination of the Hedges and Century's related disclosures**

2          The FAC alleges that "in mid-2008" Century owed "commodities trading

3    conglomerate Glencore Ltd." "over **three quarters of a billion dollars**" on certain

4    "forward financial sales contracts."  FAC ¶¶ 8, 55 (emphasis in original).[1]  Glencore

5    allegedly owned "28.5% of Century Aluminum's shares at that time" and "could have

6    either forced Century Aluminum into bankruptcy and/or taken over the Company outright

7    via a tender offer or proxy contest."  FAC ¶ 8.  "In July [2008], Century Aluminum

8    announced that they had mollified Glencore."  FAC at 3, n.2.  Century and Glencore agreed

9    to terminate the Hedges "upon the payment by Century to Glencore Ltd of $730.2 million

10   and upon the issuance by Century to Glencore Investment Pty Ltd of 160,000 shares of a

11   non-voting Series A Convertible Preferred Stock."  FAC ¶ 56 (quoting RJN Ex. 3, at 165-

12   66).  "Of the [$730.2 million] cash payment, Century ha[d] deferred payment of $505.2

13   million until August 31, 2008."  *Id.*  The FAC alleges "[t]he total cash outlay to Glencore

14   under the agreement amounted to the equivalent of $1.65 billion."  *Id.* ¶ 57.

15         On July 7, 2008, Century signed the documents terminating the Hedges.  The next

16   day it:  (1) held a conference call with analysts and investors, with a slideshow, to explain

17   the transaction (RJN Ex. 5-6); (2) filed an 8-K announcing that it had agreed with Glencore

18   to terminate the Hedges via the contemporaneous execution of four agreements, *each of*

19   *which were attached in their entirety to the 8-K* (RJN Ex. 3, at 186-260); and (3) filed a

20   13D/A detailing Glencore's purchase of preferred stock from Century, including all the

21   cash that changed hands as part of this transaction (RJN Ex. 4, at 276-80).

22         Two things are striking about these disclosures:

23         *First*, the disclosures cover every aspect of the transaction that the FAC mentions:

24   _____

25   [1] This allegation is disingenuous.  The mark-to-market valuation was not a current
     obligation, due upon demand; it was an estimate, based on estimated cash flows
26   discounted to present value, of what Century would have to pay Glencore through 2015
     (when the Hedges expired) if aluminum prices stayed where they were as of the estimate.
27   RJN Ex. 1, at 76.  If aluminum prices fell below the Hedges' maximum, Century would
     have no liability.  And if aluminum prices fell below the Hedges' minimum, Glencore
28   would owe Century money.

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   the discharge of liabilities created by the Hedges, the payment of cash, the giving of a

2   promissory note and the sale of preferred stock.  Thus, Century advised the public that:

3   •   Glencore discharged $1.832 billion of liabilities associated with the Hedges.  RJN Ex.

4       5, at 295; Ex. 17, at 721.

5   •   Century made a cash payment of $225 million and gave Glencore a note for the

6       deferred settlement amount of $505.2 million.  RJN Ex. 3, at 188-89; Ex. 4, at 280; Ex.

7       7, at 354, 356; Ex. 8, at 412-14; Ex. 17, at 721-23, 752, 771; Ex. 22, at 847.

8   •   Century issued to Glencore 160,000 shares of preferred stock, convertible into

9       16,000,000 shares of common stock.  RJN Ex. 3, at 165, 175-76; Ex. 17, at 771.

10  •   Glencore paid Century, in cash, the purchase price of the preferred stock:

11      $1,090,259,200, which sum Century immediately paid back to Glencore in partial

12      settlement of Century's liabilities associated with the Hedges (in this motion, we refer

13      to this transfer of cash as the "touch-pass" payment).  RJN Ex. 3, at 165, 175-76, 188-

14      89, 200; Ex. 4, at 276, 280; Ex. 17, at 721.[2]

15      *Second*, the FAC does not allege these disclosures were false or misleading —its

16  accusations pertain solely to the technical presentation of the "touch-pass" payment in the

17  Q3 interim statement of cash flows, filed four months later.  FAC ¶¶ 65-75.

18  **D.      The third-quarter interim financials**

19      Century's next periodic disclosures occurred after the third quarter.  As usual,

20  Century made an earnings release (filed as an 8-K), held a conference call with a slideshow,

21  and then several weeks later, filed its 10-Q.  RJN Ex. 13-18.  The 10-Q incorporated by

22  reference the agreements that terminated the Hedges.  RJN Ex. 17, at 786-87.

23      The FAC challenges only one aspect of these financials – the technical presentation

24  of certain cash elements of the transaction on the interim unaudited consolidated statement

25  of cash flows.  The FAC does not say that the cash at the start of the period was wrong, or

26  that the cash at the end of the period was wrong, or that the net changes in cash were wrong

27  _____

    [2]  The preferred stock had a fair market value, net of certain costs, of $929,480,000.  The
28      settlement resulted in a net gain to Century $161,976,000 after transactions costs.  *Id.*

1   (the restatement changed none of these things).  Rather, the FAC alleges that certain cash

2   flows associated with the transaction should have been shown as "Cash Flows From

3   Financing Activities," as opposed to "Cash Flows From Operating Activities," and argues

4   that this misled investors into thinking that Century was "cash rich."  FAC ¶¶ 10, 18, 69-76.

5   That the restatement changed nothing of substance can be seen most clearly by looking at

6   the 8-K announcing the restatement.  It provides a revised statement of cash flows showing

7   the *movement* of the $929,480,000 from operating to financing, *without any bottom line*

8   *effects*.  RJN Ex. 30, at 1064.

9   **E.      The secondary shelf offering of January 2009**

10          September 2008 saw Wall Street melt down, and the fourth quarter brought

11   disruption in the aluminum market too, as the recession really started to take hold.  As

12   noted above, the LME spot price fell precipitously after July 2008 (FAC ¶ 7; RJN Ex. 61)

13   and, as a result, Century made a doleful series of announcements (via 8-K), including big

14   operating losses, and a plant curtailment and layoffs.  FAC ¶¶ 9, 58-62; RJN Ex. 19-20.

15   Throughout this period, the price of Century's common stock also fell precipitously, from

16   over $60 in July to under $10 in December.  RJN Ex. 62.

17          On January 29, 2009, Century made the Shelf Offering of common stock at $4.50.

18   RJN Ex. 22.  The offering was dilutive; Century's stock price dropped from $7.35 to $4.60.

19   Throughout February, Century's stock price continued downward, starting the month at

20   $3.70 and ending the month at $2.22.  RJN Ex. 62, at 1525.

21   **F.      The SEC filings of March 2, 2009, including the restatement**

22          On Monday, March 2, 2009, Century made three SEC filings; the FAC mentions

23   only one.  The three filings were:  an 8-K containing the announcement of a restatement

24   (accepted by EDGAR at 11:51 am Eastern); a prospectus supplement seeking to register

25   more common stock, possibly in advance of another dilutive stock offering (accepted by

26   EDGAR at 2:38 pm Eastern); and Century's 10-K for 2008 (accepted by EDGAR after the

27   market had closed, at 5:14 pm Eastern).  RJN Ex. 30-32.

28          The 8-K announced the restatement of the Q3 interim statement of cash flows and

1   indicated the old interim cash-flow statement "should no longer be relied upon."  FAC

2   ¶¶ 12-13; RJN Ex. 30, at 1063.  Plaintiffs allege that, as a result of the restatement, "the

3   Company's shares on NASDAQ fell to $1.06, a 87% drop from the January 2009 Offering

4   price of $8.00 slightly more than one month earlier."  FAC ¶¶ 12, 13, 121.  The Court may

5   take judicial notice of stock price tables, which show this allegation is not even

6   approximately true.  To start, the "January 2009 Offering price" was $4.50, not $8.  RJN

7   Ex. 22, at 824.  The closing price on the last trading day before the alleged "curative

8   disclosure" was $2.22, not $8.  RJN Ex. 62, at 1525.  And the close after the disclosure was

9   $1.68, not $1.06.  *Id.*  Thus, we have a 54 cent stock drop based on the daily closing prices,

10  not a $6.94 stock drop, as the FAC alleges.  FAC ¶¶ 12-13, 121.

11       If we look at intra-day trading, the stock drop shrinks even more.  EDGAR accepted

12  the 8-K announcing the restatement at 11:51 am Eastern.  By then, Century's stock had

13  fallen from $2.22 (the close on Friday, February 27) to $1.86.  RJN Ex. 63.  In the hours

14  after the alleged "curative disclosure," the price fell less than another 20 cents, closing at

15  $1.68.  Indeed, on average the stock fell less rapidly after the "curative disclosure" than

16  before.  *Id.*  Later that day Century made two additional SEC filings.  At 2:38 pm Eastern,

17  Century filed a prospectus supplement (a so-called POSASR) seeking to register more

18  common stock, possibly in advance of another dilutive stock offering.  RJN Ex. 31.[3]  Then

19  at 5:14 pm Eastern, after the markets closed, Century filed its 10-K for 2008.  The 10-K

20  _____

21  [3] Century filed the POSASR because the market decline had caused it (like many other
        companies) to lose its "WKSI" status.  WKSI, an acronym standing for "Well-known

22  seasoned issuer" (*see* definition in 17 C.F.R. § 230.405), permits automatic shelf
        registration statements allowing the registration of an unlimited amount of securities, with

23  filing fees to be paid on a "pay as you go" basis.  One test for WKSI status is having a
        market cap in excess of $700 million.  *Id.*  As Century's stock price fell, its market cap

24  fell, and it lost its WKSI status.  In January, the SEC had told issuers what to do so that
        they could continue to offer and sell securities off of automatic shelf registration

25  statements pending conversion to an non-automatic shelf registration statement (required
        because of the loss of WKSI status).  *See* answer to question 198.06 in the SEC's

26  Securities Act Rules Compliance and Disclosure Interpretation (Jan. 2009).  The process
        involved filing this POSASR before the 10-K, and then filing another one after the 10-K.

27  Therefore, Century did this.  The filing may have suggested to the market that Century
        might be making another offering of common stock in the near future; investors might

28  have viewed this as dilutive, as the January 2009 offering had been dilutive.

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   included a clean opinion from Deloitte & Touche as to Century's internal controls.  RJN

2   Ex. 32, at 892, 901.  (As discussed below, the FAC alleges, without any factual basis, that

3   Century had internal control problems.  FAC ¶¶ 17-20, 123-25.)

4          When the market opened the next day, March 3, 2009, Century stock fell again,

5   closing at $1.41.  RJN Ex. 63.  But the FAC alleges no facts suggesting that the further fall

6   had anything to do with the restatement, as opposed to the POSASR, or the 10-K, or the

7   LME spot price, or broader market factors, or anything else.

8          What we do know is that Century's stock, after bottoming at $1.06 on March 9, has

9   trended up since, and on February 25, 2010 closed at $11.81.  Supp. RJN Ex. 65, at 1542-

10  43.  What we also know is that the analysts who commented on Century in the weeks

11  following March 2, 2009 talked about many things, but never once did any analyst who

12  follows Century comment on the restatement.  RJN Ex. 54-60 (these are all analyst reports

13  written between March 2, 2009 and late July 2009).  For analysts, and investors – and

14  indeed everyone except plaintiffs' class action lawyers – the restatement was a non-event.

15  **G.      The claims asserted by the FAC**

16         Plaintiffs filed their Consolidated Complaint on November 17, 2009.  Doc. 51.

17  Defendants filed their motions to dismiss on January 15, 2010.  Doc. 61-65.  Eleven days

18  later, Plaintiffs announced that they wished to amend, both to add the Section 11 claim they

19  say was inadvertently omitted, and "to add additional allegations."  Doc. 66, at 1:6; *see id.,*

20  Ex. A, for a red-line of the FAC against the Consolidated Complaint.  The FAC thus

21  reflects Plaintiffs' thinking *after* studying defendants' motions for nearly two weeks.

22         The FAC asserts five counts:  (1) Section 10(b) of the Exchange Act and Rule 10b-

23  5; (2) Section 20(a) of the Exchange Act; (3) Section 11 of the Securities Act; (4) Section

24  12(a)(2) of the Securities Act; and (5) Section 15 of the Securities Act.

25         The Exchange Act claims are brought "on behalf of a Class composed of all holders

26  of Century Aluminum common stock from October 21, 2008 and March 2, 2009."  FAC

27  ¶ 115.  (The class cannot be composed of holders.  *See Blue Chip Stamps v. Manor Drug*

28  *Stores,* 421 U.S. 723, 731-55 (1975).)   The gravamen of the Exchange Act claims is that

- 11 -

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1    "to create and/or maintain artificial inflation of the price of Century's common stock," the

2    Century Defendants "undertook a fraudulent scheme to raise money by inflating the

3    Company's stated cash-in-hand in violation of Generally Accepted Accounting Principles

4    ('GAAP')."  FAC ¶¶ 4, 10, 52.  The alleged fraud is presenting cash flows from the

5    termination of the Hedges as "operating activity" rather than "financing activity" and then

6    predicting Century might, or might not, remain liquid for the next 18 months.  FAC ¶¶ 10,

7    17-20, 70-71, 73, 76, 116-18, 124-25.

8          The Securities Act claims allege substantially the same facts, stripping off the

9    baseless adjectives about motive and adding baseless allegations of an internal control

10   failure.  FAC ¶¶ 17-20, 123-25.  The FAC alleges Century, all Individual Defendants except

11   Hale, and underwriters Credit Suisse Securities (USA) LLC, and Morgan Stanley & Co.

12   "issued a false and misleading Registration Statement which induced Plaintiffs and other

13   parties to purchase shares of Century Aluminum common stock pursuant and/or traceable to

14   the [Shelf Offering]."  FAC ¶ 16.  These claims are brought "on behalf of a Class composed

15   of all those who purchased or otherwise acquired Century Aluminum common stock

16   pursuant and/or traceable to the Company's January 2009 Secondary Offering, and who

17   were damaged thereby," excluding "Defendants."  FAC ¶ 129.

18   **III.    ARGUMENT**

19   **A.    The Court should dismiss the Exchange Act claims**

20   **1.    Standards applicable to Exchange Act claims**

21          This Court has delineated the standards for pleading a Section 10(b) claim; thus, we

22   need not review them here.  *E.g., McCasland v. FormFactor Inc.,* No. C-07-5545-SI, 2009

23   WL 2086168, at *4 (N.D. Cal. July 14, 2009) ("*FormFactor II*"); *see also Zucco Partners*

24   *v. Digimarc,* 552 F.3d 981, 1000 (9th Cir. 2009).  We note only that Plaintiffs cannot satisfy

25   their pleading obligations by mischaracterizing documents.  If the documents contradict the

26   FAC, the documents control.  *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th

27   Cir. 1998); *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003); *In*

28   *re Infonet Servs. Sec. Litig.,* 310 F. Supp. 2d 1080, 1087-88 (C.D. Cal. 2003).

1    2.        **The allegations of scienter do not suffice**

2         ***GAAP vs. scienter:***  The FAC alleges only a technical GAAP violation.  But glib

3    attempts to equate a GAAP violation with scienter, as Plaintiffs make here, are not

4    sufficient.  GAAP is "far from being a canonical set of rules that will ensure identical

5    accounting treatment of identical transactions."  *In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d

6    881, 890 (8th Cir. 2002) (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544

7    (1979)).  Indeed, "[t]here are [nineteen] different GAAP sources, any number of which

8    might present conflicting treatments of a particular accounting question."  *Shalala v.*

9    *Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  Accordingly, GAAP standards "tolerate a

10   range of 'reasonable' treatments, leaving the choice among alternatives to management."

11   *K-Tel Int'l*, 300 F.3d at 890 (quoting *Thor Power Tool*, 439 U.S. at 544).

12        "'[T]he mere publication of inaccurate accounting figures, or a failure to follow

13   GAAP, without more, does not establish scienter.'"  *DSAM Global Value Fund v. Altris*

14   *Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*,

15   50 F.3d 615, 627 (9th Cir. 1994)).  "[T]he mere publication of a restatement is not enough

16   to create a strong inference of scienter."  *Zucco,* 552 F.3d at 1000.[4]  This is so, even if the

17   GAAP violations are "significant" or "require large or multiple restatements."  *See In re*

18   *U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002).  "Rather, to

19   plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that:

20   (1) specific accounting decisions were improper; and (2) the defendants knew specific facts

21   at the time that rendered their accounting determinations fraudulent."  *UTStarcom,* 560 F.

22   Supp. 2d at 889 (citing *DSAM*, 288 F.3d at 390-91).

23        ***No strong inference of scienter:***  The FAC offers six pages of scienter allegations.

24   FAC ¶¶ 83-95, at 33-39.  All are conclusory or formulaic:  long-winded variations on the

25   theme that 'you must have known the accounting was wrong, because you are directors and

---

26   [4] Nor does the signing of quarterly certifications of financial statements, as mandated by
27   the Sarbanes-Oxley Act (FAC ¶ 75), without more, support an inference of scienter.  *See*
     *McCasland v. FormFactor Inc.,* No. C-07-5545-SI, 2008 WL 2951275, at *9 (N.D. Cal.
28   July 25, 2008)*; Rudolph v. UTStarcom,* 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008).

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1    senior officers.'  Stripped of this boilerplate, what the FAC really alleges is that there must

2    be scienter because the mistake involved a lot of money.  *Id.* ¶ 95.  But as a matter of law,

3    that is wrong.  *FormFactor II,* 2009 WL 2086168, at *6; *In re U.S. Aggregates, Inc. Sec.*

4    *Litig.*, 235 F. Supp. 2d at 1073.  And as applied to the FAC, it makes no sense.

5         Defendants disclosed – in truthful disclosures the FAC does not challenge – all

6    salient aspects of the transaction terminating the Hedges.  *See* part II.C above.  Century

7    disclosed all the deal documents and explained all the deal terms, including the cash later

8    misplaced on the Q3 statement of cash flows.  Nobody tried to hide the cash flows; why

9    would they?  The cash had no practical significance because Century immediately applied it

10   in full toward Century's obligation to the counterparty from which it had just been received

11   – Glencore.  The impact of the movement on the Net Change in Cash on the statement of

12   cash flows was *zero*.  The restatement did not change the bottom line – not assets, not

13   liabilities, not shareholders' equity, not net income (or loss), not cash at the opening of the

14   period, and not cash at the end of the period.  To use a basketball analogy, Century's

15   handling of the cash was only a touch-pass.  Only by exalting form over substance, or to

16   generate an unfounded lawsuit, could one get excited about moving an amount of cash –

17   itself fully disclosed – where the movement had no effect on the opening amount of cash,

18   the closing amount of cash, or the Net Change in Cash.  RJN Ex. 30, at 1064.

19        Consider two alternative ways of structuring the preferred stock portion of the

20   termination transaction:  (1) Century could simply have issued the preferred stock to

21   Glencore, in partial payment of the settlement of the liability created by the Hedges.  No

22   cash changes hands.  (2) Century could have issued the preferred stock to Glencore in

23   return for $1.09 billion in cash.  A second after receipt of this $1.09 billion in cash, Century

24   could have wired every cent of that $1.09 billion back to Glencore in partial payment of the

25   settlement of the liability created by the Hedges.  There is no substantive difference

26   between the two structures.  Either way, Glencore ends up with the preferred stock, and

27   Century is $1.09 billion closer to ridding itself of the Hedges.  Surely nobody would say

28   that Century's cash position is materially affected because, under structure (2), it held $1.09

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   billion for one second, during which second it had a contractual obligation to return the

2   money.[5]  Yet for GAAP and GAAP alone, that made all the difference.  Had Century

3   employed structure (1), Century's presentation in the Q3 interim statement of cash flows

4   would have been correct under GAAP.  But because Century in fact employed structure (2),

5   the cash received for the preferred stock technically should have been shown under "Cash

6   Flows From Financing Activities," rather than "Operating Activities."  Why?  Because in

7   form (not substance) Century received some of the cash in payment for preferred stock,

8   even though the cash Century received was part of a transaction that settled an operating

9   liability – a liability for which associated cash flows until then had been accounted for as an

10   operating activity.  RJN Ex. 2, at 117-18, 132-34.

11       Plaintiffs have not alleged, and cannot allege, the required strong inference of

12   scienter.  The only reasonable inference is that, a few days before finishing their annual

13   audit at the end of February 2009, the auditors spotted a technical issue they had missed

14   when reviewing the 10-Q and the prospectus and brought it to Century's attention, and

15   Century then promptly corrected it.  The contrary inference – that Century recklessly or

16   intentionally hid the error until March, and then surfaced it and voluntarily made a

17   restatement – is implausible, and not cogent and compelling.  *FormFactor II,* 2009 WL

18   2086168, at *7-*8.  Where's the motive?  The cash payments themselves had been

19   disclosed the day after the termination itself, back in July 2008.  RJN Ex. 4, at 276.  The

20   agreements that disclosed the cash payment were incorporated by reference into the Q3 10-

21   Q.  RJN Ex. 17, at 786-87.  Nobody pretended that Century's operations had somehow

22   generated cash out of nowhere, as Plaintiffs allege.  To the contrary, the prospectus said

23   over and over that Century's operations were cash-flow negative and not providing the

24   liquidity Century needed – which, after all, was the whole point of seeking to raise capital

25   through the Shelf Offering.  RJN Ex. 22, at 827, 829, 831, 833, 852-54, 856-57, 871-74.

26       In short, the inference Plaintiffs urge – that the Century defendants fiddled with an

27   _____

28   [5]  Plaintiffs cannot decide whether Century touched the cash or, if so, how much it touched.  *Cf.* FAC ¶ 10 (describing "paper proceeds") *with id.* ¶ 57 (cash outlay of $1.65 billion).

1   interim statement of cash flows so they could portray Century as "cash rich" (FAC ¶¶ 18,

2   76) – is belied by what Century actually said and what analysts actually saw.  As in

3   *FormFactor II,* here Plaintiffs' inference of scienter is implausible and cannot satisfy

4   *Tellabs*; the only reasonable inference is that Century did not know of the immaterial

5   accounting error until immediately before it forthrightly corrected that error.

6   3.      **The allegations of falsity do not suffice**

7          **The restatement:**  Materiality from an accounting perspective does not equate to

8   materiality under the federal securities laws, or amount to an actionable falsehood.[6]  Rather,

9   a plaintiff must allege facts to allow a court to "'discern whether the alleged GAAP

10  violations were minor or technical in nature, or whether they constituted widespread and

11  significant inflation of revenue.'"  *In re Daou Systems, Inc.,* 411 F.3d 1006, 1017-18 (9th

12  Cir. 2005) (internal citations and quotations omitted).  A plaintiff must plead facts showing

13  how the accounting errors "affected the company's financial statements and whether they

14  were material in light of the company's overall financial position."  *Id.* at 1018.

15         The technical accounting error was of no real significance; it merely decreased cash

16  flows on one line, "Due to affiliates," and increased cash flows (by the same amount) on

17  another line, "Issuance of preferred stock," and thus had no effect on Century's Net Change

18  in Cash.  RJN Ex. 30, at 1064.  Likewise, it had no effect on Century's assets, liabilities,

19  shareholders' equity, net income (or loss), or beginning or ending cash position.  Century

20  _____

21  [6] *See J & R Marketing, SEP v. General Motors Corp.*, No. 06-10201, 2007 WL 655291, at
    *12 (E.D. Mich. Feb. 27, 2007) (holding that while a restatement "may have been
22  material from an accounting perspective, Plaintiffs' brief is bereft of any legal authority to
    support its attempted alchemy of transforming an accounting standard into a principle of
23  federal securities law, so this argument is without merit."), *aff'd,* 519 F.3d 552 (6th Cir.
    2008); *In re Atlas Mining Co., Sec. Litig.*, No. 07-428-N-EJL, 2009 WL 3151135, at *3
24  (D. Idaho Sept. 25, 2009) (rejecting the contention that an announced intention to restate
    financial statements is an admission of materiality).  *See also In re Metawave Commc'ns
25  Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1079 (W.D. Wash. 2003) (finding "Plaintiffs'
    contention that [the company's GAAP] restatement is an admission that Defendants
26  issued false and misleading financial reports is without merit.").  *In re Cylink Sec. Litig.*,
    178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) is distinguishable:  plaintiffs in that case
27  alleged multiple accounting misstatements amounting to "a widespread and significant
    inflation of revenue."  The restatement here had no effect on revenue, earnings or any
28  other important metric.

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1   disclosed that the cash came in from Glencore; Century disclosed that the cash immediately

2   went back to Glencore.  This GAAP violation was thus "minor or technical in nature,"

3   rather than widespread and significant, as required by *Daou*, 411 F.3d at 1017.

4         **The forward-looking statement:**  Recognizing that a technical accounting error is

5   neither widespread not significant, as required by *Daou*, Plaintiffs attempt to buttress their

6   case by arguing that the technical error somehow allowed Century to say that, if it

7   completed the Shelf Offering and could use its revolving line of credit, "we would expect to

8   have sufficient liquidity to fund our operations for approximately the next 18 months.'"

9   FAC ¶ 76 (quoting RJN Ex. 22, at 829).  But try as they might, Plaintiffs cannot convert

10  this tepid forward-looking statement into an actionable falsehood.  Where, after all, is the

11  falsehood?  Even in hindsight, Century's forecast is perfectly valid and accurate.  The safe

12  harbor applies.  15 U.S.C. § 78u-5(c)(1).  The prospectus clearly identifies forward-looking

13  statements (RJN Ex. 22, at 866) and accompanies them with meaningful cautionary

14  statements.  *Id.* at 827-39, 852-66 (risk factors).  And the prospectus not only "bespeaks

15  caution," it fairly shrieks caution.  *See* Underwriters' Motion, filed herewith, at 20-22.

16        Both before the prospectus and in the prospectus itself, Century repeatedly

17  cautioned investors that the worldwide financial crisis and the crash in aluminum prices

18  meant that Century was operating at a loss and faced liquidity risks.  As the LME dropped

19  from over $3,200 in July 2008 to under $1,300 in February 2009, Century started losing lots

20  of money and made no attempt to pretend otherwise:  Throughout Q4 of 2008 and Q1 of

21  2009, Century repeatedly filed dreary 8-Ks detailing the downward trajectory of its

22  operations.  FAC ¶¶ 58-62.  On December 17, 2008, Century announced it might close its

23  entire Ravenswood plant (the source of 22% of its production capacity), had already shut

24  down one of four potlines and had given WARN Act notices to all its workers, telling them

25  "that the plant could be curtailed unless the LME selling price for aluminum stabilizes and

26  the company is able to materially reduce costs and stem monthly losses."  RJN Ex. 19, at

27  805; FAC ¶ 62.  Two days later, Century announced the termination of 13% of its salaried

28  workforce:  "'Given the unprecedented recent decline in aluminum prices, we had no

1   choice but to aggressively explore every opportunity to reduce our costs across the

2   company.'"  RJN Ex. 20, at 814; FAC ¶ 62.

3        Late in January 2009, Century made the Shelf Offering, which the market perceived

4   as dilutive.  Word of the offering drove the stock down from $7.35 to $4.60.  And no

5   wonder.  The prospectus is like a prolonged cold shower.  RJN Ex. 22.  On page 1, it notes

6   that while the year-end financials have yet to be finalized, Century expects Q4 operating

7   losses of $60 million to $74 million, with worse results yet forecast for Q1 2009 because of

8   the continued drop in aluminum prices.  *Id.* at 827.  After noting expected charges for

9   impairment of assets and the like, the prospectus states that U.S. operations are "**not cash**

10  **flow positive at recent aluminum prices**" (*id.* at 829) (emphasis added) and then, in bold

11  type, said (in the words quoted on pages 2-3 above) that Century might not have the

12  liquidity to make it through 2009 (*id.* at 829, 874).  Century reiterated this later, saying "If

13  primary aluminum prices were to remain on average at or around recent levels for the

14  entirety of 2009, or were to decline further, **our liquidity would be at risk**."  *Id.* at 852

15  (emphasis added).  Two pages later, Century said:  "**we cannot be certain that funding for**

16  **our operating or capital needs will be available from the credit and capital markets if**

17  **needed and to the extent required, or on acceptable terms**."  *Id.* at 854 (emphasis

18  added).  Century also announced that Moody's had downgraded its credit rating, and a page

19  later said:  "**None of our U.S. smelting capacity is profitable on a cash basis at recent**

20  **primary aluminum prices**."  Id. at 857-58 (emphasis added).  And in case someone

21  missed the point:  "The market price of our common stock has declined significantly, may

22  continue to be volatile, and may decline further."  *Id.* at 855; *see also id.* at 856-57, 871-74.

23  Century followed this in February with 8-Ks announcing the closure of the remainder of the

24  Ravenswood plant, and net charges associated with that shutdown.  RJN Ex. 24-25.[7]

25  _____

26  [7] Analysts also questioned Century's liquidity.  While some thought the situation more
    serious than others, all thought Century's operations were cash-flow negative and all saw
27  liquidity as an issue.  *E.g.,* RJN Ex. 48, at 1404 ("we estimate the company could be
    burning through $20mm+ of cash each month."); Ex. 49, at 1411-12 ("Liquidity concerns
28  paramount, maintain Underperform … Earnings and cash flow are at risk as three of four
    (continued…)

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1    Thus, it is no surprise that when Century publicly announced the restatement to

2    correct a technical presentation error, no analyst commented.  There was no appreciable

3    change in the trajectory of the stock price, because no one cared about the error.  Neither

4    the error, nor Century's tepid forecast that it expected to survive 18 months, can possibly be

5    deemed a material misstatement or omission.  The FAC thus fails to allege falsity.

6    **4.      The allegations of loss causation do not suffice**

7    As shown above, while Plaintiffs allege the restatement caused a $6.94 stock price

8    drop (from $8.00 to $1.06), this is disingenuous, and in fact on March 2, 2009 the stock

9    dropped less than 20 cents after the restatement (from $1.86 to $1.68).

10   The drop from $8.00 to $1.86 occurred before any alleged curative disclosure, and

11   thus is not actionable, pure and simple.  The Ninth Circuit so ruled in *In re Daou,* 411 F.3d

12   at 1027.  *Accord, Morgan v. AXT, Inc.,* No. C 04-4362-MJJ, C 05-5106-MJJ, 2005 WL

13   2347125, at *16 (N.D. Cal. Sept. 23, 2005).  The remaining drop, from $1.86 immediately

14   before the restatement to $1.68 at the close of that trading day, is too trivial to state a claim,

15   especially where, as here, the stock soon recovered and since has risen to over $10.  *See*

16   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008)

17   (affirming dismissal on loss causation grounds of 10b-5 claim because defendants showed a

18   "stock recover[y] very shortly after the modest 10% drop that accompanied" a corrective

19   disclosure); *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F.

20   Supp. 2d 763, 820-21 (D. Ariz. 2009).  Even if this case could survive a motion to dismiss,

21   this puny drop shows the case to be essentially worthless – a waste of this Court's time.

22   **B.      The Court should dismiss the Securities Act claims**

23   **1.      Standards applicable to Securities Act claims**

24   To state a Section 11 claim, the FAC must allege:  "(1) that the registration

25   ───────────────

(…continued)

26   smelters are currently operating at a loss.  Liquidity and balance sheet is under stress as
cash burn is accelerating."); Ex. 50, at 1419 ("this [liquidity concern] is what happens

27   when the price of the product drops 30% below the cost of making that product."); Ex.
51, at 1429 ("The big issue remains liquidity"); Ex. 52, at 1446 ("We estimate cash burn

28   rate of close to $300mm in 2009").

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1    statement contained an omission or misrepresentation, and (2) that the omission or

2    misrepresentation was material, that is, it would have misled a reasonable investor about the

3    nature of his or her investment." *Daou,* 411 F.3d at 1027 (quoting *In re Stac Elecs. Sec.*

4    *Litig.,* 89 F.3d 1399, 1403-04 (9th Cir. 1996)).  Plaintiffs must have purchased shares in, or

5    traceable to, the offering.  *Lilley v. Charren,* 936 F. Supp. 708, 715 (N.D. Cal. 1996).

6          To state a Section 12(a)(2) claim, the FAC must allege: "(1) an offer or sale of a

7    security; (2) by the use of any means of interstate commerce; (3) through a prospectus or

8    oral communication; (4) which includes an untrue statement of material fact." *Rubke v.*

9    *Capitol Bancorp Ltd.,* 460 F. Supp. 2d 1124, 1133 (N.D. Cal. 2006) (quoting *In re Itel Sec.*

10   *Litig.,* 89 F.R.D. 104, 115 (N.D. Cal. 1981)).

11         The FAC fails to plead falsity (§§ 11, 12(a)(2)), traceability (§ 11), and standing and

12   a direct offer or sale (the "statutory seller" requirement) (§ 12(a)(2)).

13         Assuming *arguendo* that Rule 8 applies, a plaintiff must allege "enough facts to

14   state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S.

15   544, 555-56, 570 (2007); *see also Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.

16   2009).  This requires facts that add up to "more than a sheer possibility that a defendant has

17   acted unlawfully." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).  While courts do not

18   require "heightened fact pleading of specifics" under Rule 8, a plaintiff must provide "more

19   than labels and conclusions, and a formulaic recitation of the elements of a cause of action

20   will not do." *Id.* at 1965.  A complaint asserting allegations that are merely consistent with

21   liability is insufficient because "'it stops short of the line between possibility and

22   plausibility of entitlement to relief.'" *Moss,* 572 F.3d at 969 (quoting *Twombly,* 550 U.S. at

23   557).  And "the tenet that a court must accept as true all of the allegations contained in a

24   complaint is inapplicable to legal conclusions. . . . '[including] legal conclusion[s] couched

25   as [] factual allegation[s].'" *Iqbal,* 129 S. Ct. at 1949-50 (citation omitted); *see also Moss,*

26   572 F.3d at 969.[8]

27   _____

28   [8] Careful scrutiny at the motion to dismiss stage is required because the "practical

<span style="text-align:right;">(continued…)</span>

Century's Motion to Dismiss FAC
Case No. C 09-1376 (SI)

1    2.        **The allegations of falsity do not suffice**

2            The element of falsity is the same under Section 11 as it is under Section 12(a)(2),

3    except that under Section 11 "[p]laintiffs also have the burden of proving that they did not

4    know of the untrue statements or omissions when they purchased the securities." *Rubke,*

5    460 F. Supp. 2d at 1134.  For a falsehood to be material, "'there must be a substantial

6    likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

7    investor as having significantly altered the 'total mix' of information made available.'"

8    *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  It is not enough that a statement is false

9    or incomplete, if the misrepresented fact is insignificant.  *Id.* at 238; *In re Levi Strauss &*

10   *Co. Sec. Litig.,* 527 F. Supp. 2d at 974-78 (finding alleged misstatements and omissions

11   immaterial on motion to dismiss).  If a stock trades in an efficient market (as is alleged

12   here, FAC ¶¶ 102-03), a failure of the market to react to the disclosure of news is an

13   indicator that the news is not material.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330

14   (3d Cir. 2002); *Oran v. Stafford*, 226 F.3d 275, 282-83 (3d Cir. 2000); *In re Fidelity/Apple*

15   *Sec. Litig.*, 986 F. Supp. 42, 48 (D. Mass. 1997).

16           As this Court said in *In re iAsia Works, Inc. Sec. Litig.,* No. C-01-3224-SI, 2002 WL

17   1034041, at *7 (N.D. Cal. May 15, 2002), "[r]eview of the contents of a prospectus at the

18   pleadings stage is permitted to determine whether it actually contains the alleged

19   misrepresentations and omits information alleged to have been omitted."  Here, review of

20   the prospectus shows that the FAC's allegations of falsity are baseless.  For the reasons

21   stated in part III.A.3 above, the FAC does not adequately plead falsity as to the Section 11

22   and Section 12(a)(2) claims any more than it pleads falsity as to the Rule 10b-5 claim:

23           **The restatement:**  Century fully disclosed all salient aspects of the termination of

24   _____

(…continued)

25   significance" of permitting "a largely groundless claim" to go forward is "to take up the
     time of a number of other people, with the right to do so representing an in terrorem

26   increment of the settlement value."  *Twombly,* 550 U.S. at 557-58 (internal quotations
     omitted).  Only "by taking care to require" sufficiently detailed and plausible allegations

27   can the courts "hope to avoid the potentially enormous expense of discovery in cases with
     no reasonably founded hope that the discovery process will reveal relevant evidence" of

28   wrongdoing.  *Id.* at 559 (internal quotations omitted).

1   the Hedges, including the cash flows involved.  *See* Part III.A.3 above; RJN Ex. 22, at 835,

2   837, 876-78, 880-83.  At most, Century made a technical error in presenting its Q3 interim

3   statement of cash flows.  The error did not affect Century's reported assets, liabilities,

4   shareholders' equity, net income (or loss), total cash at the beginning of  the quarter or total

5   cash at the end of the quarter.  The portion of the transaction that necessitated the change in

6   presentation (the "touch-pass" payment) was of no economic significance to Century and

7   no concern to its investors.  Century's financial position at all times would be exactly the

8   same had the transaction been structured to omit the touch-pass altogether.  Nor was the

9   presentation error of any significance; the amount of cash Century had did not change one

10  cent, and nobody could have been led to believe that, at the time, Century was doing

11  anything but operating at a substantial loss, as Century and every analyst was saying

12  throughout the first quarter.  In that regard, it is significant that no analyst writing after the

13  restatement thought the restatement even worth mentioning (RJN Ex. 54-60) and the market

14  basically yawned (*id.* Ex. 63).

15       **The forward-looking statement:**  Nothing was false about this forecast, even in

16  hindsight.  And it was protected by the safe harbor (15 U.S.C. §§ 77z-2(c)(1)) and the

17  "bespeaks caution" doctrine.  See Underwriters' Motion at 20-22.

18       **Internal controls:**  In the FAC, unlike the Consolidated Complaint, Plaintiffs have

19  added bootstrap allegations that Century's technical presentation error must mean that its

20  internal controls are deficient, which must mean that the Sarbanes-Oxley certifications of

21  its CEO and CFO were false.  FAC ¶¶ 17-20, 123-25.  But these allegations are mere

22  conclusions, unsupported by any facts.  Here, nobody has found any internal controls

23  problem; indeed, Deloitte & Touche's clean audit opinion on internal controls was filed

24  with Century's 10-K just hours after the issuance of the restatement.  RJN Ex. 32, at 1183;

25  *see also id.,* Ex. 1, at 46 (clean internal controls opinion in 10-K for 2007).  *Cf. In re*

26  *Charles Schwab Corp. Sec. Litig.,* 257 F.R.D. 534, 558-59 (N.D. Cal. 2009) (dismissing

27  § 11 claim based on internal control allegations); *see also In re Verifone Holdings, Inc. Sec.*

28  *Litig.,* No. C-07-6140-MHP, 2009 WL 1458211, at *8 (N.D. Cal. May 26, 2009); *New York*

1    *State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 07-cv-5756-FMC (FFMx), 2009 WL

2    3112574, *12-*13 (C.D. Cal. Sept. 25, 2009) (dismissing internal control claims).

3    3.    **Plaintiffs lack standing to assert Section 11 or Section 12(a)(2) claims**

4         To minimize repetition, the Century Defendants join in, and incorporate by

5    reference, the Underwriters' arguments on this point.  Underwriters' Motion at 6-14.

6         As the Underwriters show, Plaintiffs did not buy in the Shelf Offering because they

7    did not buy on the day of the offering, or at the price of the offering.  To maintain a Section

8    12(a)(2) claim against a particular defendant, a plaintiff must allege facts showing that the

9    plaintiff purchased securities in a public offering (not the secondary market) directly from

10   that defendant, or at the solicitation of that defendant.  Underwriters' Motion at 6-9, 12-14.

11   The FAC does not meet this standard.

12        The Consolidated Complaint alleged that Plaintiffs purchased their Certificates

13   "pursuant or traceable to the defective Prospectuses."  Consol. Compl. ¶ 147; *see also id.*

14   ¶¶ 16, 28-31, 148.  Courts reject such allegations as insufficient to establish standing.

15   Underwriters' Motion at 7-9.  The FAC repeats this defective allegation  at least 12 times,

16   including twice in the Section 12(a)(2) claim itself.  FAC ¶¶ 16, 28-31, 122, 129, 143, 148,

17   151, 163, 164.  But Plaintiffs, having had nearly two weeks to study defendants' first round

18   of motions to dismiss, which raised this point (Doc. 62, at 22-23; Doc. 63, at 10-11), also

19   have added inconsistent allegations that they purchased stock directly from the

20   underwriters.  FAC ¶¶ 112, 158.  They have done so without any attempt to explain the

21   inconsistency and without any attempt to explain their certificates, filed under oath and

22   attached to their FAC, which show their purchases were **both** not on the date of the Shelf

23   Offering **and** not at the offering price of $4.50.  Thus, all were aftermarket purchases, and

24   Plaintiffs have no Section 12(a)(2) claims against anyone.

25        Plaintiffs fare no better under Section 11.  As shown above, Plaintiffs did not buy in

26   the Shelf Offering, or on the day of the Shelf Offering, or at the price of the Shelf Offering.

27   While one may trace under Section 11 (unlike Section 12(a)(2)), Plaintiffs' later purchases

28   cannot be traced to the Shelf Offering, because it was a secondary offering of a common

1    stock that had already traded in large volumes for over a decade, so nobody can identify the

2    source of any shares purchased anonymously in the open market.  Underwriters' Motion at

3    10-12.  This lack of standing also means Plaintiffs have no Section 15 claim.  *Id.* at 24-25.

4    4.        **The Century Defendants were not statutory sellers**

5            Even assuming Plaintiffs had purchased in the Shelf Offering, which they did not, a

6    defendant can be liable under Section 12(a)(2) only if (1) title to the securities passes

7    directly from him or her to the plaintiff (a direct sale) or if (2) he or she solicits the

8    purchase, motivated in part by his or her own financial interests (a direct solicitation).  *In re*

9    *Infonet Services Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100-02 (C.D. Cal. 2003); *see also*

10   *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171 (C.D. Cal. 2003); *In*

11   *re Musicmaker.com Sec. Litig.*, No. CV 00-2018, 2001 U.S. Dist. LEXIS 25118, at *50-*52

12   (C.D. Cal. June 4, 2001); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 307 (S.D.N.Y. 2001),

13   *aff'd*, 318 F.3d 170 (2d Cir. 2003).

14           The FAC does not allege any direct sale or solicitation by the Century Defendants;

15   all it says is that the Individual Defendants signed the prospectus supplement and then

16   offers the unsupported legal conclusion that each defendant "was an offeror, seller or

17   solicitor of a security in the Secondary Offering."  FAC ¶ 142.  The majority view is that

18   signing does not amount to solicitation for Section 12(a)(2) purposes, and all courts of

19   appeals that have resolved the issue have so ruled.  *See Rosenzweig v. Azurix Corp.,*

20   332 F.3d 854, 871 (5th Cir. 2003) (rejecting the contention that "signing the registration

21   statement suffices for solicitation"); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 636

22   (3d Cir. 1989) ("purchaser must demonstrate direct and active participation in the

23   solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller"); *In re*

24   *Harmonic, Inc. Sec. Litig.,* No. C 00-2287-PJH, 2006 WL 3591148, at *13 (N.D. Cal.

25   Dec. 11, 2006) (collecting cases).

26   **C.        The control person claims do not suffice**

27           To state a Section 20(a)  claim, Plaintiffs must first state a violation of Section 10(b)

28   or Rule 10b-5.  *UTStarcom,* 560 F. Supp. 2d at 892-93.  Similarly, to state a Section 15

1   claim, Plaintiffs must first state a violation of Section 11 or Section 12(a)(2).  *Twinde v.*

2   *Threshold Pharms. Inc.,* No. C 07-4972-CW, 2008 WL 2740457, at *16 (N.D. Cal. July 11,

3   2008); *Rubke,* 460 F. Supp. 2d at 1151.  As Plaintiffs have not adequately alleged any

4   primary violations, and lack standing (Underwriters' Motion at 24-25), the Court should

5   dismiss their control person claims as well.

6   **IV.      CONCLUSION**

7         For each of the foregoing reasons, the Court should dismiss the Consolidated Class

8   Action FAC.  Because Plaintiffs drafted the FAC after close to two weeks' review of

9   defendants' first motions to dismiss (*see* Doc. 61-66), this should not be regarded as the

10   first round of motions, and therefore the dismissal should be without leave to amend.

11         Dated:  February 26, 2010.

12                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                     BRUCE A. ERICSON
13                                    JEFFREY S. JACOBI
                                     50 Fremont Street
14                                    Post Office Box 7880
                                     San Francisco, California 94120-7880
15
                                     By /s/ Bruce A. Ericson
16                                        Bruce A. Ericson

17                                    Attorneys for Defendants
                                     CENTURY ALUMINUM COMPANY,
18                                    LOGAN W. KRUGER, MICHAEL A. BLESS,
                                     STEVE SCHNEIDER, JOHN C. FONTAINE,
19                                    JACK E. THOMPSON, PETER C. JONES, JOHN
                                     P. O'BRIEN, WILLY R. STROTHOTTE, JARL
20                                    BERNTZEN, WAYNE R. HALE, ROBERT E.
                                     FISHMAN and CATHERINE Z. MANNING

21

22

23

24

25

26

27

28

702057208v3