ROBERT P. VARIAN (SBN 107459)
STEPHEN M. KNASTER (SBN 146236)
LILY I. BECKER (SBN 251145)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   (415) 773-5700
Facsimile:    (415) 773-5759
Emails:   rvarian@orrick.com
          sknaster@orrick.com
          lbecker@orrick.com

Counsel For Defendants
Morgan Stanley & Co. Incorporated and
Credit Suisse Securities (USA) LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* CENTURY ALUMINUM COMPANY SECURITIES LITIGATION | Lead Case No.  3:09-cv-01001-SI |
| | CLASS ACTION |
| | **UNDERWRITERS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:        Friday April 16, 2010<br>Time:        9:00 a.m.<br>Court:       10, 19th Floor<br>Judge:       Honorable Susan Illston |

1

# TABLE OF CONTENTS

2

**Page**

3

NOTICE OF MOTION AND MOTION ................................................................ viii

4

ISSUES TO BE DECIDED (CIVIL LOCAL RULE 7-4(a)(3)) ................................. viii

5

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

6

INTRODUCTION ................................................................................................ 1

7

KEY FACTS RELEVANT TO MOTION ............................................................... 3

8

ARGUMENT ....................................................................................................... 6

9

I.     PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF STANDING

10          AND SUBJECT MATTER JURISDICTION ................................................ 6

11          A.     Overview ........................................................................................ 6

12          B.     Plaintiffs Lack Standing To Assert A Section 12 Claim ................. 7

13          C.     The Section 12 Claim Further Fails Because The Underwriters Were Not
                   Statutory "Sellers." ...................................................................... 9

14

15          D.     The Section 11 Claim Fails For Lack of Standing Because
                   Plaintiffs' Cannot Trace Their Shares to The Secondary Offering ...... 10

16          E.     Plaintiffs' Conclusory Standing Allegations Fail Under *Twombly* and *Iqbal* ...... 12

17          F.     Plaintiffs' Claims Also Fail For Lack of Subject Matter Jurisdiction ................ 13

18     II.    THE FAC'S "SUBSTANTIVE" ALLEGATIONS ARE FATALLY DEFICIENT ........ 14

19          A.     Plaintiffs Cannot State A Section 11 or 12(a)(2) Claim Based On A Gross
                   Mischaracterization Of The Underlying Documents ........................... 15

20

21          B.     Plaintiffs Fail To Plead Specific And Plausible Facts ......................... 18

22     III.   THE FORWARD-LOOKING STATEMENT REGARDING LIQUIDITY
            EXPECTATIONS PROVIDES NO BASIS FOR ANY CLAIM .......................... 19

23          A.     Plaintiffs Cannot Plead That The Forward-Looking Statement Regarding
                   Liquidity Expectations Is False .......................................................... 19

24

25          B.     The Statement Is Non-Actionable Under The Bespeaks Caution Doctrine. ......... 20

26          C.     The Statement Is Protected By The Reform Act's Safe Harbor Provisions. ........ 22

27     IV.   THE FAC FAILS TO PLEAD FACTS SHOWING THAT THE
            UNDERWRITERS BREACHED THEIR DUTY OF "DUE DILIGENCE." ................ 22

28

1

**TABLE OF CONTENTS**
**(continued)**

2
Page

3   V.     PLAINTIFFS' SECTION 15 CLAIM FOR "CONTROL PERSON" LIABILITY
          AGAINST THE UNDERWRITERS MUST BE DISMISSED ....................................... 24

4
          A.     Plaintiffs' Section 15 Claim Fails For Lack Of Standing And Subject
5                Matter Jurisdiction ............................................................................................. 24

6          B.     Plaintiffs Cannot Otherwise Plead A Section 15 Claim Against The
                  Underwriters ....................................................................................................... 25
7
     CONCLUSION ............................................................................................................................. 25
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Abbey v. Computer Memories, Inc.,*
   634 F. Supp 870 (N.D. Cal. 1986) ....................................................................... 11

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ............................................................................... *passim*

*Baron v. Smith,*
   380 F.3d 49 (1st Cir. 2004) ................................................................................. 22

*Bell Atlantic Corp. v. Twombly ,*
   550 U.S. 544 (2007) ................................................................................... *passim*

*Brody v. Homestore, Inc.,*
   2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) ................................................ 9, 24

*Colwell v. Dept. of Human Services,*
   558 F.3d 1112 (9th Cir. 2009) ............................................................................ 14

*Conley v. Gibson,*
   355 U.S. 41 (1957) .............................................................................................. 12

*Corrie v. Caterpillar, Inc.,*
   503 F.3d 974 (9th Cir. 2007) .............................................................................. 14

*Craftmatic Sec. Litig. v. Kraftsow,*
   890 F.2d 628 (3d Cir. 1989) ............................................................................... 10

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.,*
   2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ..................................................... 10

*Grand Lodge of Pa. v. Peters,*
   550 F. Supp. 2d 1363 (M.D. Fla. 2008) ................................................. 11, 12, 13

*Griffin v. PaineWebber, Inc.,*
   2001 WL 740764 (S.D.N.Y. June 29, 2001) ...................................................... 10

*Gustafson v. Alloyd Co., Inc.,*
   513 U.S. 561 (1995) ........................................................................................... 7, 9

*Hertzberg v. Dignity Partners, Inc.,*
   191 F.3d 1076 (9th Cir. 1999) .......................................................................... 7, 10

*Hollinger v. Titan Capital Corp.,*
   914 F.2d 1564 (9th Cir. 1990) ............................................................................ 24

*Howard v. Everex Sys., Inc.,*
   228 F.3d 1057 (9th Cir. 2000) ...................................................................... 24, 25

*In re Alamosa Holdings, Inc. Sec. Litig.,*
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Azurix Corp. Sec. Litig.*,
   198 F. Supp. 2d 862 (S.D. Tex. 2002),
   *aff'd*, 332 F.3d 854 (5th Cir. 2003) .................................................................. 9

*In re Brooks Automation, Inc. Sec. Litig.*,
   2007 WL 4754051 (D. Mass. Nov. 6, 2007) ....................................................... 8

*In re Calpine Corp. Sec. Litig.*,
   288 F. Supp. 2d 1054 (N.D. Cal. 2003) ........................................................... 16

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................................... 23

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005).......................................................................... 22

*In re Exodus Commc'n, Inc. Sec. Litig.*,
   2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) ................................................... 25

*In re Exodus Commc'n, Inc. Sec. Litig.*,
   2006 WL 1530081 (N.D. Cal. June 2, 2006) ................................................... 24

*In re Exodus Commc'n, Inc. Sec. Litig.*,
   2006 WL 2355071 (N.D. Cal. Aug. 14, 2006) ................................................. 14

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)............................................................. 7, 9

*In re Infonet Servs. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal. 2003)....................................................... 15, 20

*In re JDN Realty Corp. Sec. Litig.*,
   182 F. Supp. 2d 1230 (N.D. Ga. 2002) .............................................................. 8

*In re Late Fee and Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ........................................................ 18, 23

*In re Levi Straus & Co. Sec. Litig.*,
   527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................... 7

*In re MusicMaker.com Sec. Litig.*,
   2001 WL 34062431 (C.D. Cal. June 4, 2001) ................................................ 7, 24

*In re Novagold Res. Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009)........................................................ 20, 21, 22

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)............................................................... 10

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003)............................................................. 22

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)............................................................................ 15

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*In re Sonus Networks, Inc. Sec. Litig.*,
   2006 WL 1308165 (D. Mass May 10, 2006) ........................................ 10

4

*In re Stac Elec. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .......................................... 15, 18, 20

5

6

*In re Stratosphere Corp. Sec. Litig.*,
   1 F. Supp. 2d 1096 (D. Nev. 1998) ................................... 10, 25

7

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) .......................................... 20, 21, 23

8

*In re WRT Energy Sec. Litig.*,
   1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) .............................. 19

9

10

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005) ...................................... 11, 12, 14

11

*Lee v. Ernst & Young, LLP*,
   294 F.3d 969 (8th Cir. 2002) ............................................... 11

12

13

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990) ........................................................ 14

14

*Lilley v. Charren*,
   936 F. Supp. 708 (N.D. Cal. 1996) ............................... 10, 11, 25

15

16

*Lopes v. Vieira*,
   488 F. Supp. 2d 1000 (E.D. Cal. 2007) ................................. 9

17

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989) ............................................. 10

18

19

*Murphy v. Hollywood Entm't Corp.*,
   1996 WL 393662 (D. Or. May 9, 1996) ................................... 9

20

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ........................................... 18

21

22

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ............................................. 24

23

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ........................................................ 9

24

*Port Dock & Stone Co. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007) .............................................. 13

25

*Rubin v. MF Global, Ltd.*,
   634 F. Supp. 2d 459 (S.D.N.Y. 2009) .................................... 13

26

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) .............................................. 20

27

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006),
    *aff'd,* 551 F.3d 1156 (9th Cir. 2009) ................................................................. 24

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ........................................................................... 14

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (lst Cir. 1996) ............................................................................. 10

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ........................................................................ 18, 23

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ........................................................................... 15

*Steel Co. v. Citizens for a Better Env't.*,
    523 U.S. 83 (1998) .............................................................................................. 14

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ........................................................................... 15

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................. 19

*Wilson v. Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989) ............................................................................. 10

**STATUTES**

15 U.S.C.
    Section 77l(a)(2) ................................................................................................... 9
    Section 77z-2 ....................................................................................................... 22

8 Del. C.
    Section 141(a) ...................................................................................................... 25

Securities and Exchange Act of 1933
    Section 11 ..................................................................................................... *passim*
    Section 12 ..................................................................................................... *passim*
    Section 15 ............................................................................................................ 24

Securities and Exchange Act of 1934
    Section 10(b) ......................................................................................................... 3
    Section 20(a) .................................................................................................. 3, 24

**OTHER AUTHORITIES**

2 Fletcher Cyc. Corp. § 495 ........................................................................................ 25

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 1357 (3d ed. 2009) ........................................................................................... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Const. Art. III, Sec. 2, (1.1) ................................................................. 14

**<u>RULES</u>**

Federal Rules of Civil Procedure
  Rules 8............................................................................................ 12, 18
  Rule 9(b)..................................................................................... 15, 18, 19
  Rule 12(b)(1)................................................................................ *passim*
  Rule 12(b)(6)............................................................................... 1, 13, 15

Federal Rules of Evidence
  Rule 201 ............................................................................................... 15

OHS West:260846651.2

vii

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

1

## NOTICE OF MOTION AND MOTION

2

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE THAT on Friday, April 16, 2010 at 9:00 a.m. or as soon

4

thereafter as counsel may be heard, in the courtroom of the Honorable Susan Illston, United

5

States District Judge, at Courtroom 10, 450 Golden Gate Avenue, San Francisco, California,

6

94102, defendants Morgan Stanley & Co. Incorporated ("Morgan Stanley") and Credit Suisse

7

Securities (USA) LLC ("Credit Suisse") (collectively, the "Underwriters"), will and hereby do

8

move this Court for an order granting their motion to dismiss plaintiffs' First Amended

9

Consolidated Class Action Complaint dated January 28, 2010 (the "FAC"). The Underwriters'

10

motion seeks dismissal of all claims against them and is brought pursuant to Rules 8, 9(b) and

11

12(b)(6) of the Federal Rules of Civil Procedure, and pursuant to Rule 12(b)(1) for lack of subject

12

matter jurisdiction.

13

This motion is based upon this Notice and the accompanying Memorandum of Points and

14

Authorities; the Request for Judicial Notice ("RJN") and the Declarations of Ryan E. Fitzpatrick

15

("Fitzpatrick Decl.") and Scott A. Gregory ("Gregory Decl.") filed herewith; the papers on file in

16

the action; the argument of counsel at the hearing; and other such matters as may be considered

17

by the Court.

18

19

## ISSUES TO BE DECIDED (CIVIL LOCAL RULE 7-4(A)(3))

20

1.      Whether plaintiffs' claim under Section 12(a)(2) of the Securities Act of 1933 (the

21

"Securities Act") should be dismissed pursuant to Rule 12(b)(6) because the FAC cannot plead

22

that any plaintiff purchased stock in the secondary offering, or that plaintiffs have standing.

23

2.      Whether plaintiffs' claim under Section 12(a)(2) of the Securities Act should be

24

dismissed for lack of standing pursuant to Rule 12(b)(6) because the FAC cannot plead that the

25

Underwriters were statutory "sellers."

26

3.      Whether plaintiffs' claim under Section 11 of the Securities Act should be

27

dismissed for lack of standing because plaintiffs cannot trace their shares to the secondary

28

offering.

viii

4.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

5.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed because they are based on a false premise that is contradicted by the documents upon which they purport to be based.

6.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(6) because the FAC fails to comply with the pleading standards imposed under the Supreme Court's decisions in *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*, Ninth Circuit and Northern District cases regarding conclusory pleading, and Rule 9(b).

7.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(6) because the FAC fails to allege facts that show that the forward-looking statement regarding Century Aluminum's liquidity expectations is false.

8.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(6) because the forward-looking statement regarding Century Aluminum's liquidity expectations is non-actionable under the "bespeaks caution" doctrine.

9.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(6) because the forward-looking statement regarding Century Aluminum's liquidity expectations is non-actionable under the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995.

10.      Whether plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed pursuant to Rule 12(b)(6) because plaintiffs fail to allege facts sufficient to state a claim that the Underwriters breached their duty to conduct a reasonable due diligence investigation.

11.      Whether plaintiffs' claim under Section 15 of the Securities Act should be dismissed pursuant to Rules 12(b)(6) and 12(b)(1) because the FAC fails to plead a primary violation, standing or subject matter jurisdiction, or that the Underwriters were control persons.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

Plaintiffs were on notice of the core deficiencies that permeate their current complaint before it was filed, but have been utterly unable to rectify them.  Not only does their amended pleading fail to salvage the claims asserted against the Underwriters, it confirms that the underlying defects are beyond repair.  As demonstrated below, the Section 11 and Section 12 claims should be dismissed both under Rule 12(b)(6) for failure to state a claim, and under Rule 12(b)(1) for lack of subject matter jurisdiction.

The motion to dismiss filed by Credit Suisse and Morgan Stanley on January 15, 2010 (the "Prior Motion") exposed a series of gaping holes in the claim plaintiffs are attempting to assert under Section 12.  Rather than responding to that motion, plaintiffs filed a First Amended Complaint (the "FAC") that tinkered with the Section 12 allegations and added a claim under Section 11.  Both efforts fail on grounds that are both fatal and irremediable.

As the Prior Motion demonstrated in detail, none of the four named plaintiffs has standing to assert a Section 12 claim because they did not purchase shares in the subject offering.  Accordingly, the claim must be dismissed pursuant to Rule 12b)(6), and under 12(b)(1) for lack of subject matter jurisdiction.  The Section 12 claim further fails because plaintiffs did not purchase their shares from the Underwriters.  Those pivotal facts are (1) apparent from the individual certifications incorporated into plaintiffs' pleadings, and (2) confirmed by declarations that are properly before the Court under Rule 12(b)(1).

Nor does the FAC's addition of a Section 11 claim solve the problem.  To assert a claim under Section 11, a plaintiff must be able to "trace" his or her shares to the relevant offering.  In this case, it is not possible for anyone who did not purchase in the offering to satisfy the tracing requirement because the registration statement at issue was filed in connection with a secondary offering of 24,500,000 shares of common stock.  At the time it became effective there were already 49,052,692 common shares trading in the aftermarket.  RJN Ex. A at S-8.  It is therefore impossible to establish that particular shares in the 75 million share pool that existed after the

1

1   secondary offering came from the offering -- rather than a prior offering -- <u>unless</u> they were

2   purchased in the offering from the Underwriters at the offering price.

3          Under settled law, the fact that plaintiffs did not purchase in the subject offering, or from

4   the Underwriters or at the offering price, requires dismissal of their claims.  That result is

5   compelled (1) as to both the Section 11 and Section 12 claims, (2) pursuant to Rule 12(b)(6), and

6   (3) under Rule 12(b)(1) for lack of subject matter jurisdiction.

7          Although further analysis is unnecessary, the Section 11 and Section 12 claims also fail

8   because they are founded on a false premise that is refuted by the documents from which they

9   purportedly derived.  That glaring defect was exposed in the Prior Motion and elaborated upon at

10  length in the separate prior motion to dismiss filed by Century Aluminum (the "Company

11  Motion").  The FAC nevertheless makes no attempt to correct it.

12         The FAC is further deficient because, as was demonstrated in the Prior Motion, plaintiffs

13  fail to plead facts that might support key elements of their claims in conformance with the

14  standards imposed by the Supreme Court's decisions in *Twombly* and *Iqbal* or Rule 9(b).  That is

15  particularly true with respect to the FAC's conclusory assertions that plaintiffs have standing, or

16  that the Underwriters breached their duty of due diligence, or were sellers for purposes of

17  Section 12.

18         Because plaintiffs' lack of standing implicates subject matter jurisdiction, the Court can

19  (and should) consider the Fitzpatrick and Gregory declarations filed with this motion pursuant to

20  Rule 12(b)(1).  The declarations confirm facts that are also apparent from the face of the FAC and

21  the certifications by the individual plaintiffs regarding the dates and prices of their purchases,

22  which are part of the FAC -- *i.e.*, that plaintiffs did not purchase stock from Credit Suisse or

23  Morgan Stanley in the Offering.

24

25

26

27

28

**KEY FACTS RELEVANT TO MOTION[1]**

Plaintiffs' claims against Credit Suisse and Morgan Stanley arise out of a January 29, 2009 secondary "shelf" offering by Century Aluminum Company (the "Offering"), which was made on the basis of a prospectus supplement filed by Century Aluminum on January 29, 2009 (the "Prospectus Supplement"), at a price of $4.50 per share.  FAC ¶¶ 17, 72, 126.  The Prospectus Supplement included financial statements prepared by Century Aluminum and audited and/or reviewed by Deloitte & Touche LLP, and incorporated a series of Securities and Exchange Commission ("SEC") filings previously made by the Company.  RJN Ex. A at  S-54.

Credit Suisse and Morgan Stanley served as the underwriters for the Offering, and played no other role.  As underwriters, Credit Suisse and Morgan Stanley purchased the stock issued in the Offering from Century Aluminum at a discount from the Offering price, and sold it in the Offering at $4.50 per share.  RJN Ex. A at S-49.

While the FAC is at times confusing,[2] this much is unmistakably clear:  None of the plaintiffs purchased stock in the Offering, or from the Underwriters, or at the Offering price.  None of the stock sold in the Offering was -- or could have been -- sold on any date other than January 29, 2009 or at any price other than $4.50.  As the FAC and plaintiffs' incorporated certifications state on their face, none of plaintiffs' purchases occurred on that date or at that price.  FAC ¶¶ 28-31 & attached certifications.

Although plaintiffs were provided with a clear and detailed exposition of these dispositive facts in the Prior Motion, the FAC does not (and cannot) make any meaningful attempt to address them.  Plaintiffs instead serve up generic conclusions that are insufficient under the governing

---

[1] Additional background facts relevant to this motion are set forth in the motion to dismiss filed by Century Aluminum and several of its officers and directors, in which the Underwriters hereby join and incorporate by reference.  *See* Docket No. 69.

[2] Plaintiffs sometimes appear to lump the Underwriters in with the "Exchange Act Defendants" with respect to their claims under Section 10(b) and 20(a), by stating that such claims are asserted against "all defendants" and "Defendants."  See FAC Count I & ¶ 136; Count II.  The FAC also fails to allege the correct Offering price on a consistent basis.  Indeed, plaintiffs only get it right once -- in paragraph 72, which acknowledges that the stock issued in the Offering was sold at $4.50 per share.  The other allegations incorrectly state that the price was $8.00 per share.  *See*, *e.g.*, FAC ¶¶ 13, 79, 121.

1   pleading standards, and, more importantly, directly contradicted by other allegations and their

2   own certifications.  The FAC's unadorned assertions that plaintiffs purchased in the Offering,

3   bought stock pursuant and/or traceable to the Offering, or from the Underwriters (¶¶ 16, 28-31,

4   112, 143, 148, 151, 163-64), are further eviscerated by declarations from Credit Suisse and

5   Morgan Stanley, which confirm that none of the named plaintiffs purchased in the Offering or

6   from the Underwriters.  Fitzpatrick Decl. ¶¶ 2-6; Gregory Decl. ¶¶ 2-5.

7       Plaintiffs' claim that Credit Suisse and Morgan Stanley breached their "duty to make a

8   reasonable and diligent investigation of the statements contained in the Registration Statement"

9   (FAC ¶ 146) is based on a gross distortion of a single disclosure event -- the GAAP reporting of a

10  transaction in which Century Aluminum terminated hedging contracts with its largest shareholder

11  and affiliate (Glencore International AG) for the sale of aluminum.  *See, e.g.*, FAC ¶¶ 81, 84, 113.

12  The elements of the transaction were disclosed in great detail, both in the Prospectus Supplement

13  for the Offering and the Company's prior SEC filings (*see, e.g.*, FAC ¶¶ 62, 63), but one aspect of

14  the manner in which Century Aluminum accounted for it was later determined to have been in

15  error.

16      Although Century Aluminum's outside auditors had reviewed the accounting for the fully

17  disclosed transaction in three quarterly reviews, and in connection with the Offering itself, the

18  Company later determined that the appropriate treatment under GAAP was to account for it as a

19  financing activity, rather than as an operating activity.  Century Aluminum's statement of cash

20  flows for the nine months ending September 30, 2009 was restated to reflect that reclassification

21  -- and that adjustment alone.  RJN Ex. B.

22      As the Prior Motion and Company Motion explicitly and forcefully pointed out, plaintiffs'

23  attempt to suggest that $929 million suddenly disappeared from Century Aluminum's balance

24  sheet, thereby devastating investors who had been led to believe that the Company was "cash

25  rich," is entirely bogus.  The reclassification had no impact whatsoever on the Company's cash

26  position, cash flows, change in cash flows or liquidity.  Nor did it change the Company's assets,

27  liabilities, income or shareholder equity.  RJN Ex. B.  It merely decreased cash flows on one line

28  of the cash flow statement, and increased them by the same amount on another line.  *Id.*  The

1  totals for cash flows and net change in cash flows were <u>exactly the same</u> before and after the

2  restatement.  The net effect was zero.

3        Despite those uncontestable facts, and the fact that the Prior Motion and Company Motion

4  beat them like a drum, plaintiffs have not changed course.  The FAC continues plaintiffs' clumsy

5  misportrayal of the GAAP reclassification as a dramatic change in Century Aluminum's reported

6  financial position, and attempts to use that distortion and a related allegation regarding internal

7  controls as a basis for assertions that the Underwriters breached their due diligence duties in

8  connection with the Offering.  *See, e.g.*, FAC ¶¶ 11, 13, 18, 76, 118.  Those unfortunate assertions

9  are wholly unavailing.

10        It is not the role of an underwriter to audit or review financial statements, make fine-tuned

11  interpretations of GAAP, or second-guess accountants on esoteric accounting issues, and

12  plaintiffs make no attempt to allege how or why Credit Suisse or Morgan Stanley could or should

13  have done so in this case.  As the Prospectus Supplement and incorporated SEC filings make

14  clear, Century Aluminum's financial statements and internal control certifications were reviewed

15  and audited by highly qualified independent auditors, who consented to use of their name in

16  connection with the Offering.  RJN Ex. A at S-53-54, B-6.  Perhaps not surprisingly, the FAC

17  makes no attempt to allege how or why it was unreasonable for the Underwriters to rely on

18  Deloitte & Touche with respect to GAAP determinations in Century Aluminum's financial

19  statements or evaluations of the Company's internal controls.

20        Plaintiffs' attempts to use the accounting reclassification as a springboard for alleging that

21  the registration statement falsely advised investors that "the Company was liquid and cash rich

22  when -- in reality it was not" (¶ 18), and "could easily weather the financial 'storm' which was

23  ravaging the economy" (¶ 116), reflect still more overzealous advocacy.  Those unfounded

24  assertions could not be justified the first time they were made.  Plaintiffs' repetition of them in

25  their current pleading is inexcusable.

26        The accounting reclassification, again, had no impact on Century Aluminum's balance

27  sheet, income, cash on hand, net cash flows, or liquidity.  As the motions filed by the

28  Underwriters and the Company made abundantly clear, the facts regarding the underlying

1  transaction that generated the reclassification were fully disclosed, and no one could possibly

2  have been misled as to its financial impact.

3  Moreover, the registration statement made absolutely clear that Century Aluminum was

4  not "cash rich," that liquidity was a significant issue, and that the Company might not "weather

5  the financial storm."  It bristled with disclosures that market conditions had "significantly reduced

6  the amount of cash available to meet [the Company's] current obligations and fund [its] long-term

7  business strategies," that its U.S. operations were "not cash flow positive," and that the Company

8  would "need sources of liquidity other than from its operations to fund operations and

9  investments."  RJN Ex. A, at S-18, S-2.

10  The bottom line is that the FAC does not plead a viable claim, or that plaintiffs have

11  standing, or that the Court has subject matter jurisdiction -- with respect to any of the claims

12  against the Underwriters.  As to most of those defects, it is not just that plaintiffs have failed to

13  plead the requisite facts; they <u>cannot</u> do so.

14  # ARGUMENT

15

16  **I.  PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF**

17  **STANDING AND SUBJECT MATTER JURISDICTION.**

18  **A.  Overview.**

19  Plaintiffs' claims fail at the threshold for several interrelated reasons that are discussed

20  separately below.  The Section 12(a)(2) claim cannot be sustained because none of plaintiffs'

21  shares were bought "in" the Offering or from the Underwriters.  Plaintiffs also lack standing to

22  assert a Section 11 claim, and cannot establish subject matter jurisdiction, because it is impossible

23  to trace their shares to the Offering.

24  Purely as a matter of pleading, the FAC's allegations regarding plaintiffs' purchases are

25  insufficient under this Court's decision in *Lilley v. Charren*, the Supreme Court's subsequent

26  decisions in *Twombly* and *Iqbal*, and other cases, to show a purchase either in the Offering or

27  traceable to the Offering.  *Lilley v. Charren* requires plaintiffs to plead "facts" showing that the

28  shares they purchased came from the subject offering.  *Twombly* and *Iqbal* impose more rigorous

6

1    requirements, including that plaintiffs plead specific facts demonstrating that their claims are

2    plausible, not merely possible.  Because the FAC itself shows that plaintiffs did not purchase in

3    the Offering, and therefore cannot show that their stock came from that secondary offering,

4    plaintiffs <u>cannot possibly</u> satisfy either of those pleading burdens.

5         Moreover, the question need not be resolved simply as a matter of pleading, because

6    plaintiffs' lack of standing also demonstrates the absence of subject matter jurisdiction.  Unless

7    plaintiffs have standing, there is no justiciable case or controversy.  Because subject matter

8    jurisdiction is at issue, the Court can -- and should -- consider evidence beyond the FAC and

9    make factual determinations.  The declarations submitted by the Underwriters confirm plaintiffs'

10   lack of standing and subject matter jurisdiction, which are also apparent from the face of the FAC

11   and the certifications it attaches and incorporates.

12        **B.      <u>Plaintiffs Lack Standing To Assert A Section 12 Claim.</u>**

13        Only plaintiffs who purchased in a public offering have standing to assert a claim under

14   Section 12.  *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995) (only investors who

15   purchased shares in an offering have standing to sue under Section 12(a)(2)); *Hertzberg v. Dignity*

16   *Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999).[3]

17        Plaintiffs cannot demonstrate that they purchased in the Offering, or from the

18   Underwriters, or at the Offering price.  Throughout the FAC plaintiffs allege only that they

19   purchased "pursuant and/or traceable to the offering."  *See, e.g.*, FAC ¶¶ 28-31.  Such allegations

20   are insufficient to state a claim or to confer standing.  *See, e.g.*, *In re Levi Straus & Co. Sec.*

21   *Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007).  Dismissal would be required on that basis

22   alone, but that is only the beginning of the FAC's shortcomings.  Plaintiffs' generic assertions,

23   and the naked conclusion that plaintiffs purchased "in" the Offering (FAC ¶¶ 163-64), are directly

24   refuted by plaintiffs' own certifications and the Underwriter declarations.

25

26        [3] *Accord In re MusicMaker.com Sec. Litig.*, 2001 WL 34062431, at *15 (C.D. Cal. June 4, 2001) (dismissing Section 12(a)(2) claim because plaintiffs failed to allege they purchased shares

27   in the offering); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) ("[L]iability pursuant to section 12(a)(2) only attaches to plaintiffs who purchased their shares

28   directly in the initial public offering, and not the so-called 'aftermarket.'") (citing *Gustafson*).

Importantly, the FAC does not merely fail to plead the facts necessary to confer standing or state a claim; it conclusively demonstrates that plaintiffs <u>cannot</u> plead them.  The FAC acknowledges that the Offering occurred on January 29, 2009 at $4.50 per share.  FAC ¶¶ 17, 72, 126.  Those indisputable facts are also clear from the Prospectus Supplement (RJN Ex. A), which indicates on its face that it was filed on January 29, 2009, and that the price to the public was $4.50 per share, and the declarations submitted with this motion.  Fitzpatrick Decl. ¶ 2; Gregory Decl. ¶¶ 2, 4.

Rather than showing that plaintiffs purchased on January 29 at $4.50, the certifications incorporated by reference in paragraphs 28, 29, 30 and 31 of the FAC show that <u>none</u> of the plaintiffs purchased a single share on that date or at that price:

| PLAINTIFF | DATE(S) | PURCHASE PRICE(S) |
|---|---|---|
| Stuart Wexler | 10/23/08 | $10.14 |
|  | 01/28/09 | $ 4.56 |
|  | 01/30/09 | $ 3.56 |
|  |  |  |
| Peter Abrams | 01/16/09 | $ 8.08 |
|  | 01/28/09 | $ 5.60 |
|  | 01/30/09 | $ 3.79 |
|  | 02/10/09 | $ 4.10 |
|  | 02/26/09 | $ 2.46 |
|  | 02/27/09 | $ 2.26 |
|  |  |  |
| Eric Petzchke | 01/28/09 | $ 4.52 |
|  |  |  |
| Cory McClellan | 01/28/09 | $ 4.0950 |
|  | 01/30/09 | $ 4.1000 |
|  | 01/30/09 | $ 4.0500 |
|  | 02/26/09 | $ 2.4388 |

Plaintiffs' own certifications[4] thus affirmatively establish that all of their purchases were made outside the Offering, at prices other than the Offering price.  Accordingly, the 12(a)(2)

---

[4] Even when they are not attached to and incorporated into the complaint, courts routinely evaluate a plaintiff's certification for purposes of establishing standing.  *See, e.g., In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *5 (D. Mass. Nov. 6, 2007) (examining certification to determine standing under Sections 11 and 12); *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1244 (N.D. Ga. 2002) (examining certification for Section 11 standing).

1 │ claim must be dismissed for lack of standing. *See, e.g., Gustafson*, 513 U.S. at 578; *In re Fuwei*,

2 │ 634 F. Supp. 2d at 445.[5]

3

4 │ **C.      The Section 12 Claim Further Fails Because The Underwriters Were Not Statutory "Sellers."**

5 │      Section 12(a)(2) provides that any person who "offers or sells a security" by means of a

6 │ materially misleading prospectus shall be liable "to the person purchasing such security from

7 │ him." *See* 15 U.S.C. § 77l(a)(2) (emphasis added).  Similarly, the Supreme Court made clear that

8 │ a defendant can be liable only to the "buyer's immediate seller," and that "a buyer cannot recover

9 │ against his seller's seller." *Pinter v. Dahl*, 486 U.S. 622, 643 n.21 (1988).

10 │      The certifications incorporated into plaintiffs' pleading established that none of the four

11 │ plaintiffs purchased stock from the Underwriters in the Offering.  Faced with that fact, and the

12 │ detailed demonstration set forth in the Prior Motion, the best plaintiffs could do in the FAC was

13 │ to add two conclusions, one of which is a mealy-mouthed assertion on "information and belief,"

14 │ that they purchased shares from the Underwriters.  FAC ¶¶ 112, 158.  In addition to being refuted

15 │ by the certifications, those conclusory allegations are demolished by the declarations submitted

16 │ by Credit Suisse and Morgan Stanley.  *See* Fitzpatrick Decl. ¶5; Gregory Decl. ¶ 5.

17 │      Although in certain limited circumstances -- not present here -- liability can extend

18 │ beyond those who literally passed title, the fact that a defendant's activities were a "substantial

19 │ factor" in a sale of securities is insufficient to convert him into a "seller." *Dahl*, at 649-50.

20 │ Rather, "[t]he purchaser must demonstrate direct and active participation in the solicitation of the

21 │ immediate sale" not participation in preparation of the registration statement, or organization of

22

23 │ Plaintiffs expressly reference (and thereby incorporate) into the FAC their certifications that are attached to it.  *See* FAC ¶¶ 28-31.

24 │ [5] *See also Brody v. Homestore, Inc.,* 2003 WL 22127108, at *4 (C.D. Cal. Aug. 8, 2003)

25 │ (dismissing Section 12 claim because complaint failed to allege that purchase was made in initial public offering); *Murphy v. Hollywood Entm't Corp.,* 1996 WL 393662, at *3 (D. Or. May 9, 1996) (dismissing Section 12 claim because plaintiffs "purchased their shares in the after-

26 │ market," not initial offering); *Lopes v. Vieira,* 488 F. Supp. 2d 1000, 1024 (E.D. Cal. 2007) (granting motion to dismiss because complaint failed to allege that purchase was made in initial

27 │ public offering); *In re Azurix Corp. Sec. Litig.,* 198 F. Supp. 2d 862, 892-93 (S.D. Tex. 2002), *aff'd,* 332 F.3d 854 (5th Cir. 2003) (dismissing Section 12(a)(2) claim because purchase was not

28 │ made within initial public offering).

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

1   the offering or other activities necessary to effect the sale.  *Craftmatic Sec. Litig. v. Kraftsow*, 890

2   F.2d 628, 636 (3d Cir. 1989).  *See also Moore v. Kayport Package Express, Inc.,* 885 F.2d 531,

3   537 (9th Cir. 1989); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir.

4   1989).[6]  Plaintiffs who cannot satisfy the "seller" requirement lack standing to assert a claim

5   under Section 12.[7]

6          Despite the demonstration in the Prior Motion, the FAC does not attempt to plead facts

7   that might show that any of the four plaintiffs had any contact or dealings of any kind with the

8   Underwriters -- much less that their immediate sales were directly solicited by them.  It merely

9   alleges that Credit Suisse and Morgan Stanley performed the ordinary services routinely provided

10  by underwriters in all offerings, including that they "served as financial advisors," and

11  "participat[ed]" in the "preparation" and "dissemination" of the Offering documents.  *See, e.g.,*

12  FAC ¶¶ 112, 126, 160.  As noted above, such boilerplate allegations are woefully insufficient.

13          **D.      The Section 11 Claim Fails For Lack of Standing Because**
                    **Plaintiffs' Cannot Trace Their Shares to The Secondary Offering.**

14

15          As this Court has held, plaintiffs do not have standing under Section 11 unless they

16  purchased shares either (1)  in the public offering for which the misleading registration statement

17  was filed, or (2) that are traceable to that public offering.  *Lilley v. Charren*, 936 F. Supp. 708,

18  715 (N.D. Cal. 1996) (Illston, J.).  *Accord Hertzberg*, 191 F.3d at 1080 n.4.  Plaintiffs bear the

19          [6] *See also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1216 (lst Cir. 1996) (dismissing

20  12(a)(2) complaint, finding that "sparse" allegations that defendants were "involve[d] in
    preparing the registration statement, prospectus, and other 'activities necessary to effect the sale
    of the securities to the investing public'" do not show solicitation); *In re Sonus Networks, Inc.*

21  *Sec. Litig.*, 2006 WL 1308165, at *10 (D. Mass May 10, 2006) (finding allegations that
    defendants assisted in "drafting, producing, revising, reviewing, approving and/or executing"

22  documents insufficient to establish seller status); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp.
    2d 1096 (D. Nev. 1998) (holding that mere involvement in the preparation of a registration

23  statement is insufficient to state a claim under Section 12).

24          [7] *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 n.223 (S.D.N.Y. 2007)
    (noting that to have standing to pursue a Section 12 claim, a plaintiff must either purchase from

25  an underwriter, or the underwriter must have "successfully solicited the purchase.") (citing *In re
    Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 283 (S.D.N.Y. 2003); *Griffin v. PaineWebber, Inc.*,

26  2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (finding no standing as plaintiff had not
    "established an actual controversy" due to failure to allege facts that established "seller"

27  status); *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, 2001 WL 300733, at
    *10 (S.D.N.Y. Mar. 28, 2001) (finding allegations that defendants "solicited the sale" of stock is

28  "insufficient to confer standing.")

1    burden on the tracing element of their claims. *Abbey v. Computer Memories, Inc.*, 634 F. Supp

2    870, 876 n.5 (N.D. Cal. 1986).  Because Section 11's liability provisions are expansive, its

3    standing provision is narrow, and "a plaintiff must meet higher procedural standards." *Krim v.*

4    *pcOrder.com, Inc.*, 402 F.3d 489, 495, 496 (5th Cir. 2005).

5          The higher procedural standards governing Section 11 claims require plaintiffs to actually

6    "demonstrate that their shares are traceable to the challenged registration statement." *Id.* at 502.

7    The mere probability that a plaintiff can trace its shares is insufficient. *In re Alamosa Holdings,*

8    *Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 864 (N.D. Tex. 2005).  *See also Krim*, 402 F.3d at 492, 496-

9    98, 502 (holding that 99.85% statistical likelihood of tracing shares to offering is insufficient).

10         Even before *Twombly* and *Iqbal* raised the pleading bar, it was clear that a plaintiff must

11   plead "facts" demonstrating the ability to trace his or her shares to the offering in order to confer

12   Section 11 standing. *Lilley*, 936 F. Supp. at 716 (Illston, J.) (granting motion to dismiss

13   Section 11 claim where plaintiff failed to plead sufficient facts demonstrating tracing). *Accord*

14   *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008) (granting motion to

15   dismiss Section 11 claim where plaintiffs failed to proffer "<u>evidence</u>" demonstrating that the

16   shares could be traced to the secondary offering; *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 978

17   (8th Cir. 2002) (Section 11 claim could proceed only if plaintiffs make "a *prima facie* showing"

18   that the shares they purchased are traceable to the challenged registration statement) (emphasis

19   added).

20         None of the plaintiffs in this case attempts to plead a single fact that might demonstrate

21   that any of the shares they purchased can be traced to the Offering.  The FAC relies instead on the

22   boilerplate conclusion that plaintiffs purchased shares "pursuant to or traceable to the Secondary

23   Offering." FAC ¶¶ 143, 148 and 151.  That pleading formulation was insufficient in the pre-

24   *Twombly/Iqbal* era and does not fare any better now. *See, e.g., Lilley*, 936 F. Supp. at 716;

25   *Peters*, 550 F. Supp. 2d at 1375.

26         Nor is this defect a matter of pleading formalities.  In this case, the fact that plaintiffs did

27   not purchase in the Offering means that they cannot possibly trace their purchases to the Offering.

28

11

1    Each of the purchases made by plaintiffs prior to the Offering is by definition out of the

2    tracing universe.  *See, e.g., Peters*, 550 F. Supp. 2d at 1376 n.76.  The purchases made after the

3    Offering fare no better, because the Offering is a secondary issuance of fungible common stock

4    that was already trading in large volumes.  It is therefore impossible to show that shares

5    purchased in the aftermarket were issued in the Offering, rather than in a prior offering of

6    common stock.  Plaintiffs would lack standing even if it were 99.85% likely that their shares

7    came from the Offering.  *See, e.g., Krim*, 402 F.3d at 492, 502.  In this case the probabilities run

8    exactly the other way.  The 24.5 million shares issued in the Offering were a small drop in a large

9    bucket.  Nearly 75 million shares were trading in the aftermarket following the Offering.  *See*

10    RJN Ex. A at S-8.

11    **E.     Plaintiffs' Conclusory Standing Allegations Fail Under *Twombly* and
          *Iqbal*.**

12

13    The Supreme Court's landmark decisions in *Bell Atlantic Corp. v. Twombly* , 550 U.S.

14    544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), imposed more rigorous pleading

      requirements that further undercut plaintiffs' attempts to plead standing under Sections 11 and 12.
15
      In *Twombly*, the Court held that Rule 8 of the Federal Rules of Civil Procedure require a plaintiff
16
      to plead facts that "raise a right to relief above the speculative level."  550 U.S. at 555.  Only a
17
      complaint that pleads sufficient facts to state a claim for relief "that is plausible on its face" may
18
      avoid dismissal for failure to state a claim.  *Id.* at 570.[8]
19

20    To determine whether Securities Act claims contain enough factual support to meet the

21    "plausibility" standard, *Iqbal* instructs that a court should begin by identifying pleadings that,

22    because they are no more than "conclusions, are not entitled to the assumption of truth" because

23    they are not supported by "factual allegations."  129 S. Ct. at 1950-51.  The Court should then

24    consider whether the remaining fact-based allegations "are not merely consistent with the

25    conclusion that the defendant violated the law, but  . . . actively and plausibly suggest that

26    _____

27    [8] In abolishing the "no set of facts" standard enunciated in *Conley v. Gibson*, 355 U.S. 41
      (1957), the Court noted that this language has been "questioned, criticized and explained away
      long enough" and is "best forgotten as an incomplete negative gloss" on the pleading standard.
28    *Twombly*, 550 U.S. at 562-63.

1    conclusion." *Port Dock & Stone Co. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir.

2    2007) (citing *Twombly*, 550 U.S. at 557).

3         The FAC does not come close to pleading specific facts showing that plaintiffs' claims are

4    "plausible on their face." It shows precisely the <u>opposite</u>. The FAC itself makes clear that

5    plaintiffs did not purchase in the Offering from the Underwriters. Plaintiffs cannot rely on

6    boilerplate conclusions in any circumstances, but their attempt to do so in a complaint that

7    contains <u>facts</u> that <u>refute</u> such conclusions is doubly deficient. The result is exactly the same

8    under Section 11.

9         The fact that none of the plaintiffs makes any pretense of pleading "evidence" or "facts"

10   to support the proposition that any purchase was traceable to the Offering is decisive. *See, e.g.,*

11   *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 469-70 (S.D.N.Y. 2009) (applying *Twombly* and

12   *Iqbal* and dismissing Section 11 and 12(a)(2) claims for failure to plead the requisite "factual

13   content" in support of alleged misstatements and omissions).

14        Apart from the absence of any specific facts, it is clear from the FAC and the underlying

15   documents that tracing plaintiffs' purchases to the Offering is <u>impossible</u>, not merely implausible.

16   That is the end of the story. *See, e.g., Peters*, 550 F. Supp. 2d at 1376 n.78 (citing *Twombly*, 127

17   S. Ct. at 1968) ("wholly conclusory" allegations of standing are insufficient and a complaint

18   cannot withstand a motion to dismiss based on the "possibility" that a plaintiff might later

19   establish some set of undisclosed facts to support recovery). Moreover, even if plaintiffs were

20   permitted to resort to statistics to show that the stock they purchased is "probably" traceable to

21   the Offering (and they are not), it is in fact probable that the shares did <u>not</u> come from the

22   Offering. Again, their post-Offering purchases were made in a pool of 75 million shares of

23   common stock. RJN Ex. A at S-8.

24        **F.    Plaintiffs' Claims Also Fail For Lack of Subject Matter Jurisdiction.**

25        Although the FAC should be dismissed under Rule 12(b)(6), based on the face of the

26   pleadings and the documents from which it is derived, the claims asserted against the

27   Underwriters should also be dismissed pursuant to Rule 12(b)(1) for lack of subject matter

28

1  jurisdiction.  In determining subject matter jurisdiction, the Court can also consider the

2  declarations filed in further support of this Motion.

3      A case is properly dismissed for lack of subject matter jurisdiction under 12(b)(1) when

4  the court lacks the statutory or constitutional power to adjudicate the case.  *See, e.g., Krim*, 402

5  F.3d at 494 (affirming dismissal of Section 11 claim for lack of standing and subject matter

6  jurisdiction).  If a party lacks standing, a court lacks the authority under U.S. Const. Art. III,

7  Sec. 2, (1.1) to render a judgment. [9]

8      Plaintiffs bear the burden of establishing subject matter jurisdiction.  *Colwell v. Dept. of*

9  *Human Services*, 558 F.3d 1112, 1121 (9th Cir. 2009).  In determining whether plaintiffs have

10 discharged their burden, the Court may consider evidence beyond the complaint without

11 converting the 12(b)(1) motion to dismiss into a motion for summary judgment.  *See, e.g., Corrie*

12 *v. Caterpillar, Inc.*, 503 F.3d 974, 980 (9th Cir. 2007); *Safe Air for Everyone v. Meyer*, 373 F.3d

13 1035, 1039 (9th Cir. 2004).

14     As demonstrated in detail above, plaintiffs cannot satisfy their burden of establishing

15 standing to assert claims under Section 11 or Section 12.  Accordingly, both claims must be

16 dismissed for lack of subject matter jurisdiction.  *See, e.g.*, *In re Exodus Commc'n, Inc. Sec.*

17 *Litig.*, 2006 WL 2355071, at *2 (N.D. Cal. Aug. 14, 2006) (granting motion to dismiss for lack of

18 subject matter jurisdiction where plaintiffs did not establish standing to assert a Section 11 claim).

19 **II.    THE FAC'S "SUBSTANTIVE" ALLEGATIONS ARE FATALLY**
20 **       DEFICIENT.**

       Although the absence of standing and subject matter jurisdiction are decisive, the FAC

21

22 suffers from other fatal defects that also require dismissal.  As demonstrated below, plaintiffs'

23 "substantive" allegations are based on a fundamental mischaracterization of the underlying

24 documents, and do not come close to satisfying the pleading standards imposed by *Twombly*,

25

26     [9] For subject matter jurisdiction to exist pursuant to Article III, § 2, there must be a justiciable
   "case" or "controversy."  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).  When a
27 plaintiff cannot allege standing, he or she fails to present a justiciable case or controversy.  *See,*
   *e.g., Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of
28 the common understanding of what it takes to make a justiciable case.").

*Iqbal,* Rule 9(b), or in cases decided in the Ninth Circuit and Northern District prior to *Twombly* and *Iqbal*.

**A.    Plaintiffs Cannot State A Section 11 or 12(a)(2) Claim Based On A Gross Mischaracterization Of The Underlying Documents.**

Plaintiffs cannot evade dismissal by mischaracterizing the documents cited in the FAC. The documents, not the FAC's characterization of them, control for purposes of evaluating a motion to dismiss under Rule 12(b)(6).  *See, e.g., Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *In re Infonet Servs. Sec. Litig.*, 310 F. Supp. 2d 1080, 1087-88 (C.D. Cal. 2003).

Those elemental rules are particularly important here.  The FAC paints a picture that collides head-on with the documents upon which it purports to be based.[10]  Accordingly, the conflicting allegations must be disregarded.  *See, e.g., In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).

Plaintiffs' claims are founded upon the premise that (1) the Prospectus Supplement and the financial statements it incorporated portrayed Century Aluminum as a "cash rich" company with excellent liquidity that was well-positioned to weather a difficult business environment, and (2) there was a dramatic revision of the Company's financial position, cash and liquidity after the Offering.  Both components are false.  The Prospectus Supplement and the 8-K from which those assertions are derived tell a fundamentally different story.

The FAC repeatedly attempts to portray the restatement as working a $924 million reduction in the cash reflected on Century Aluminum's balance sheet statement of in cash flows. *See, e.g.,* FAC ¶¶ 8, 10, 13, 18, 70, 73, 76, 118.  In fact, the March 2, 2009 8-K that describes the restatement, and quantifies the differences between the financial statements as originally reported, and as restated, shows that cash at the end of the reporting period, and net change in cash, were exactly the same before and after the restatement.  RJN Ex. B.  The only change to the statement

---

[10] Documents referenced in the FAC, or filed with the SEC, may be judicially noticed by the Court and considered on a motion to dismiss.  *See*  Fed. R. Evid. 201; *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (holding it was proper for district court to consider SEC filings incorporated by reference into the complaint).  The Underwriters have filed a Request for Judicial Notice ("RJN") contemporaneously with this motion.

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

1   of cash flows was a recharacterization regarding "operating activities" and "financing activities."

2   *Id.* Furthermore, the details of the transaction being reported were fully disclosed in the

3   Prospectus Supplement. *See, e.g.*, RJN Ex. A, at S-5 - S-6, S-37 - S-39, S-41 - S-44.

4       Plaintiffs' claims are based on various allegations that Century Aluminum's financial

5   statements "inflated" the Company's statement of cash flows and "cash position" (*e.g.*, FAC

6   ¶¶ 10, 13, 20), that investors "were being told" that the Company was "cash rich" (*e.g.*, ¶¶ 8, 18,

7   26), and that the Company later "revealed" that Century Aluminum's, "access to cash, and cash

8   on hand" had been dramatically overstated (*e.g.*, ¶ 118). The claims are themselves baseless.

9       The restatement reclassified an amount reported on the operating activity line to the

10  financing activity line. That is all. RJN Ex. B; FAC ¶ 115. Again, the total cash flows -- and the

11  ending cash number and the cash on the balance sheet -- were the same before and after the

12  restatement. Plaintiffs' claims are thus refuted by the very SEC filings upon which they

13  purportedly are based, and should be given no consideration in assessing the viability of their

14  complaint. *See, e.g., In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1078 (N.D. Cal.

15  2003).

16      The FAC's pronouncements that the Company "inflated" its statement of cash flows in

17  connection with the January 2009 Offering (FAC ¶ 115) in order to "lead investors . . . to believe

18  that the Company had sufficient resources to cover any shortfalls … allowing Century Aluminum

19  to easily weather the financial 'storm' which was ravaging the economy" (¶ 116) are also directly

20  contradicted by the Prospectus Supplement. [11] That document repeatedly emphasized the material

21  adverse effects that declining aluminum prices and the global financial crisis were having on the

22  Company's cash flows, liquidity and financial position. RJN Ex. A at S-2, S-4, S-13, S-14. It

23  also specifically warned that actions to reduce costs would be necessary in order to generate the

24

25      [11] *See, e.g.*, RJN Ex. A at S-2 ("If prices remain at current levels or continue to decline, we
    will have to take additional action to reduce costs, including significant curtailment of our
26  operations, in order to have the liquidity required to operate through 2009, and there can be no
    assurance that these actions will be sufficient."); at S-13 ("Recent declines in aluminum prices
27  have adversely affected our financial position and results of operations and could result in a
    curtailment of operations"); S-18 ("A continued downturn in primary aluminum prices may force
28  further curtailment of all or a portion of our operations at one or more facilities.").

1    liquidity required to operate through 2009, and that there could be no assurance such actions

2    would be sufficient.  *Id.* at S-2, S-14, S-23, S-35.  In addition to reporting large losses, and

3    pointedly emphasizing liquidity concerns, the Prospectus Supplement warned that the global

4    financial crisis was taking a serious toll on Century Aluminum's access to credit, and that the

5    Company's credit rating had been reduced by two credit rating agencies.  RJN Ex. A, at S-14, S-

6    18.

7          In statements that are diametrically opposed to the central theme of the FAC, the offering

8    document specifically warned:  (1)  that the downturn in aluminum prices "significantly reduced

9    the amount of cash available to meet [the Company's] current obligations and fund [its] long-term

10   business strategies" (*id.*, at S-18), and (2) "[b]ecause our U.S. operations are not cash flow

11   positive … the Company will need sources of liquidity other than from its operations to fund

12   operations and investments."  *Id.* at S-2.

13         Such pointed warnings and disclosures eviscerate plaintiffs' assertions that Century

14   Aluminum portrayed itself as a cash rich company with ample liquidity, or that it was well-

15   positioned to ride out any financial storm.  Indeed, it is difficult to imagine what more the

16   Prospectus Supplement could have said on the subject.

17         Moreover, the FAC (¶ 62) <u>itself</u> acknowledges that the Prospectus Supplement

18   emphasized that Century Aluminum had been forced to take "a number of drastic actions,"

19   including shutting down the Ravenwood aluminum smelting plant and laying off 120 employees,

20   reducing overall staffing by 13%, and curtailing production and development of other facilities.

21   The FAC (¶ 63) further notes that the Prospectus Supplement disclosed that "[a]s a result of all

22   these economic pressures, Century Aluminum was forced to seek an additional influx of cash …"

23   through a public offering of stock. [12]

24   ────────────────

         [12] The allegations in the FAC are plainly contradictory; parts of the FAC include allegations
25   that investors believed the Company was "cash rich," yet other parts discuss the Company's
     difficulties due to the downturn in the economy.  *Compare* ¶ 18 (alleging investors invested
26   "believing that the Company was liquid and cash rich") and ¶ 76 ("shareholders and potential
     investors in Century Aluminum were being told that the Company was cash rich") *with* ¶ 55 ("in
27   mid-2008 Century Aluminum found itself in debt to the tune of over three quarters of a billion
     dollars" to Glencore) and ¶¶ 59, 61 (allegations relating to the Company's losses).  Thus, not only
28   do the judicially noticeable documents undermine plaintiffs' baseless theory of the case, their
     own complaint refutes their central claim that the Company was telling investors it was "cash

UNDERWRITERS' NOTICE OF MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

## B.    Plaintiffs Fail To Plead Specific And Plausible Facts.

As demonstrated above, the FAC and plaintiffs' incorporated certifications demonstrate that they did not purchase in the Offering, and thus preclude any plausible claim to the contrary. Nor do plaintiffs plead any facts that might support the assertion that the Underwriters were statutory sellers, or that they failed to conduct adequate due diligence in connection with the Offering.  Indeed, the FAC and underlying documents severely undercut those conclusory claims.

"[C]onclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences are insufficient to defeat a motion to dismiss."  *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 957 (N.D. Cal. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  While factual allegations are generally taken as true, that is not a license to rely on allegations or inferences that are unreasonable.[13]  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).  As noted above, *Twombly* and *Iqbal* amplified these well-established principles by instructing courts to reject at the pleading stage conclusory allegations which do not rise above the "speculative" level and do not state a "plausible" claim.  *Twombly*, 550 U.S. at 555; *Iqbal*, 129 S.Ct. at 1949-51.

Because plaintiffs' allegations that the Underwriters "knew" of the alleged accounting error and intentionally failed to correct it (FAC ¶¶ 126, 128, 162) "sound in fraud," the FAC thus must <u>also</u> comply with the heightened requirements of Rule 9(b).  *See, e.g., In re Stac*, 89 F.3d at 1405-06 (Rule 9(b) applies to a Securities Act claim where it is "grounded in fraud").

The FAC makes no attempt to plead any facts to support plaintiffs' bare-bones accusation that the Underwriters *"were aware of"* (FAC ¶¶ 126, 128), "knew of," or "should have known of" (FAC ¶ 162) the accounting error alleged but went forward with the Offering anyway and does not come close to satisfying the heightened specificity requirements of Rule 9(b).  Plaintiffs plead no facts at all regarding who supposedly had this knowledge, or how or when it was obtained.

rich."

[13] *See also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2009) (noting that courts, when examining 12(b)(6) motions, have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations").

1    Nor do they plead with particularity -- or at all -- how the Underwriters could have possibly

2    detected the accounting error, or why they would or should have second-guessed Century

3    Aluminum's accounting professionals and outside auditors.

4         In addition, it is simply not "plausible" that the Underwriters would deliberately disregard

5    a known accounting error.  *See e.g., Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal.

6    1998) (rejecting argument that underwriters were motivated to commit fraud in order to "get the

7    underwriting business" for the IPO and "pocket millions from the IPO proceeds as the lead

8    underwriters"); *In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *9 (S.D.N.Y. Mar. 31, 1999)

9    (noting "it would be unlikely for the Underwriter Defendants to risk their reputations in order to

10   generate fees likely amounting to only a small percentage of their annual revenues") (internal

11   punctuation omitted).

12

13   **III.   THE FORWARD-LOOKING STATEMENT REGARDING LIQUIDITY
        EXPECTATIONS PROVIDES NO BASIS FOR ANY CLAIM.**

14        Plaintiffs' attempt to rely upon the forward-looking statement (FAC ¶¶ 19, 73, 118, 124)

15   that the Company expected to have "sufficient liquidity to fund [its] operations for approximately

16   the next 18 months" goes nowhere.  FAC ¶¶ 19, 73, 118, 124, RJN Ex. A at S-2, S-14.  The FAC

17   fails to allege facts that might show that the statement was false, and it is impossible for plaintiffs

18   to do so.  Nor do plaintiffs account for the fact that the statement was accompanied by detailed

19   cautionary language, and is therefore protected under both the "bespeaks caution" doctrine, and

20   the Safe-Harbor provisions of the Private Securities Litigation Reform Act of 1995.

21        **A.   <u>Plaintiffs Cannot Plead That The Forward-Looking Statement
                  Regarding Liquidity Expectations Is False.</u>**

22        The forward-looking statement regarding Century Aluminum's expectation that it would

23   have sufficient liquidity to fund operations for approximately 18 months is amorphous and

24   inherently cautionary.[14]  Plaintiffs plead nothing that might show that it was false, and it is

25   impossible for them to do so.

26   _____

27   [14] Language within the statement itself is also cautionary.  The Company stated it "would
     <u>expect</u> to have sufficient liquidity," and expectations suggest uncertainty.  RJN Ex. A at S-2
28   (emphasis added); s*ee, e.g., In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294
     (S.D.N.Y. 2009) (finding that the use of the word "'estimate' . . . is inherently cautionary, as the

First, as of the date of this Motion, only thirteen of the eighteen months referenced in the statement have passed, and Century Aluminum continues to fund its operations and in fact is prospering.[15]  It is therefore impossible for the statement to be false at this time.  Nor does the FAC plead facts that might show that the Company did <u>not</u> expect to be able to fund its operations for 18 months, or that the statement lacked any reasonable basis.

Second, the suggestion that the statement is false and/or materially misleading is based on plaintiffs' gross mischaracterization of the restatement.  As discussed in detail at pages 15 through 17 above, Century Aluminum's cash on hand, net cash flows and liquidity remained exactly the same before and after the restatement.  All that occurred was a reclassification of cash relating to operating activities to cash related to financing activities within the statement of cash flows.

B.     **The Statement Is Non-Actionable Under The Bespeaks Caution Doctrine.**

Even if plaintiffs could plead that the statement regarding Century Aluminum's liquidity expectations was false, and had done so, the statement would be non-actionable under the "bespeaks caution" doctrine because it was accompanied by pointed cautionary language and specific warnings.  *See, e.g.*, *In re Stac*, 89 F.3d at 1408 ("We have recognized that the 'bespeaks caution' doctrine provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendants against claims of securities fraud.").[16]

---

word 'estimate' connotes uncertainty.").

[15] In fact, over the thirteen-month period, the Company's performance has improved, and its stock price is trading significantly higher than the $4.50 purchase price in the Offering.  *See* separate motion to dismiss filed by the Century Aluminum defendants at 3, 11, 19.

[16] *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994) ("The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud."); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1092 (C.D. Cal. 2003) (reading the prospectus as a whole and determining it contained "ample specific cautionary language to put a reasonable investor on notice" of risks).  *See also Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994) ("[T]he 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.").

1    In bold-faced type adjacent to the alleged misstatement, the Prospectus Supplement

2    warned:

3          Our financial position and liquidity have been and will continue to
           be materially adversely affected by declining aluminum prices.  If
4          prices remain at current levels or continue to decline, we will have
           to take additional action to reduce costs, including significant
5          curtailment of our operations, in order to have the liquidity required
           to operate through 2009, and there can be no assurance that these
6          actions will be sufficient.

7    RJN Ex. A at S-2 (emphasis added).

8          Just two sentences prior to the forward-looking statement, the Prospectus Supplement

9    again explicitly warned that liquidity was an issue, and that Century Aluminum faced challenges

10   in addressing it:  "Because our U.S. operations are not cash flow positive at recent aluminum

11   prices and our Icelandic operations are breaking even at recent prices, we will need sources of

12   liquidity other than our operations to fund operations and investments."  Id.  (emphasis added).

13         The forward-looking liquidity statement again appears on page S-14 of the Prospectus

14   Supplement, and is immediately followed by specific risk disclosures:

15         However, if (1) primary aluminum prices were to remain on
           average at or around recent levels, or were to decline further, or (2)
16         our expected liquidity sources, none of which is contractually
           committed, does not materialize, or (3) our costs are higher than
17         contemplated, or (4) we suffer unexpected production outages, or
           (5) Icelandic laws change and limit our access to cash flow there,
18         we would need to identify additional sources of liquidity sooner and
           the period of time for which we would be confident in our liquidity
19         position would be shorter.

20   Id. at S-14 (emphasis added).

21         These prominent and specific warnings of risks are cautionary statements that directly

22   address the factors that could change the Company's predictions as to its future liquidity.  In re

23   Novagold, 629 F. Supp. 2d at 294 (approving warnings placed "prominently and specifically" at

24   the beginning of a registration statement and again in bold text).  No reasonable investor could

25   have been misled by the statement of future expectations, as the Prospectus Supplement was

26   replete with cautionary statements about future risks.  Worlds of Wonder, 35 F.3d. at 1415

27   (applying bespeaks caution doctrine to disclosures in prospectus regarding liquidity).

28   Accordingly, plaintiffs' claims relating to the liquidity statement must fail.

1

2

**C.      The Statement Is Protected By The Reform Act's Safe Harbor Provisions.**

The purported misstatement is further protected by the Safe Harbor provisions of the Act.

15 U.S.C. § 77z-2.  The safe harbor applies whenever a forward-looking statement <u>either</u> (1) was

accompanied by "meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the forward-looking statement" or (2) was not

made with actual knowledge of falsity.  *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F.

Supp. 2d 1150, 1164 (C.D. Cal. 2003) ("[T]hese two prongs of the safe harbor provision are taken

to be independent, alternative means by which a defendant may insulate itself from liability").

The Prospectus Supplement identified the statement regarding Century Aluminum's

liquidity expectations as forward-looking by noting that such statements "may be identified by the

use of forward-looking words such as 'expects.'" RJN Ex. A at B-2.  *See In re Novagold*, 629 F.

Supp. 2d at 293 (general notation that registration statement issued in connection with secondary

offering contained forward-looking statements triggered the PSLRA's safe harbor); *Baron v.

Smith*, 380 F.3d 49, 53-54 (1st Cir. 2004).

Both prongs of the safe harbor apply here.  As noted above, the forward-looking statement

regarding liquidity was accompanied by pointed cautionary language that identified the specific

factors, including changes in operations and the fluctuating price of aluminum, that could

adversely impact the Company's future liquidity.  Moreover, even if the statement had been false,

plaintiffs have alleged no facts that suggest the Underwriter Defendants would have had "actual

knowledge" that it was false at the time it was made.  *See, e.g.,  In re Daou Sys., Inc.*, 411 F.3d

1006, 1021 (9th Cir. 2005).

**IV.     THE FAC FAILS TO PLEAD FACTS SHOWING THAT THE UNDERWRITERS BREACHED THEIR DUTY OF "DUE DILIGENCE."**

The FAC's naked assertions that the underwriters breached "a duty to make a reasonable

and diligent investigation" of the truth of the statements in the Prospectus Supplement (FAC

¶¶ 147, 162) are also woefully deficient.  Plaintiffs do not, and cannot, plead any facts in support

of this conclusion, which is contradicted by the FAC and the documents from which it

22

1    purportedly is derived.  That fundamental shortcoming is independently fatal to the claims

2    asserted against the Underwriters.  *See, e.g., In re Late Fee*, 528 F. Supp. 2d at 957 ("[c]onclusory

3    allegations of law … are insufficient to defeat a motion to dismiss"); *Sprewell*, 266 F.3d at 988.

4        The misstatement alleged in the FAC is generated by a GAAP interpretation that is far

5    outside the expertise or role of underwriters.  Underwriters are not accounting experts, and do not

6    audit, review or "certify" financial statements for compliance with GAAP.  That is the province

7    of accountants and outside auditors.  As the Prospectus Supplement makes clear, the financial

8    statements used in the Offering, and the internal controls used to generate them, were audited

9    and/or reviewed by Deloitte & Touche LLP, which consented to use of its name as an expert in

10   connection with the Offering.  RJN Ex. A at S-53, B-6.  The fact that expert accountants failed to

11   identify the fact that GAAP required a reclassification within the statement of cash flows makes

12   clear that the determination was well beyond the scope and expertise of underwriters.

13       Plaintiffs do not -- and plainly cannot -- plead anything that might support the wholly

14   conclusory assertion that the Underwriters violated a duty to conduct a reasonable and diligent

15   investigation.  *See, e. g., In re Worlds of Wonder*, 35 F.3d 1407, 1421 (9th Cir. 1994) ("It is

16   absurd…for Plaintiffs to suggest that the other defendants, who are not accountants possibly

17   could have known of any mistake by [the auditors].  Therefore, even if there are errors in the

18   financial statements, no defendant except [the auditors] can be liable under section 11 on that

19   basis").  The FAC makes no attempt of any kind to plead how or why the Underwriters

20   purportedly breached their duties, or why it was not reasonable for them to have relied on Deloitte

21   & Touche.

22       Even if the Court were to disregard plaintiffs' repeated allegations that the Underwriters

23   are liable because they breached their duty to conduct reasonable due diligence, and treated due

24   diligence solely as an affirmative defense, dismissal would still be appropriate because the

25   defense would be established on the face of the pleadings.  As a matter of law, the Underwriters

26   were entitled to rely on the accountants' review of the financial statements used in the Offering.

27   *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 1174-75, 1182 (C.D.

28   Cal. 2008) ("Underwriter Defendants have a due diligence defense on the face of the [Complaint]

1  as a matter of law.  The defense only covers <u>accounting-related</u> allegations in one year.  This is

2  because underwriters may reasonably rely on auditors' statements, absent red flags that the

3  underwriters were in a position to see.") (emphasis in original).

4  **V.    PLAINTIFFS' SECTION 15 CLAIM FOR "CONTROL PERSON"
       LIABILITY AGAINST THE UNDERWRITERS MUST BE DISMISSED.**

5

6      A.    <u>Plaintiffs' Section 15 Claim Fails For Lack Of Standing And Subject
             Matter Jurisdiction.</u>

7          To state a claim for control person liability, a plaintiff must allege: (1) a primary violation

8  of the securities laws; (2) that the defendant exercised actual power or control over the primary

9  violator; and (3) that the defendant possessed the power to directly or indirectly control the

10  specific transaction that is the focus of the primary violation.[17]  *Howard v. Everex Sys., Inc.*, 228

11  F.3d 1057, 1065 (9th Cir. 2000); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151

12  (9th Cir. 1996).  The FAC does not come close to alleging a primary violation and makes no

13  pretense of attempting to allege either of the other two elements.

14          Because plaintiffs have failed to allege a primary violation of Section 11 or 12, their

15  Section 15 claim must likewise be dismissed.  *Howard*, 228 F.3d at 1065 (holding that a primary

16  violation of the securities laws is required for control person liability); *Rubke v. Capitol Bancorp*

17  *Ltd.*, 460 F. Supp. 2d 1124, 1151 (N.D. Cal. 2006), *aff'd*, 551 F.3d 1156 (9th Cir. 2009)

18  (dismissing Section 15 claim for failure to plead primary violation).

19          In addition, because plaintiffs do not have standing to assert a primary violation of the

20  securities laws against the Underwriters, they similarly lack standing to assert a claim for

21  secondary liability under Section 15.  *In re Exodus Commc'n, Inc. Sec. Litig.*, 2006 WL 1530081,

22  at *2 n.2 (N.D. Cal. June 2, 2006) (noting that if a plaintiff "lacks standing to assert a § 11 claim,

23  he likewise lacks standing to assert his § 15 claim.")  *See also In re MusicMaker.com*, 2001 WL

24  34062431 at *15; *Brody*, 2003 WL 22127108, at *4.  Absent standing plaintiffs cannot

25  demonstrate subject matter jurisdiction.  *See In re Exodus*, 2008 WL 2355071, at *2.

26

27

28          [17] Controlling person analysis is the same under Section 15 of the 1933 Act and under Section 20(a) of the 1934 Act.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990).

**B.**     **Plaintiffs Cannot Otherwise Plead A Section 15 Claim Against The Underwriters.**

Even if plaintiffs could show a primary violation, they do not (and could not possibly) plead <u>facts</u> that would state a claim against the Underwriters as control persons. *Lilley*, 936 F. Supp. at 716-17 (dismissing control person allegations where plaintiffs failed to allege "facts" showing that each defendant "possessed the actual power to control the person primarily liable.") *See also Howard*, 228 F.3d at 1065; *In re Exodus Commc'n, Inc. Sec. Litig.*, 2005 WL 1869289, at *45 (N.D. Cal. Aug. 5, 2005). Underwriters do not control issuers. *See, e.g., In re Stratosphere*, 1 F. Supp. 2d at 1122. Rather, the management of the Company and its officers and directors control the affairs of the corporation. *See, e.g.*, 8 Del. C. § 141(a); 2 Fletcher Cyc. Corp. § 495.

# CONCLUSION

Plaintiffs are represented by highly skilled counsel who know how to plead a claim when one exists, and have had ample opportunity to do so. They have failed because the core defects discussed above are both fundamental and irremediable. No further amendment could confer standing or overcome the absence of subject matter jurisdiction. Accordingly, the FAC should be dismissed with prejudice.

Dated: February 26, 2010                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By:  _____*/s/ Robert P. Varian*_____
                          Robert P. Varian

Attorneys for Defendants
MORGAN STANLEY & CO. INCORPORATED
AND CREDIT SUISSE SECURITIES (USA) LLC