FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re* CENTURY ALUMINUM<br>COMPANY SECURITIES LITIGATION<br>_____<br><br>This document relates to all actions.<br>_____ | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

Case No.  C 09-1001 SI
[Consolidate With Case Nos. C 09-1103 SI,
C 09-1162 SI, C 09-1205 SI]

**PLAINTIFFS' OPPOSITION TO THE
CENTURY DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS'
CONSOLIDATED CLASS ACTION
COMPLAINT (SECURITIES AND
EXCHANGE ACT OF 1934)**

DATE:        April 16, 2010
TIME:        9:00 A.M.
DEPT.       10, 19th Floor
JUDGE:      Hon. Susan Illston

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i-v

I.    INTRODUCTION............................................................................................................ ii

II.   BACKGROUND................................................................................................................3

      A.   Exchange Act Allegations Against Century Aluminum Defendants....................3

      B.   Background ...........................................................................................................5

      C.   Century Aluminum's False Financial Statements................................................7

      D.   Loss of Stock Value After the Truth is Disclosed................................................9

III.  LEGAL STANDARDS....................................................................................................10

IV.   ARGUMENT ...................................................................................................................10

      A.   Standards Applicable to Exchange Act Claims .................................................10

      B.   Defendants' Repeated Misstatement of Cash Flow
           From Operations in the Amount of $928 Million is a
           False and Misleading Statement of Material Fact..............................................11

           1.   The Statement That Century Aluminum had $204 Million in net
                Cash Provided by Operating Activities is False.........................................11

           2.   A Misstatement of $928 Million in Cash From Operating
                Activities is Material to any Reasonable Investor......................................13

           3.   The Financial Statements in the November Quarterly Report
                and January 2009 Registration Statement are not Forward-Looking........17

      C.   The Complaint Alleges Facts Raising a Strong Inference of
           Scienter as to the Century Aluminum Defendants.............................................17

           1.   The Complaint Alleges Significant Direct and
                Circumstantial Evidence of Scienter as to the Officer Defendants...........17

           2.   The Officer Defendants, Given Their Day-to-Day
                Responsibility for an Monitoring of Century Aluminum's
                "Core" Operations, Knew or Recklessly Disregarded the
                Facts Contradicting the Public Statements of Cash Flow From Operations............19

      D.   Plaintiffs More Than Sufficiently Pled Loss Causation Under Section 10(b)................22

V.    LEAVE TO AMEND SHOULD BE FREELY GRANTED ...................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

*Applied Signal Tech.,*
527 F.3d at 989 .................................................................................................................. 25

*Atlas v. Accredited Home Lenders Holding Co.,*
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................................................... 19

*Basic, Inc. v. Levinson,*
485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) .................................................. 23

*Berson v. Applied Signal Tech., Inc.,*
527 F.3d 982 (9th Cir. 2008) ........................................................................................... 19

*Boucher v. Shaw,*
572 F.3d 1087 (9th Cir. 2009) ......................................................................................... 24

*Caiafa v. Sea Containers Ltd.,*
525 F. Supp. 2d 398 (S.D.N.Y. 2007) ............................................................................. 12

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) .......................... 1, 10, 22, 23

*Durning v. First Boston Corp.,*
815 F.2d 1265 (9th Cir. 1987) ......................................................................................... 16

*Eminence Capital, LLC v. Aspeon, Inc.,*
316 F.3d 1048 (9th Cir. 2003) ......................................................................................... 25

*Foman v. Davis,*
371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ...................................................... 25

*Fouad v. Isilon Sys., Inc.,*
No. C07-1764 MJP,
2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ............................................................ 18

*Garbini v. Protection One, Inc.,*
49 Fed. Appx. 169 (9th Cir. 2002) .................................................................................. 15

*Howard v. Everex Sys., Inc.,*
228 F.3d 1057 (9th Cir. 2000) ......................................................................................... 18

*In re Cadence Design Systems, Inc. Securities Litig.,*
No. 08-4966 SC,
2010 WL 726515 (N.D. Cal. March 2, 2010) ............................................................ 20, 21

*In re Connectics Corporation Securities Litig.,*
No. C07-02940 SI,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ................................................................ 18

*In re Countrywide Fin. Corp. Derivative Litig.,*
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..................................................................... 19, 20

*In re Cylink Sec. Litig.,*
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ...............................................................................12, 13

*In re Daou Sys.,*
  411 F.3d 1006 ...............................................................................................2, 11, 22, 25

*In re Gilead Sciences Sec. Litig.,*
  536 F.3d 1046 (9th Cir. 2008) ...............................................................................22

*In re Lattice Semiconductor Corp. Sec. Litig.,*
  No. CV 04-1255 AA,
  2006 WL 538756 (D. Or. Jan. 3, 2006) ...............................................................................22

*In re NationsMart Corp. Sec. Litig.,*
  130 F.3d 309 (8th Cir. 1997) ...............................................................................17

*In re NovaGold Res. Inc. Sec. Litig.,*
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...............................................................................14

*In re Peoplesoft Sec. Litig.,*
  No. 99-00472 WHA,
  2000 WL 1737936 (N.D. Cal. May 25, 2000) ...............................................................................18

*In re PMI Group, Inc. Securities Litig.,*
  Nos. C-08-1405 SI, C-08-1406 SI,
  2009 WL 1916934 (N.D. Cal. July 1, 2009) ...............................................................................10, 15, 18, 22

*In re Proquest Sec. Litig.,*
  527 F. Supp. 2d 728 (E.D. Mich. 2007) ...............................................................................22

*In re Silicon Graphics,*
  183 F.3d 970 (9th Cir. 1999) ...............................................................................18

*In re Telxon Corp. Sec. Litig.,*
  133 F. Supp. 2d 1010 (N.D. Ohio 2000) ...............................................................................12

*In re The Goodyear Tire & Rubber Co. Sec. Litig.,*
  436 F. Supp. 2d 873 (N.D. Ohio 2006) ...............................................................................12

*In re Trans World Airlines, Inc. S'holders Litig.,*
  C.A. No. 9844, 1988 WL 111271 (Del. Ch. Oct. 21, 1988) ...............................................................................16

*In re UTStarcom, Inc. Sec. Litig.,*
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................................15

*Isquith v. Middle S. Utils.,*
  847 F.2d 186 (5th Cir. 1988) ...............................................................................16

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F.3d 940 (9th Cir. 2005) ...............................................................................17

*Marucci v. Overland Data, Inc.,*
  No. 97CV0833-TW (JFS),
  1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) ...............................................................................16

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................................................25

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
  523 F.3d 75 (1st Cir. 2008) ....................................................................................20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West.*,
  320 F.3d 920, 943-44 ....................................................................................18, 20, 23

*Nursing Home Pension Fund, Local 144 v. Oracle*,
  380 F.3d 1226 (9th Cir. 2004) ................................................................................19

*O'Malley v. Boris*,
  742 A.2d 845 (Del. 1999) .......................................................................................16

*Rudolph v. UTStarcom*,
  No. C07-04578 SI,
  2008 WL 4002855 (N.D. Cal. Aug. 21, 2008)...................................................18, 20

*S. Ferry LP., No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................17, 18

*S.E.C. v. Conaway*, --- F.Supp.2d ----,
  2010 WL 318283 (E.D. Mich. Jan. 20, 2010)..........................................................13

*S.E.C. v. Murphy*,
  626 F.2d 653 (9th Cir. 1980) ..................................................................................14

*Shaev v. Saper*,
  320 F.3d 373 (3rd Cir. 2003) ..................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)................................2, 11, 18

*Thor Power Tool Co. v. Comm'r*,
  439 U.S. 522, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979) ...........................................12

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)......................................13, 14

*United States v. Reyes*,
  577 F.3d 1069 (9th Cir. 2009) ................................................................................14

*West v. Prudential Securities, Inc.*,
  282 F.3d 935 (7th Cir. 2002) ..................................................................................24

*Zell v. InterCapital Income Sec. Inc.*,
  675 F.2d 1041 (9th Cir. 1982) ................................................................................16

*Zucco Partners LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................................19

**STATUTES**

15 U.S.C.
  § 77 et seq ................................................................................................................1, 3

§ 78 *et seq* ...................................................................................................................1
§ 78 *et seq.* ..................................................................................................................3
§ 78j(b) ....................................................................................................................3, 13
§ 78t(a) .........................................................................................................................3
§ 78u-4(b)(2) ...............................................................................................................10
§ 78u-5(c)(1) ...............................................................................................................17

17 C.F.R.
§ 240.10b-5 ................................................................................................................10

**RULES**

Federal Rule of Civil Procedure (Fed. R. Civ. P.)
Rule 9(b) .....................................................................................................................10
Rule 12(b)(6) ..............................................................................................................10
Rule 15(a)(2) ..............................................................................................................25

**OTHER AUTHORITIES**

Alan D. Holtz, *Liquidity is Lord: Evaluating Imminent Financial Distress*,
18-NOV Am. Bankr. Inst. J. 12 1999) ..........................................................................13

John R. Kroger, *Enron, Fraud, and Securities Reform: An Enron Prosecutor's Perspective*,
76 U. Colo. L. Rev. 57, 72 (2005) ................................................................................13

Lee B. Shepard, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*,
57 Hastings L.J. 891, 915 n.180 (2006) .......................................................................13

Leia Michele Toovey, *Aluminum's Path to the Bottom, Are We There Yet?*, Aluminum Investing
News, Oct. 28, 2008, at *1, *available at* http://aluminuminvestingnews.com/aluminum-articles/55/aluminum%E2%80%99s-path-to-the-bottom-are-we-there-yet
(last visited March 9, 2010) .......................................................................................5, 6

Marcia Vickers, *The Rich Boys: An ultra-secretive network rules independent oil trading. Its
mentor: Marc Rich*, BusinessWeek, July 18, 2005,
*available at* http://www.businessweek.com (last visited March 10, 2010) ...................................9

Standard & Poor's, Inc.,
2005 Corporate Ratings Criteria 8-9, 19 (2005) ...........................................................13

Timothy P. Carney, *The story of Clinton's Marc Rich Pardon: Co-conspirators serve time while
multimillionaire enjoys clemency*, World Net Daily, February 05, 2001,
*available at* http://www.wnd.com (last visited March 10, 2010) ....................................9

USGS, *Mineral Commodity Summaries: Aluminum*, at *19 (January 2009), *available at*
http://minerals.usgs.gov/minerals/pubs/commodity/aluminum/mcs-2009-alumi.pdf
(last visited March 9, 2010) ..........................................................................................5

# I.     INTRODUCTION

This is a consolidated federal securities class action that separately sets forth claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 *et seq.*, and under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 *et seq.* This Memorandum addresses *only* the Century Defendants' Motion to Dismiss as it relates to Plaintiffs' Exchange Act claims. Plaintiffs' opposition to the Century Defendants' Motion to Dismiss as it relates to the Securities Act claims is contained in Plaintiffs' Omnibus Opposition to the Century Defendants' and the Underwriter Defendants' Motion to Dismiss and is incorporated by reference as if fully set forth herein.

Plaintiffs' allegations (and the fraudulent scheme that they describe) are straight-forward, primarily relate to a single key accounting precept, and stem from a misstatement of cash flows from operations in a quarterly report and registration statement, both filed with the Securities and Exchange Commission ("SEC"). In the "Summary of Consolidated Financial Data" section of both documents, Century Aluminum Company ("Century Aluminum" or the "Company") falsely reported a surplus of $204,875,000 in "Adjusted net cash provided by operating activities." In reality, Century actually had *negative $698,721*,000 in Cash from Operations. This is a discrepancy of over $928 million, resulting in a conclusion that not only was the Company not in a position to be making significant cash from its operating activities, but was actually losing millions from its operations.

In order to defeat a motion to dismiss, under the Exchange Act claims, plaintiffs must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a causal connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005). Here, the Century Aluminum Defendants [1] only challenge the adequacy of Plaintiffs'

---

[1]     The Century Aluminum Defendants are Century Aluminum, Logan W. Kruger, Michael A. Bless, Steve Schneider, John C. Fontaine, Jack E. Thompson, Peter C. Jones, John P. O'Brien, Willy R. Strothotte, Jarl Berntzen, Wayne R. Hale, Robert E. Fishman and Catherine Z. Manning.

1    allegations as to falsity, scienter and loss causation, which Plaintiffs sufficiently allege.

2          First, the Century Aluminum Defendants concede that the Company's SEC filings falsely

3    reported that Century Aluminum had a positive cash flow of $230 million from operations, when

4    in reality Century Aluminum had a deficit of $698 million – a misstatement of $928 million in

5    cash flows from operations in a Company in the midst of a liquidity crisis.  *See* Century

6    Defendants' Motion to Dismiss First Amended Consolidated Class Action Complaint ("Century

7    Mem.") [Dkt No. 69] at 2-4, 16-19. No matter how the Century Aluminum Defendants may

8    characterize these financial statements, they were false and a $928 million misstatement of cash

9    flow from operations in a Company facing a liquidity crisis is material to any reasonable investor.

10         Next, Plaintiffs have met the *Tellabs* standard and adequately alleged a strong inference of

11   scienter which is "at least as likely as any plausible opposing inference."  *Tellabs, Inc. v. Makor*

12   *Issues & Rights, Ltd.*, 551 U.S. 308, 311, 328, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).  As the

13   Century Aluminum Defendants concede, the Company was under extreme and unprecedented

14   economic pressures from the various sources:  Glencore International, Ltd. ("Glencore") and the

15   cancellation of two derivative hedging contracts, a worldwide financial crisis, and the crash in

16   aluminum prices.  All of these factors created a desperate and immediate need for cash if the

17   Company was to survive.  Century Mem. at 2:26, 2-4, 16-19.  To address this unprecedented need

18   for cash, Plaintiffs allege that the Century Aluminum Defendants undertook a fraudulent scheme

19   to raise the necessary and critical funding through a secondary offering in January 2009.  The false

20   financial statements in the Registration Statement were key to this plan, which probably would not

21   have succeeded otherwise.  The scheme did succeed and, as the Century Aluminum Defendants

22   put it: "Century did survive 2009."  Century Mem. at 3:5.

23         Finally, the Amended Complaint sufficiently connects the false statements at issue with the

24   economic harm done to the Plaintiffs and class members.  *See In re Daou Systems, Inc.*, 411 F.3d

25   1006, 1026 (9th Cir. 2005).  A precipitous fall of 24% in the value of Century Aluminum's

26   common stock after the disclosure of the error in the quarterly report and the necessary

27   restatement and a 87% drop from the Class Period (defined *infra*) high adequately connects the

28

1    false statements to the stock drop and satisfies the element of loss causation.[2]

2    **II.      BACKGROUND**

3         **A.      Exchange Act Allegations Against Century Aluminum Defendants**

4         Plaintiffs allege that the Century Aluminum Defendants acted knowingly or were

5    deliberately reckless in issuing two materially false financial statements relating to cash flow from

6    operations and failing to disclose material facts concerning the Company's financial condition

7    between October 21, 2008 and March 2, 2009, inclusive (the "Class Period") and thus, are liable

8    to purchasers of Century Aluminum common stock during the Class Period for violations of

9    sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively.[3]

10        The First Amended Complaint sufficiently alleges that Century Aluminum undertook a

11   fraudulent scheme to raise money by inflating the Company's stated cash-on-hand.  ¶¶ 52-104.[4]

12   This was done by improperly accounting for the paper 'proceeds' of a redemption of convertible

13   stock as "cash flows from operating activities," rather than as its proper classification, cash from

14   financing activities.  *Id.*; *see also id.* at 25:16-18, 27:5-7, 31:12-15.  Century Aluminum then

15   falsely reported in its quarterly report, (Century Aluminum Co., Quarterly Report (Form 10-Q), at

16   *3, 30, 37 (November 10, 2008)) ("November Quarterly Report"), that the Company had a surplus

17   of $230,759,000 in free cash flows provided by operating activities in the third fiscal quarter of

18   2008, when in reality Century Aluminum had a deficit of $698,721,000.  ¶¶ 10, 13, 77.  No matter

19   how it is characterized by the parties, no one disputes that the Company reported **$929,480,000**

20   **more in cash from operations than was actually in the Century Aluminum coffers and that**

21   **this statement was false when made**.  ¶¶ 13, 77, 117; Century Mem. at 6.

---

22   2     As discussed, *infra*, Plaintiffs' calculation takes into account Century Aluminum's price on January
23   21, 2009 ($8.00) just prior to the Offering and its March 9, 2009 price ($1.06), a few days after the
     Offering.

24   3     As noted above, the Century Aluminum Defendants do not challenge the sufficiency or adequacy
25   of Plaintiffs' section 20(a) claim (15 U.S.C. § 78t(a)) as to control person liability except to the extent that
     a primary violation under section 10(b) (15 U.S.C. § 78j(b)) is not stated.  Century Mem. at 24-25.

26   4     All references to "¶" refer to the paragraph numbers in the First Amended Consolidated Class
27   Action Complaint for Violation of the Securities Act of 1933, 15 U.S.C. § 77 *et seq.*, and the Securities
     Exchange Act of 1934, 15 U.S.C. § 78 *et seq.* ("First Amended Complaint") [attached as Exhibit B to Dkt
28   No. 66].

---

With the inflated statement of cash flows in place, Century Aluminum was able to seek, as the Century Aluminum Defendants concede, a desperately needed additional influx of $100 million through a public offering of stock ("January 2009 Offering"). ¶¶ 11, 63; *see* Century Mem. at 2-4, 16-19. Thus, in February 2009, pursuant to a registration statement ("January 2009 Registration Statement"), the Century Aluminum Defendants again incorporated the false statement of cash flows identical to that reported in the November Quarterly Report. ¶¶ 11, 17, 19, 72-73. The Century Aluminum Defendants knew or should have known, based on their own public admissions relating to the Company's critical liquidity situation, that cash flow from operations was overstated by $928 million and false and misleading when made. With the help of the overstated cash flow from operations, Century Aluminum raised $104 million by completing the January 2009 Offering of 24.5 million shares. ¶¶ 11, 17, 63, 72, 74. The truth only came to light ***after*** the Century Aluminum Defendants had successfully completed the January 2009 Registration Statement when, on March 2, 2009, Century Aluminum filed a restatement informing shareholders that the Company's "previously issued financial statements for the nine months ended September 30, 2008 . . . should no longer be relied upon . . . " ¶¶ 12, 77.

The Century Aluminum Defendants, with access to inside information about its mounting $928 million debt due to the Company's hedging contracts with Glencore, the Company's liquidity crisis, and certain knowledge about the crash in aluminum prices, knew or were deliberately reckless in not knowing that the statement of cash flows from operations was misstated. ¶¶ 76; *see* Century Mem. at 2-4, 16-19.

Indeed, there can be no doubt that had investors known that Century Aluminum had a **negative $698,721,000** in operating cash, they would have chosen not to purchase—or to sell immediately—their Century Aluminum shares. ¶¶ 13, 79, 120. The false financial statements artificially inflated the price and market for Century Aluminum's common stock, as evinced by the significant drop in price following the disclosure of the truth on March 2, 2009 – the price of the Company's shares traded on NASDAQ fell 24% or $0.55 per share to close at $1.67, compared to the previous day's close of $2.22, a loss of $40 million in market capitalization in one day. ¶¶ 14,

79.[5]   Indeed, on news of the Restatement, the price of the Company's shares traded on NASDAQ fell to $1.06 on March 6, 2009, an all time low for Century Aluminum common stock and a 87% drop from the $8.00 high on January 21, 2009, a week prior to the January 2009 Registration Statement.  ¶ 79.  As a result, Plaintiffs and the Class have suffered damages in connection with their purchases of Century Aluminum common stock during the Class Period.

## B. Background

Same background information is helpful in understanding the impact of the misstated cash flow on Century Aluminum shareholders.  Immediately prior to the November Quarterly Report, Century Aluminum was in serious trouble.  ¶¶ 53-63.  In late 2008, the Company was under increasing pressure due to a significant degradation in the market price for aluminum[6] and starkly increased operating and fuel costs.[7]  *See id.*  In addition to general market forces and increased costs, Century Aluminum was also facing mounting debts, liquidity problems and excess operating capacity.  *See id.*  Indeed, Century Aluminum—like other aluminum producers—was feeling the crunch of ever dwindling margins, leading to large and mounting losses.  *See* Century

---

[5]     When compared to the price of Company's stock just prior to the January 2009 Offering, $8.00 on January 21, 2009, the price drop is even more drastic at approximately 79%.

[6]     According to a report issued by the United States Geological Survey ("USGS"), Aluminum prices declined significantly at the end of 2008.  As the USGS stated in a report issued in January of 2009:

> The price of primary aluminum generally rose through July 2008 before declining significantly. In January, the average monthly U.S. market price for primary ingot quoted by Platts Metals Week was $1.136 per pound; it reached a high of $1.426 per pound in July, but in September, the price was $1.192 per pound. Prices on the London Metal Exchange (LME) followed the trend of U.S. market prices. The monthly average LME cash price for September was $1.138 per pound.

USGS, *Mineral Commodity Summaries: Aluminum*, at *19 (January 2009), *available at* http://minerals.usgs.gov/minerals/pubs/commodity/aluminum/mcs-2009-alumi.pdf (last visited March 9, 2010).

[7]     *See, e.g.*, Leia Michele Toovey, *Aluminum's Path to the Bottom, Are We There Yet?*, Aluminum Investing News, Oct. 28, 2008, at *1, *available at* http://aluminuminvestingnews.com/aluminum-articles/55/aluminum%E2%80%99s-path-to-the-bottom-are-we-there-yet (last visited March 9, 2010) ("The precipitous drop in commodity prices is putting companies under pressure. Particularly feeling the squeeze are oil and metal mining companies.  The current prices of certain commodities are rendering some operations unprofitable.  Aluminum companies are taking the brunt of the hit with the metal at a three-year low at around 87 cents per pound.").

---

Mem. 2-4, 16-19; ¶¶ 53-63; *see also* Leia Michele Toovey, *Aluminum's Low Price Forces Smelters to Operate at a Loss*, Aluminum Investing News, Nov. 11, 2008, *available at* http://aluminuminvestingnews.com ("At aluminum's current price around 90 per cent of the world's smelting capacity is operating at a loss, and this is forcing producers to revise production programs to cope with aluminum's current price point.").

As a result of these growing economic pressures, disaster was on the horizon for Century Aluminum, including, but not limited to, plant shutdowns, sale of assets and even bankruptcy. *See* ¶¶ 20, 120, 125; *See* Century Mem. at 2-4. Indeed, on February 19, 2009, Century Aluminum announced that it would be implementing immediate "curtailment" of operations (later close[8]) in its Ravenswood, West Virginia aluminum smelter. ¶¶ 62, 74; *see* Century Mem. at 9:10-14; Request for Judicial Notice in Support of Century Defendants' Motion to Dismiss Consolidated Class Action Complaint ("Century RJN"), Exs. 19, 24. As such, investors and commentators alike were raising serious doubts about Century Aluminum's ability to fund ongoing operations, much less capital improvements such as the Company's newly initiated endeavor to construct a smelter in Iceland. *Id.*

Moreover, Century Aluminum was facing pressure, not only from external forces, but also internal forces. Specifically, Century Aluminum was under pressure from its former parent company, Glencore Investment Pty Ltd. ("Glencore"), to make good on margin calls under which Century Aluminum owed Glencore for losses on "certain swap contracts for the sale of primary unalloyed aluminum ingots." Century RJN, Ex. 3 (Ex. 10.1) [Dkt No. 61-1 at 188]. The total amount of the losses incurred was over $730,000,000 and Glencore was threatening a hostile takeover of its former subsidiary in order to secure the money it was owed. *See id.* at Ex. 10.3 [Dkt No. 61-1 at 215]. While the Company was able to mollify Glencore by essentially making them a secured creditor to the company—through the issuance of 160,000 of non-voting preferred shares (the "Standstill Agreement")—this was just a temporary fix and would not solve the

---

[8]    On Feb. 4, 2009, Century Aluminum announced that it would close the Ravenswood, West Virginia plant permanently.

Company's liquidity problems. *See id.*

### C.   Century Aluminum's False Financial Statements

It was in the midst of this economic distress and uncertainty that Century Aluminum issued its November Quarterly Report and launched the January 2009 Registration Statement (Century Aluminum, Co., Prospectus (Form 424(b)5) (January 29, 2009) ("January 2009 Registration Statement")). ¶¶ 69-76. Featured prominently in both is a "Summary [of] Consolidated Financial Data," which features a non-Generally Accepted Accounting Principles ("GAAP") calculation of Earnings before Interest, Taxes, Depreciation and Amortization ("EBITDA").[9] One of the most important line items of the EBITDA calculation—and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash"). Indeed, Net Operating Cash in the November Quarterly Report and January 2009 Registration Statement represents an enormous percentage – *over 74%* – of the Company's total adjusted EBITDA as presented in that document. ¶ 116.

In addition, the November Quarterly Report and January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740 ) | $(5,755 ) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884 ) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

---

[9]   Defined by Century Aluminum as "income (loss) before income taxes and equity in earnings of joint ventures adjusted to exclude: (i) interest expense, net; (ii) depreciation and amortization; and (iii) net loss on forward contracts." January 2009 Registration Statement, at S-11.

¶ 116.   Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm.  *Id.*

> Indeed, as expressed in the explanation above the table in the Secondary Offering:

> We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

January 2009 Registration Statement, at S-11; Century RJN, Ex. 22 at S-11.  The presentation of adjusted net cash provided by operations is useful, however, ***only*** if it is accurate, and not false and misleading.

Just a few weeks later—yet after Century Aluminum had sold over 24 million shares of the Company's common stock—the Company announced that the statement of cash flows reproduced above was materially misstated and needed to be restated.  Century Aluminum Co., Current Report (Form 8-K) (March 2, 2009) (the "Restatement").   ¶ 77.   In the March 2, 2009 Restatement, Century Aluminum informed investors and the market alike that the January 2009 Registration Statement was false and misleading, stating:

> On February 27, 2009, Century Aluminum Company (the Company) determined that our previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an error in the interim consolidated statement of cash flows.  A restatement of these previously issued financial statements is necessary as the Company has determined that preferred stock issued in July 2008 was not presented on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

The Restatement, at *1; Century RJN, Ex. 30.

In the same filing Century Aluminum presented an "adjusted" statement of cash flows, illustrating the extraordinary impact of the Restatement on the Company's cash position.  ¶ 77; Century RJN, Ex. 30.   Among other things, the Restatement had a cumulative impact of $989,480,000, resulting in a Net Operating Cash balance ***of negative $698,721,000***.  *Id.*

### D.  Loss of Stock Value After the Truth is Disclosed

Considering that prior to the Restatement investors falsely believed that Century Aluminum had a positive balance of Net Operating Cash of $204,875,00, it is not surprising that the truth—almost a ***one billion dollar*** difference—had an immediate and dramatic impact on Century Aluminum's stock price.  ¶ 121.  Indeed, on news of the Restatement, Century Aluminum's stock plummeted, losing over 87% of its value.  *Id.*  To illustrate the gravity of the situation, following the Restatement, Century Aluminum's stock reached its lowest price in the Company's history, *i.e.*, over fifteen (15) years.[10]  ¶¶ 79, 121; *see also* Supplemental Request for Judicial Notice in Support of Century Defendants' Motion to Dismiss First Amended Consolidated Class Action Complaint ("Supp. Century RJN"), Ex. 65.



---

[10]     Century Aluminum was incorporated in 1995, when it was spun-off by Glencore following a scandal involving Glencore's founder Marc Rich.  Rich was indicted in the United States Federal Court for the Southern District of New York on charges of tax evasion arising out of his alleged violation of a United States oil embargo in place against Iran (the so-called "food-for-oil" scandal) in the early 1980s.  *See* Marcia Vickers, *The Rich Boys: An ultra-secretive network rules independent oil trading. Its mentor: Marc Rich*, BusinessWeek, July 18, 2005, *available at* http://www.businessweek.com (last visited March 10, 2010).  Before he was tried, however, Rich fled to Switzerland, where he remained a fugitive, until being pardoned by President Bill Clinton on January 20, 2001.  *See id.; see also* Timothy P. Carney, *The story of Clinton's Marc Rich Pardon: Co-conspirators serve time while multimillionaire enjoys clemency*, at *1, World Net Daily, February 05, 2001, *available at* http://www.wnd.com (last visited March 10, 2010).

PLNTFFS' OPP TO DEFS' MOT TO DISMISS FIRST AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

1    Due to the precipitous fall in stock price, Century Aluminum investors saw shares that they

2   had paid $8.00 per share during the Class Period drop to $1.06 just a few weeks later. *See* ¶¶ 79,

3   121. With hundreds-of-millions of dollars lost in market capitalization by investors and fears of

4   bankruptcy swirling, investors were left 'holding the bag' while Century Aluminum used the

5   money raised by the Offering to bail the Company out of the trouble it had conceived. ¶¶ 11-13;

6   66, 79, 86-97; *see also* Century Mem. at 11:8-9; Supp. Century RJN, Ex. 65.

7   **III.    LEGAL STANDARDS**

8    Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

9   if it fails to state a claim upon which relief can be granted. "In undertaking this review, we will

10  accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs,

11  and will hold dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief

12  that's plausible on its face." *In re PMI Group, Inc. Securities Litig.*, Nos. C-08-1405 SI, C-08-

13  1406 SI, 2009 WL 1916934, at *6 (N.D. Cal. July 1, 2009) (internal quotation and citation

14  omitted). At the pleading stage, a complaint, stating claims under section 10(b) of the Exchange

15  Act must satisfy the requirements of Federal Rule of Civil Procedure 9(b) and Private Securities

16  Litigation Reform Act of 1995 ("PLSRA"). *In re PMI Group, Inc.*, 2009 WL 1916934, at *6; 15

17  U.S.C. § 78u-4(b)(2). Under the PLSRA, a plaintiff must "plead with particularity both falsity and

18  scienter." *In re PMI Group, Inc.*, 2009 WL 1916934, at *6 (internal quotation and citation

19  omitted).

20  **IV.    ARGUMENT**

21      **A.    Standards Applicable to Exchange Act Claims**

22    Thus, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant;

23  (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

24  of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

25  causation. 17 C.F.R. § 240.10b-5; *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. at 341-342.

26  The Century Aluminum Defendants challenge the adequacy of Plaintiffs' allegation on three of

27  these elements: (1) falsity; (2) scienter; and (3) loss causation. *See* Century Mem. at 17-42.

28    As discussed below, the November Quarterly Report and January 2009 Registration

Statement reported a positive cash flow of $230 million from operations when in reality Century Aluminum had a deficit of $698 million – a material misstatement of $928 million.   Next, Plaintiffs have met the *Tellabs* standard and adequately alleged scienter as to Century Aluminum Defendants.   *Tellabs*, 551 U.S. at 324; ¶¶ 83-95.   Century Aluminum was in the midst of a liquidity crisis, a fact which was well known by Century Aluminum's officers and directors and is conceded in the Century Aluminum Defendants' Memorandum and in the approximately 65 exhibits (over 1,000 pages) attached to the Century Aluminum RJN and Supplemental RJN. Century Mem. at 2-4, 16-19; Century RJN, Exs. 1-3, 17, 30-32.   In response to this crisis, the Century Defendants undertook a fraudulent scheme to raise the necessary and critical funding by inflating the Company's cash on hand by nearly $928 million.   The Century Aluminum Defendants knew or were deliberately reckless in not knowing that these misstatements were false and misleading.   *See* ¶¶ 2, 79, 86-98.   Finally, the 24% drop in the value of Century Aluminum's common stock after the disclosure of the Restatement (and 87% from the Class Period high of $8.00 per share), connects the false statements to the stock drop and satisfies the element of loss causation.  *See Daou*, 411 F.3d at 1026.

## B.   Defendants' Repeated Misstatement of Cash Flow From Operations in the Amount of $928 Million is a False and Misleading Statement of Material Fact

The identification of the false and misleading financial statements made by the Century Aluminum Defendants is rather straight-forward – Century Aluminum presented a false "Summary of Consolidated Financial Data" in the November Quarterly Report and in the January 2009 Registration Statement.  *See* ¶¶ 64-76; *compare* Century RJN, Ex. 30 [Restatement] at *2, *with* Century RJN, Ex. 22 [January 2009 Registration Statement] at S-9 to S-12.   Century Aluminum did not have a surplus of $204,875,000 in "Adjusted net cash provided by operating activities." ¶ 116.  Instead, Century Aluminum actually had *negative $698,721,000* in Cash from Operations. ¶ 117; Century RJN, Ex. 30 [Restatement] at *2.

### 1.   The Statement That Century Aluminum had $204 Million in net Cash Provided by Operating Activities is False

The Century Aluminum Defendants concede that the aforementioned financial statements

1   contained a $928 million "error."[11]   Century Mem. at 16:15-16.  Thus, there is *no* dispute that the

2   statement – that Century Aluminum had $204 million in net cash flow from operations – made in

3   the November Quarterly Report and the January 2009 Registration Statement was false when

4   made.  This conclusion is further evinced by the fact that Century Aluminum admitted that the

5   November Quarterly Report and the January 2009 Registration Statement were false when they

6   issued and filed the Restatement with the SEC.   ¶ 117; *see also* Century RJN, Ex. 30

7   [Restatement] at *1.  In pertinent part, the Restatement states:

8   
9   
10   
11   
12   

> [O]ur previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an **error** in the interim consolidated statement of cash flows.  A restatement of these previously issued financial statements is **necessary** as the Company has determined that preferred stock issued in July 2008 was **not presented** on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

13   The Restatement, at *1; Century RJN, Ex. 30 at *1.

14   This Court—and courts around the country—have routinely held that such a statement

15   included in a Restatement of financial result is unassailable evidence of falsity and *per se*

16   sufficient to withstand a motion to dismiss.[12]   *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084

17   (N.D. Cal. 2001) ("the existence of restated financial results is sufficient to support plaintiffs'

18   belief that the statements were misstated."); *see also In re The Goodyear Tire & Rubber Co. Sec.*

19   *Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) ("By definition . . . a restatement says that the

20   prior financial statement was false.") (internal quotations and citation omitted); *Caiafa v. Sea*

21   *Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same); *In re Telxon Corp. Sec. Litig.*,

22   133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000) (same).  Therefore, it is sufficient for Plaintiffs to

23   

---

[11]   Words such as "error," "necessary [Restatement]" and "not presented," can have no other reasonable meaning.  *See* Merriam-Webster, Online Dictionary, *available at* www.meriam-webster.com (defining "false" as "adjusted or made so as to deceive").

[12]   *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979) (Century Mem. at 13) is inapplicable.  There, the Supreme Court rejected a taxpayer's argument that tax and financial accounting should be presumed to be equivalent, noting in passing that GAAP allows a range of reasonable alternatives.  *Id.* at 544.  *Thor* has no bearing on a financial accounting case like this one, where Plaintiffs allege that the financial statement was false when made.

1  rely on the Restatement as practically incontrovertible evidence of falsity. *In re Cylink*, 178 F.

2  Supp. at 1084. Once a statement is confirmed false, the only other question under section 10(b)

3  (15 U.S.C. § 78j(b)) is whether the false statement is material. *Id.*

### 2. A Misstatement of $928 Million in Cash From Operating Activities is Material to any Reasonable Investor

6  Any reasonable investor deciding to invest in a company with well-publicized liquidity

7  issues would find the cash flow from operations to be, not simply material to any decision to

8  invest in the stock, but fundamental. *See* Century Mem. at 2:26 (Century "might not survive

9  2009"). The statement of cash flows is one of the most important and easily understandable

10  indices that investors look to in order to construe the financial stability and viability of a public

11  corporation.[13] *See S.E.C. v. Conaway*, --- F.Supp.2d ----, 2010 WL 318283, at *84-86 (E.D. Mich.

12  Jan. 20, 2010) (holding statements regarding cash and cash from operating activities actionable as

13  false and materially misleading).

14  The standard for materiality is well-settled – a false or misleading statement is material if

15  there is "a substantial likelihood that the disclosure of the omitted [or misrepresented] fact would

16  have been viewed by the reasonable investor as having significantly altered the 'total mix' of

17  information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct.

18  2126, 48 L. Ed. 2d 757 (1976). Because materiality is a question of both law and fact, it generally

19  cannot be used to support the dismissal of an action, unless the statement is "so obviously

20  [un]important to an investor, that reasonable minds cannot differ on the question of materiality."

21  *Id.* at 450. It is impossible to conclude that a near $1 billion dollar false statement made by

---

22  [13]     Financial, legal and investment commentators alike consistently describe the statement of cash

23  flows as one of the most important factors in whether to invest in a company. *See* Lee B. Shepard, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 Hastings L.J. 891, 915 n.180 (2006) ("Cash-

24  flow analysis is the single most critical aspect of all credit ratings decisions.") (quoting Standard & Poor's, Inc., 2005 Corporate Ratings Criteria 8-9, 19 (2005)); John R. Kroger, *Enron, Fraud, and Securities*

25  *Reform: An Enron Prosecutor's Perspective*, 76 U. Colo. L. Rev. 57, 72 (2005) ("Revenue and cash flow are two of the most important metrics that companies report in their 10-Qs and 10-Ks, and if a company

26  reports bad numbers, or numbers that are positive but lower than expected, investors and lenders will head for the hills."); Alan D. Holtz, *Liquidity is Lord: Evaluating Imminent Financial Distress*, 18-NOV Am.

27  Bankr. Inst. J. 12 (1999) ("[A] cash flow forecast is the most important tool to judge a company's potential to face imminent financial distress.").

28

---

PLNTFFS' OPP TO DEFS' MOT TO DISMISS FIRST AMENDED COMPLAINT - CASE NO. C 09-1001 SI

1  Defendants in this case was "immaterial" or "so obviously [un]important" that it can be dismissed.
2  *See id.* The case law squarely supports this view.

3  First, the Ninth Circuit has consistently held that a public company's financial disclosures
4  are—by virtue of their very nature—*per se* material. *United States v. Reyes*, 577 F.3d 1069, 1076
5  (9th Cir. 2009) ("We have recognized that information regarding a company's financial condition
6  is material to investment."), *accord S.E.C. v. Murphy*, 626 F.2d 653 (9th Cir. 1980) ("Surely the
7  materiality of information relating to financial condition, solvency and profitability is not subject
8  to serious challenge."). Thus, the mere fact that the misstatement occurred in conjunction with an
9  important financial statement in a November Quarterly Report **and** Registration Statement is, by
10 itself, enough to evince materiality.

11 Moreover, the magnitude of the false statements – $928 million – is also indicative of
12 materiality. *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 300-01 (S.D.N.Y. 2009).
13 As the *NovaGold* court related:

> The SEC's guidance in Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150
> (1999) ("SAB 99"), regarding the determination of materiality, which the Second
> Circuit considers to be persuasive authority, ECA, 553 F.3d at 197, supports a
> finding that materiality has been adequately pleaded. SAB 99 requires
> consideration of both quantitative and qualitative factors. *Id.* Quantitatively,
> SAB 99 observes that misstatements of less than 5% (with respect to the specified
> item) are prima facie unlikely to be material. SAB 99 at 45151. Qualitative
> factors "that may well render material a quantitatively small misstatement of a
> financial statement item" include, inter alia, "whether the misstatement arises
> from an item capable of precise measurement or whether it arises from an
> estimate and, if so, the degree of imprecision inherent in the estimate" as well as
> "whether the misstatement concerns a segment or other portion of the registrant's
> business that has been identified as playing a significant role in the registrant's
> operations or profitability." *Id.* While the misstatement alleged here "arises from
> an estimate," the error was allegedly of large magnitude, and it concerned a
> venture highly significant to NovaGold, as evinced in part by analysts' positive
> comments following the release of the Hatch Study.

*Id.* at 300-01. Under any reasonable standard, including the SEC's guidelines as enumerated in
SAB 99, the false statements by Defendants in this case are material. The following are just a few
metrics with which to analyze the Restatement:

| Restatement Amount: $929,480,000 |
| --- |
| |

Century Aluminum's Net Sales for 2007: $1,798,163,000

Restatement Percentage of Net Sales for FY 2007: **51.7%**

Century Aluminum's Net Income for FY 2006: $1,558,566

Accordingly, the Restatement accounted for over 50% of Century Aluminum's Net Sales for the entire fiscal years of 2006 and 2007, and it is disingenuous and antithetical to consider such an enormous mistake "immaterial" or "of no real significance."   Century Mem. at 16:4, 16:15; Century RJN, Ex. 30 at *1.

Further, the context in which the misstatements occurred demonstrates materiality.  A cash balance of over $200 million from operations made Century Aluminum appear to be liquid in the midst of a financial crisis.  ¶¶ 18, 70, 76-77; *see also* Century Mem. at 2-4, 18.  The Century Aluminum Defendants place great weight on the numerous disclosures by the Company as to its liquidity but these disclosures must be viewed along with the misstatements relating to cash flow from operations in the financial statements.  Century Mem. at 18:14, 18:19 ("our liquidity would be at risk"; U.S. smelting capacity is not profitable "on a cash basis") (citing January 2009 Registration Statement, at S-13, S-19).  As the Court noted in *In re PMI Group*, "the disclosures do not insulate defendants because the statements 'create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re PMI Group*, 2009 WL 1916934, at *7 (citation omitted).

Finally, the precipitous drop in Century Aluminum's stock price following the announcement of the Restatement is not only probative of causation, but also illustrates the materiality of the false statements in the minds of investors. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 977 n.17 (N.D. Cal. 2009) ("Upon review of the Complaint, the Court finds that there are numerous additional examples of corrective disclosures and corresponding stock price drops that connect to allegations of material misstatements.").  On the day that the news of the Restatement was released, Century Aluminum' stock plummeted, losing over 24% of its value and reached its lowest price in 15 years.  ¶¶ 79, 121; *see Garbini v. Protection One, Inc.*, 49 Fed. Appx. 169, 170 (9th Cir. 2002) (a financial misrepresentation that "touches upon" the drop

in stock price from $9.50 per share on June 2, 1998, to its price of approximately $3.13 per share at the time plaintiffs filed their first complaint is material); *Marucci v. Overland Data, Inc.*, No. 97CV0833-TW (JFS), 1999 WL 1027053, at *1 (S.D. Cal. Aug. 2, 1999).

Nonetheless, the Century Aluminum Defendants argue that investors could have connected the dots and understood that the cash flow was from the proceeds of the sale of preferred stock, not operations. Century Mem. at 16. Fortunately, the securities laws do not require investors to review and compare over 60 different SEC filings, company transcripts and analyst reports and then reach a conclusion that the Company, with well-publicized liquidity issues, made a $928 million 'technical error' in its statement of cash flow from operations. Century Mem. at 2-4, 16-19. For example, investors are ***not*** required, to review and understand the accounting significance of the four separate agreements (approximately 75 pages of material) between Glencore and Century Aluminum, ***and then*** understand that the Company misstated cash flow from operations in later filed financial statements. Century Mem. at 6-7; *Zell v. InterCapital Income Sec. Inc.*, 675 F.2d 1041, 1049 (9th Cir. 1982) (the inclusion of certain material information in a form 10-K does not excuse failure to include it in other documents in which disclosure is required).[14] The fact that the Company has reported liquidity issues does not mean that the investors should *assume* that the Company's financial statements, filed with the SEC and reporting a positive $204 million in cash flow from operations, are wrong. *See* Century Mem. at 18-19.

---

[14] *See also Isquith v. Middle S. Utils.*, 847 F.2d 186, 208 (5th Cir. 1988) (citing *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) (Because it requires the delicate assessments of the thought process of a reasonable investor, the question of whether certain disclosures put an investor on notice of the claimed fraud similarly is a mixed question of law and fact that should be resolved by a jury.); *Shaev v. Saper*, 320 F.3d 373, 381 (3rd Cir. 2003) (although "an investor could hypothetically conduct research to clarify ambiguities and discover omissions," defendant was not relieved of its obligation to disclose material facts); *see also In re Trans World Airlines, Inc. S'holders Litig.*, C.A. No. 9844, 1988 WL 111271, at *10 (Del. Ch. Oct. 21, 1988) ("Nor can I agree that if a fact is material, ... a failure to disclose it is necessarily cured by reason that it could be uncovered by an energetic shareholder by reading an SEC filing."); *O'Malley v. Boris*, 742 A.2d 845, 851 (Del. 1999) (Supreme Court of Delaware reversed Chancery Court finding that a reasonable investor could not miss **material** facts implied by disclosures, stating that "[i]nvestors should not be required to correctly 'read between the lines' to learn all of the **material** facts relating to the transaction at issue") (emphasis added).

---

3.     **The Financial Statements in the November Quarterly Report and
January 2009 Registration Statement are not Forward-Looking**

According to the Century Aluminum Defendants, the falsity of financial statements cannot be "inferred" because the statement that "we would expect to have sufficient liquidity to fund our operations for approximately the next 18 months" is "forward-looking" and somehow not actionable.   Century Mem. at 3:23-34, 17:7-8; ¶ 76.   The Century Aluminum Defendants deliberately miss the significance of this statement and the context in which it is found.   This statement provided credibility for the $204 million in cash flow from operations and put all of the cautionary statements cited by the Century Aluminum Defendants into context.  *Id.* (referring to the false statements in ¶¶ 65-75).   The First Amended Complaint does not allege that this statement is false but that it portrays a misleading view of the Company's liquidity.[15]  ¶ 76.

Finally, the "safe harbor" provisions of the Exchange Act do not immunize the false statements in the November Quarterly Report and the January 2009 Registration Statement due to the retrospective nature of those financial disclosures.  *See* 15 U.S.C. §§ 78u-5(c)(1).   Here the false financial statements are included in a section which is described by the November Quarterly Report (at *34) and the January 2009 Registration Statement (at S-9) as a "summary historical results of operations."   Therefore, the safe harbor does not apply.

C.     **The Complaint Alleges Facts Raising a Strong Inference of Scienter as to the
Century Aluminum Defendants**

1.     **The Complaint Alleges Significant Direct and Circumstantial Evidence
of Scienter as to the Officer Defendants**

Defendants act with the requisite scienter when they act either intentionally or with deliberate recklessness.  *S. Ferry LP., No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).   A

---

[15]     Thus, even if Plaintiffs claims did concern "forward-looking" false statements—which they do not—the "generic" cautionary language included in the Registration Statement would be insufficient to defeat Plaintiffs' claims.  *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 317-18 (8th Cir. 1997) (holding the "bespeaks caution" defense inapplicable to generic or nonspecific warnings regarding cash flow and cash from operating activities).   In order for the safe harbor to apply, the forward-looking statements also must be accompanied by "meaningful" cautionary language.   However, cautionary language is only "meaningful" if, due to the inclusion of such statements, "reasonable minds could not disagree that the challenged statements were not misleading."  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005).

---

defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1064 (9th Cir. 2000) (internal quotations and citation omitted). The inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 310, 323. An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely* as any plausible opposing inference." *Id.* at 324, 328 (emphasis in original). The inference of scienter need not be more likely than a plausible opposing inference: a tie goes to the plaintiff in that instance. *Id.* at 324. Also "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted).

In applying *Tellabs,* courts have held that "if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *In re PMI Group.,* 2009 WL 3681669, at *2 (internal quotations and citation omitted); *see also S. Ferry,* 542 F.3d at 784 (in light of *Tellabs,* a court "should look to the complaint as a whole, not to each individual scienter allegation as [*In re*] *Silicon Graphics* [, 183 F.3d 970 (9th Cir. 1999)] suggests"); *Fouad v. Isilon Sys., Inc.,* No. C07-1764 MJP, 2008 WL 5412397, at *8 (W.D. Wash. Dec. 29, 2008) (citing *S. Ferry,* 542 F.3d at 784). "Scienter may be pled and proven by reference to circumstantial evidence." *Rudolph v. UTStarcom*, No. C07-04578 SI, 2008 WL 4002855, at *2 (N.D. Cal. Aug. 21, 2008) (citing *In re Peoplesoft Sec. Litig.,* No. 99-00472 WHA, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000)); *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West.,* 320 F.3d 920, 943-44.

The First Amended Complaint easily meets the *Tellabs* pleading standards. *See also In re Connectics Corporation Securities Litig.*, No. C07-02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (scienter adequately alleged because Defendants knew specific facts at the time that rendered their accounting determinations fraudulent).

### 2.   The Officer Defendants, Given Their Day-to-Day Responsibility for an Monitoring of Century Aluminum's "Core" Operations, Knew or Recklessly Disregarded the Facts Contradicting the Public Statements of Cash Flow From Operations

Plaintiffs plead scienter by, among other means, alleging *in detail* that Century Aluminum's cash flow from operations was critical to the Company during the Class Period and that the Individual Defendants closely monitored the Company's liquidity.[16]   ¶¶ 83-95; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1066 (C.D. Cal. 2008) (found scienter was alleged as to key executives because they "were involved in the day-to-day operation of the company and would have been even more aware of a 'culture' of undisciplined loan origination").   Based on the numerous public disclosures cited by the Century Aluminum Defendants, they essentially concede that Century Aluminum's hedging practices, the hedging contracts with Glencore and the Company's liquidity crisis were closely monitored during the Class Period.  Century Mem. at 2-4, 16-19; Century RJN, Exs. 1-5, 9-32.  Thus, the Individual Defendants conducted active oversight of, and were necessarily made, aware of issues concerning the Company's cash flow, liquidity, and internal controls during the Class Period.[17] ¶¶ 32-50.

The Ninth Circuit has endorsed this means of pleading scienter.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (finding it "hard to believe" that executives directly responsible for day-to-day operations would not have known about "stop-work order" that

---

[16]   The Ninth Circuit's decision in *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) is easily distinguished.  Century Mem. at 12, 13.  In *Zucco*, the alleged fraud involved a mere $2.7 million Restatement relating to a "fledgling" startup company (*id.* at 991-2) and not the massive $928 million fraud alleged here involving the Company's cash flow from operations in the midst of a liquidity crisis.

[17]   Plaintiffs also allege that the Century Aluminum Defendants had access to basic financial information, and regularly received certain internal information concerning cash flow.  ¶¶ 47-50; *see Countrywide*, 554 F. Supp. 2d at 1066 ("[T]he executive Defendants were privy to the company's risk management systems on an ongoing basis. . . . [T]hey also had access to the data contained in the Exception Processing System [("EPS")].");  *id.* at 1063 (noting allegation, also found here, that EPS was "designed to route highly risky loans to a central underwriting group for evaluation"); *see* ¶¶ 126-128; *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.") (quoting *Nursing Home Pension Fund, Local 144 v. Oracle*, 380 F.3d 1226, 1230 (9th Cir. 2004).

---

disrupted company's business); *No. 84 Employer-Teamster*, 320 F.3d at 943 & n.21 ("absurd to suggest" that directors of airline would not have discussed major operations problems). Here, the First Amended Complaint alleges particularized, *contemporaneous* facts showing that the Century Aluminum Defendants' statements concerning cash flow were false and misleading when made.[18] ¶¶ 77, 117. In fact, Plaintiffs' scienter allegations here are *at least* compelling as those the Ninth Circuit upheld in *Applied Signal* and *No. 84 Employer-Teamster* because, here, Plaintiffs also allege particularized facts, such as the Glencore hedging contracts and the relationship between Glencore and Century Aluminum, indicating that the Century Defendants had *actual* knowledge or were deliberately reckless in not knowing the truth.[19] ¶¶ 32-50, 77, 117; *see Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) ("It is fair to infer the company has highly effective information systems . . . Defendants are in a highly regulated industry and the company, it can be inferred, constantly monitors reports . . . and looks for prompt solutions to such problems.") (finding scienter under *Tellabs* standard).

Scienter has also been inferred based on very similar allegations to the allegations here – where the facts pled supported an inference that could 'bridge the gap' between key details of an agreement and the improper accounting treatment of the agreements. *In re Cadence Design Systems, Inc. Securities Litig.*, No. 08-4966 SC, 2010 WL 726515, *8 (N.D. Cal. March 2, 2010). In *Cadence*, plaintiffs alleged that certain earnings statements were false because *Cadence* had improperly accounted for two major agreements and a restatement was issued to correct the false

---

[18]    The Century Defendants' argument that a fraudulent accounting practice alone is insufficient to infer scienter fails here. *See* Century Mem. at 13-16. Here, Plaintiffs have plead fraudulent intent based on accounting violations by alleging "facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *Rudolph*, 2008 WL 4002855, at *5 (internal quotations and citations omitted) (pattern of grants combined with all of plaintiffs' other allegations sufficient to plead scienter in stock option back dating action). The Century Defendants concede that the accounting decision was improper and the Century Defendants knew that the cash flow came from the sale of preferred stock and not operations. ¶¶ 13-14.

[19]    *See Countrywide*, 554 F. Supp. 2d at 1065, 1066 ("[T]he idea that a Company-wide culture that encouraged unchecked deviations from underwriting standards in a way which would fatally affect the Company's continued financial performance went unnoticed by a Board of Directors simply does not square with the specific and comprehensive monitoring duties assigned to the members of the Board;" and inference "even stronger" as to executives, including all Officer Defendants).

representation. *Id.* at *1. The Court concluded that individual defendants' knowledge of the facts relating to the agreements – the largest deals in the quarter, not routine deals – and knowledge that the mistreatment of these deals made the difference between *Cadence* missing or meeting projections, created an inference of scienter since the individual defendants either knew or were deliberately reckless in not knowing that the accounting treatment was improper. *Id.* at *8. Similarly, the cancellation of hedging contracts with Glencore was a major change in how Century Aluminum conducted its business, and the improper accounting treatment created a positive cash flow from operations in the midst of its liquidity crisis and attracted investors to the January 2009 Offering. ¶¶ 55-57, 115-116. As a result, the Century Aluminum Defendants either knew or were deliberately reckless in not knowing that the accounting treatment was improper.

Furthermore, in arguing that investors knew "all salient aspects of the transaction terminating the Hedges," that "Century received some of the cash in payment for preferred stock" and that the Company was not "cash rich," the Century Aluminum Defendants must also concede the same level of knowledge on the part of the Century Aluminum Defendants, who were key officers and directors at the Company. Century Mem. at 2-10, 16-19 (specifically, Century Mem. at 14:6, 15:7, and 16:1). As such, the Century Aluminum Defendants not only had the same information available in the approximately 65 exhibits (over 1,000 pages) presented in the Century Aluminum RJN but they actually prepared, reviewed, signed, presented or participated in the creation of many of these documents. *See* Century RJN, Exs. 1-3, 8, 17, 30-32; ¶¶ 67, 68. If anything, following the Century Aluminum Defendants' argument, it should have been even clearer to the Company's insiders that Century Aluminum did not have $204 million in cash from operations based on access to internal reports and their personal knowledge. ¶¶ 32-50. Indeed, it would be absurd to suggest that the Defendants Kruger and Bless, as CEO and CFO would *not* have unfettered access to such information related to the fraud and the financial reporting related to cash from operations.[20] *See* ¶ 87.

---

[20] Courts have held that where, as here, other indicia of scienter are pleaded, Sarbanes-Oxley certifications will support an inference that Defendants Kruger and Bless knew or recklessly disregarded that the financial statements were false and misleading. ¶ 68 (signing November Quarterly Report). *See,*

Here, the Century Aluminum Defendants essentially concede scienter – knowing the impossible situation facing the Company and knowing that Century Aluminum could *not* have generated $204 million in cash from operations; the only *plausible* inference is that the Century Aluminum Defendants deliberately made a $928 million misstatement in reporting the Company's cash flow from operations in order to complete a desperately needed January 2009 Registration Statement.

### D.      Plaintiffs More Than Sufficiently Pled Loss Causation Under Section 10(b)

To prove loss causation, Plaintiffs must demonstrate a causal connection between the deceptive actions that form the basis of the securities fraud and the injury suffered by the Plaintiffs.   *In re Daou*, 411 F.3d at 1025.   The First Amended Complaint pleads a causal connection between the disclosure of the fraud – the Restatement – and a specific stock drop. ¶¶ 80-85.  The First Amended Complaint need only provide the Century Defendants "with notice of what the . . . causal connection might be between that loss and the misrepresentation" by alleging that "[the defendants'] share price fell significantly after the truth become known." *Dura*, 544 U.S. at 347.  The Ninth Circuit recently emphasized "that a plaintiff must only allege 'facts that, if taken as true, plausibly establish loss causation.'"[21] *In re PMI Group*, 2009 WL 1916934, at *11 (citing *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1046, 1057 (9th Cir. 2008)).  Plaintiffs allege that Century Aluminum common stock dropped 24% on March 2, 2009, the day that the Restatement was disclosed, and dropped 87% from a Class Period high prior to the January 2009 Offering.  ¶ 79. This allegation is sufficient under the applicable standards.

Defendants' arguments to the contrary are simply not consistent with well-settled law. First, the Century Aluminum Defendants argue that other announcements made only hours after

---

*e.g.*, *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of [the signer's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV 04-1255 AA, 2006 WL 538756, at *20-21 (D. Or. Jan. 3, 2006).

[21]    In *In re PMI Sec. Litig*, the Court also noted that "the Ninth Circuit cited with approval decisions by other circuits suggesting that loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage."  *In re PMI Sec. Litig.*, 2009 WL 1916934, at *11 (citations omitted).

---

the Restatement on March 2, 2009 caused the stock to decline.  Century Mem. at 9-10 (analyzing intra-day trading based on the disclosure the Company's 10-K and a prospectus supplement).  This analysis is improper in a motion to dismiss.  *See No. 84 Employer-Teamster*, 320 F.3d at 935 (district court's consideration of other potential causes for the stock decline such as the company's labor dispute with its maintenance workers improper on a motion to dismiss).  The Century Aluminum Defendants also incorrectly assume that the market immediately reacts to each material disclosure.  In *Basic*, the Supreme Court specifically stated "we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in the market price."  *Basic, Inc. v. Levinson,* 485 U.S. 224, 248 n.28, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).  Relying on *Basic*, the Ninth Circuit rejected the same argument made by the Century Aluminum Defendants here for adoption of a bright-line rule requiring an immediate market reaction and stated that "assuming that the stock price will instantly react would fail to address the realities of the market" and declined to adopt a bright line test on market reaction.  *No. 84 Employer-Teamster*, 320 F.3d at 935 (citing *Basic*, 485 at 240).  The Century Aluminum Defendants' theory that the market was instantly reacting on an hourly basis to a series of disclosures is wrong and improper in the context of a motion to dismiss.

Second, Defendants' disagreement with Plaintiffs' characterization of the losses suffered by the class is not relevant or determinative at this state in the litigation.  *See Dura*, 544 U.S. at 347 (holding that at the motion to dismiss stage, plaintiffs are only required to "provide defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation").  Plaintiffs have provided "notice" of the relevant economic loss as follows:

| Date | Event | Stock Price |
|------|-------|-------------|
| January 21, 2009 | One week before offering. | $8.00 per share (¶¶ 79, 121) |
| January 29, 2009 | January 2009 Offering Completed | $4.50 per share (¶ 72) |
| February 27, 2009 | One day before Restatement public | $2.22 per share (¶ 79) |
| March 2, 2009 | Restatement made public | $1.67 per share (¶ 79) |
| March 9, 2009 | One week after Restatement public | $1.06 per share (¶¶ 79, 121) |

With regard to the above share prices, Plaintiffs calculated the total potential loss in market capitalization at 87% (($8.00-$1.06)/$8.00).   ¶¶ 13, 79 and 121.  This calculation leads to an approximation of damages in the $166 million range.  *See id.* ($6.94 x 24 million shares in the January 2009 Offering = $166 million).  In fact, this is at least a plausible a calculation of loss as Century Aluminum's proffered calculation, which takes into consideration only the following dates:

| Date | Event | Stock Price |
|------|-------|-------------|
| March 2, 2009 | Immediately before restatement | $1.86 per share |
| March 2, 2009 | Restatement made public | $1.68 per share |

Century Mem. at 19.  Indeed, Defendants do not fully explain the derivation of their $1.86 figure, although it is worth noting that the opening price on March 2, 2009 was $2.22 (not $1.86).[22]  *See* Century Aluminum, http://finance.yahoo.com (historical stock prices for CENX) (last visited March 17, 2010).

Also, Defendants statement that "the stock soon recovered and since has risen to over $10," is misleading.  As reflected above, Century Aluminum reached its all time low price of $1.06 per share on March 9, 2009, just one week after the Restatement was made public, revealing that the January 2009 Registration Statement was false.  Further, it took Century Aluminum ***over six months*** to get back to $8.00 per share, much less the irrelevant $10 quote offered by Defendants.  *Contra* Century Mem. at 19-20.  The fact that Defendants are quoting stock prices

[22]     This is aside from stating that this number represents some sort of 'intra-day' price. *See* Century Mem. at 10. However, Defendants tellingly cite no case law authorizing the use of intra-day prices in calculating losses in a section 10(b) case, nor do Defendants suggest (or present evidence establishing) that it was impossible that the "market" had been alerted to the fact that Century Aluminum was going to announce bad news prior to the morning of March 2, 2010. *See, e.g., West v. Prudential Securities, Inc.,* 282 F.3d 935, 938 (7th Cir. 2002) (J. Easterbrook, writing for the majority) ("Sometimes full-time market watchers can infer important news from the identity of a trader (when the corporation's CEO goes on a buying spree, this implies good news) or from the sheer volume of trades (an unprecedented buying volume may suggest that a bidder is accumulating stock in anticipation of a tender offer)."). Regardless, issues of fact, such as those raised by Defendants in connection with loss causation are not susceptible to resolution on a motion to dismiss, and therefore should fail. *See, e.g., Boucher v. Shaw,* 572 F.3d 1087, 1092 (9th Cir. 2009) ("defendants' subsequent argument that Ballard's FLSA claim should fail because her wage claim has already been satisfied in the bankruptcy proceeding raises a question of fact not properly resolved on a motion to dismiss").

over a year outside the Class Period - and over a year-and-a-half after the Restatement in support of their motion to dismiss - is as disingenuous as it is immaterial.[23]   *See, e.g., Applied Signal Tech.*, 527 F.3d at 989 (upholding plaintiffs' allegations of loss causation and holding that "plaintiffs bringing a 10b-5 securities fraud claim must plead the element of loss causation with particularity, plaintiffs have done so here by alleging particular facts indicating that 'but for the circumstances that the fraud concealed' -namely, the fact that much of Applied Signal's backlog had been halted by stop-work orders-"[plaintiffs'] investment ... would not have lost its value").

## V.   LEAVE TO AMEND SHOULD BE FREELY GRANTED

Should the Court conclude that the First Amended Complaint does not sufficiently plead a section 10(b) claim (which it does), Plaintiffs respectfully request leave to amend.  Rule 15(a)(2) of the Federal Rules of Civil Procedure provides: "leave shall be freely given when justice so requires."  In the Ninth Circuit, "[t]his policy is 'to be applied with extreme liberality.'"  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (reversing district court's denial of leave to amend) (internal quotations and citation omitted); *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).  Plaintiffs should therefore be given an opportunity to correct any pleading defects that may be identified by the Court in the First Amended Complaint.

DATED:  March 19, 2010

Respectfully submitted,

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT

_____
BETSY C. MANIFOLD

---

[23]   The cases cited by Defendants do not help their cause.  Indeed, the primary case relied on by Defendants regarding loss causation concerned plaintiffs' failure to even allege loss causation in the first instance.  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("The TAC's characterization of the August 2 earnings announcement similarly fails to allege that the market became aware of, and the resulting stock drop resulted from, widespread enrollment fraud.").  In stark contrast, Defendants concede that Plaintiffs have pled loss causation in this case, they just disagree with the conclusions and/or inputs.  This is not enough, however, to prevail at the motion to dismiss stage.  *See In re Daou Sys.*, 411 F.3d 1006.

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599

Lead Counsel for Plaintiffs

CENTURYALUMINUM:17415