FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re* CENTURY ALUMINUM COMPANY SECURITIES LITIGATION<br>————————————————————<br>This document relates to all actions.<br>————————————————————| ) Case No.  C 09-1001 SI<br>) [Consolidate With Case Nos. C 09-1103 SI,<br>) C 09-1162 SI, C 09-1205 SI]<br>)<br>) **PLAINTIFFS' OMNIBUS OPPOSITION**<br>) **TO THE CENTURY DEFENDANTS'**<br>) **AND THE UNDERWRITER**<br>) **DEFENDANTS' NOTICE OF MOTION**<br>) **AND MOTION TO DISMISS**<br>) **PLAINTIFFS' FIRST AMENDED**<br>) **COMPLAINT (SECURITIES AND**<br>) **EXCHANGE ACT OF 1933)**<br>)<br>) DATE:         April 16, 2010<br>) TIME:          9:00 a.m.<br>) DEPT.         10, 19th Floor<br>) JUDGE:       Hon. Susan Illston |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................ii-vi

I.      INTRODUCTION .........................................................................................................1

II.     BACKGROUND PERTINENT TO SECURITIES ACT CLAIMS ................................2

III.    PLAINTIFFS HAVE STATED A CLAIM UNDER SECTIONS 11, 12(A)
        AND 15 OF THE SECURITIES ACT OF 1933 ...........................................................7

        A.  The First Amended Complaint States a Claim for
            Under the Requirements of the Securities Act ...................................................8

            1.  Rule 8(a) Applies to Plaintiffs Securities Act Claims .............................8

            2.  The January 2009 Registration Statement Contained
                False and Misleading Statements of Material Fact..................................10

            3.  Defendants' Attempts to Negate the Falsity of the
                Statements in the Registration Statement are Unpersuasive .................16

                a)  The False Statements are not Forward-Looking and
                    not Protected by the "Bespeaks-Caution" Doctrine ........................16

                b)  The Safe-Harbor Provisions of the Securities Act do not
                    Apply to the False Statements in the Registration Statement..........18

        B.  Defendants' Standing Arguments are Unripe and Nonjusticiable at this Stage of the
            Action ..............................................................................................................19

            1.  Plaintiffs have Plead Facts Sufficient to Confer
                Standing to Assert their Claims under § 11 ...........................................19

            2.  Plaintiffs have also Plead Sufficient Facts to
                Plead a *Prime Facie* Case for Violation of § 12(2) ...............................21

IV.     CONCLUSION .........................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**                                                         **PAGE(S)**

*In re American Bank Note Holographics, Inc. Securities Litigation,*
   93 F. Supp. 2d 424..................................................................................22

*Ashcroft v. Iqbal,*
   ___ U.S. ___, 129 S. Ct. 1937 (2009) .......................................................9

*Belizan v. Hershon,*
   495 F.3d 686 (D.C. Cir. 2007)..................................................................23

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..............................................................................7, 9

*In re Boeing Securities Litigation,*
   40 F. Supp. 2d 1160 (W.D. Wash. 1998) .................................................18

*Caifa v. Sea Containers Ltd.,*
   525 F. Supp. 2d 398 (S.D.N.Y. 2007) .....................................................12

*In re CBT Group PLC Securities Litgation,*
   No. C-98-21014, 2000 WL 33339615 (N.D. Cal. Dec. 29, 2000) .............16

*In re Countrywide Financial Corp. Securities Litigation,*
   588 F. Supp. 1132 (C.D. Cal. 2008)...............................................8, 10, 11

*In re Craftmatic Securities Litigation,*
   890 F.2d 628 (3d Cir. 1989) ....................................................................22

*In re Cylink Securities Litigation,*
   178 F. Supp. 2d 1077 (N.D. Cal. 2001).............................................10, 12

*In re Daou Systems, Inc., Securities Litigation,*
   397 F.3d 704 (9th Cir. 2005) ..................................................................1, 9

*In re DDi Corp. Securities Litigation,*
   No. CV 03-7063, 2005 WL 3090882 (C.D. Cal. July 21, 2008).........*passim*

*Fouad v. Isilon Systems, Inc.,*
   No. C07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ........10, 23

*Garbini v. Protection One, Inc.,*
   49 Fed. Appx. 169 (9th Cir. 2002) ..........................................................15

*Gilligan v. Jamco Development Corp.,*
  108 F.3d 246 (9th Cir. 1997) ............................................................................................... 7

*In re Goodyear Tire & Rubber Co. Securities Litigation,*
  436 F. Supp. 2d 873 (N.D. Ohio 2006) ...................................................................... 10, 12

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983) ...................................................................................................... 1, 8

*Hertzberg v. Dignity Partners, Inc.,*
  191 F.3d 1076 (9th Cir. 1999) ................................................................................*passim*

*Hevesi v. Citigroup, Inc.,*
  366 F.3d 70 (2d Cir. 2004) ................................................................................................ 20

*In re Intrabiotics Pharmaceuticals, Inc. Securities Litigation,*
  No. C 04-02675, 2006 WL 708594 (N.D. Cal. Jan. 23, 2006) ..................................... 21

*In re Leapfrog Enterprises, Inc. Securities Litigation,*
  No. C-03-05421, 2005 WL 3801587 (N.D. Cal. Nov. 23, 2005) ................................. 20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F.3d 940 (9th Cir. 2005) ..................................................................................... 17, 18

*Marucci v. Overland Data, Inc.,*
  No. 97CV0833-TW, 1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) ............................... 16

*In re McKesson HBOC, Inc. Securities Litigation,*
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................ 7

*In re Morgan Stanley Information Fund Securities Litigation,*
  592 F.3d 347 (2d Cir. 2010) ............................................................................................. 15

*In re National Golf Properties, Inc.,*
  No. CV 02-1383, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ................................ 23

*In re NationsMart Corp. Securities Litigation,*
  130 F.3d 309 (8th Cir. 1997) ..................................................................................... 18, 19

*In re NovaGold Resources Inc. Securities Litigation,*
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...................................................................... 13, 14

*Pinter v. Dahl,*
  486 U.S. 622 (1988) ......................................................................................................... 22

*In re PMA Capital Corp. Securities Litigation,*
  No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ...................................................... 20

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004) .............................................................................................. 10, 15

*Rubinstein v. Collins,*
  20 F.3d 160 (5th Cir. 1994) ...................................................................................................... 17

*Rubin v. MF Global, Ltd.,*
  634 F. Supp. 2d 459 (S.D.N.Y. 2009) ................................................................................... 9, 10

*Rubke v. Capitol Bancorp, Ltd.,*
  551 F.3d 1156 (9th Cir. 2009) .................................................................................................. 10

*S.E.C. v. Conaway,*
  ___ F. Supp. 2d. ___, No. 05-CV-40263,
  2010 WL 318283 (E.D. Mich. Jan. 20, 2010) .......................................................................... 14

*S.E.C. v. Murphy,*
  626 F.2d 633 (2d Cir. 1980) ...................................................................................................... 13

*Shapiro v. UJB Financial Corp.,*
  964 F.2d 272 (3d Cir. 1992) ...................................................................................................... 22

*Silvas v. E*Trade Mortgage Corp.,*
  514 F.3d 1001 (9th Cir. 2008) .................................................................................................... 7

*In re Stac Electronics Securities Litigation,*
  89 F.3d 1399 (9th Cir. 1996) ................................................................................................ 8, 17

*Stack v. Lobo,*
  903 F. Supp. 1361 (N.D. Cal. 1995).................................................................................. 2, 21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ..................................................................................................................... 9

*In re Telxon Corp. Securities Litigation,*
  133 F. Supp. 2d 1010 (N.D. Ohio 2000) ................................................................................... 12

*TSC Industries Inc. v. Northway Inc.,*
  426 U.S. 438 (1976) .............................................................................................................. 12, 13

*United States v. Reyes,*
  577 F.3d 1069 (9th Cir. 2009) .................................................................................................. 13

*In re UTStarcom, Inc. Securities Litigation,*
    617 F. Supp. 964 (N.D. Cal. 2009) ...................................................................................15, 16

*In re VeriSign, Inc.,*
    No. C 02-02270, 2005 WL 88969 (N.D. Cal. Jan. 13, 2005) ....................................................20

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ..................................................................................................10

*In re Washington Mutual, Inc., Derivative & ERISA Litigation,*
    259 F.R.D. 490 (W.D. Wash. 2009) ..........................................................................................11

*Weber v. Department of Veterans Affairs,*
    521 F.3d 1061 (9th Cir. 2008) ....................................................................................................7

*In re Westinghouse Securities Litigation,*
    90 F.3d 696 (3d Cir. 1996) .......................................................................................................23

*In re Worlds of Wonder Securities Litigation,*
    35 F.3d 1407 (9th Cir. 1994) ....................................................................................................17

## STATUTES & RULES

Federal Rules of Civil Procedure
    Rule 8(a) ...............................................................................................................................*passim*
    Rule 12(b)(6) ........................................................................................................................*passim*

Securities Exchange Act of 1933
    § 11 .......................................................................................................................................*passim*
    § 12(a) ..................................................................................................................................*passim*
    § 15 .......................................................................................................................................*passim*

15 U.S.C.
    § 77 *et seq.* ..........................................................................................................................*passim*
    § 78 *et seq.* ..........................................................................................................................*passim*

## OTHER AUTHORITIES

Carney, Timothy P., *The story of Clinton's Marc Rich Pardon: Co-conspirators
serve time while multimillionare enjoys clemency*, World Net Daily
(February 05, 2001) http://www.wnd.com ...................................................................................6

Holtz, Alan D., E&Y Restructuring LLC, *Liquidity is Lord: Evaluating Imminent
Financial Distress*, 18-9 ABIJ 12 (Amer. Bankr. Inst. J., November 1999) .............................14

Perler, Jeremy, CFA, *Transparency and Other Issues in Financial Statement Analysis: Uncovering Misleading Metrics and Avoiding Financial Shenanigans*, Riskmetrics: CFA Institute (Riskmetrics Group, June 2009).......................................15

Kroger, John R., *Enron, Fraud, and Securities Reform: An Enron Prosecutor's Perspective*, 76 U. Colo. L. Rev. 57, 72 (2005) ...................................................14, 15

Shepard, Lee B., *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 Hastings L.J. 891 (2005) .............................................................14

Toovey, Leia Michele, *Aluminum's Low Price Forces Smelters to Operate at a Loss*, Aluminum Investing News (Nov. 11, 2008)........................................*passim*

Toovey, Leia Michele, *Aluminum's Path to the Bottom: Are We There Yet?* Aluminum Investing News (Oct. 28, 2008) http://aluminuminvestingnews.com/aluminum-articles/55/ .................................................*passim*

United States Geological Society, *Mineral Commodity Summaries: Aluminum*, http://minerals.usgs.gov/minerals/pubs/commodity/ aluminum/mcs-2009-alumi.pdf ......................................................................................2

Vickers, Marcia, *The Rich Boys: An ultra-secretive network rules independent oil trading. Its mentor: Marc Rich*, BusinessWeek (July 18, 2005). ..................................................6

# I.    INTRODUCTION

Plaintiffs have provided Defendants' with a short, plain statement of their claims—all that is required under Rule 8(a) of the Federal Rules of Civil Procedure, in a Securities Act case. *See In re Daou Sys., Inc., Sec. Litig.*, ("*In re Daou*") 397 F.3d 704, 723 (9th Cir. 2005) ("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).") (internal citations omitted).  As the First Amended Complaint informs Defendants: (1) Plaintiffs, and other unnamed members of the Class, purchased Century Aluminum common stock, pursuant to  (2) the January 2009 Registration Statement, which contained patently false statements (3) of material fact. *See* ¶¶ 118-28[1].  These allegations are, without more, sufficient to withstand a motion to dismiss.

Indeed, notwithstanding Defendants' efforts at confusion and obfuscation, stating a claim under §§ 11, 12(a) and 15 of the Securities and Exchange Act of 1933 is a relatively simple matter. Plaintiffs bear only the "relatively minimal burden" of establishing a "material misstatement or omission" of a material fact in connection with the filing of a registration statement with the SEC. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (holding that a plaintiff "need only show a material misstatement or omission to establish his prima facie case" pursuant to § 11). As the Supreme Court stated in *Herman & MacLean*, § 11 provides for "virtually absolute [liability], even for innocent misstatements." *Id*. at 382.  Accordingly, the well-plead allegations of material misstatements in the Registration Statement are *per se* sufficient to prevail on Defendants' motion to dismiss.

Understanding that they cannot prevail based on the great weight of the law, Defendants attempt to interject immaterial and unripe arguments.  First, Defendants attempt to challenge Plaintiffs' standing allegations, despite the fact that Plaintiffs have clearly plead that they "purchased Century Aluminum securities pursuant to and/or traceable to the Company's Secondary Offering."  ¶¶ 28-31.  Defendants do not—and cannot—establish that Plaintiffs are required to provide more information than this, at this stage of the proceedings. *See, e.g.,*

---

[1]    For the convenience of the Court, all references in the format "¶ __" are to the corresponding paragraph numbers in the First Amended Complaint, unless otherwise noted.

1    *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999).  Moreover, Defendants'

2    contentions that the self-identified historical misstatements are "forward looking" are equally

3    misplaced.  *Compare* Registration Statement at S-9 ("summary historical results of operations"),

4    with 15 U.S.C. § 77z-2(c)(1)(a) (granting 'safe harbor' for "only . . . forward-looking statements").

5    Finally, as with primary violations under § 11, Plaintiffs have adequately pled violations of §§

6    12(a) and 15.  *See Stack v. Lobo*, 903 F. Supp. 1361, 1375 (N.D. Cal. 1995).

7        Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motions to

8    dismiss.

9    **II.    BACKGROUND PERTINENT TO SECURITIES ACT CLAIMS**

10       In the First Amended Consolidated Class Action Complaint for Violation of the Securities

11   Act of 1933, 15 U.S.C. § 77, *et seq.,* and the Securities Exchange Act of 1934, 15 U.S.C. § 78,

12   *et seq.* ("First Amended Complaint"), Plaintiffs allege various violations of the Securities Act. *See*

13   ¶¶ 110, *et seq*.  These violations arise from a course of conduct which began in January 2009,

14   when the Securities Act Defendants issued a false and misleading Preliminary Prospectus

15   Supplement to Prospectus, dated May 29, 2007 (the "January 2009 Registration Statement" or

16   "Registration Statement").  Nonetheless, a little background is helpful in understanding the impact

17   of the misstated January 2009 Registration Statement on Century Aluminum shareholders, such as

18   Plaintiffs.

19       Immediately prior to the filing of the January 2009 Registration Statement, Century

20   Aluminum was in serious trouble.  In late-2008, the Company was under increasing pressure due

21   to a significant degradation in the market price for aluminum[2] and starkly increased operating and

22   [2]   According to a report issued by the United States Geological Survey ("USGS"), Aluminum prices
23   declined significantly at the end of 2008.  As the USGS stated in a report issued in January of 2009:

24       The price of primary aluminum generally rose through July 2008 before declining
         significantly. In January, the average monthly U.S. market price for primary ingot quoted
25       by Platts Metals Week was $1.136 per pound; it reached a high of $1.426 per pound in
         July, but in September, the price was $1.192 per pound. Prices on the London Metal
26       Exchange (LME) followed the trend of U.S. market prices. The monthly average LME cash
         price for September was $1.138 per pound.

27   USGS, *Mineral Commodity Summaries: Aluminum*, at *19 (January 2009), *available at*
28   http://minerals.usgs.gov/minerals/pubs/commodity/aluminum/mcs-2009-alumi.pdf .

fuel costs.[3]  *See* ¶¶ 121-23.  In addition to general market forces and increased costs, Century Aluminum was also facing mounting debts, liquidity problems and excess operating capacity.  *See* ¶ 128.  Indeed, Century Aluminum—like other aluminum producers—was feeling the crunch of ever dwindling margins, leading to large and mounting losses.  *See id.*; *see also* Toovey, Leia Michele, *Aluminum's Low Price Forces Smelters to Operate at a Loss*, Aluminum Investing News (Nov. 11, 2008) ("At aluminum's current price around 90 per cent of the world's smelting capacity is operating at a loss, and this is forcing producers to revise production programs to cope with aluminum's current price point.").

As a result of these growing economic pressures, disaster was on the horizon for Century Aluminum, including, but not limited to, plant shutdowns, sale of assets and even bankruptcy.  *See* ¶¶ 118-20.  Indeed, on February 4, 2009, Century Aluminum announced that it would close the Ravenswood, West Virginia plant permanently.  As such, investors and commentators alike were raising serious doubts about Century Aluminum's ability to fund ongoing operations, much less capital improvements such as the Company's newly initiated endeavor to construct a smelter in Iceland.

Moreover, Century Aluminum was facing pressure not only from external forces but also internal forces.  Specifically, the Company was under pressure from its former parent company, Glencore Investment Pty Ltd. ("Glencore"), to make good on a margin calls under which Century Aluminum owed Glencore for losses on "certain swap contracts for the sale of primary unalloyed aluminum ingots."  Century Aluminum, Current Report (Form 8-K), Ex. 10.1, at *3 (July 8, 2008).  The total amount of the losses incurred was over $730,000,000 and Glencore was threatening a hostile takeover of its former subsidiary in order to secure the money it was owed.  *See id.* at Ex. 10.3.  While the Company was able to mollify Glencore by essentially making them a secured

---

[3]      *See, e.g.,* Toovey, Leia Michele, *Aluminum's Path to the Bottom: Are We There Yet?*, at *1, Aluminum Investing News (Oct. 28, 2008), *available at* http://aluminuminvestingnews.com/aluminum-articles/55/aluminum%E2%80%99s-path-to-the-bottom-are-we-there-yet ("The precipitous drop in commodity prices is putting companies under pressure. Particularly feeling the squeeze are oil and metal mining companies. The current prices of certain commodities are rendering some operations unprofitable. Aluminum companies are taking the brunt of the hit with the metal at a three-year low at around 87 cents per pound.").

creditor to the company—through the issuance of 160,000 of non-voting preferred shares (the "Standstill Agreement")—this was just a temporary fix, and would not solve the Company's liquidity problems. *See id.*

It was in the midst of this economic distress and uncertainty that Century Aluminum launched an aggressive $100,000,000+ common stock offering in order to solve the Company's liquidity and debt problems. *See* January 2009 Registration Statement at *1, *et seq*. In accord with SEC regulations, Century Aluminum filed the 2009 Registration Statement, which was technically a "supplement," to an earlier shelf registration which was filed on May 29, 2007.[4]

Featured prominently in the January 2009 Registration Statement is a "Summary [of] Consolidated Financial Data," which features a non-GAAP calculation of EBITDA.[5] *See* Ex. A, at S-9 to S-12. One of the most important line items of the EBITDA calculation—and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash"). *See id.* at S-10. Indeed, Net Operating Cash in the January 2009 Registration Statement represents an enormous—***over 74%***—of the Company's total adjusted EBITDA as presented in that document. *See id.*

In addition, the January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure. Specifically, page S-11 of the Registration Statement sets forth the following table:

---

[4]     *See* Century Aluminum, Registration Statement Under the Securities Act of 1933 (Form S-3), at *1 *et seq*. (May 29, 2007).

[5]     Defined by Century Aluminum as "income (loss) before income taxes and equity in earnings of joint ventures adjusted to exclude: (i) interest expense, net; (ii) depreciation and amortization; and (iii) net loss on forward contracts." *Id.* at S-11.

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (In thousands) | | | | |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $230,759 | $(40,740 ) | $(5,755 ) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884 ) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

*Id.* at S-11 (emphasis added). Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm. Indeed, as the explanation above the table—which was positioned at the very beginning of the Registration Statement—stated:

> We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

*Id.* at S-11. It was not true, however, that Century Aluminum had Net Operating Cash of $204,875,000

Just a few weeks later—yet after Century Aluminum had sold over 24 million shares of the Company's common stock—the Company announced that the statement of cash flows reproduced above was materially misstated and needed to be restated. *See* Century Aluminum, Current Report (Form 8-K), at *1, et seq. (March 2, 2009) (the "Restatement"). In the March 2, 2009 Restatement, Century Aluminum informed investors and the market alike that the January 2009 Registration Statement was false and misleading, stating:

> On February 27, 2009, Century Aluminum Company (the Company) determined that our previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an error in the interim consolidated statement of

cash flows.   A restatement of these previously issued financial statements is necessary as the Company has determined that preferred stock issued in July 2008 was not presented on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

*Id*. at *2.

In the same filing Century Aluminum presented an "adjusted" statement of cash flows, illustrating the extraordinary impact of the Restatement wrought on the Company's cash position. *See id*. at *3.   Among other things, the Restatement had a cumulative impact of $989,480,000, resulting in a Net Operating Cash balance *of negative $698,721.00*.

Considering that prior to the Restatement, investors falsely believed that Century Aluminum had a positive balance of Net Operating Cash of $204,875,00, it is not surprising that the truth—almost a *one billion dollar* difference—had an immediate and dramatic impact on Century Aluminum's stock price.   Indeed, on news of the Restatement Century Aluminum's stock price plummeted, losing over 87% of its value. ¶¶ 121-22.   To illustrate the gravity of the situation, following the Restatement, Century Aluminum's stock reached its lowest price in the Company's history, *i.e.*, over fifteen (15) years.[6]

//

//

//

//

//

---

[6]   Century Aluminum was incorporated in 1995, when it was spun-off by Glencore following a scandal involving Glencore's founder Marc Rich.   Rich was indicted in the United States Federal Court for the Southern District of New York on charges of tax evasion arising out of his alleged violation of a United States oil embargo in place against Iran (the so-called "food-for-oil" scandal) in the early 1980s.   *See* Vickers, Marcia, *The Rich Boys: An ultra-secretive network rules independent oil trading. Its mentor: Marc Rich*, BusinessWeek (July 18, 2005).   Before he was tried, however, Rich fled to Switzerland, where he remained a fugitive, until being pardoned by President Bill Clinton on January 20, 2001.   *See id*.; *see also* Carney, Timothy P., *The story of Clinton's Marc Rich Pardon: Co-conspirators serve time while multimillionare enjoys clemency*, at *1, World Net Daily (February 05, 2001), *available at* http://www.wnd.com.



Due to the precipitous fall in stock price, investors in the January 2009 Offering saw shares that they had paid $8.00 per share for drop to $1.06 just a few weeks later. *See* ¶ 121. With hundreds of millions of dollars lost in market capitalization by investors and fears of bankruptcy swirling, investors were left 'holding the bag' while Century Aluminum used the money raised by the Offering to bail the Company out of the trouble it had conceived. *See id.*

## III.    PLAINTIFFS HAVE STATED A CLAIM UNDER SECTIONS 11, 12(A) AND 15 OF THE SECURITIES ACT OF 1933

Dismissal under Rule 12(b)(6) is disfavored and, as a result, such motions are rarely granted. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1257 (N.D. Cal. 2000), *accord Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008). While conclusory allegations of law are insufficient to withstand a motion to dismiss, a "complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim of relief that is plausible on its face.'" *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When viewed in light of this ubiquitous standard, Plaintiffs' complaint sufficiently pleads

false and misleading statements made in connection with the offering or sale of a security and causing damage to the Plaintiffs and the class.

### A. The First Amended Complaint States a Claim for Under the Requirements of the Securities Act

Section 11 is a "***harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement***." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008) (emphasis added) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). As the United States Supreme Court held in *Herman & MacLean v. Huddleston*:

> If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. **Liability against the issuer of a security is virtually absolute, even for innocent misstatements.** Other defendants bear the burden of demonstrating due diligence.

459 U.S. at 382 (citing 15 U.S.C. § 77k(b) and H.R.Rep. No. 85, 73d Cong., 1st Sess. 9 (1933)) (emphasis added). As such, fraud is not an element of a § 11 claim, nor is a plaintiff required to plead intentional, knowing or otherwise reckless misconduct in order to establish a prime facie case for violation of 15 U.S.C. § 77k(b). *See id.*; *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) ("*In re Stac*") ("No scienter is required for liability under § 11 [and] defendants will be liable for innocent or negligent material misstatements or omissions.").

In fact, Pleading a violation of § 11 of the Securities Act is a fairly straightforward matter. Plaintiffs only bear the "relatively minimal burden" of establishing that defendants have made a "material misstatement or omission" in connection with a registration statement. *See Herman & MacLean*, 459 U.S. at 382; *see also In re Stac*, 89 F.3d at 1403 ("The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.").

### 1. Rule 8(a) Applies to Plaintiffs Securities Act Claims

As noted above, fraud is not an element of § 11 claims, such as those alleged in the First Amended Complaint. *See, e.g., In re DDi Corp. Sec. Litig. ("In re DDi")*, No. CV03-7065, 2005

WL 3090882, at *9 (C.D. Cal. July 21, 2009), *accord In re Daou*, 397 F.3d at 723 (9th Cir. 2005). As the United States Court of Appeals for the Ninth Circuit held in *In re Daou*:

> In a case where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need only satisfy the ordinary notice pleading standards of Rule 8(a).

*Id.* Because fraud is not an element, and scienter plays no part in a claim brought under § 11, Plaintiffs need only present a short, plain statement of their claim in order to withstand a motion under Rule 12(b)(6). *See id.*, *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (for non-fraud claims plaintiff need only "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Notwithstanding these well-settled principles, Defendants advance the well-worn argument that a "more rigorous pleading requirement" should be applied in this case based on the United States Supreme Court's decisions in *Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009). Underwriters' Motion at 12-13. Defendants are incorrect and their one-sided interpretation of *Twombly* and its progeny is inaccurate. In *Twombly*, the Supreme Court specifically denounced Defendants' argument, making clear that they did not mean to "apply any 'heightened pleading standard.'" 550 U.S. at 569. The *Twombly* court also reiterated the above-cited standard that Rule 8(a)(2) requires "only a short plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 555 (quotations and citations omitted). *Ashcroft v. Iqbal* is in accord: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1949.[7]

---

[7] *Rubin v. MF Global, Ltd.*, cited by Defendants, does not help their cause. Underwriter Defendants' Motion at 3. In that case, the United States District Court for the Southern District of New York *actually applied Rule 8(a)'s notice pleading standard*, but found that plaintiffs had not alleged any "false or misleading" statement. *See Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 469-70 (S.D.N.Y. 2009). Unlike *Rubin*, the January 2009 Registration Statement contained patently false statements, evinced by Defendants' own actions in correcting those statements via the Restatement. *See, e.g., In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) ("By definition ... a restatement says that the prior financial statement was false."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) (holding that "the existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated.").

Moreover, even a cursory review of the First Amended Complaint demonstrates that Plaintiffs claims are based entirely on negligence and/or recklessness, rendering Rule 9 wholly inapplicable. *See* ¶¶ 20, 113-28, 149. The very presentation of the Complaint makes clear that the fraud-based § 10(b) claims are not related to the § 11 claims, as they are physically separated and apart from each other. *See id.* at ¶¶ 113-28; *Cf. Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) (holding that where § 11 claims incorporated by reference § 10(b) fraud claims, Rule 9 should apply); *see Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (applying Rule 8(a) because those claims "sound[ed] in negligence: each of the Underwriter Defendants owed to the purchasers of the shares of [Family Golf] ... the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus."). In addition, and perhaps most importantly, the basis for the § 11 claims is the failure of Defendants to "implement sufficient internal controls" to prevent the dissemination of the false statement in the January 2009 Registration Statement. ¶ 123-25.

Thus, Rule 8(a) alone applies to Plaintiffs' Securities Act Claims and, as detailed below, the First Amended Complaint easily satisfies Rule 8(a)'s notice pleading standards.[8]

## 2. The January 2009 Registration Statement Contained False and Misleading Statements of Material Fact

Plaintiffs' allegations as presented in the First Amended Complaint are more than sufficient to support a claim under §§ 11, 12(a) and 15 of the Securities Act. Indeed, in this case, the allegations are rather straight-forward, in that they stem from one SEC filing, concerning a single

---

[8]     Nonetheless, even if the court were to conclude that Rule 9 applies—which it most certainly does not—Rule 9 would only apply to the Defendants who are named under both § 10(b) and § 11. *See Fouad*, 2008 WL 5412397, at *3; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments, however, serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a)."). Instead, like in the recent decision by this Court in *In re Countrywide*, even if the fraud requirements of Rule 9 were to apply, the correct course of action is to strip away the fraud allegations from the § 11 claims, and allow the claims based on negligent or reckless representation survive. 588 F. Supp. 2d at 1162-63; *see also Vess*, 317 F.3d at 1104. Nevertheless, under no circumstances would Plaintiffs be required to establish "scienter" in conjunction with § 11, as that element is unique to § 10(b) and not part of § 11. *See, e.g., Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

set of misstatements and primarily relate to a discrete set of accounting precepts. *Cf. See, e.g., In re Washington Mutual, Inc., Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 503-04 (W.D. Wash. 2009) (concerning six or seven categories of false statement); *In re Countrywide*, 588 F. Supp. 2d at 1153 (concerning "myriad statements that occur throughout the 4-year class period."). At bottom, Plaintiffs sufficiently allege that the Securities Act Defendants failed to prevent a false "Summary of Consolidated Financial Data" from being published in the 2009 Registration Statement. *See* ¶¶ 117-25; *Compare* Restatement, at *2, *with* January 2009 Registration Statement at S-9 to S-12.

As discussed above, despite the disclosures in the January 2009 Registration Statement, Century Aluminum did not have a surplus of $204,875,000 in "Adjusted net cash provided by operating activities." *See id.* at ¶ 118-20. Instead, Century Aluminum actually had *negative $698,721,000* in Cash from Operations. *See id.*; Restatement, at *2. This is a discrepancy of over $900,000,000, resulting in a conclusion that not only was the Company not in a position to be making significant cash from its operating activities, but was actually losing much more money than that which the market had been previously aware. *See id.*

Therefore, while the magnitude and impact of these misstatements contained in the January 2009 Registration Statement may be disputed, their falsity cannot. This conclusion is bolstered by the fact that Century Aluminum itself admitted that the January 2009 Registration Statement was false when they issued the Restatement. *See* Restatement, at *1. In pertinent part, the Restatement states:

> [O]ur previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an **error** in the interim consolidated statement of cash flows. A restatement of these previously issued financial statements is **necessary** as the Company has determined that preferred stock issued in July 2008 was **not presented** on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

*Id.* Accordingly, the falsity of the June 2009 Registration Statement is bolstered by Defendants' own admissions in a SEC filing. Words such as "error," "necessary [Restatement]" and "not presented," can have no other reasonable meaning. *See* Merriam-Webster, Online Dictionary,

1   available at www.merriam-webster.com (defining "false" as "not being in agreement with what is

2   true <early reports about the explosion contained much false information>") (emphasis in

3   original).

4        This Court and courts around the country have routinely held that a restatement of financial

5   result is unassailable evidence of falsity and *per se* sufficient to withstand a motion to dismiss. *In*

6   *re Cylink*, 178 F. Supp. 2d at 1084; *see also In re Goodyear Tire & Rubber Co.*, 436 F. Supp. 2d

7   873, 894 (N.D. Ohio 2006) ("By definition ... a restatement says that the prior financial statement

8   was false."); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same); *In*

9   *re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000) (same). For example, in

10  *In re Cylink*, this Court concluded that, under the much more stringent requirements of § 10(b),

11  falsity could be established by financial statements that were later restated. *See id.* As the court

12  stated:

13         Under the first prong of the PSLRA's particularity requirement, plaintiffs are

14         obligated to allege facts demonstrating how their "belief [that the statements at

15         issue are false] was formed." 15 USC § 78u-4(b)(1). As the court previously
       noted, one fact can be a sufficient basis upon which to form such a belief. Whether

16         Daws participated in the decision to restate the earlier statements or not, therefore,
       **the existence of restated financial results is sufficient to support plaintiffs'**

17         **belief that the statements were misstated.**

18  *Id* (emphasis added). Accordingly, it is sufficient for Plaintiffs to rely on the restatement as

19  practically incontrovertible evidence of falsity. *See id.*

20       Once a statement is confirmed false, the only other question under § 11 is whether the false

21  statement is material. The standard for materiality is one that is well-settled under the law. A false

22  or misleading statement is material if there is "a substantial likelihood that the disclosure of the

23  omitted [or misrepresented] fact would have been viewed by the reasonable investor as having

24  significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway,*

25  *Inc.*, 426 U.S. 438, 449 (1976). Because materiality is a question of both law and fact it generally

26  cannot be used to support the dismissal of an action, unless the statement is "so obviously

27  [un]important to an investor, that reasonable minds cannot differ on the question of materiality."

28  *Id.* at 450.

It would be virtually impossible for anyone to conclude that a false statement made by Defendants in this case regarding almost a billion dollars in cash available made by Defendants in this case was "immaterial" or "so obviously [un]important" that it can be dismissed.  The case law squarely supports this view.  First, the Ninth Circuit has consistently held that a public company's financial disclosures are—by virtue of their very nature—*per se* material.  *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009) ("We have recognized that information regarding a company's financial condition is material to investment."), *accord S.E.C. v. Murphy*, 626 F.2d 633 (2d Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.").  Thus, the mere fact that the misstatement occurred in conjunction with a very important financial statement is, by itself, enough to evince the materiality of the $929,480,000 false statement in the January 2009 Registration Statement.

Moreover, the size of the false statements in this case is particularly indicative of materiality.  For example, at least one court has concluded that the SEC's guidelines for materiality are instructive in some cases.  *See In re NovaGold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 300-01 (S.D.N.Y. 2009).  As the *NovaGold* court related:

> The SEC's guidance in Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (1999) ("SAB 99"), regarding the determination of materiality, which the Second Circuit considers to be persuasive authority, ECA, 553 F.3d at 197, supports a finding that materiality has been adequately pleaded. SAB 99 requires consideration of both quantitative and qualitative factors. *Id.* Quantitatively, SAB 99 observes that misstatements of less than 5% (with respect to the specified item) are prima facie unlikely to be material. SAB 99 at 45151. Qualitative factors "that may well render material a quantitatively small misstatement of a financial statement item" include, *inter alia*, "whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate" as well as "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." *Id.* While the misstatement alleged here "arises from an estimate," the error was allegedly of large magnitude, and it concerned a venture highly significant to NovaGold, as evinced in part by analysts' positive comments following the release of the Hatch Study.

*Id.* at 300-01.  Under any reasonable standard, including the SEC's guidelines as enumerated in SAB 99, the false statements by Defendants in this case are material.  The following are just a few metrics with which to analyze the Restatement:

| |
|---|
| Restatement Amount: $929,480,000 |
| Century Aluminum's Net Sales for 2007: $1,798,163,000 |
| Restatement Percentage of Net Sales 2007: **51.7%** |
| Century Aluminum's Net Income for FY 2006: $1,558,566 |

Accordingly, the Restatement accounted for over 50% of Century's Net Sales for the entire fiscal years of 2006 and 2007, and it is disingenuous and antithetical to consider such an enormous mistake "immaterial."  *See id.*

Further, the nature of the false statements demonstrates their materiality in this case.  As discussed above, the January 2009 Registration Statement falsely stated that Century Aluminum was liquid and cash-rich, with a balance of Cash from Operating Activities of over $200 million. The statement of cash flows is one of the most important and easily understandable indices that investors look to in order to construe the financial stability and viability of a public corporation. *See S.E.C. v. Conaway*, ___ F. Supp. 2d ___, No. 05-CV-40263, 2010 WL 318283, at *84-86 (E.D. Mich. Jan. 20, 2010) (holding statements regarding cash and cash from operating activities actionable as false and materially misleading).  Indeed, financial, legal and investment commentators alike consistently describe the statement of cash flows as one of the most important factor in whether to invest in a company.  *See* Shepard, Lee B., *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 Hastings L.J. 891, 915 n.180 ("Cash-flow analysis is the single most critical aspect of all credit ratings decisions.") (quoting Standards & Poors, Inc., 2005 Corporate Ratings Criteria 8-9, 19 (2005); Kroger, John R., *Enron, Fraud, and Securities Reform: An Enron Prosecutor's Perspective*, 76 U. Colo. L. Rev. 57, 72 (2005) ("Revenue and cash flow are two of the most important metrics that companies report in their 10-Qs and 10-Ks, and if a company reports bad numbers, or numbers that are positive but lower than expected, investors and lenders will head for the hills."); Holtz, Alan D., E&Y Restructuring LLC*, Liquidity is Lord: Evaluating Imminent Financial Distress*, 18-9 ABIJ 12 (Amer. Bankr. Inst. J., November 1999)

1  ("[A] cash flow forecast is the most important tool to judge a company's potential to face

2  imminent financial distress.").

3        Unfortunately for investors—including those Class members in this case—the statement of

4  cash flows, being a non-GAAP statement, is open to various forms of abuse, including acquisition

5  accounting.  *See* Perler, Jeremy, CFA, *Transparency and Other Issues in Financial Statement*

6  *Analysis: Uncovering Misleading Metrics and Avoiding Financial Shenanigans*, Riskmetrics: CFA

7  Institute (Riskmetrics Group, June 2009) ("For the cash flow statement, unfortunately, very little

8  guidance is available and multiple opportunities for manipulation exist, including . . . . acquisition

9  accounting, including acquisition of working capital, proceeds from sale of businesses, and

10 keeping receivables of sold operations . . . .").

11       Finally, the precipitous drop in Century Aluminum's stock price following the

12 announcement of the Restatement is not only probative of causation,[9] but also illustrates the

13 materiality of the false statements in the minds of investors.  *See, e.g., In re UTStarcom, Inc. Sec.*

14 *Litig.*, 617 F. Supp. 2d 964, 977 n.17 (N.D. Cal. 2009) ("Upon review of the Complaint, the Court

15 finds that there are numerous additional examples of corrective disclosures and corresponding

16 stock price drops that connect to allegations of material misstatements.").  Indeed, on news of the

17 Restatement Century Aluminum's stock plummeted, losing over 87% of its value.  ¶¶ 121-22.  To

18 illustrate the gravity of the situation, following the Restatement, Century Aluminum's stock

19 reached its lowest price in the Company's history, *i.e.*, over fifteen (15) years.  This also is

20 sufficient to establish materiality and state a claim under § 11 sufficient to withstand a motion to

21 dismiss.  *See id.*; *see also Garbini v. Prot. One, Inc.*, 49 Fed. Appx. 169, 170 (9th Cir. 2002)

22 (holding that "the complaint sufficiently alleges that improper amortization of customer accounts

23 and the goodwill associated with them led to the material overstatement of Protection One's 1997

24

---

25 [9]    Nevertheless, Plaintiffs need not establish loss causation in order to state a claim under §§ 11, 12(a)

26 or 15 of the Securities Act.  *See, e.g., In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d
Cir. 2010) ("plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or

27 loss causation") (citing *Rombach*, 355 F.3d at 169 n.4).  In fact, loss causation or "negative causation," as it
is called, is an affirmative defense.  However, Defendants have not raised any negative causation arguments

28 in their briefing and those arguments are not before the Court.

earnings: a misrepresentation that touches upon the drop in stock price from $9.50 per share on June 2, 1998, to its price of approximately $3.13 per share at the time plaintiffs filed their first complaint.") (internal citations omitted); *Marucci v. Overland Data, Inc.*, No. 97CV0833-TW (JFS), 1999 WL 1027053, at *1 (S.D. Cal. Aug. 2, 1999).

Thus, the First Amended Complaint adequately alleges that the Offering Documents contained untrue statements and omitted material facts regarding Century Aluminum's financial condition, specifically its Cash from Operating Activities, at the time of the January 2009 Offering. *See In re DDi*, 2005 WL 3090882, at **12-13 (allegations that defendants' "accounting improprieties" caused prospectus to be "materially" misleading met Rule 8(a)'s pleading standard); *In re CBT Group PLC Sec. Litig.*, No. C-98-21014, 2000 WL 33339615, at *4 (N.D. Cal. Dec. 29, 2000) (§ 11 violations were adequately pled where complaint alleged that statement contained financial misstatements).

### 3.   Defendants' Attempts to Negate the Falsity of the Statements in the Registration Statement are Unpersuasive

Defendants advance three interlaced and despairing arguments regarding Plaintiffs' otherwise actionable claims. Specifically, Defendants argue that: (1) the materially false statement described above were "forward-looking" and therefore non-actionable; (2) the amorphous "bespeaks-caution" doctrine insulates the false statements; and (3) fact arguments regarding the Underwriters' role in the misstatements in the January 2009 Registration Statement. *See* Underwriters' Motion at 19-24. Each of these extremely frail arguments are either premature at this stage of the litigation or misplaced according to well-settled law.

#### a)   The False Statements are not Forward-Looking and not Protected by the "Bespeaks-Caution" Doctrine

It borders on the absurd for Defendants to argue that the statement in the January 2009 Registration Statement are "forward-looking," and therefore not actionable. *See* Underwriters' Motion at 19-20. The statements which Plaintiffs identify as false, are clearly statements of historical fact. *See* ¶¶ 117-22. In fact, the statements which Plaintiffs allege are false in the Registration Statement are identified in the Registration Statement *itself* as "***summary historical***

*results of operations*." January 2009 Registration Statement at S-9 (emphasis added). This renders any application of the "bespeaks caution" or related doctrines inapplicable and unhelpful to Defendants.

As the Ninth Circuit made clear over five years ago in *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, "extension of the bespeaks caution doctrine to statements of historical fact is inappropriate." 416 F.3d 940, 948 (9th Cir. 2005). That being the case, the precedents cited by Defendants regarding forward-looking statements are wholly inapplicable.[10] *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994) (holding that certain "forward-looking statements are protected"); *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994) (relating to "predictive statements" which are "contingent" on future circumstances); *In re Stac*, 89 F.3d at 1408 (stating that the "bespeaks caution" doctrine applies only to "forward-looking representations that contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud").

Defendants' arguments regarding "cautionary" statements in the January 2009 Registration Statement misunderstands Plaintiffs' claims. For example, Defendants argue that Century Aluminum's statements regarding its "expectation that it would have sufficient liquidity to fund operations for approximately 18 months," is *nihil ad rem*. *Contra* Underwriters' Motion at 19.

---

[10]    In *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994), the Ninth Circuit explained the rationale behind the "bespeaks-caution" doctrine, quoting a Fifth Circuit case as follows:

> The "bespeaks caution" doctrine ... reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law, an evolution driven by the increase in and the unique nature of fraud actions based on predictive statements. In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus, the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language-in particular, relevant specific facts or assumptions-affecting the reasonableness of reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine reflects the unremarkable proposition that statements must be analyzed in context.

*Id.* (quoting *Rubinstein*, 20 F.3d at 167). As illustrated above, the false numbers presented in the January 2009 Registration Statement were not contingent upon any future or un-accrued circumstance, nor were they "projections coupled with cautionary language." *See id.* Therefore, the "bespeaks-caution" doctrine, as well as any related doctrine relating to forward-looking statements, are not applicable in this case. *See id.*

Indeed, the First Amended Complaint does not allege—and Plaintiffs' are not claiming—that such self-described "amorphous and inherently cautionary" statements are false. Quite the opposite, Plaintiffs claim that the actual financial numbers presented in the Registration Statement belied those statements and, in fact, were patently false. *See* ¶¶ 117-22. In addition, even if Plaintiffs' claims did concern "forward-looking" false statements—which they do not—the "generic" cautionary language included in the Registration Statement would be insufficient to defeat Plaintiffs' claims. *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 317-18 (8th Cir. 1997) (holding the "bespeaks caution" defense inapplicable to generic or nonspecific warnings regarding cash flow and cash from operating activities).

### b)   The Safe-Harbor Provisions of the Securities Act do not Apply to the False Statements in the Registration Statement

Like the "bespeaks caution" doctrine,[11] the so-called "safe harbor" provisions of the Securities Act fail to immunize the false statements in the Registration Statement due to the retrospective nature of those financial disclosures. *See* 15 U.S.C. §§ 77z-2(c)(1)(A)(I) and 78u-5(c)(1)(B); *contra* Underwriters' Motion at 22. The law is clear, and pursuant to the plain language of both §§ 77z-2 and 78u-5, those provisions "apply only to a **forward-looking statement** . . . ." 15 U.S.C. §§ 77z-2(c)(1)(a) (emphasis added) and 15 U.S.C. § 78u-5(a) (same). According to those statutes, a "forward-looking statement" is one that projects future income or revenues, predicts future economic performance, or discusses management's plans for future operations. *See* 15 U.S.C. § 77z-2 (i)(1)(A)-(C). Moreover, in order for §§ 77z-2 and 78u-5 to inoculate a false statement, forward-looking statements must be accompanied by "meaningful" cautionary language. However, cautionary language is only "meaningful" if, due to the inclusion of such statements, "reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd.*, 416 F.3d at 948.

As discussed *supra*, the statements set forth in the First Amended Complaint are included

---

[11]   The safe harbor provisions of the PSLRA codify the bespeaks caution doctrine. *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1170 n. 6 (W.D. Wash. 1998). Nonetheless, the bespeaks caution doctrine remains a defense in its own right. *See id.*

in a section which is described by the January 2009 Registration Statement itself as "summary historical results of operations." January 2009 Registration Statement at S-9; *see supra*. Therefore, neither the safe harbor provisions of §§ 77z-2(c)(1)(A)(I) and 78u-5(c)(1)(B), nor the "bespeaks caution" doctrine apply to the false statements in this action. *See In re NationsMart*, 130 F.3d at 317 (8th Cir. 1997) (holding that "§ 11 claims do not involve fraud, and . . . plaintiffs [need not] plead specific facts to avoid the safe-harbor rule.").[12]

### B. Defendants' Standing Arguments are Unripe and Nonjusticiable at this Stage of the Action

Despite the fact that Plaintiffs have easily pled a *prime facie* case for violation of § 11, Defendants try to obfuscate the straightforward nature of such claims by raising a number of red herrings such as multiple species of an argument regarding the Plaintiffs' "standing" and factual questions regarding the chain of ownership for specific shares. *See* Underwriters' Brief at 6-10. All of these arguments—including Defendants bootstrapped subject matter jurisdiction assertions—are premature at this stage of the proceedings, considering that Plaintiffs have pled all that is necessary under the Federal Rules. *See infra*.

### 1. Plaintiffs have Plead Facts Sufficient to Confer Standing to Assert their Claims under § 11

Defendants' arguments concerning standing are both premature and incorrect. The First Amended Complaint pleads facts in excess of what is required in order to withstand a motion to dismiss. *See* ¶¶ 28-31. Specifically, the First Amended Complaint sets forth the following "facts" which are more than sufficient for Plaintiffs to proceed with this litigation:

> 28. Lead Plaintiff Stuart Wexler, a resident of Philadelphia, Pennsylvania, **purchased Century Aluminum securities pursuant and/or traceable to the Company's Secondary Offering, as set forth in the**

---

[12] Defendants also attempt to graft some manner of Draconian prove-up requirement onto § 11, which obviously doesn't exist. *See* Underwriters' Motion at 22. While it is rather confusing, Defendants seem to invent a "due diligence" defense, which they aver entitles them to immunity so long as they conducted a "reasonably and diligent investigation." *See id.* at 23. Not only is such a defense fabricated, but it would necessarily hinge on questions of fact, which are not at issue under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Hertzberg*, 459 U.S. at 382 ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

1
2
3
4
5
6
7
8
9

**accompanying certification, and has been damaged thereby**. In addition, Lead Plaintiff transacted in Century Aluminum Common Stock during the Exchange Act Class Period, and was damaged thereby.

29.     Plaintiff Peter Abrams, a resident of Memphis, Tennessee, **purchased Century Aluminum securities pursuant and/or traceable to the Company's Secondary Offering**, as set forth in the accompanying certification, and has been damaged thereby.

30.     Plaintiff Eric Petzschke, as set forth in the accompanying certification, incorporated by reference herein, **purchased Century Aluminum securities pursuant and/or traceable to the Company's Secondary Offering**, as set forth in the accompanying certification, and has been damaged thereby.

31.     Plaintiff Cory McClellan, as set forth in the accompanying certification incorporated by reference herein, **purchased Century Aluminum securities pursuant and/or traceable to the Company's Secondary Offering**, as set forth in the accompanying certification, and has been damaged thereby.

10
11

*Id.* (*emphasis added*).   These allegations of "fact," along with the certifications are all that is required for Plaintiffs to demonstrate standing to pursue this action at the motion to dismiss stage.

12
13
14
15
16
17
18
19
20
21
22

Initially, it is important to point out that a Lead Plaintiff need not have standing to pursue all claims which may be presented by the Class as a whole. *See, e.g., Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 n.13 (2d Cir. 2004) ("[A]ny requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff- namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole."). Instead, a representative plaintiff is only required to plead facts which demonstrate the he has been injured by Defendants' false or misleading statements. *See In re Leapfrog Enters., Inc. Sec. Litig.*, No. C-03-05421, 2005 WL 3801587, at *3 (N.D. Cal. Nov. 23, 2005) ("lead plaintiffs needed only to prove that they suffered a concrete injury because of defendants' wrongdoing, not every injury alleged by the class") (citing *In re VeriSign, Inc.*, No. C 02-02270, 2005 WL 88969 at *4 (N.D. Cal. Jan. 13, 2005)).[13]

23
24
25

Moreover, § 11 does not require that a representative plaintiff purchase on either the particular date of the offering or at the specific price of the offering in question. *See Hertzberg*,

26
27
28

---

[13]     *See also In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 005 WL 1806503, at *18 (E.D. Pa. July 27, 2005) ("Lead Plaintiffs may pursue claims on behalf of the entire class because they were appointed to oversee litigation on behalf of the class. The PSLRA does not require that the lead plaintiffs have standing to sue on every available cause of action.").

191 F.3d at 1080 (9th Cir. 1999).  It would have been both anachronistic and antithetical for Congress to require a putative plaintiff to prove that he purchased his securities both at the offering price and on the exact date of the offering in order to enjoy standing under § 11.  First, it overlooks the realities of today's markets, which operate perpetually and allow complex transfers of stock in seconds.  Also, it is contrary to the plain language of § 11, as the Ninth Circuit explained in *Hertzberg*:

> The limitation on "any person" is that he or she must have purchased "such security." Clearly, this limitation only means that the person must have purchased a security issued under that, rather than some other, registration statement. *See Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967). While it might present a problem of proof in a case in which stock was issued under more than one registration statement, the only Dignity stock ever sold to the public was pursuant to the allegedly misleading registration statement at issue in this case. Thus, as long as Hertzberg is suing regarding this security, he is "any person purchasing such security," regardless of whether he bought in the initial offering, a week later, or a month after that.

*See Hetrzberg*, 191 F.3d at 1080.  Accordingly, because Plaintiffs are suing "regarding [the same] security," they have standing to sue Century Aluminum whether they "bought in the initial offering, a week later, or a month after that." *Id.*

More recently, this Court has recognized that allegations such as those reproduced above, *i.e.*, that they purchased stock "pursuant to or traceable to" the January Offering—are *per se* sufficient to withstand a motion to dismiss. *See In re Intrabiotics Pharma., Inc. Sec. Litig.* ("*In re Intrabiotics Pharm.*"), No. C 04-02675 JSW, 2006 WL 708594, at *13 (N.D. Cal. Jan. 23, 2006); *Stack v. Lobo*, 903 F. Supp. at 1375.  Indeed, in *In re Intrabiotics Pharm.*, this Court concluded that a simple allegation that "[plaintiff] purchased stock pursuant to or traceable to the registration statement," was—without more—sufficient to withstand a motion to dismiss. *Id.* at *13. Accordingly, Defendants' standing arguments as to § 11 are completely unavailing and insufficient to warrant dismissal.

### 2. Plaintiffs have also Plead Sufficient Facts to Plead a *Prime Facie* Case for Violation of § 12(2)

Like § 11, § 12(2) does not require any particular showing of "facts" at this stage of the litigation.  Instead, under Rule 8(a) Plaintiffs' need only supply a "short plain statement showing

that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them." *In re DDi*, 2005 WL 3090882, at *19.  Plaintiffs have satisfied this burden.  *See* ¶¶ 28-31; 111-13.

The First Amended Complaint adequately alleges that: (1) Plaintiffs purchased stock either pursuant to, or traceable to, the January 2009 Offering; and (2) that the Underwriter Defendants statutory sellers in the January 2009 Offering under § 12(2).  ¶¶ 28-31; 114-17.  Nothing more is required at this stage of the proceedings.  *Stack v. Lobo*, 903 F. Supp. at 1375 (holding that, for purposed of a motion to dismiss, it is sufficient for plaintiff to allege that they "purchased their shares" in the transaction in question or "alleged facts giving rise to an inference that their shares can be traced to the [offering in question]"); *see also In re Craftmatic Sec. Litig.*, 890 F.2d 628, 637 (3d Cir. 1989) ("We find that plaintiffs' claim that the Craftmatic defendants were sellers for purposes of § 12(2) is sufficient to survive a Rule 12(b)(6) motion to dismiss.").

Additionally, the First Amended Complaint sufficiently alleges that the Underwriter Defendants were sellers within the meaning of § 12(a)(2).  As the Supreme Court held in *Pinter v. Dahl*, 486 U.S. 622, 647 (1988), the term "seller" under § 12(1) is not limited to the person who passes title to the security.  Rather, it includes anyone "who successfully ***solicits the purchase***, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* (emphasis added). Therefore, Plaintiffs have standing under § 12(a)(2) if either: (1) they purchased their shares directly from the Underwriter Defendants; or (2) they can establish that they purchased their shares pursuant to an offering in which the Underwriter Defendants solicited the purchase of shares.  *See id.*; *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992); *see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 439 n. 4 (S.D.N.Y. 2000) (personal solicitation of the plaintiff by the defendant not required where significant involvement in the solicitation is found).  Nonetheless, as noted above, because ***all inferences are to be drawn in favor of Plaintiffs*** at this stage of the proceedings, it is sufficient for Plaintiffs to allege that they purchased shares from the Underwriter Defendants pursuant to the false and misleading January 2009 Secondary Offering.  *See In re Craftmatic Sec. Litig.*, 890 F.2d at 637.

Also, as discussed above the representative Plaintiffs have standing to bring claims on behalf of unrepresented members of the class at this point in the litigation, raising a question of fact as to the particulars of the transactions at issue—making Defendants' arguments demanding "specific facts" entirely premature at this stage in the proceedings.  *See, e.g., Fouad*, 2008 WL 541397, at **7-8 (holding that allegations that name plaintiff purchased shares in IPO were sufficient to "establish standing for the plaintiff class"); *In re Nat'l Golf Props. Inc.*, No. CV02-01383, 2003 WL 23018761, at *2 (C.D. Cal. Mar. 19, 2003) (finding sufficient allegations of § 12(a)(2) violations where at least one named plaintiff was alleged to have purchased securities pursuant to the misleading offering documents at issue).

Defendants seem to advocate the requirement of a Draconian prove-up hearing or something of the sort in order for Plaintiffs to be allowed to proceed with this litigation.  However, no such requirement exists, and any such requirement would be clearly antithetical and contrary to § 12(a).  *See In re DDi*, 2005 WL 3090882, at **19-20 ("Plaintiffs need not allege which underwriter sold securities to each plaintiff"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) ("we do not find support in *Pinter* for the district court's statement that, in order to [allege that the underwriter defendants were § 12(a)(2) sellers], plaintiffs are required to allege which underwriter sold securities to which plaintiff").

Accordingly, Plaintiffs have standing to pursue this action on behalf of the Class and any fact issues concerning standing must be resolved either at the class certification stage or at summary judgment.  Moreover, even if the court were to assume, *arguendo*, that Plaintiffs have failed to adequately plead standing, it would be reversible error to dismiss Plaintiffs' claims with prejudice, as Defendants suggest.[14]  *Belizan v. Hershon*, 495 F.3d 686, 694 (D.C. Cir. 2007) (holding that "the district court abused its discretion by dismissing the plaintiffs' § 12(a)(2) claim without explaining why the addition of a "John Doe" plaintiff and the dates he purchased Fund VI

---

[14]     Defendants' § 15 arguments fail for the same reasons and do not warrant separate treatment, except to say that if the court upholds Plaintiffs' §§ 11 and 12(a) claims, it would also be appropriate to uphold Plaintiffs' § 15 claims—as Defendants impliedly concede. *Cf.* Underwriters' Motion at 24.

1   securities did not establish at least one plaintiff's standing and sufficiently plead the facts necessary

2   to satisfy the statute of limitations").

3   **IV.     CONCLUSION**

4          For the reasons stated herein, Plaintiffs respectfully request that the Court DENY

5   Defendants' Motion to Dismiss in its entirety.

6   DATED: March 19, 2010                      Respectfully submitted,

7                                               WOLF HALDENSTEIN ADLER
                                                 FREEMAN & HERZ LLP
8                                               FRANCIS M. GREGOREK
                                                BETSY C. MANIFOLD
9                                               RACHELE R. RICKERT

10                                                    /s/ Betsy C. Manifold
11                                                    BETSY C. MANIFOLD

12                                              750 B Street, Suite 2770
                                                San Diego, CA 92101
13                                              Telephone: 619/239-4599
                                                Facsimile:  619/234-4599
14
                                                Lead Counsel for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

27

28