United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re CENTURY ALUMINUM COMPANY
SECURITIES LITIGATION,

_____/

Nos. C 09-1001 SI, C 09-1103 SI, C 09-1162
SI, C 09-1205 SI

**ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS AND
GRANTING PLAINTIFFS LEAVE TO
AMEND**

On April 23, 2010, the Court held a hearing on defendants' motions to dismiss the first amended consolidated class action complaint, and on the underwriter defendants' motion to strike. For the reasons set forth below, the Court GRANTS defendants' motions to dismiss and GRANTS plaintiffs leave to amend the complaint. The Court DENIES as moot the underwriter defendants' motion to strike. The Court GRANTS defendants' requests for judicial notice.

**BACKGROUND**

On January 29, 2010, plaintiffs filed a first amended consolidated class action complaint against Century Aluminum Company ("Century"), a number of Century officers and members of the Century Board of Directors, and two underwriters, Credit Suisse Securities (USA) LLC and Morgan Stanley & Co. Plaintiffs allege claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

United States District Court
For the Northern District of California

1  § 78 *et seq*., and under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 *et seq*.[1]

2  Plaintiffs' Securities and Exchange Act claims are plead separately and independently, and the

3  complaint alleges different classes for the Exchange Act and Securities Act claims. However, the

4  gravamen of all of plaintiffs' claims is that Century issued false and misleading financial statements in

5  November 2008 and in connection with a January 29, 2009 secondary offering of common stock, and

6  that these false and misleading statements incorrectly portrayed Century as "liquid and cash-rich, when

7  – in reality – it was not." FAC ¶ 18. Plaintiffs allege that the truth about Century's financial condition

8  was revealed when the company issued a restatement on March 2, 2009, and that upon news of the

9  restatement, Century's stock dropped 24% to close at $1.68, compared to the previous trading day's

10  close of $2.22, a loss of $40 million in market capitalization in one day, and a significant drop from the

11  January 29, 2009 offering price of $4.50. *Id*. ¶¶ 13-14.[2]

12  Century is a holding company which through its subsidiaries, manufactures and produces

13  aluminum and aluminum products. *Id*. ¶ 5. Century was formed by Glencore International of

14  Switzerland, as a holding company for that corporations's aluminum producing assets. *Id*. The

15  complaint alleges that by mid-2008, the "commodities markets were in peril, and the market for

16  aluminum in particular was being heavily compromised." *Id*. ¶ 6. Century was facing rising raw

17  material input prices and declining prices for aluminum due to problems in the auto, heavy truck and

18  commercial building industries. *Id*. ¶¶ 6-7. By late 2008, Century was incurring substantial monthly

19  losses, culminating in a net loss of $700.2 million (or $14.27 per share) for the Fourth Quarter of 2008.

20  *Id*. ¶ 9. In addition, Century was forced to take a $94.8 million charge for "goodwill impairment" ($1.93

21  per share), a tax charge of $522.9 million ($10.66 per share) based on a "recording of a valuation

22  allowance on deferred tax assets," and an inventory write-down charge of $55.9 million ($1.14 per

24  [1] The Exchange Act defendants include Century and the Century officers and directors, and the Securities Act defendants include all of the Century defendants, as well as Credit Suisse and Morgan Stanley.

26  [2] The FAC alternately alleges that the secondary offering price was $4.50 and $8.00. Documents filed by defendants show that the secondary offering price was $4.50. Century's RJN, Ex. 22 at 824. In addition, the FAC incorrectly alleges, alternately, that the closing price of Century's stock on March 2, 2002 was $1.06 and $1.67. FAC ¶¶ 13-14, 121. Documents filed by defendants show that the closing price on that date was $1.68. Century RJN, Ex. 62.

United States District Court
For the Northern District of California

share).  *Id.*

The complaint alleges that "[t]o compound matters, . . . defendants . . . were facing the loss of their positions, control and holdings in Century Aluminum due to their losses on the open market."  *Id.* ¶ 8.  In mid-2008, Century owed over $750 million to commodities trading conglomerate Glencore Ltd., as a result of certain risky derivatives or "forward financial sales contracts."  *Id.*[3]  The parties refer to these contracts as the "Hedges."[4]

On July 7, 2008, after three years of steady losses under the Hedges as a result of increasing aluminum prices, Century and Glencore agreed to terminate the Hedges.  Under the transaction, (1) Glencore discharged $1.832 billion of liabilities owed from Century to Glencore; (2) Century made a cash payment of $225 million and gave Glencore a note for the deferred settlement amount of $505.198 million; (3) Century issued to Glencore 160,000 shares of preferred stock, convertible into 16,000,000 shares of common stock; (4) Glencore paid Century, in cash, the purchase price of the preferred stock, $1,090,259,200, which sum Century immediately paid back to Century in partial settlement of Century's liabilities associated with the Hedges.[5]  *See* Century RJN, Ex. 17 at 721-23, 771 (Nov. 10, 2008 Form 10-K).

On July 8, 2008, Century disclosed the transaction to the public by (1) holding a conference call with analysts and investors to explain the transaction, *Id.* Ex. 5-6, (2) filing an 8-K announcing that it

---

[3]  Century asserts that the allegation that Century owed $750 million on the contracts is disingenuous because the "mark-to-market valuation was not a current obligation, due upon demand; it was an estimate, based on estimated cash flows discounted to present value, of what Century would have to pay Glencore through 2015 (when the Hedges expired) if aluminum prices stayed where they were as of the estimate."  Century's motion to dismiss at 7 n.1, citing RJN, Ex. 1 at 76.

[4]  The Century defendants state that the Hedges worked in the following way: For each year starting in 2006 and continuing through 2015, the Hedges set a minimum price and a maximum price, and specified two quantities of primary aluminum (expressed in metric tons): "Tonnage 1" and "Tonnage 2."  There was a possible cash settlement each month.  If the average London Metal Exchange (LME) spot price for the month was below the minimum, Glencore paid Century the difference between the LME spot price and the minimum, multiplied by the quantity of Tonnage 1.  If, however, the average LME spot price for the month was above the maximum, Century paid Glencore the difference between the LME spot and the maximum, multiplied by the sum of the quantities of Tonnage 1 + Tonnage 2. If the average LME spot price for the month was between the minimum and the maximum, neither party paid the other anything.  Century Motion to Dismiss at 6:1-11.

[5]  Defense counsel chose a basketball analogy, the "touch pass," to illuminate this part of the transaction.

had agreed to terminate the Hedge via the execution of four agreements, all of which were attached in their entirety to the 8-K, *Id.* Ex. 3 at 186-260, and (3) filing a 13D/A detailing Glencore's purchase of preferred stock from Century, including all of the cash that changed hands as part of this transaction. *Id.* Ex. 4 at 276-80.

Plaintiffs' claims arise out of how this financial transaction was classified in Century's November 2008 quarterly financial statement, as well as in the January 29, 2009 secondary offering prospectus.  In both statements, certain cash elements of the transaction were classified as "Cash Flows From Operating Activities" instead of as "Cash Flows From Financing Activities."  FAC ¶ 10. Plaintiffs allege, "As such, Century Aluminum falsely reported in its [November 2008] quarterly report (Form 10-Q) that the Company had a surplus of $230,759,000 in free cash flows provided by operating activities in the third fiscal quarter of 2008 when in reality Century Aluminum had a deficit of $698,721,000." *Id.*  Plaintiffs allege that defendants' misclassification of cash flows violated Generally Accepted Accounting Principles ("GAAP").

On March 2, 2009, Century filed a Restatement that informed shareholders and investors that the Company's "previously issued financial statements for the nine months ended September 30, 2008 . . . . should no longer be relied upon as a result of an error in the interim consolidated statement of cash flows."  Century RJN, Ex. 30 at 1063.[6]  The Restatement states, "The Company initially reported cash flows associated with the termination of forward financial sales contracts [the Hedges] by issuing $929 million of Series A Convertible Preferred Stock on a net basis as an operating activity.  Management has concluded the transaction should have been presented on a gross presentation basis as both an operating activity and a financing activity to reflect the cash receipts and disbursements associated with the transaction."  *Id.*  The revised statement of cash flows shows the movement of $929,480,000 from "cash flows from operating activities" to "cash flows from financing activities," without any effect on "net change in cash," "cash at the beginning of the period" or "cash at the end of the period."  *Id.* at 1064.  The Restatement also did not affect Century's balance sheet, income statement, or statement of

---

[6]  On March 2, 2009, Century made two other filings with the SEC: a prospectus supplement seeking to register more common stock, possibly in advance of another stock offering, and Century's 10-K for 2008.  Century's RJN, Ex. 31 and 32.

1   shareholders' equity.

2        The complaint alleges that with the inflated statement of cash flows from operating activities,

3   Century was able to seek an additional influx of cash from the only avenue remaining to the company:

4   a public offering of stock.  *Id*. ¶ 11.  On January 29, 2009, Century made a secondary offering of

5   common stock at $4.50 per share.  *Id*. ¶¶ 17, 72, 176.

6        At the time of the offering, Century was in the midst of a dire financial situation and was facing

7   plant shutdowns, mounting losses and debts, and possible bankruptcy.  The January 29, 2009 prospectus

8   states, "Our financial position and liquidity have been and will continue to be materially adversely

9   affected by declining aluminum prices.  If prices remain at current levels or continue to decline, we will

10  have to take additional action to reduce costs, including significant curtailment of our operations, in

11  order to have the liquidity required to operate through 2009, and there can be no assurance that these

12  actions will be sufficient."  Century RJN, Ex. 22 at 829.  The prospectus also disclosed that Century

13  suffered a substantial Q4 operating loss, stood to lose even more the next quarter, had a negative

14  operating cash flow, would be taking an impairment charge to its goodwill, had to write down

15  inventories, had worsening liquidity problems, and that Moody's had downgraded its credit rating.  *Id*.

16  at 827, 831, 833, 852-54, 856-57, 871-74.

17       Plaintiffs allege that because of these disclosed problems, "there can be no doubt that

18  information concerning Century Aluminum's cash position was of the most valuable to investors and

19  the market.  As such, the . . . Defendants should have been primarily concerned with the accuracy of the

20  disclosures in the Secondary Offering Documents which concerned operating cash and cash-on-hand.

21  Indeed, *extra* scrutiny should have been given to those accounting items in view of the Company's

22  situation – not only with respect to outside auditors and underwriters – but also internally (*i.e.*,

23  management, officers and the Board)."  FAC ¶ 20.  The complaint alleges that Century failed to

24  implement sufficient and functional internal controls that would have discovered the false and

25  misleading statements in the Registration Statement.  *Id*.

26

27                            **LEGAL STANDARD**

28       Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss,

2    the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

3    *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While courts do not require "heightened fact pleading of

4    specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and

5    a formulaic recitation of the elements of a cause of action will not do."  *Id*. at 555.  Plaintiff must allege

6    facts sufficient to "raise a right to relief above the speculative level."  *Id.*

7        In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court

8    must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the

9    plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the

10   Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions

11   of fact, or unreasonable inferences."  *St. Clare v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.)*, 536

12   F.3d 1049, 1055 (9th Cir. 2008).

13

14                                    **DISCUSSION**

15   **I.    Exchange Act claims**

16       Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b)

17   and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R.

18   § 240.10b-5.  Plaintiffs allege that the Exchange Act defendants [7] acted knowingly or were deliberately

19   reckless in issuing materially false or misleading statements and/or failing to disclose material facts

20   concerning the Company's business and financial condition between October 21, 2008 and March 2,

21   2009, inclusive.

22       To prove a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material

23   ───────────────────

24       [7] The Exchange Act defendants include Century Aluminum; Logan W. Kruger, the President
     and CEO of Century since 2005, and a director of the Century Board of Directors; John C. Fontaine, a
     member of the Board since 2005 and Lead Director of Century from 2005 to 2008; Jack E. Thompson,
25   a member of the Board since 2005; Peter C. Jones, a member of the Board since 2007; Robert E.
     Fishman, a member of the Board since 2007; John P. O'Brien, Chairman of the Board since 2008; Willy
26   R. Strothotte, member of the Board since 1996; Catherine Z. Manning, member of the Board since 2008;
     Steve Schneider, Senior Vice President and Chief Accounting Officer since 2006, and Vice President
27   and Corporate Controller from April 2002 through May 2006; Michael A. Bless, Executive Vice
     President and Chief Financial Officer since January 2006; and Wayne R. Hale, Chief Operating Officer
28   and Executive Vice President since March 2007.

misrepresentation or omission of fact (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1014 (9th Cir. 2005). Defendants challenge plaintiffs' allegations of materiality, scienter, and loss causation.

### A.     Scienter

"[T]o adequately plead scienter, the complaint must [] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Zucco Partners LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009). The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Inc.,* 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) (emphasis in original). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510 (internal quotation marks omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

The complaint's scienter allegations consist of the following: (1) defendants "had both the motive and opportunity to conduct fraud," FAC ¶ 83[8]; (2) defendants "knew the Company's public documents and statements issued or disseminated by or in the name of the Company were false and misleading" *Id.* ¶ 84; (3) the individual defendants were involved in drafting, producing, reviewing,

---

[8]     The FAC also alleges that "as members of Century Aluminum's executive management, Defendants Kruger, Bless and Hale have the motive to mislead public shareholders and investors, as evinced by their considerable salaries [chart with salaries]." *Id.* ¶ 88.

7

**United States District Court**
For the Northern District of California

approving and/or disseminating the materially false and misleading statements, and approved or ratified these statements, *Id.* ¶ 85; (4) as officers and controlling persons of a publicly-traded company, the individual defendants had a duty to promptly disseminate accurate and truthful information with respect to the company's financial condition, *Id.* ¶ 86; (5) by virtue of their positions, defendants Kruger (CEO) and Bless (CFO) "were in a position to know that the statements concerning cash flows in the 2009 Registration Statement and November 2008 Quarterly Report were false when they were made" *Id.* ¶ 87; (6) due to their positions as members of the Audit Committee, defendants Berntzen, Fishman, O'Brien, Jones, and Manning "either knowingly or deliberately approved the dissemination of the false statement contained in the January 2009 Registration Statement and the November 2008 Quarterly Report" and "they were in a position to know, and did know, that Century Aluminum's cash position was overstated" in these reports, *Id.* ¶ 89; (7) as members of the Compensation and Health, Safety & Sustainability Committees, defendants Fontaine and Thompson "are required to be knowledgeable about accounting and financial matters" and "as such, they would be in a position know that the statements . . . were false," *Id.* ¶ 90; (8) the individual defendants were able to and did control the contents of SEC filings, and therefore are responsible for the accuracy of the public reports and releases, *Id.* ¶ 91; (9) "By virtue of their receipt of information reflecting the true facts regarding Century Aluminum and its business practices, their control over or receipt of Century Aluminum's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning Century Aluminum," defendants were "active and culpable participants in the alleged fraudulent scheme, *Id.* ¶ 92; (10) the fraudulent scheme "could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of Century Aluminum," including defendants, *Id.* ¶ 93; (11) the individual defendants engaged in a scheme to inflate the price of Century stock "in order to protect and enhance their executive positions, their own personal wealth in accumulated holdings of Century Aluminum stock, and the substantial compensation and prestige they obtained thereby, as demonstrated by the salary and bonuses they earned" during the class period, *Id.* ¶ 94; and (12) "the sheer magnitude of the fraud in this case – almost $1 billion – ensures that any reasonable person would have recognized the accounting error in the Statement of Cash Flows." *Id.* ¶ 95.

United States District Court
For the Northern District of California

The scienter allegations are insufficient for a number of reasons. "'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); *see also Software Toolworks*, 50 F.3d at 627 ("[S]cienter requires more than a misapplication of accounting principles."). Similarly, the signing of quarterly certifications of financial statements mandated by the Sarbanes-Oxley Act does not, without more, support an inference of scienter. *See Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008). "[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 743 (quoting *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 979 (9th Cir. 1999)).

Plaintiffs argue that scienter can be inferred because the cancellation of hedging contracts with Glencore was a major change in how Century conducted its business, and the improper accounting treatment created a positive cash flow from operations in the midst of a liquidity crisis and attracted investors to the January 2009 offering. Plaintiffs rely on *Berson v. Applied Signal Technology*, 527 F.3d 982 (9th Cir. 2008), and *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). In both cases, bare allegations of falsity were held sufficient to plead scienter. The Ninth Circuit recently addressed the "certain narrow conditions" under which such allegations are adequate:

> The first exception permits general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" to create a strong inference of scienter when these allegations are buttressed with "detailed and specific allegations about management's exposure to factual information within the company." *South Ferry*, 542 F.3d at 785 To satisfy this standard, plaintiffs might include in their complaint "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database," *id.*, a specific admission from a top executive that " '[w]e know exactly how much we have sold in the last hour around the world,' " *id.* (quoting *Nursing Home*, 380 F.3d at 1231), or other particular "details about the defendants' access to information within the company." *Id.*
>
> . . .
>
> The second exception to *Read-Rite* [*In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir.2003)] permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management. Where the defendants "must have known" about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of

9

United States District Court
For the Northern District of California

1
2
3
4
5
6
7

the company, the defendants' awareness of the information's falsity can be assumed. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008). Nevertheless, reporting false information will only be indicative of scienter where the falsity is patently obvious – where the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* at 989 (quoting *America West*, 320 F.3d at 943 n. 21). In *Berson* we found that the defendant company's misrepresentation of the status of stop-work orders was enough to infer scienter when the four stop-work orders had respectively "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers," "halted $8 million of work," "caused the company to reassign 50-75 employees," and "required [Defendant] to complete massive volumes of paperwork." *See id.* at 988 n. 5 (quotation marks omitted).

8
9
10
11
12
13
14
15
16
17
18
19
20

*Zucco Partners*, 552 F.3d at 1000-01. In *Zucco Partners*, a company announced that it had erroneously accounted for software expenditures, and that due to these errors, earnings had been overstated by $2.7 million. *Id.* at 988. The Ninth Circuit held that the plaintiffs did not allege scienter, and that neither of the two exceptions to the general scienter pleading rules were met. With regard to the first exception, the Ninth Circuit held that "allegations that Digimarc's management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated." *Id.* at 1000-01. The Ninth Circuit held that the second exception was not met because the alleged misrepresentation "did not concern especially prominent facts" and instead "are largely definitional" and "[t]here is no indication that the differences between the 'preliminary project' stage, the 'application development' stage, and the 'post-implementation' stage of a software project would be operationally visible to executives not intimately connected with the development process and GAAP's definitions." *Id.* at 1001.

21
22
23
24
25
26
27
28

Here, plaintiffs have not shown that this case fits within either of the exceptions described in *Zucco*. The bare allegations that Century officers had access to financial statements and analyzed those statements does not support the inference that defendants knew about the accounting error. *See Glazer Capital Mgmt.*, 549 F.3d at 746. The FAC essentially alleges that defendants must have known about the accounting error because the mistake involved a lot of money. However, as the FAC alleges and Century's SEC filings show, the Restatement moved $929,480,000 from "Cash Flows From Operating Activities" to "Cash Flows From Financing Activities"; there was no effect on net change in cash, assets, liabilities, shareholders' equity, net income (or loss), cash at the opening of the period, or on cash

10

United States District Court
For the Northern District of California

at the end of the period.  Century disclosed all of the salient aspects of the transaction terminating the Hedges, and the termination of the Hedges was a one-time event.  There are no allegations in the complaint to suggest that management had any factual basis for knowing that GAAP required that the one-time transaction should be classified under "Cash Flows From Financing Activities" as "Issuance of preferred stock" rather than netted against "Due to affiliates" under "Cash Flows From Operating Activities."  As in *Zucco*, the alleged misrepresentation is "largely definitional" and the FAC does not allege why the falsity of the original statements would have been obvious to corporate management. *Cf. Berson*, 527 F.3d at 987-88 (plaintiffs could infer that two high-level managers responsible for day-to-day operations must have known about misrepresentations about the status of stop-work orders when four stop-work orders had halted tens of millions of dollars of the company's work and had "devastating effect on the corporation's revenue"); *see also Cornerstone Propane Partners*, 355 F. Supp. 2d at 1091 (internal quotation marks omitted) ("In order to distinguish deliberate recklessness from ordinary carelessness, allegations of GAAP violations must be augmented by facts that shed light on the mental state of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles."); *see also Pac. Gateway Exch.*, 169 F. Supp. 2d at 1167 (holding that plaintiffs must allege "how [and] when each defendant became aware of the allegedly improper accounting practices, [and] the extent of each defendant's contribution or involvement . . .").

### B.    Materiality

Defendants also contend that the misstatement regarding cash flows was immaterial as a matter of law because the restatement had no effect whatsoever on Century's bottom-line.  Defendants argue that the error is immaterial by the standard set in *In re Daou*, 411 F.3d at 1018-19, which requires that a complaint allege facts showing that accounting irregularities "were material in light of the company's overall financial position."  Defendants emphasize the numerous statements in the January 2009 prospectus regarding Century's liquidity risk, such as ". . . our U.S. operations are not cash flow positive at recent aluminum prices . . ." (RJN, Ex. 22 at 829, 874), ". . . we do not have other committed sources of capital . . ." (*Id*. at 831, 874), "If prices remain and current levels or continue to decline, we will have

United States District Court
For the Northern District of California

1   to take additional action to reduce costs, including significant curtailment of our operations, in order to

2   have the liquidity required to operate through 2009, and there can be no assurance that these actions will

3   be sufficient." *Id.* at 829.

4       Plaintiffs argue that precisely because of Century's liquidity problems, the misstatement about

5   cash flows from operating expenses is material.  Plaintiffs contend that the statement of cash flows is

6   one of the most important and easily understandable indices that investors look to in order to construe

7   the financial stability and viability of a corporation, and they emphasize the magnitude of the

8   misstatement – nearly $1 billion.  The Supreme Court has held that "[a]n omitted fact [or misstatement]

9   is material if there is a substantial likelihood that a reasonable shareholder would consider it important

10  in deciding how to vote." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc.*

11  *v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotations omitted).  "[T]o fulfill the materiality

12  requirement there must be a substantial likelihood that the disclosure of the omitted fact would have

13  been viewed by the reasonable investor as having significantly altered the total mix of information made

14  available." *Id.* at 231-32 (quoting *TSC Indus.*, 426 U.S. at 449) (internal quotations omitted).

15      "The 'materiality' of an omission is a fact-specific determination that should ordinarily be

16  assessed by a jury [and] [o]nly if the adequacy of the disclosure or the materiality of the statement is so

17  obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of

18  law." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).  In light of all the public

19  disclosures which were made in this case, this is a close question.  On balance, however, the Court finds

20  that whether the misstatement here is material raises factual issues that cannot be resolved on the

21  pleadings at this stage.

22

23      **C.    Loss causation**

24      Defendants contend that the FAC's allegations of loss causation are insufficient.  "[T]o prove

25  loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form

26  the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys., Inc.*,

27  411 F.3d at 1025 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  "A complaint fails

28  to allege loss causation if it does not 'provide[ ] [a defendant] with notice of what the relevant economic

United States District Court
For the Northern District of California

1   loss might be or of what the causal connection might be between that loss and the misrepresentation[.]'"

2   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quoting *Dura*,

3   544 U.S. at 347).

4   　　　The FAC alleges that "on news of the Restatement, the price of the Company's shares traded on

5   NASDAQ fell to $1.06, a 87% drop from the January 2009 Offering price of $8.00 slightly more than

6   one month earlier." FAC ¶ 13; *see also id.* ¶ 79 (similar allegation regarding 87% drop). However, as

7   defendants correctly argue, stock drops that precede curative disclosures are not actionable. *See In re*

8   *Daou*, 411 F.3d at 1026-27 ("We note that, as the TAC currently reads, at the time when Daou began

9   to reveal its true financial health in August 1998, its stock was trading at $18.50 per share and not at the

10  class high of $34.375. The TAC does not allege any revelation of Daou's true financial health prior to

11  August 1998. Thus, as the TAC reads now, any loss suffered between $34.375 and $18.50 cannot be

12  causally related to Daou's allegedly fraudulent accounting methods because before the revelations began

13  in August 1998, the true nature of Daou's financial condition had not yet been disclosed."). Here, as

14  in *Daou*, any loss that preceded the restatement is not actionable.

15  　　　Defendants also argue that after eliminating the pre-Restatement drop, all that remains is a 18-

16  cent drop, or approximately 10% of the stock price, and that this drop was a "blip" that is not actionable.

17  Defendants calculate the 18-cent drop by looking at the stock price at 11:40 am on March 2, 2009

18  ($1.86), which was immediately prior to the filing of the Restatement, and comparing that to the stock

19  price at the close of business that same day, $1.68. RJN, Ex. 63.[9] Plaintiffs, on the other hand, contend

20  that the correct starting stock price is $2.22 (the closing price on the prior trading day), *Id.* Ex. 62, and

21  the complaint alleges loss causation based on the drop from $2.22 to $1.68. FAC ¶ 79 ("Indeed, on

22  March 2, 2009, Century Aluminum's stock plunged 24% . . . compared to the previous trading day's

23  close of $2.22, erasing more than $40.4 million in market capitalization in one day.").[10] Neither party

24  has cited any authority regarding how, precisely, to select the pre-disclosure stock price.

---

[9] The stock began trading on March 2, 2009 at $2.20. *Id*. Ex. 63.

[10] As noted *supra*, the FAC incorrectly alleges, alternately, that the closing price was $1.06 and $1.67. FAC ¶¶ 13-14, 121.

13

1    A  plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation." *In*

2    *re Gilead Scis. Litig.*, 536 F.3d at 1057.  Plaintiffs allege a 24% stock drop due to the restatement, with

3    a loss of $40.4 million in market capitalization.  Whether the stock drop was due to other factors, as

4    defendants argue, is a factual inquiry better suited for determination on summary judgment or trial,

5    rather than at the pleading stage.  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir.

6    2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003).

7    Accordingly, although it is a close call, the Court finds that as a pleading matter, plaintiffs have

8    sufficiently alleged loss causation.

9

10         **D.      Section 20(a)/control person liability**

11         Plaintiffs also allege Section 20(a) claims against the Century defendants on a "control person"

12   theory of liability.  As plaintiffs have not adequately alleged a primary violation of 10b-5, plaintiffs'

13   claims for control person liability under Section 20 are DISMISSED with leave to amend.  *See Howard*

14   *v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

15

16   **II.    Securities Act Claims**

17         Plaintiffs have alleged claims under Section 12(a)(2), Section 11 and Section 15 against all of

18   the Century defendants, and against the two Underwriter defendants, Credit Suisse Securities (USA)

19   LLC, and Morgan Stanley & Co.  Defendants challenge plaintiffs' Securities Act claims on numerous

20   grounds.  First, defendants contend that plaintiffs lack standing under both Section 12(a)(2) and Section

21   11, and thus that the Court lacks subject matter jurisdiction over these claims.  Second, defendants

22   contend that plaintiffs cannot state a claim under these sections because the substantive allegations are

23   deficient.  Third, defendants contend that plaintiffs cannot state a claim for control person liability under

24   Section 15 because they have not stated claims under Section 12 and Section 11.

25

26         **A.      Section 12(a)(2) claim**

27         The Century and Underwriter defendants contend that plaintiffs lack standing to bring claims

28   under Section 12(a)(2).  Section 12(a)(2) provides that any person who "offers or sells" a security by

14

means of a prospectus containing a materially false statement or material omission shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77l(a)(2). Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999) ("Section 12 . . . permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus") (quoting 15 U.S.C. § 77l(a)(2)) (emphasis added); *see also In re Levi Strauss & Co. Securities Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007) (holding Section 12(a) does not apply to aftermarket purchases).

Plaintiffs allege that they purchased "pursuant and/or traceable to the offering," FAC ¶¶ 28-31. As defendants point out, courts have dismissed Section 12(a)(2) allegations stated in precisely such terms. *See, e.g.*, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 305 (D. Mass. 2009) ("Here, plaintiffs allege that they 'acquired' securities 'pursuant and/or traceable to' the registration statements and prospectus supplements. . . . If plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so. An evasive circumlocution does not suffice as a substitute.").

Moreover, defendants argue that the plaintiffs' certifications of their stock purchases, which are incorporated by reference in paragraphs 28, 29, 30 and 31 of the FAC, show that none of the named plaintiffs purchased any shares on the date of the secondary offering, or at the secondary offering price. The FAC states that the secondary offering occurred on January 29, 2009 at $4.50 per share. FAC ¶¶ 17, 72, 176; *see also* Prospectus Supplement (Underwriters' RJN Ex. A). The certifications incorporated in the FAC state:

| Plaintiff | Date(s) | Purchase Price(s) |
|---|---|---|
| Stuart Wexler | 10/23/08 | $10.14 |
| | 1/28/09 | $4.56 |
| | 1/30/09 | $3.56 |
| | | |

| Peter Abrams | 1/16/09 | $8.08 |
|---|---|---|
|  | 1/28/09 | $5.60 |
|  | 1/30/09 | $3.79 |
|  | 2/10/09 | $4.10 |
|  | 2/26/09 | $2.46 |
|  | 2/27/09 | $2.26 |
|  |  |  |
| Eric Petzchke | 1/28/09 | $4.52 |
|  |  |  |
| Cory McClellan | 1/28/09 | $4.0950 |
|  | 1/30/09 | $4.1000 |
|  | 1/30/09 | $4.0500 |
|  | 2/26/09 | $2.4388 |

The Underwriter defendants have also submitted the declarations of Ryan Fitzpatrick, a Credit Suisse employee, and Scott Gregory, a Morgan Stanley employee.[11]  The declarations are substantially identical, and state the following: (1) Credit Suisse and Morgan Stanley were the underwriters in the January 29, 2009 secondary offering; (2) the offering was a "firm commitment" offering, meaning that all of the shares included in the offering were purchased by the underwriters from Century and then sold by the underwriters to the investors who purchased stock in the offering; (3) the offering was priced after the market closed on January 28, 2009; (4) sales of all of the shares included in the offering occurred at the price of $4.50 per share; and (5) according to the records of Credit Suisse and Morgan Stanley, the four named plaintiffs were not allocated any Century stock in the offering and did not purchase any Century stock from Credit Suisse and Morgan Stanley in the offering.  Fitzpatrick Decl. ¶¶ 2-6; Gregory Decl. ¶¶ 2-5.

In their oppositions, plaintiffs do not specifically respond to defendants' arguments about the certifications or to the Fitzpatrick and Gregory declarations, and instead simply generally assert that they

---

[11]  Because plaintiffs' lack of standing implicates subject matter jurisdiction, the Court can consider the Fitzpatrick and Gregory declarations filed with defendants' motion, pursuant to Fed. R. Civ. P. 12(b)(1).  *See Thornhill Publishing Company v. General Telephone and Electronic Corporation*, 594 F.2d 730, 733 (9th Cir. 1979).

16

United States District Court
For the Northern District of California

1   have met their burden to show standing by pleading purchases "pursuant and/or traceable to" the

2   January 2009 offering.  As noted above, such conclusory allegations are insufficient to establish

3   standing under Section 12(a)(2).  Moreover, plaintiffs' certifications and the Fitzpatrick and Gregory

4   declarations show as a factual matter that that the named plaintiffs did not purchase directly in the

5   January 29, 2009 secondary offering.

6          Accordingly, plaintiffs' Section 12(a)(2) claim is DISMISSED as to the currently named

7   plaintiffs.[12]

8

9          **B.      Section 11 claim**

10         The Century and Underwriter defendants also challenge plaintiffs' standing to bring claims under

11  Section 11. Section 11 of the Securities Act of 1933 imposes liability on issuers, underwriters, and other

12  participants in a public securities offering for any material misstatement of fact or material omission in

13  the registration statement.  15 U.S.C. § 77k.  To have standing to bring suit under Section 11, a plaintiff

14  must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering.

15  *See Hertzberg*, 191 F.3d at 1080 n.4; *see also Guenther v. Cooper Life Scis., Inc.*, 759 F. Supp. 1437,

16  1441 (N.D. Cal. 1990) (citation omitted).  "The burden of tracing shares to a particular public offering

17  rests with plaintiffs." *Id.* at 1439; *see also Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 875-76

18  (N.D. Cal. 1986).

19         The named plaintiffs in this action bring suit on behalf of a class "composed of all those who

20  purchased or otherwise acquired Century Aluminum common stock pursuant and/or traceable to the

21  Company's January 2009 Secondary Offering, and who were damaged thereby."  FAC ¶ 129.  The

22  Century and Underwriter defendants contend that the FAC does not plead any facts that might

23  demonstrate that any of the shares they purchased can be traced to the offering, and instead the FAC

24  only contains the boilerplate conclusion that plaintiffs purchased shares "pursuant to or traceable to the

25  Secondary Offering." *Id.* ¶¶ 143, 148 and 151.

26         As discussed *supra*, plaintiffs' certifications of their stock purchases and the Fitzpatrick and

27  ─────────────

28       [12] Because plaintiffs have not established standing under Section 12, the Court need not address
    defendants' arguments that they were not statutory "sellers" under Section 12.

United States District Court
For the Northern District of California

Gregory declarations show that the named plaintiffs did not purchase in the secondary offering. Defendants argue that the fact that plaintiffs did not purchase in the secondary offering means that they cannot possibly trace their purchases to the offering, and that this defect is not simply a pleading matter, but a factual one that goes to standing. Defendants have submitted evidence showing that the registration statement at issue was filed in connection with a secondary offering of 24,500,000 shares of common stock. At the time it became effective, there were already 49,052,692 common shares trading in the aftermarket. Underwriters RJN Ex. A at S-8. Plaintiffs have neither alleged in the FAC, nor have they articulated in their oppositions, how to trace any particular shares in the 75 million share pool that existed after the secondary offering to show that those shares came from the secondary offering.[13]

Plaintiffs contend that defendants' arguments about standing are premature, and that their allegations are sufficient. However, standing and subject matter jurisdiction present a "threshold inquiry" that is "particularly important in securities litigation." *Plumbers' Union Local No. 12 Pension Fund*, 658 F. Supp. 2d at 303. Defendants have cited cases that have analyzed traceability as a matter of Section 11 standing. *See, e.g, Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008). Plaintiffs also assert that the named plaintiffs need not have standing to pursue all claims which may be represented by the class as a whole. However, case law is clear that a named plaintiff has standing under Section 11 only as to the documents that governed his own purchase of securities. *Hertzberg*, 191 F.3d at 1080. Here, defendants have raised serious questions about the named plaintiffs' standing, and the complaint does not allege any facts showing that the named plaintiffs' purchases are traceable to the January 29, 2009 offering. If plaintiffs can never meet their burden of tracing their shares to the secondary offering, there is no reason to defer this question to a later stage.

Plaintiffs also argue that "[i]t would have been both anachronistic and antithetical for Congress to require a putative plaintiff to prove that he purchased his securities both at the offering price and on the exact date of the offering in order to enjoy standing under § 11." Omnibus opposition at 21:1-3.

---

[13] At the hearing on this matter, plaintiffs' counsel suggested that it might be possible to trace plaintiffs' purchases. However, the FAC does not contain any facts showing that plaintiffs' shares are traceable.

However, as courts have recognized, because no scienter is required for liability under Section 11 and thus defendants are liable for innocent or negligent material misstatements or omissions, its standing provision is narrow. *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495-96 (5th Cir. 2005) (affirming dismissal of Section 11 claims for lack of subject matter jurisdiction where plaintiffs could not prove shares traceable to offering, but had submitted expert evidence showing there was a 99.85% statistical likelihood that shares were from offering). As Judge Lynch explained in *Abbey*,

> Section 11 limits its conclusive presumption of reliance to persons acquiring any securities issued pursuant to the registration statement, notwithstanding the obvious fact that a false or misleading statement in or an omission from a registration statement could easily affect the price of stock issued prior to the offering. Section 11 simply was not intended to provide a remedy to every person who might have been harmed by a defective registration statement. The Court believes that the language of section 11 and the existing case law indicate that a plaintiff who can only show that his or her shares might have been issued in the relevant offering should not be given the benefit of section 11's conclusive presumption of reliance; such a person should be treated the same as individuals whose shares clearly were not issued in the offering.
>
> It is important to note that section 11's direct tracing requirement does not leave individuals who have been harmed by a defective registration statement completely without a remedy. Abbey, for example, may still pursue his lawsuit under his 10b-5 claim. The "direct tracing" requirement simply precludes a shareholder from taking advantage of section 11's relaxed liability requirements when the shareholder's connection to the relevant offering is so attenuated that he or she cannot directly trace his or her shares to the offering.

634 F. Supp. at 875 (granting summary judgment in favor of defendants where plaintiff could not demonstrate direct tracing and only submitted evidence showing that shares might have come from offering at issue) (internal citation omitted).

Accordingly, because the complaint does not allege facts showing that the named plaintiffs' purchases are traceable to the January 29, 2009 offering, plaintiffs' Section 11 claim is DISMISSED as to the currently named plaintiffs.

### C.     Section 15 Claims

Plaintiffs also allege Section 15 claims against the Century and underwriter defendants on a "control person" theory of liability. As plaintiffs have not adequately alleged a primary violation of the federal securities laws, plaintiffs' claims for control person liability under Section 15 are DISMISSED. *See Howard*, 228 F.3d at 1065.

**III.     Underwriter defendants' motion to strike class allegations**

The Underwriter defendants move to strike the class allegations to the extent that they would include Glencore as a member of the putative class.  Defendants argue that it is improper to include Glencore, which purchased 47% of the shares in the January 29, 2009 offering, in the putative class because Glencore is an affiliate of Century.  Plaintiffs contend that defendants' motion is premature, and raises issues that should be addressed in the context of class certification.

In light of the dismissal of all of plaintiffs' claims, the Court finds defendants' motion is MOOT.

**IV.     Request for judicial notice**

The Century and Underwriter defendants have requested judicial notice of various exhibits. Plaintiffs object to the Court taking judicial notice of the following exhibits submitted by Century: Ex. 5, 6, 10, 11, 14, 15, 28, 29 (transcripts of conference calls with analysts and PowerPoint presentations to analysts); Ex. 33-47 and 48-60 (analyst reports and news articles); and Ex. 61 and 64 (graphs of London Metal Exchange prices for primary aluminum).   Plaintiffs have not objected to the other exhibits submitted by defendants, and as to those exhibits, the Court GRANTS defendants' requests for judicial notice.

The Court finds that plaintiffs' objections to the exhibits lack merit.  Plaintiffs object that the transcripts of conference calls with analysts, PowerPoint presentations to analysts, analyst reports, and news articles are hearsay.  However, defendants have submitted those exhibits not for the truth of the matter asserted, but to show disclosure of information.  With regard to the exhibits about LME prices, courts routinely take judicial notice of publicly-available indices such as stock market and consumer prices indices.  *See Metzler*, 540 F.3d at 1064 & n.7.

**CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS defendants' motions to dismiss and GRANTS plaintiffs leave to amend the complaint.  The Court DENIES as moot the underwriter

1    defendants' motion to strike.  The Court GRANTS defendants' requests for judicial notice. (Docket Nos.

2    69, 70, 72, 73, & 74).  Plaintiffs' amended complaint must be filed no later than **May 14, 2010**.

3

4        **IT IS SO ORDERED.**

5

6    Dated: April 27, 2010

7                                                          SUSAN ILLSTON
                                                           United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28