FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re* CENTURY ALUMINUM COMPANY SECURITIES LITIGATION | Case No.  C 09-1001 SI [Consolidate With Case Nos. C 09-1103 SI, C 09-1162 SI, C 09-1205 SI] |
| This document relates to all actions. | **STIPULATION AND [PROPOSED] ORDER TO FILE THIRD AMENDED COMPLAINT AND REVISE BRIEFING SCHEDULE** |
| | DEPT.        10, 19th Floor JUDGE:      Hon. Susan Illston |

1    **WHEREAS**, on April 27, 2010 the Court issued an Order Granting Defendants' Motions
2    to Dismiss and Granting Plaintiffs Leave to Amend ("April 27th Order");

3    **WHEREAS**, on May 11, 2010 the Court granted Plaintiffs leave to file a Second
4    Amended Consolidated Class Action Complaint for Violation of the Securities Act of 1933,
5    15 U.S.C. § 77 *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.* ("Second
6    Amended Complaint") on or before May 28, 2010;

7    **WHEREAS**, Plaintiffs' Second Amended Complaint was filed with the Court on
8    May 28, 2010;

9    **WHEREAS**, Plaintiff Chris McNulty is a client of one of Plaintiffs' counsel and through
10   his counsel requested that he be added as a Plaintiff in the Second Amended Complaint and
11   provided the dates of his purchases of Century Aluminum Company securities between
12   October 21, 2008 and March 2, 2009;

13   **WHEREAS**, after the Second Amended Complaint was filed, Lead Counsel for Plaintiffs
14   requested that Plaintiff Chris McNulty complete a certification pursuant to the Federal Securities
15   Laws and in the certification dated June 6, 2010, Mr. McNulty stated that he purchased 800 shares
16   of Century Aluminum Company securities on January 28, 2009, not January 29, 2009 as
17   previously indicated by his counsel;

18   **WHEREAS**, Plaintiffs request leave to amend the Second Amended Complaint to correct
19   the date of Mr. McNulty's purchase and to file a [Proposed] Third Amended Complaint with Mr.
20   McNulty's Certification attached;

21   **WHEREAS**, a copy of the [Proposed] Third Amended Complaint is attached hereto as
22   Exhibit A;

23   **WHEREAS**, by Order dated June 3, 2010, the parties set a briefing schedule on
24   Defendants' contemplated motion(s) to dismiss and now agree to move the schedule out by one
25   week in light of the Plaintiffs' [Proposed] Third Amended Complaint;

26   **NOW, THEREFORE**, the Parties stipulate and agree as follows:

27       1.      Plaintiffs may file the [Proposed] Third Amended Complaint immediately;

28       2.      Defendants shall file with the Court their motion(s) to dismiss on or before

STIP AND [PROPOSED] ORDER TO FILE THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

1   July 9, 2010;

2       3.    Plaintiffs shall file their opposition(s) to defendants' motions to dismiss on or

3   before July 30, 2010;

4       4.    Defendants shall file their repl(ies) on or before August 13, 2010; and

5       5.    Defendants shall notice their motions to dismiss for hearing on September 3, 2010,

6   as previously agreed and so ordered by the Court on June 3, 2010.

7       IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

8   DATED:  June 24, 2010           Respectfully submitted,

WOLF HALDENSTEIN ADLER

9                       FREEMAN & HERZ LLP

FRANCIS M. GREGOREK

10                    BETSY C. MANIFOLD

RACHELE R. RICKERT

11

12                    BETSY C. MANIFOLD

13

14                    750 B Street, Suite 2770

San Diego, CA 92101

15                    Telephone:  619/239-4599

Facsimile:  619/234-4599

16

                    *Lead Counsel for Plaintiffs*

17   DATED: June 24, 2010           PILLSBURY WINTHROP SHAW LLP

JEFFREY SCOTT JACOBI

18

19

20                    */s/ Jeffrey Scott Jacobi*

JEFFREY SCOTT JACOBI

21                    50 Fremont Street

San Francisco, CA 94105-2228

22                    Telephone: 415/983-1000

Facsimile: 415/983-1200

23

24                    *Attorneys for Defendants Century Aluminum Co.,*

*Logan W. Kruger, Michael A. Bless, Steve Schneider,*

25                   *John C. Fontaine, Jack E. Thompson, Peter C. Jones,*

*John P. O'Brien, Willy R. Strothotte, Jarl Berntzen*

26                   *and Wayne R. Hale*

27

28

STIP AND [PROPOSED] ORDER TO FILE THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

DATED: June 24, 2010
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
ROBERT P. VARIAN
STEPHEN M. KNASTER

_____/s/Stephen M. Knaster_____
STEPHEN M. KNASTER

The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:  415/773-5700
Facsimile:   415/773-5759

*Attorneys for Defendants Morgan Stanley
& Co., Inc. and Credit Suisse Securities (USA) LLC*

CENTURYALUMINUM:17648

## **ORDER**

PURSUANT TO STIPULATION, IT IS SO ORDERED that:

1.     Plaintiffs' [Proposed] Third Amended Complaint shall be considered filed as of the date of this Order;

2.     Defendants shall e-file any motion(s) to dismiss the Third Amended Complaint no later than July 9, 2010;

3.     Plaintiffs shall e-file their opposition(s) to said motions no later than July 30, 2010;

4.     Defendants shall e-file their replies no later than August 13, 2010; and

5.     The hearing on said motions shall be Friday, September 3, 2010, at 9 a.m. as previously set by the Court in its June 3, 2010 Order.

DATED: _____       _____
                                          HONORABLE SUSAN ILLSTON
                                          UNITED STATES DISTRICT JUDGE

## ATTESTATION PURSUANT TO GENERAL ORDER 45

I, Betsy C. Manifold, am the ECF User whose ID and password are being used to file this Stipulation and [Proposed] Order to File Third Amended Complaint and Revise Briefing Schedule. In compliance with General Order 45.X.B., I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 24th day of June 2010, at San Diego, California.

_____

BETSY C. MANIFOLD

# EXHIBIT A

FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re* CENTURY ALUMINUM COMPANY SECURITIES LITIGATION<br><br>———————————————————<br><br>This document relates to all actions.<br>———————————————————| )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  C 09-1001 SI<br>[Consolidate With Case Nos. C 09-1103 SI, C 09-1162 SI, C 09-1205 SI]<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933, 15 U.S.C § 77 *et seq.*, AND THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78 *et seq.***<br><br>DEPT.       10, 19th Floor<br>JUDGE:      Hon. Susan Illston |

1

**TABLE OF CONTENTS**

2  NATURE OF THE ACTION .................................................................................................1

3      Summary of The Exchange Act Action ..........................................................................2
    Summary of the Securities Act Action ..........................................................................6

4  JURISDICTION AND VENUE .........................................................................................8

5      The Exchange Act Action ...............................................................................................8
6      The Securities Act Claim ................................................................................................9

7  PARTIES ...............................................................................................................................9

    The Exchange Act Defendants .......................................................................................9
8

9  DUTIES OF INDIVIDUAL DEFENDANTS ...............................................................15

10  SUBSTANTIVE ALLEGATIONS ................................................................................16

11  THE EXCHANGE ACT ACTION ................................................................................16

12      A.   General Background ...............................................................................16
    B.   Background to False Statements..........................................................18
13      C.   False Statements During the Exchange Act Class Period....................27
    D.   The Truth About Century Aluminum's Cash Position is Revealed......37
14      E.   Scienter Allegation ...............................................................................40
    F.   Undisclosed Material Adverse Facts....................................................46
15      G.   Applicability of Presumption of Reliance Under the Fraud-on-the-Market Doctrine.........47
16      H.   No Safe Harbor ......................................................................................48

17  EXCHANGE ACT CLASS ACTION ALLEGATIONS ............................................48

18  THE SECURITIES ACT ACTION ................................................................................50

19      A.   Additional Securities Act Defendants...................................................50
    B.   Securities Act Standing Allegations .....................................................50
20      C.   False and Misleading Statements in the January 2009 Registration Statement....................56
    D.   The Truth is Revealed via the Restatement ..........................................59
21      E.   Materiality of the False Statement ........................................................60
22      F.   Failure of Internal Controls to Identify or
        Correct the False Statement of Cash Flows .........................................61

23  DUTIES OF UNDERWRITER DEFENDANTS ..........................................................63

24  SECURITIES ACT CLASS ACTION ALLEGATIONS.............................................64
25

COUNT I
26  For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Against All Exchange Act Defendants ..............................................................66
27

28

COUNT II
For Violation of Section 20(a) of the Exchange Act
Against All Exchange Act Defendants ........................................................................................66

COUNT III
For Violation of Section 11 of the Securities
Act (Against All Defendants) ....................................................................................................67

COUNT IV
Against All Defendants for Violations of Section 15 of the Securities Act ...............................69

PRAYER FOR RELIEF ..............................................................................................................70

1        Lead Plaintiff Stuart Wexler ("Lead Plaintiff"), and Plaintiffs Peter Abrams, Eric Petzschke,

2   Chris McNulty and Cory McClellan (collectively "Plaintiffs") on behalf of the classes of all others

3   similarly situated, allege the following based upon personal knowledge, and upon the investigation

4   of Plaintiffs' counsel as to all other matters.  Plaintiffs' counsel conducted a thorough investigation

5   which included, among other things, a review of public documents published or disseminated by or

6   on behalf of, Century Aluminum Co. ("Century Aluminum" or the "Company") and/or any of its

7   competitors or peers, and any of the Defendants named herein, including, but not limited to, the

8   United States Securities and Exchange Commission ("SEC") filings, wire and press releases and

9   other announcements, transcripts or wire broadcasts of conference calls, securities analysts' reports

10  and advisories, and information readily available on the Internet.  Plaintiffs believe that substantial

11  additional evidentiary support exists for the allegations set forth herein after a reasonable

12  opportunity for discovery.

13                      **NATURE OF THE ACTION**

14       1.     This is a consolidated federal securities class action that separately sets forth claims

15  under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 *et seq.*, and under the

16  Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 *et seq.*

17       2.     As to the Exchange Act claims, Plaintiffs separately allege that the Exchange Act

18  Defendants (defined *infra*) acted knowingly or were deliberately reckless in issuing materially false

19  or misleading statements and/or failing to disclose material facts concerning the Company's

20  business and financial condition between October 21, 2008 and March 2, 2009, inclusive (the

21  "Exchange Act Class Period") and thus, are liable to purchasers of Century Aluminum common

22  stock during the Exchange Act Class Period, for violations of sections 10(b) and 20(a) of the

23  Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively (the "Exchange Act Action").

24       3.     The negligence-based Securities Act claims (the "Securities Act Action") are pled

25  separate and apart from the Exchange Act Action.  Plaintiffs allege that the Securities Act

26  Defendants (defined *infra*) are strictly liable for issuing materially false and misleading statements

27  in the Offering Documents (defined *infra*), in violation of §§ 11 and 15 of the Securities Act, 15

28  U.S.C. §§ 77k and 77o.  The Securities Act Action does not incorporate by reference, or otherwise

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

rely upon, any allegations pled in support of the Exchange Act claims, except those non-fraud based allegations that are specifically incorporated. Plaintiffs' non-fraud allegations in support of the Securities Act Action are pled as separate, stand-alone claims under the notice-pleading standards of Fed. R. Civ. P. 8(a).

**Summary of The Exchange Act Action**

4.    The fraud-based Exchange Act Action arises out of a scheme orchestrated by Century Aluminum and certain of its officers (defined *infra* as the "Exchange Act Defendants") to create and/or maintain artificial inflation in the price of Century Aluminum common stock throughout the Class Period, to the detriment of ordinary investors who were damaged when the truth began to be revealed to the market.

5.    Founded in 1995 in Monterey, California, Century Aluminum is a holding company, which through its subsidiaries, manufactures and produces aluminum and aluminum products. Headquartered in Monterey, California, Century Aluminum was formed by Glencore International of Switzerland, as a holding company for that corporation's aluminum producing assets. Until this year, Century Aluminum's largest production facility was the Ravenswood plant in Ravenswood, West Virginia.

6.    By mid-2008, the commodities markets were in peril, and the market for aluminum in particular was being heavily compromised. At that time, Century Aluminum was facing the combination punch of declining aluminum prices, in conjunction with rising raw material input prices. In percentage terms, in the third fiscal quarter of 2008, the price of caustic soda and calcined coke (both important inputs for the production of aluminum) had increased by 88% and 100%, respectively. The increased production costs drastically affected Century Aluminum's earnings, forcing down margins and increasing production costs.

7.    In addition to increasing costs, the end markets for Century Aluminum's products were also feeling the full brunt of the economic downturn. The auto, heavy truck and commercial building industries were all either flat or declining. Accordingly, the market price for a ton of raw aluminum fell from almost $3,217 per ton in July of 2008, to approximately $1,500 per ton as of January 8, 2009. With such a dramatic decrease in the market price for their products, the major

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

aluminum producers—including Century Aluminum—were cutting all discretionary spending and hunkering down for a long downturn in the market.

8.     To compound matters, the Exchange Act Defendants (defined *infra*) were facing the loss of their positions, control and holdings in Century Aluminum due to their losses on the open market.   Specifically, in mid-2008 Century Aluminum was in debt to the tune of over **three quarters of a billion dollars** to commodities trading conglomerate Glencore Ltd. ("Glencore") as a result of certain risky derivatives or "forward financial sales contracts."   As an owner of 28.5% of Century Aluminum's shares at that time, Glencore held a huge bargaining chip over the heads of the Exchange Act Defendants (defined *infra*).   Indeed, if it had wished, Glencore could have either forced Century Aluminum into bankruptcy and/or taken over the Company outright via a tender offer or proxy contest.   However, because Glencore would have simply sold the Company off in pieces or attempted to consolidate it with its other aluminum companies,[1] Glencore was willing to deal with Century Aluminum—which makes sense considering the leverage which they could exert.[2]

9.     By late 2008, Century Aluminum was incurring substantial monthly losses, culminating in a net loss of $700.2 million (or $14.27 per share) for the Fourth Quarter of 2008. Further, Century Aluminum was forced to take a $94.8 million charge for goodwill impairment ($1.93 per share), a tax charge of $522.9 million ($10.66 per share) based on a "recording of a valuation allowance on deferred tax assets," and a inventory write-down charge of $55.9 million

---

[1]     Glencore owns a controlling stake in RUSAL, one of the largest aluminum producers in the world.

[2]     In July, Century Aluminum announced that they had mollified Glencore, to their own benefit. In exchange for agreeing to a "standstill," which precluded a hostile takeover until 2010, Century Aluminum agreed to: (1) pay Glencore no less than $730,200,000 in cash; and (2) issue Glencore 160,000 shares of a new class of convertible stock, valued at $6,115.00 per share (the "Standstill agreement").   Century Aluminum Co., Current Report (Form 8-K), at *1-3 (July 8, 2008) ("July 8, 2008 Form 8-K").   The total cash outlay to Glencore under the agreement amounted to the equivalent of $1.65 billion. *See id.*   In return, Glencore agreed to forgo a hostile takeover until 2010. *See id; see also* Century Aluminum Co., Current Report (Form 8-K) (Jan. 27, 2009) ("January 27, 2009 8-K").

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    ($1.14 per share).[3]

2         10.    As a result of all of these economic pressures, Century Aluminum undertook a

3    fraudulent scheme to raise money by inflating the Company's stated operating income.  This was

4    done by improperly accounting for the paper 'proceeds' of a redemption of convertible stock as

5    "cash flows from operating activities," rather than as its proper classification, cash from financing

6    activities.  As such, Century Aluminum falsely reported in its quarterly report (Form 10-Q) that the

7    Company had a surplus of $230,759,000 in free cash flows provided by operating activities in the

8    third fiscal quarter of 2008, when in reality Century Aluminum had a deficit of $698,721,000.

9    *Compare* Century Aluminum Co., Quarterly Report (Form 10-Q), at *3 (November 10, 2008) (the

10   "November Quarterly Report" or "November 2008 Quarterly Report"), *with* Century Aluminum

11   Co., Current Report (Form 8-K), at *2 (March 2, 2009) (the "Restatement").

12        11.    With the inflated statement of cash flows in place, Century was able to seek an

13   additional influx of cash from the only avenue remaining to the Company: a public offering of

14   stock.  Accordingly, in late January 2009, pursuant to the a registration statement that the Exchange

15   Act Defendants knew or should have known to be false and misleading when made, Exchange Act

16   Defendants incorporated a false statement of cash flows identical to that reported in the November

17   Quarterly Report.  By February of 2009, with the help of the false financial results, Century

18   Aluminum had completed a public offering of 24.5 million shares of its common stock, raising

19   approximately $104 million in cash (the "January 2009 Offering" or "Secondary Offering" or the

20   "Offering").

21        12.    The truth of the matter only came to light after the Exchange Act Defendants had

22   succeeded in raising the $104 million.  Indeed, it wasn't until March 2, 2009 that Century

23   Aluminum filed the Restatement.  Among other things, the Restatement informed shareholders and

24

25   [3]    As noted above, Century Aluminum's problems were not limited to the downturn in the

26   global market for aluminum.  Indeed, in Fiscal Year 2008, Century Aluminum lost almost $750
     million on risky derivative investments, termed "forward contracts" by the Company.  These

27   losses, when added to the already increasing cost to produce aluminum and the declining market

28   for the commodity, put Century Aluminum in a particularly precarious position.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

investors alike that the Company's "previously issued financial statements for the nine months ended September 30, 2008 . . . .should no longer be relied upon . . . ." Restatement at *2. ***The Company attempted to explain the almost $1,000,000,000 false inflation of cash from operating activities simply as an "error."***

13.    Notwithstanding Century Aluminum's claim that the billion dollar inflation of the Company's cash flows was merely an "error," the Exchange Act Defendants—by virtue of their positions within the Company and access to inside information—knew that the statement of cash flows was misstated.  Indeed, an "error" so large would appear unusual to even an untrained lay investor who ventured even a sideways glance at the SEC filings.  Therefore, the Exchange Act Defendants, who are the duly elected and appointed directors and officers of a multi-billion-dollar corporation, through the Quarterly Results, stated that the Company had **$929,480,000 more in cash from operations than was actually in the Century Aluminum coffers.**[4]  Moreover, there can be no doubt that had investors known that Century Aluminum had **negative $698,721,000** in operating cash, they would have chosen not to purchase—or to sell immediately—their Century Aluminum shares.  Indeed, on news of the Restatement, the price of the Company's shares traded on NASDAQ fell to $1.06, an 87% drop from the January 2009 Offering price of $8.00 slightly more than one month earlier.

14.    As a result of the Exchange Act Defendants' scheme to raise money by propping-up the Company's reported cash from operations, the Exchange Act Defendants committed a fraud on the Company's common shareholders in violation of sections 10(b) and 20 of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t.  The false statements artificially inflated the price and market for Century Aluminum's common stock, as evinced by the significant drop in price following the disclosure of the truth on March 2, 2009.  Indeed, on news of the Restatement, the price of the Company's shares

---

[4]    The result of the Restatement was a $929,480,000 change to net operating cash, changing Century Aluminum's net operating cash from $230 million, as reported in the January 29, 2009 Registration Statement (defined *infra*), to -$698,721,000—the actual number. *See* Restatement at *2; *see also* Century Aluminum Co., Prospectus Supplement to Prospectus Dated May 29, 2007 (Form 424(b)5) (Jan. 29, 2009) ("January 2009 Registration Statement" or "Registration Statement").

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

traded on NASDAQ fell 24% or $0.55 per share to close at $1.67, compared to the previous day's close of $2.22, a loss of $40 million in market capitalization in one day.  The Exchange Act Defendants collectively made, disseminated and approved statements which they knew to be false, and failed to disclose material information necessary to make those statements, in the light of the circumstances under which they were made, not false or misleading.

15.    As a result, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Century Aluminum common stock. Plaintiffs and the Class would not have purchased Century Aluminum common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.  Accordingly, as a direct and proximate result of these wrongful acts, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Century Aluminum common stock during the Class Period.

**Summary of the Securities Act Action**

16.    As part of the Securities Act Action, Plaintiffs allege that the Securities Act Defendants (defined *infra*) issued a false and misleading Registration Statement which induced Plaintiffs and other parties to purchase shares of Century Aluminum common stock pursuant and/or traceable to the January 2009 Offering (the "Securities Act Class"), causing Plaintiffs to suffer damages in violation of §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

17.    On or about January 29, 2009, the Company completed its January 2009 Secondary Offering in which it sold approximately 24.5 million shares, or $104.700,000 million worth of Century Aluminum common stock.  In order to facilitate the January 2009 Offering, the Securities Act Defendants (defined *infra*) caused to be filed with the SEC a Registration Statement which misstated the Company's cash from operating activities.  Considering Century Aluminum's dismal financial performance and business outlook at the end of 2008, investors would not have been willing to invest in an offering of common stock without some reassurance that the Company could continue operations and weather the economic downturn.  The false and misleading statement of cash flows assisted in this purpose, and the negligent failure of internal controls, which would have

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   caused the discovery and correction of those errors, allowed investors to garner a 'false sense of
2   security' in their purchase of Century Aluminum stock.

3       18.     In particular, the Registration Statement, which incorporated false and misleading
4   statement of cash flows from the November Quarterly Report, assured investors that Century
5   Aluminum had a surplus of over $200 million in cash from operating activities—plenty to fund any
6   short-term downturn in the business. *See* January 2009 Registration Statement at *S-2.  As such,
7   investors were willing to invest in the Company's stock, believing that the Company was liquid and
8   cash rich, when—in reality—it was not.

9       19.     The January 2009 Registration Statement falsely stated that: "Based upon . . . price
10  forecasts, and ***taking into account our current balance of cash and short-term investments*** . . . we
11  would expect to have sufficient liquidity to fund our operations for approximately the next 18
12  months." January 2009 Registration Statement at *S-2 (emphasis added).  Therefore, according to
13  Century Aluminum itself, the Company's access to cash, especially cash-on-hand from operating
14  activities was the ***most important piece of information*** for investors and the primary selling point
15  for the January 2009 Offering.  However, due to a complete failure of Century Aluminum's internal
16  controls, this statement was disseminated to shareholders in conjunction with the Secondary
17  Offering, despite the fact that it was materially false and misleading (and Century Aluminum
18  actually had ***negative*** cash flow from operating activities).

19      20.     At the time of the January 2009 Offering, Century Aluminum was in the midst of a
20  dire financial situation and was facing plant shutdowns, mounting losses and debts, and possible
21  bankruptcy.  Thus, there can be no doubt that information concerning Century Aluminum's cash
22  position was of the most valuable to investors and the market.  As such, the Securities Act
23  Defendants should have been primarily concerned with the accuracy of the disclosures in the
24  Secondary Offering Documents which concerned operating cash and cash-on-hand.  Indeed, ***extra***
25  scrutiny should have been in given to those accounting items in view of the Company's situation—
26  not only with respect to outside auditors and underwriters—but also internally (*i.e.*, management,
27  officers and the Board).  Had Century Aluminum implemented sufficient and functional internal
28  controls in view of these circumstances—including *inter alia* thorough Board review of financial

disclosures and the accounting treatment of cash items—the false and misleading statement in the Secondary Offering documents would have been discovered.  The failure to implement adequate internal controls led to the false and misleading statements regarding cash from operating activities and cash-on-hand and, due to the market's understandable focus on these items, proximately and directly caused damages to Plaintiffs and the Class when Century Aluminum's share price dropped like a stone following the Restatement.

21.    The negligence-based Securities Act claims (the "Securities Act Action") are pled separate and apart from the Exchange Act Action and are contained in ¶¶ 129-177. Plaintiffs allege that the Securities Act Defendants (defined *infra*) are strictly liable for issuing materially false and misleading statements in the January 2009 Registration Statement, in violation of Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. The Securities Act Action does not incorporate by reference, or otherwise rely upon, any allegations pled in support of the Exchange Act claims, except those non-fraud based allegations that are specifically incorporated. Pursuant to decisions rendered by the United States Court of Appeals for the Ninth Circuit, such as *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105-06, 1108 (9th Cir. 2003), and recent decisions from this District, Plaintiffs' non-fraud allegations in support of the Securities Act Action are pled as separate, stand-alone claims under the notice-pleading standards of Fed. R. Civ. P. 8(a).

## JURISDICTION AND VENUE

**The Exchange Act Action**

22.    These separate claims arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

23.    This Court has jurisdiction over the subject matter of this action pursuant to section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

24.    Venue is proper in this District pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Defendant Century Aluminum is headquartered in Monterey, California, and because many of the acts, transactions and omissions alleged herein,

including the preparation and dissemination of materially false and misleading information, took place in substantial part within this District.

**The Securities Act Claim**

25. The claims arise under and pursuant to sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. This Court has jurisdiction over the subject matter of this action pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

26. Venue is proper in this District pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District.

27. In connection with the acts and conduct alleged herein, the Securities Act Defendants (defined *infra*) directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## PARTIES

28. Lead Plaintiff Stuart Wexler has at all times relevant to this Complaint been an owner of Century Aluminum common stock.

29. Plaintiff Peter Abrams has at all times relevant to this Complaint been an owner of Century Aluminum common stock.

30. Plaintiff Eric Petzschke has at all times relevant to this Complaint been an owner of Century Aluminum common stock.

31. Plaintiff Cory McClellan has at all times relevant to this Complaint been an owner of Century Aluminum common stock.

32. Plaintiff Chris McNulty has at all times relevant to this Complaint been an owner of Century Aluminum common stock

**The Exchange Act Defendants**

33. **Defendant Century Aluminum** is a Delaware corporation with its principal executive offices located 2511 Garden Road, Building A, Suite 200, Monterey, California 93940. Specifically, Century Aluminum functions as a holding company engaged in producing aluminum. The Company's principal subsidiaries are Century Aluminum of West Virginia, Inc. ("Century of

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

West Virginia"), Berkeley Aluminum, Inc. ("Berkeley"), Century Kentucky, Inc. ("Century Kentucky") and Nordural ehf ("Nordural"). Century of West Virginia operates a primary aluminum reduction facility in Ravenswood, West Virginia ("Ravenswood"). Berkeley holds a 49.7% interest in a partnership, which operates a primary aluminum reduction facility in Mt. Holly, South Carolina ("Mt. Holly") and a 49.7% undivided interest in the property, plant, and equipment comprising Mt. Holly. The remaining interest in the partnership and the remaining undivided interest in Mt. Holly are owned by Alumax of South Carolina, Inc., a subsidiary of Alcoa ("ASC"). In addition to its primary aluminum assets, it has 50% joint venture interests in the Gramercy Alumina Refinery, located in Gramercy, Louisiana ("Gramercy") and St. Ann Bauxite, a related bauxite mining operation in Jamaica. During the relevant period, its primary aluminum facilities included Grundartangi (Iceland), Hawesville (Kentucky, owned by Century Aluminum subsidiary, Century Kentucky), Ravenswood (West Virginia) and Mt. Holly (South Carolina).

34.   **Defendant Logan W. Kruger** ("Kruger") has served as President and Chief Executive Officer ("CEO") of Century Aluminum since 2005. A director of Century Aluminum Board of Directors ("Board"), Kruger received a salary and bonus in 2008 of $855,000 and $637,000, respectively, in 2007, a salary and bonus of $815,000 and $1,115,000, respectively, and in 2006, a salary and bonus of $750,000 and $562,500 respectively. The bonus component of Kruger's annual compensation was based upon annual quantitative and qualitative performance targets established by the Board. Kruger signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. Kruger also reviewed, approved and signed Century's Form 10-K for 2007 and 2008 filed with the SEC on February 29, 2008 (*see* Century Aluminum Co., Annual Report (Form 10-K) (February 29, 2008) ("2007 10-K")) and on March 2, 2009 (*see* Century Aluminum Co., Annual Report (Form 10-K) (March 2, 2009) ("2008 10-K")), Century's Form 10-Q for the first, second and third quarter of 2008 filed with the SEC respectively on May 12, 2008, on August 11, 2008, and on November 10, 2008. Century Aluminum Co., Quarterly Report (Form 10-Q) (May 12, 2008) ("Q1'08 10-Q"); Century Aluminum Co., Quarterly Report (Form 10-Q) (Aug. 11, 2008) ("Q2'08 10-Q"); Century Aluminum Co., Quarterly Report (Form 10-Q) (Nov. 10, 2008) ("Q3'08 10-Q"). Kruger is also a

1   Director of Cleco Corporation, and has held that position since October 2008. Previously, he served

2   as a President of Asia/Pacific Inco Limited from September 2005 to November 2005; and

3   Executive Vice President, Technical Services for Inco Ltd. from September 2003 to September

4   2005.

5       35.     **Defendant John C. Fontaine** ("Fontaine") served as a member of the Board since

6   2005, and also served as a Lead Director of Century Aluminum Co. from 2005 to 2008. Defendant

7   Fontaine signed the Company's January 2009 Registration Statement filed with the SEC and

8   approved the issuance of false SEC reports. Fontaine also reviewed, approved and signed the 2007

9   10-K and the 2008 10-K. Fontaine is also Of Counsel to the law firm of Hughes Hubbard & Reed

10  LLP, a position he has held since January 2000, and was formerly a partner in that firm from July

11  1997 to December 1999. Fontaine has also served as Chairman of the Samuel H. Kress Foundation

12  (1994 to 2006); Trustee of the National Gallery of Art (2003 to 2007) and Chairman of the Board

13  of Trustees (2006 to 2007).

14      36.     **Defendant Jack E. Thompson** ("Thompson") has been a member of the Board

15  since 2005. Thompson has also served as a Director of Tidewater Inc. since 2005; Director of

16  Rinker Group Ltd. from May 2006 to June 2007; Director of Phelps Dodge Corp. from January

17  2003 to March 2007; Director of Stillwater Mining Co. from 2002 to June 2006; Vice Chairman of

18  Barrick Gold Corporation from December 2001 to April 2005; and Member of the Advisory Board

19  of Resource Capital Funds III and IV, LLP from 2002 to January 2009; and Member of the Industry

20  Advisory Council for the College of Engineering at the University of Arizona since 2002.

21  Thompson signed the Company's January 2009 Registration Statement filed with the SEC and

22  approved the issuance of false SEC reports. Thompson also reviewed, approved and signed the

23  2007 10-K and the 2008 10-K.

24      37.     **Defendant Peter C. Jones** ("Jones") has been a member of the Board since 2007.

25  Defendant Jones is also Chairman of Lakota Resources Inc. since September 2008; Director of

26  Royal Nickel Corp. since December 2008; Director of Mizuho Corporate Bank (Canada) since

27  December 2006; Director IAMGOLD Corporation since May 2006; Director, President and Chief

28  Operating Officer of Inco Ltd. from April 2002 to November 2006; President Commissioner P.T.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

Inco. Tbk from 1999 to 2006; Chairman Goro Nickel SAS from 2003 to February 2007; Member of the Board and Executive Committee, Mining Association of Canada from 1997 to 2006; and Member of the Board, Royal Ontario Museum from 2003 to 2006. Defendant Jones signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. Defendant Jones also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

38.    **Defendant Robert E. Fishman** ("Fishman") has been a member of the Board since 2007, and signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. Defendant Fishman has also served as a President and Chief Executive Officer of Ausra, Inc. since October 2007; Director of Range Fuels, Inc. since November 2007; Executive Vice President, Power Operations of Calpine Corporation from 2006 to 2007; and Senior Vice President of Calpine Corporation from 2001 to 2005. Fishman also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

39.    **Defendant John P. O'Brien** ("O'Brien") has served as Chairman of the Board since 2008. O'Brien has served as a Managing Director of Inglewood Associates Inc. since 1990; Chairman of Allied Construction Products since March 1993; Director of Preformed Line Products Company from May 2004 to April 2008; Director of Globe Specialty Metals from May 2008 to October 2008; Director of Oglebay Norton Company from April 2003 to February 2008; Member of the Board of Trustees of Saint Luke's Foundation of Cleveland, Ohio since 2006; Trustee of Cleveland Sight Center since 1990; Chairman, Chagrin Falls Board of Zoning Appeals since 2005; and Trustee of Downtown Chagrin Falls from 2000 to 2008. Defendant O'Brien signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. O'Brien also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

40.    **Defendant Willy R. Strothotte** ("Strothotte") has been a member of the Board since 1996. Strothotte is also the Chairman of the Board of Glencore International AG since 1994 and served as a Chief Executive Officer from 1993 to December 2001; Director of KKR Financial Holdings LLC since January 2007; Director of Minara Resources Ltd. since 2000; and Chairman of the Board of Xstrata AG (formerly Sudelektra Holding AG) since 1994. As Chairman of Glencore

and one of the original purchasers of stock in Glencore, Defendant Strothotte was familiar with the forward sales contracts between Glencore and Century Aluminum, the unwinding of these contracts in July 2008, and Glencore's subsequent increased stake in Century Aluminum through the July 8, 2008 preferred stock purchase agreement of nearly $1 billion. Defendant Strothotte signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. Strothotte reviewed, approved and signed Century's Schedule 13D/A, filed with the SEC on July 18, 2009, the 2007 10-K and the 2008 10-K. During the Relevant Period, Strothotte sold 1,500 shares of Century Aluminum stock for $109,110 in unlawful insider trading proceeds.

41. **Defendant Jarl Berntzen** ("Berntzen") has been a member of the Board since 2006. Defendant Berntzen signed the Company's January 2009 Registration Statement filed with the SEC and approved issuance of Company's false SEC reports. Defendant Berntzen was also a Managing Director and Portfolio Manager of Interlachen Capital Group from August 2008 through February 2009; Partner-Head of Mergers and Acquisitions, ThinkEquity Partners LLC from March 2006 to August 2008; Director of Universal Safety Response, Inc. from October 2007 to April 2009; Senior Vice President, Barrington Associates, LLC from April 2005 to February 2006; and Founder, Berntzen Capital Management, LLC from March 2003 to April 2005. Berntzen also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

42. **Defendant Catherine Z. Manning** ("Manning") has been a member of the Board since 2008. Prior to joining the Board, Manning was Partner, PricewaterhouseCoopers LLP from July 1986 to June 2008; Finance Effectiveness and Merger Integration leader of PricewaterhouseCoopers' Atlanta Advisory practice; Chairman, Atlanta Historical Society since January 2007, member since January 2002; Member, Georgia Appleseed since January 2006; Member, Museum of Contemporary Art of Georgia since February 2008. Manning reviewed, approved and signed Century's Post-Effective Amendment No. 1 to Form S-3 field with the SEC on March 2, 2009 and the 2008 10-K.

43. **Defendant Steve Schneider** ("Schneider") has served as Senior Vice President and Chief Accounting Officer of Century Aluminum since 2006, and served as Vice President and

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

Corporate Controller from April 2002 through May 2006. Schneider signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of the Company's false SEC reports. During the Relevant Period, Schneider sold 255 shares of Century Aluminum stock for $3,722 in unlawful insider trading proceeds. Schneider also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

44. **Defendant Michael A. Bless** ("Bless") has served as Executive Vice President and Chief Financial Officer of Century Aluminum since January 2006. Bless received a salary and bonus in 2008 of $422,000 and $270,000, respectively; in 2007, a salary and bonus of $405,000 and $345,000, respectively, and in 2006, a salary and bonus of $352,397 and 262,500, respectively. The bonus component of Bless' annual compensation was based upon annual quantitative and qualitative performance targets established by the Board of Directors. Bless signed the Company's January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC reports. Bless reviewed, approved and signed the 2007 10-K, the Q1'08 10-Q, the July 8, 2008 Form 8-K, including exhibits 10.1, 10.2, 10.3 and 10.4 ("July 8, 2008 8-K"), Q2'08 10-Q, Q3'08 10-Q and the 2008 10-K. Thus, Defendant Bless was familiar with the forward sales contracts with Glencore, the unwinding of these contracts and the July 8, 2008 preferred stock sale to Glencore. Prior to joining Century, Bless served as Managing Director of M. Safra & Co., Inc., from February 2005 to January 2006 and Executive Vice President and Chief Financial Officer of Maxtor Corporation from August 2004 to October 2004. From August 1997 through January 2004, Bless served in a number of senior executive positions with Rockwell Automation, Inc. (formerly known as Rockwell International Corporation), a leading industrial automation hardware, software and services company, including as Senior Vice President and Chief Financial Officer from June 2001 to January 2004.

45. **Defendant Wayne R. Hale** ("Hale") has been the Chief Operating Officer and an Executive Vice President of Century Aluminum since March 2007. Hale received a salary and bonus in 2008 of $472,000 and $345,000, respectively, and in 2007, a salary and bonus of $375,000 and $650,000, respectively. The bonus component of Hale's annual compensation was based upon annual quantitative and qualitative performance targets established by the Board of Directors. Prior

to joining Century, Defendant Hale served as Senior Vice President of Sual-Holding from April 2004 to February 2007. Hale also held various senior management positions with Kennecott Utah Copper Corporation from April 2000 to April 2004, including Chief Operating Officer from April 2002 to April 2004.

46. Defendants Century Aluminum, Kruger, Fontaine, Thompson, Fishman, Jones, O'Brien, Strothotte, Manning, Hale, Bless, Schneider and Berntzen all are collectively referred to hereinafter as the "**Exchange Act Defendants**."

47. Defendants Kruger, Fontaine, Thompson, Fishman, Jones, O'Brien, Strothotte, Manning, Hale, Bless, Schneider and Berntzen all are collectively referred to hereinafter as the **"Individual Defendants."**

48. It is appropriate to treat the Exchange Act Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Exchange Act Individual Defendants identified above. The Exchange Act Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information involving the Company's liquidity and cash flow, Glencore, the sale of the Company's preferred stock and its business, operations, prospects, growth, finances, financial condition and cash flow from operations as alleged herein.

## DUTIES OF INDIVIDUAL DEFENDANTS

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Century Aluminum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company including the January 2009 Registration Statement. Because of their executive, managerial and directorial positions with Century Aluminum, each Defendant had access to adverse non-public information concerning the preferred stock issued in

1  July 2008 and its adverse material impact on the Company's interim consolidated statement of cash

2  flows.

3      50.    At all times relevant hereto, each of the Defendants was the agent of each of the

4  other Defendants and was at all times acting within the course and scope of such agency.

5      51.    To discharge their duties, the officers and directors of Century Aluminum were

6  required to exercise reasonable and prudent supervision over the management, policies, practices

7  and controls of the financial affairs of the Company.  By virtue of such duties, the officers and

8  directors of Century Aluminum were required to, among other things, refrain from acting upon

9  material inside corporate information to benefit themselves.

10                          **SUBSTANTIVE ALLEGATIONS**

11      52.    The Exchange Act claims are pled at *infra* ¶¶ 53-128, 178-184.  The Securities Act

12  claims are pled separate and apart from the Exchange Act Action at *infra* ¶¶ 129-177, 185-201.

13  Plaintiffs allege that the Securities Act Defendants (defined *supra*) issued materially false and

14  misleading statements in the Offering Documents (defined *infra*), in violation of sections 11 and 15

15  of the Securities Act, 15 U.S.C. §§ 77k and 77o.  The Securities Act Action does not incorporate by

16  reference, or otherwise rely upon, any allegations pled in support of the Exchange Act claims,

17  except those non-fraud based allegations that are specifically incorporated.  Plaintiffs' non-fraud

18  allegations in support of the Securities Act Action are pled as separate, stand-alone claims under

19  the notice-pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure.

20                          **THE EXCHANGE ACT ACTION**

21      53.    The separate fraud-based Exchange Act Action arises out of a scheme orchestrated

22  by the "Exchange Act Defendants" to create and/or maintain artificial inflation in the price of

23  Century Aluminum common stock throughout the Class Period, to the detriment of ordinary

24  investors who were damaged when the truth was revealed to the market.

25      **A.    General Background**

26      54.    Century Aluminum was incorporated in 1995, when it was spun-off by Glencore

27  following a scandal involving Glencore's founder Marc Rich.  Rich was indicted in the United

28  States Federal Court for the Southern District of New York on charges of tax evasion arising out of

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

his alleged violation of a United States oil embargo in place against Iran (the so-called "food-for-oil" scandal) in the early 1980s. *See* Marcia Vickers, *The Rich Boys: An ultra-secretive network rules independent oil trading. Its mentor: Marc Rich*, BusinessWeek, July 18, 2005, *available at* http://www.businessweek.com (last visited March 10, 2010). Before he was tried, however, Rich fled to Switzerland, where he remained a fugitive, until being pardoned by President Bill Clinton on January 20, 2001. *See id.; see also* Timothy P. Carney, *The Story of Clinton's Marc Rich Pardon: Co-conspirators Serve Time While Multimillionaire Enjoys Clemency*, at *1, World Net Daily, February 05, 2001, *available at* http://www.wnd.com (last visited March 10, 2010). Century sought to protect itself against market volatility by entering into risk forward financial sale contracts with Glencore. In November 2004 and June 2005, Century entered into two forward financial sale contracts with Glencore.

55.     In 2006 and continuing through 2015, the forward financial sales contracts set a minimum price and a maximum price, and specified two quantities of primary aluminum (expressed in metric tons): "Tonnage 1" and "Tonnage 2." If the average spot price for aluminum for the month was below the *minimum*, Glencore paid Century the difference between the spot price and the minimum, multiplied by the quantity of Tonnage 1. If, however, the average aluminum spot price for the month was above the *maximum*, Century paid Glencore the difference between the aluminum spot and the maximum, multiplied by the sum of the quantities of Tonnage 1 + Tonnage 2. If the average aluminum spot price for the month was between the *minimum* and the *maximum*, neither party paid the other anything. All settlements were in cash. After the forward contracts were signed, Century disclosed in its 10-Qs and 10-Ks the change in the market value of the forward contracts. The change in market value (realized and unrealized) since the last quarter was reflected on Century's books as an adjustment to "Net Income" ("Net loss on forward contracts") on the statement of operations; and the non-cash (unrealized) portion was reflected as an adjustment to "Cash Flows From Operating Activities" ("Unrealized net loss on forward contracts") on the statement of cash flows.

56.     In early May 2008, Century held a conference call with analysts and Defendants Kruger and Hale were quoted in the May 5, 2008 *Metal Week* by reporter Tina Petersen as follows:

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

"We had a good start to the year," said Kruger, calling the aluminum price "robust." He pointed out the average LME aluminum price was $2,729/mt in the first quarter, well above Q4's $2,447. He said the aluminum price was receiving support "from the weak US dollar, ongoing rising costs and continued ongoing demand from China."

Kruger said Century's US aluminum smelters were operating well and producing at or above capacity at all facilities. But he acknowledged that the US aluminum market "is subdued" and soft, except aerospace, which remained strong. He said there was also supply-side risk, evidenced by the winter storms in China.

Wayne Hale, Century's chief operating officer, said despite a 2% reduction in metal demand, "we continue to see strong demand for our premium products."

Tina Petersen, *Global Market balanced or in slight surplus: Century*, 79 Platts Metals Week 9 (No. 18), May 5, 2008, *available at* http://www.platts.com/searchResults.aspx.

## B.     Background to False Statements

57.     As noted above, by mid-2008, the commodities markets were in peril, and the market for aluminum in particular was being heavily compromised. At that time, vertically integrated powerhouses like ALCOA Inc. ("Alcoa") and Century Aluminum were facing the combination punch of declining aluminum prices, in conjunction with rising raw material input prices. In percentage terms, in the third fiscal quarter of 2008, the price of caustic soda and calcined coke (both important inputs for the production of aluminum) had increased by 88% and 100%, respectively. As reflected in the following table, margins on aluminum production were declining dramatically as the price of raw materials was escalating geometrically:

| Raw Material Input | % Change 3Q 2007 to 3Q 2008 |
|---|---|
| Caustic Soda | 88% |
| Calcined Coke | 110% |
| Ocean Freight | -4% |
| Natural Gas | 47% |
| Fuel Oil | 77% |

Collectively, these increased costs amounted to a charge to earnings of approximately $294 million, just in the third quarter of 2008, for Alcoa. A similar charge to earnings was also negatively impacting Century Aluminum, forcing down margins and increasing production costs.

58.     In addition to increasing costs, the end markets for Century Aluminum's products were also feeling the full brunt of the economic downturn. The auto, heavy truck and commercial

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

building industries were all either flat or declining. Accordingly, the market price for a ton of raw aluminum fell from almost $3,217 per ton in July of 2008, to approximately $1,500 per ton as of January 8, 2009. With such a dramatic decrease in the market price for their products, the major aluminum producers—including Century Aluminum—were cutting all discretionary spending and hunkering down for a long downturn in the market.

59.     To compound matters, the Exchange Act Defendants were facing the loss of their positions, control and holdings in Century Aluminum due to their losses on the open market. Specifically, in mid-2008 Century Aluminum found itself in debt to the tune of over **three quarters of a billion dollars** to commodities trading conglomerate Glencore as a result of certain risky derivatives or "forward financial sales contracts." As an owner of 28.5% of Century Aluminum's shares at that time, Glencore held a huge bargaining chip over the heads of the Exchange Act Defendants. Indeed, if it had wished, Glencore could have either forced Century Aluminum into bankruptcy and/or taken over the company outright via a tender offer or proxy contest. However, because Glencore would have simply sold the Company off in pieces or attempted to consolidate it with its other aluminum companies,[5] Glencore was willing to deal with Century Aluminum—which makes sense considering the leverage which they could exert.

60.     In July, Century Aluminum announced that they had mollified Glencore, to their own benefit. In exchange for agreeing to a "standstill," which precluded a hostile takeover until 2010, Century Aluminum agreed to: (1) pay Glencore no less than $730,200,000 in cash; and (2) issue Glencore 160,000 shares of a new class of convertible stock, valued at $6,115.00 per share. July 8, 2008 Form 8-K at *1-3.

61.     On July 8, 2008, Century: (1) held a conference call with analysts and investors, with a slideshow, to explain the transaction; (2) filed an 8-K announcing that it had agreed with Glencore to terminate the Hedges via thee contemporaneous execution of four agreements; *each of which were attached in their entirety to the 8-K, both the 8-K and agreements were signed by Defendant Bless*; and (3) filed a 13D/A detailing Glencore's purchase of preferred stock from

---

[5]     *See* n.1.

Century, including all the cash that changed hands as part of this transaction.  According to media reports including *Market News Publishing*, Defendant Kruger stated that "[w]e are pleased to have reached this agreement."  Defendant Kruger also stated, "[w]e are very pleased with Glencore's continuing support; by accepting the preferred stock and its terms, they have reaffirmed their position as a long-term shareholder."

*Century Aluminum ("CENX-ABHDPQ") Unwinds Primary Aluminum Financial Forward Sales Contracts*, Market News Publishing, July 8, 2008.

62.    The July 8-K described the Standstill agreement as follows:

**Item 1.01 Entry into a Material Definitive Agreement**
On July 7, 2008, Century Aluminum Company ("Century") and Glencore Ltd. agreed to terminate forward financial sales contracts for the years 2006 through 2010 and 2008 through 2015, respectively ("Financial Sales Contracts") upon the payment by Century to Glencore Ltd. of $730.2 million and upon the issuance by Century to Glencore Investment Pty Ltd of 160,000 shares of a non-voting Series A Convertible Preferred Stock. Glencore Investment Pty Ltd is an affiliate of Glencore International AG, the beneficial owner of approximately 28.5% of our issued and outstanding common stock. In connection with this transaction, Glencore has agreed to certain limitations on its ability to acquire additional shares of our common stock and may not increase its voting interest in Century above 28.5% until April 7, 2009 and above 49% of our voting power until January 7, 2010. Under the terms of this transaction, Glencore has also agreed to forego or restrict certain actions, including unsolicited business combination proposals, tender offers, proxy contests and sales of its preferred shares for a limited period of time. We have given Glencore registration rights whereby we have agreed from time to time, subject to certain restrictions, to register the offer and sale of the common stock into which its shares of Series A Convertible Preferred Stock are convertible with the SEC.

The termination of the Financial Sales Contracts with Glencore Ltd. is governed by the following principal agreements and documents, all of which are dated July 7, 2008.

**Termination Agreement**
This agreement provides for the termination of the Financial Sales Contracts with Glencore upon the payment by Century to Glencore of $730.2 million and upon the issuance by Century to an affiliate of Glencore of 160,000 shares of Series A Convertible Preferred Stock pursuant to the Stock Purchase Agreement. Of the cash payment, Century has deferred payment of $505.2 million until August 31, 2008. If Century fails to pay this deferred amount by such date, Century is required to make minimum monthly payments of $25 million, commencing September 1, 2008 and continuing until December 31, 2009. The deferred amount

will accrue interest at the rate of LIBOR plus 2.50 percent per annum. In addition, Century must apply the net proceeds received from any public or private offering of debt or equity securities (other than issuances of securities in any business combination transaction or pursuant to employee benefit plans or arrangements, or to the extent that net proceeds are used to finance the acquisition of any plant, equipment or other property or to refinance existing indebtedness) to the prepayment of the unpaid deferred amount. Century may prepay the deferred amount at any time without penalty.

**Stock Purchase Agreement**

In partial consideration for the termination of the Financial Sales Contracts under the Termination Agreement, we have agreed to issue to an affiliate of Glencore 160,000 shares of our Series A Convertible Preferred Stock, a new class of preferred stock authorized by our Board of Directors. We valued the shares of Series A Convertible Preferred Stock at $6,115 per share, based on the closing price of our common stock into which the shares of Series A Convertible Preferred Stock are convertible on the date of purchase, as reported by the Nasdaq Global Select Market. The rights, preferences and privileges of the Series A Convertible Preferred Stock are described in Item 5.03 of this Current Report on Form 8-K, which is incorporated by reference herein.

**Standstill and Governance Agreement**

As a part of our issuance of the Series A Convertible Preferred Stock, Glencore has agreed to refrain from taking certain actions.

***Acquisition of Additional Voting Securities.*** Except for limited circumstances set forth in the agreement, Glencore may not acquire more than 28.5% of our voting securities for a period ending April 7, 2009. Between April 8, 2009 and January 7, 2010, Glencore may not acquire more than 49% of our voting securities.

***Restrictions on Certain Actions.*** For a period ending April 7, 2009, Glencore may not take the following actions, which restrictions will lapse upon a third party exchange or tender offer, as described above under the caption "Acquisition of Additional Voting Securities":

- seek to elect members of our board (other than one director nominated by Glencore under the agreement) or seek to remove any such member or withhold approval for such member;
- submit or cause others to submit stockholder proposals;
- other than as permitted under the agreement, submit business combination proposals or seek to control us or our board or encourage or support others to do so;
- except as permitted by the agreement, publicly announce any business combination proposal;
- solicit proxies in opposition or otherwise oppose any board recommendation;

- form or join any group relating to our securities; or
- take other similar actions.

***Business Combination Proposals.***  Until April 8, 2009, Glencore may not submit business combination proposals to our board unless in writing and delivered to a committee of independent directors in a manner which does not require public disclosure, or invited to do so by our committee of independent directors; thereafter, until termination of this agreement, Glencore may submit such proposals, provided that any such proposal has to be approved by our independent directors before it can be adopted.

***Board Nominees.***  Glencore may submit to our board one Class I nominee to stand for election to our board of directors. Inclusion of such nominee is subject to the consent of a majority of the members of our nominating committee, subject to the reasonable exercise of the fiduciary duties of such members.

***Voting.***  Other than with respect to its nominee, Glencore must vote its shares of our common stock for other nominees for election to our board of directors proportionally with our other stockholders until April 8, 2009. In all other matters, Glencore may vote its shares of our common stock in its sole discretion.

***Termination.***  The right of Glencore to nominate one nominee to our board of directors will terminate if Glencore holds less than 10% of our equity securities for a period of three continuous months. The restrictions on Glencore's ability to vote, acquire additional equity securities and take other actions prohibited by the Standstill and Governance Agreement will terminate at the earliest of the following: (A) Glencore holds less than 10% of our equity securities for a period of three continuous months, (B) the consummation of a business combination or tender or exchange offer, (C) January 7, 2010, and (D) a third party acquires 20% or more of our voting securities and we do not adopt a stockholder rights plan in response to such acquisition.

July 8, 2008 Form 8-K at *2-3.

63.    The total cash outlay to Glencore under the agreement amounted to the equivalent of **$1.65 billion**. *See* July 8, 2008 Form 8-K.  In return, Glencore agreed to forgo increasing its voting interest in Century above 28.5% until April 7, 2009. *See* July 8, 2008 Form 8-K at *1.

64.    On July 8, 2008, Reuters reported on the costs of unwinding all of its primary aluminum forward sales contracts with Glencore.  Reuters quoted Century as stating "it will have no further obligations under the forward contracts" and "sees greater value in open market transactions for its aluminum."  "We see favorable fundamentals for the global primary aluminum market and believe our shareholders will benefit from our ability to realize market pricing on our

entire production capacity," said Chief Executive Officer Logan Kruger. Kruger added that Century has "an attractive pipeline of growth opportunities which can be funded with the additional cash flow we will unlock through this transaction."

Carole Vaporean, *Century to Pay Glencore to Cancel Aluminum Deal*, REUTERS, July 8, 2008, *available at* http://reuters.com/article/idUSN0819324920080708.

65. On July 8, 2008, the *American Metal Market* also quoted Defendant Kruger's statements from the July 8, 2008 conference call:

> Logan W. Kruger Century's president and chief executive officer said during a conference call Tuesday that it has been difficult to watch a third of Century's production end up being sold for about half of the current marketprice.
>
> "We are living in a very different world today (than in 2004 and 2005)," Logan said. "We see favorable fundamentals for the global primary aluminum market and believe our shareholders will benefit from our ability to realize market pricing on our entire production capacity. We have an attractive pipeline of growth opportunities that can be funded with the ***additional cash flow*** we will unlock through this transaction."

Tom Jennemann, *Century Inks $1.7B Deal with Glencore to Unwind Hedge*, American Metal Market, July 8, 2008, *available at* 2008 WLNR 27744004 (emphasis added).

66. On July 25, 2008, *American Metal Market* reported that "Century pares loss despite hedge bite." *American Metal Market* quoted Defendant Kruger as follows:

> "Century made important progress during the quarter," Logan W. Kruger, president and chief executive officer, said. "The unwind of our entire aluminum hedge book provides our investors with full exposure to the commodity. We continue to believe firmly that metal markets, while volatile, will demonstrate long-term upward pressure consistent with ongoing cost increases and supply constraints, as well as increasing metal demand from emerging economies. Kruger also said that construction is accelerating at the 250,000-tonne-per-year primary aluminum smelter in Helguvik, Iceland. The company expects to begin pouring concrete by the fourth quarter."

*Century Pares Loss Despite Hedge Bite*, American Metal Market, July 25, 2008, *available at* 2008 WLNR 27747023.

67. With falling aluminum prices, many looked to any recovery in commodity prices as a possible harbinger of a forthcoming recovery. However, by late 2008, it became clear that things—at least in the aluminum sector—might get worse before they would get any better. As Christopher Barker, a columnist for *The Motley Fool* wrote of the continuing downturn:

Bellwether sectors like steel and aluminum may provide the earliest snapshots of how global industry is responding to the financial crisis, but the view is far better from the outside looking in.

Kaiser Aluminum (Nasdaq: KALU) became the latest bellwether to report earnings this week, marching an abrupt about-face from a $24.8 million gain a year earlier to a $22.1 million loss for the third quarter of 2008. Declining metal prices forced the company to log $43.8 million in mark-to-market losses from derivative positions, erasing similar gains posted through the first half of the year. On the operational side, the lost production time from a transformer failure and resulting fire at the company's Anglesey smelter in Wales set Kaiser back a further $20 million. Excluding these items and adjusting for taxes, Kaiser said it would have earned $15.7 million -- still well short of the prior-year result.

Despite all these troubles, the company reported continuing strong demand for its fabricated products, particularly from the aerospace and defense industries. Prices for such products remained above prior-year levels in the third quarter. Kaiser considers such fabricated products to be its core competency, and revealed that the company is considering a possible decommissioning of the Anglesey smelter sometime after September 2009.

With much larger competitors like Aluminum Corporation of China (NYSE: ACH) and Alcoa (NYSE: AA) scaling back production, and warnings of softening demand emanating from the likes of Rio Tinto (NYSE: RTP) and POSCO (NYSE: PKX), the near-term outlook for aluminum producers is more threatening than a rising thundercloud.

**Even Century Aluminum (Nasdaq: CENX), which disappointed analysts this week despite a fivefold earnings increase, is hunkering down for difficult times ahead by cutting all discretionary spending.** The near-term trend doesn't look much better for steel, with ArcelorMittal (NYSE: MT) announcing its own production cuts.

While I urge considerable caution on these sectors in the near term, I also remind Fools to keep their eyes on the long-term prize. Alcoa still expects 15% demand growth from China this year, and Russia's UC Rusal sees a supply shortfall looming no matter how the chips may fall. Kaiser may not be the wiser choice just now, but by following the aluminum sector closely, Fools are conducting recommended due diligence on the global economy.

Christopher Barker, *Avoid Getting Crushed Like a Can*, The Motley Fool, Nov. 7, 2008, *available at* http://www.fool.com/investing/general/2008/11/07/avoid-getting-crushed-like-a-can.aspx (emphasis added).

68.     Thus, in late 2008, the Company was under increasing pressure due to a significant

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

degradation in the market price for aluminum and starkly increased operating and fuel costs. According to a report issued by the United States Geological Survey ("USGS"), Aluminum prices declined significantly at the end of 2008. As the USGS stated in a report issued in January of 2009:

> The price of primary aluminum generally rose through July 2008 before declining significantly. In January, the average monthly U.S. market price for primary ingot quoted by Platts Metals Week was $1.136 per pound; it reached a high of $1.426 per pound in July, but in September, the price was $1.192 per pound. Prices on the London Metal Exchange (LME) followed the trend of U.S. market prices. The monthly average LME cash price for September was $1.138 per pound.

USGS, *Mineral Commodity Summaries: Aluminum*, at *19 (January 2009), *available at* http://minerals.usgs.gov/minerals/pubs/commodity/aluminum/mcs-2009-alumi.pdf (last visited March 9, 2010). *See, also*, Leia Michele Toovey, *Aluminum's Path to the Bottom, Are We There Yet?*, Aluminum Investing News, Oct. 28, 2008, at *1, *available at* http://aluminuminvestingnews.com/aluminum-articles/55/aluminum%E2%80%99s-path-to-the-bottom-are-we-there-yet (last visited March 9, 2010) ("The precipitous drop in commodity prices is putting companies under pressure. Particularly feeling the squeeze are oil and metal mining companies. The current prices of certain commodities are rendering some operations unprofitable. Aluminum companies are taking the brunt of the hit with the metal at a three-year low at around 87 cents per pound.").

69. During late 2008, things got even worse. Century Aluminum was incurring substantial monthly losses, culminating in a net loss of $700.2 million (or $14.27 per share) for the Fourth Quarter of 2008. Further, Century Aluminum was forced to take a $94.8 million charge for goodwill impairment ($1.93 per share), a tax charge of $522.9 million ($10.66 per share) based on a "recording of a valuation allowance on deferred tax assets," and a inventory write-down charge of $55.9 million ($1.14 per share).

70. As Eric Fox observed in a January 9, 2009 article entitled *Aluminum Prepares for a Downturn*:

> Although the market has punished Alcoa (NYSE:AA) for the recently announced layoffs and capacity cuts, the actions it is taking are necessary to rebalance supply and demand and allow the company to survive the cyclical downturn. Alcoa announced that it is reducing capacity in aluminum production

by 135,000 metric tons per year (MTPY), bringing the total announced capacity cuts to 750,000 MTPY (18%) of total. The company is planning on cutting 13,500 employees (13%) of its workforce by the end of 2009. Alcoa didn't stop with just layoffs and capacity cuts. The company said it would stop "all non-critical capital investment" and projected that capital expenditures in 2009 would be $1.8 billion, half of what was spent in 2008. (Make an informed decision about your investments with the easy equations in Analyze Investments Quickly With Ratios.) During the conference call held in early October to discuss third quarter earnings, the company painted a pessimistic view of the fundamentals in the aluminum market, with prices for aluminum peaking at $3,217 per ton in July and falling to $2,377 by September 30. As of January 8, 2009 it sells for approximately $1,500 per ton.

* * *

These cost increases hit earnings by $294 million in the quarter. Almost all of these cost trends have reversed and will positively impact earnings in 2009. The company also acknowledged this in the press release stating that it has "accelerated procurement actions to address major input costs, such as energy, coke, caustic soda, and aluminum fluoride that will provide significant short-term cash benefits, generating savings of greater than 20% in each of the materials. Lower market oil and gas prices also are having a positive impact."

The end markets that consume aluminum are also weakening with auto, heavy truck, and commercial building and construction declining or flat in North America and Europe.

More Capacity Cuts To Come. Investors should expect to see more capacity cuts to come in 2009 as demand weakens. Alcoa said that approximately 1/3 of global capacity is cash flow negative at an aluminum price of $2,200 per metric ton. This percentage is certainly higher now using current prices for aluminum. (For more on the importance of analyzing cash flow, read The Essentials Of Cash Flow.) Century Aluminum Company (Nasdaq:CENX) recently reduced capacity at its plant in Ravenswood, WV, and laid off salaried workers to cope with the downturn.

Eric Fox, *Aluminum Prepares for a Downturn*, Investopedia, January 9, 2009, *available at* http://stocks.investopedia.com.

71.     Nonetheless, Century Aluminum's problems were not limited to the downturn in the global market for aluminum because Century Aluminum also lost almost $750 million on the risky "forward contracts" with Glencore. These losses, when added to the already increasing cost to produce aluminum and the declining market for the commodity, put Century Aluminum in a particularly precarious position.

72.   Under such dismal circumstances, Century Aluminum was not able to maintain profitability simply by cutting discretionary spending and putting off capital improvements.   As such, the Company was forced to take a number of drastic actions, including:

• granting Glencore more voting shares and allowing Glencore to vote its shares before the expiration of the Standstill Agreement, *see* January 27, 2009 8-K;

• shutting down the Company's Ravenswood aluminum smelting plant, resulting in the lay-off of more than 120 employees;

• reducing overall staffing by 13 percent; and

• curtailing production and development of facilities at the Company's greenfield smelter project at Helguvik, Iceland.

73.   As a result of all of these economic pressures, Century Aluminum was forced to seek an additional influx of cash from the only avenue remaining to the Company: a public offering of stock.   Accordingly, Century Aluminum completed a public offering of 24.5 million shares of its common stock in early February 2009, raising the Company approximately $104 million in cash under the January 2009 Offering.

### C.   False Statements During the Exchange Act Class Period

74.   Despite Century Aluminum's dismal performance and outlook at the end of 2008, investors were willing to invest in the Company's stock, believing that the company was liquid, when—in reality—it was not.

75.   On October 21, 2008, the Individual Defendants caused the Company to issue a press release announcing its "strong" results for the third quarter of 2008.   The Company summarized its performance in the third quarter and the first nine months of 2008 as follows:

> Century Aluminum Company reported net income of $37.0 million ($0.59 per basic and $0.57 per diluted common share) for the third quarter of 2008.   The reported earnings per share data reflect, as prescribed by [Generally Accepted Accounting Principles ("GAAP")], net income allocable to common shareholders without effect for the July 2008 issuance of preferred shares.   These results were negatively impacted by a net after-tax charge of $50.4 million for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting. Quarterly results were positively impacted by a $3.3 million tax benefit related to the release of tax reserves no longer required.   For a full

reconciliation of earnings per share allocable to common and preferred shareholders, see the attached Exhibit A.

In the third quarter of 2007, the company reported net income of $7.5 million ($0.18 per basic and $0.17 per diluted common share), which included an after-tax charge of $46.2 million for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting.

Recent highlights included:

— Operating performance was strong at all primary aluminum facilities.

— Direct and toll shipments of primary aluminum totaled a record 203,618 tonnes, up nearly three percent from the previous quarter.

— Construction continues at the company's greenfield smelter project at Helguvik, Iceland.  The company is closely monitoring and evaluating the project in light of the disruptions in global financial markets.

— In early July, Century settled all of its remaining fixed price aluminum financial sales contracts.  The company made the final payment under the deferred settlement amount on October 1.

Sales in the third quarter of 2008 were $552.2 million, compared with $454.4 million in the third quarter of 2007.  Shipments of primary aluminum for the quarter totaled 203,618 tonnes compared with 195,540 tonnes in the year-ago quarter, reflecting the impact of the Grundartangi expansion to 260,000 tonnes, which was completed in the fourth quarter of 2007.

For the first nine months of 2008, the company reported a net loss of $198.2 million ($4.57 per basic and diluted common share).  The reported earnings per share data reflect, as prescribed by GAAP, net loss allocable to common shareholders without effect for the July 2008 issuance of preferred shares.  These results were negatively impacted by a net after-tax charge of $466.2 million for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting.  Results for the nine month period were positively impacted by net tax benefits of $15.9 million for various non-recurring items.  For a full reconciliation of earnings per share allocable to common and preferred shareholders, see the attached Exhibit A.

Net income for the first nine months of 2007 was $11.1 million ($0.31 per basic and $0.29 per diluted common share), which included an after-tax charge of $172.1 million for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting.

Sales in the first nine months of 2008 were $1,568.6 million compared with $1,366.0 million in the same period of 2007.  Shipments of primary aluminum for the first nine months of 2008 were 601,511 tonnes compared with 568,812 tonnes for the comparable 2007 period.

Press Release, Century Aluminum Co., Century Aluminum Reports Third Quarter 2008 Earnings (Oct. 21, 2008) (*available at* http://investor.shareholder.com/cenx/releases) ("October 21, 2008 Press Release").

76.    Commenting on the Company's third quarter 2008 results, Defendant Kruger, on behalf of the Company and the Board, stated:

> "We had a busy and productive quarter . . .  Our operations continue to turn in sound performance, with our plants in Iceland and in the U.S. shipping well above their rated capacities.  We made good progress on the new, fifteen-year, market-based power contract for our Hawesville smelter; this process is in its final stages. The team leading the construction at Helguvik has maintained the project on time and on budget.

October 21, 2008 Press Release.

77.    On November 10, 2008, the Individual Defendants caused Century Aluminum to file the November 2008 Quarterly Report.  The November 2008 Quarterly Report reiterated the financial information contained in the October 21, 2008, press release and was signed by Defendants Kruger and Bless and approved by Defendants Berntzen, Fishman, Fontaine, Hale, Jones, Manning, O'Brien, Schneider, Strothotte and Thompson.

78.    The November 2008 Quarterly Report included certifications signed by Defendants Kruger and Bless, which stated:

> I [Logan W. Kruger/Michael A. Bless], certify that:
>
> 1)    I have reviewed this quarterly report on Form 10-Q of Century Aluminum Company;
>
> 2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of and for, the periods presented in this report;
>
> 4)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the Company's conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)  The registrant's other certifying officer and I have disclosed, based on the Company's most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2008

/s/ [LOGAN W. KRUGER/MICHAEL A. BLESS]

November 2008 Quarterly Report, at Ex-31.1-Ex-31.2.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

79.   In the November 2008 Quarterly Report, Defendants misrepresented that the financial information contained therein fairly presented the Company's results, stating as follows:

> The accompanying unaudited interim consolidated financial statements of Century Aluminum Company should be read in conjunction with the audited consolidated financial statements for the year ended December 31, 2007.   In management's opinion, the unaudited interim consolidated financial statements reflect all adjustments, which are of a normal and recurring nature, that are necessary for a fair presentation of financial results for the interim periods presented.

November 2008 Quarterly Report, at *4.

80.   Century Aluminum stated in its November 2008 Quarterly Report as follows: "Net cash provided by operating activities in the first nine months of 2008 was $230.8 million primarily due to cash from operations . . . ." November 2008 Quarterly Report at *37.   This led the Company to conclude that: "We have not determined the sources of funding for our long-term capital and debt repayment requirements; however, we believe that our cash flow from operations, available borrowings under our revolving credit facility and, to the extent necessary and/or economically attractive, future financial market activities, will be adequate to address our long-term liquidity requirements." *Id.* at *38.   These statements were false when made, along with the false financial statement of cash flows, that formed the basis for those statements.   Century Aluminum had no cash flow to speak of, and information concerning Century Aluminum's cash, as stated in the November 2008 Quarterly report was materially false and misleading.

81.   The false and misleading statement of cash flows in the November 2008 Quarterly Report was reported as follows:

//
//
//
//
//
//
//

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

## CENTURY ALUMINUM COMPANY
## CONSOLIDATED STATEMENTS OF CASH FLOWS
(Dollars in thousands)
(Unaudited)

| | Nine months ended September 30, | |
|---|---|---|
| | **2008** | **2007** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income (loss) | **$(198,164)** | $  11,054 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Unrealized net loss on forward contracts | **605,105** | 201,999 |
| Depreciation and amortization | **62,912** | 57,735 |
| Deferred income taxes | **(198,352)** | (38,822) |
| Pension and other postretirement benefits | **11,677** | 6,499 |
| Stock-based compensation | **12,034** | 3,765 |
| Excess tax benefits from share-based compensation | **(657)** | (516) |
| (Gain) loss on disposal of assets | **248** | (49) |
| Non-cash loss on early extinguishment of debt | **—** | 2,461 |
| Purchase of short-term trading securities | **(97,532)** | (645,909) |
| Sale of short-term trading securities | **348,416** | 387,182 |
| Undistributed earnings of joint ventures | **(12,466)** | (11,351) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable – net | **(22,403)** | 13,244 |
| Due from affiliates | **(9,771)** | 9,849 |
| Inventories | **(36,119)** | (20,990) |
| Prepaid and other current assets | **(389)** | (1,988) |
| Accounts payable – trade | **15,266** | 11,849 |
| Due to affiliates | **(215,522)** | 12,018 |
| Accrued and other current liabilities | **(28,523)** | (52,289) |
| Other – net | **(5,001)** | 13,519 |
| **Net cash provided by (used in) operating activities** | **230,759** | (40,740) |

*Id.* at *3.

82.     According to the January 26, 2009 *Metal Bulletin Weekly*, Century Aluminum, "reeling from its ill-timed decision to close its hedge book in June last year, needs an immediate monthly cash bridge of $6-7 million to keep its Ravenwood smelter open."  Citing a US-based trader, *Metal Bulletin Weekly* stated that "Century has been hardest hit of all US producers by the pricing fall."  *Century Will Close Ravenswood if it Cannot Stem Losses*, Metal Bulletin Weekly, January 26, 2009, *available at* http://www.metalbulletin.com.  An immediate influx of cash was

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1  critical to the Company.

2    83.    On or about January 29, 2009, Century Aluminum completed a secondary offering

3  of its stock. In connection with the Offering, Defendants represented in the Registration Statement

4  filed with the SEC that "[w]e incorporate by reference. . . [o]ur Quarterly Report on Form 10-Q for

5  the fiscal quarters ended March 31, 2008, June 30, 2008 and September 30, 2008 . . ." January

6  2009 Registration Statement at *S-54.

7    84.    Quoted in the February 2, 2009 *Metals Week*, FBR Capital Markets viewed the

8  Secondary Offering as "a necessity" for the Company because the proceeds would "provide the

9  company with a longer life of 12 to 18+ months." *Century Needs $100 Million – FBR*, 80 Metals

10  Week, Issue 5, February 2, 2009, *available at* 2009 WLNR 2874032. The Offering, which closed

11  on February 3, 2009, essentially saved Century Aluminum, as it was able to raise net proceeds of

12  approximately $104 million by selling approximately 24.5 million shares of stock to the public at a

13  price of $4.50 per share.

14    85.    The January 2009 Registration Statement contained a similar misstated statement of

15  cash flows. *See* January 2009 Registration Statement, at *S-10 (stating that "Adjusted net cash

16  provided by operating activities" was $204,875,000 for the nine months ended September 30,

17  2008). The January 2009 Registration Statement stated: "Based upon . . . price forecasts, and

18  *taking into account our current balance of cash and short-term investments* . . . we would expect

19  to have sufficient liquidity to fund our operations for approximately the next 18 months." January

20  2009 Registration Statement at *S-2. These statements were false when made, along with the false

21  financial statement of cash flows that formed the basis for those statements. Century Aluminum

22  had no cash flow to speak of, and the information concerning Century Aluminum's cash position, as

23  stated in the January 2009 Registration Statement, was materially false and misleading.

24    86.    In the January 2009 Registration Statement, the "Summary [of] Consolidated

25  Financial Data," which features a non-GAAP calculation of Earnings before Interest, Taxes,

26  Depreciation and Amortization ("EBITDA").[6]   One of the most important line items of the

27  ───────────────────
[6]    Defined by Century Aluminum as "income (loss) before income taxes and equity in

28  earnings of joint ventures adjusted to exclude: (i) interest expense, net; (ii) depreciation and

EBITDA calculation—and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash"). Indeed, Net Operating Cash in the November Quarterly Report and January 2009 Registration Statement represents an enormous percentage – *over 74%* – of the Company's total adjusted EBITDA as presented in that document. ¶ 154 *infra*.

87.     The November Quarterly Report and January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740 ) | $(5,755 ) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884 ) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

88.     Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm.

89.     As expressed in the explanation above the table in the Secondary Offering:

> We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

January 2009 Registration Statement, at S-11.  The presentation of adjusted net cash provided by operations is useful, however, *only* if it is accurate.

---

amortization; and (iii) net loss on forward contracts."  January 2009 Registration Statement, at S-11.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

90.     On February 19, 2009, the Individual Defendants caused the Company to issue a press release announcing its results for the fourth quarter and year ended December 31, 2008.  The Company summarized its performance as follows:

> Century Aluminum Company today reported a net loss of $700.2 million ($14.27 per basic and diluted share) for the fourth quarter of 2008. Reported fourth quarter results were impacted by a charge for goodwill impairment of $94.8 million ($1.93 per basic and diluted share), a tax charge of $522.9 million ($10.66 per basic and 1. diluted share) related to the recording of a valuation allowance on deferred tax assets and an inventory write down to market value of $55.9 million ($1.14 per basic and diluted share).
>
> For the fourth quarter of 2007, the company reported a net loss of $112.3 million ($2.74 per basic and diluted share).  Reported results for this quarter were impacted by an alter-tax charge of $147.7 million ($3.61 per basic share) for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting and by a tax benefit of $4.0 million ($0.10 per basic share) related to the increase in the carrying amount of deferred tax assets as a result of a state tax law change.  The dilutive effect of the options, convertible notes and service-based awards would reduce basic EPS by $0.05 per share
>
> Recent highlights include
>
> — 2008 direct and toll shipment volumes totaled a record 803,771 metric tons, a 5 percent increase from 2007.  During the fourth quarter, the Grundartangi smelter shipped at an annualized rate of more than 276,000 metric tons.
>
> — All primary aluminum facilities operated safely at or above available potline capacity during 2008.
>
> — In December the company issued a WARN notice and implemented the immediate curtailment of one potline at the Ravenswood, West Virginia smelter. Pursuant to the WARN notice, an orderly curtailment of the entire smelter was essentially completed by mid February.
>
> — The company completed a public offering of 24.5 million shares of its common stock in early February.  Net proceeds were approximately $104 million.
>
> — Salaried staff reductions of approximately 13 percent were implemented at the Hawesville, KY smelter and Monterey, CA headquarters.
>
> — The company's greenfield smelter project near Helguvik, Iceland, remains under review Site activity is continuing at a minimal level.
>
> For 2008, Century reported a net loss of $898.3 million ($20.07 per basic and diluted share).  Included in these results is a net after tax charge of $742.1 million ($16.58 per basic and diluted share) for mark-to-market adjustments on

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

forward contracts that do not qualify for cash flow hedge accounting. Full year results were also impacted by a charge for goodwill impairment of $94.8 million ($2.12 per basic and diluted share), a tax charge of $522.9 million ($11.68 per basic and diluted share) related to the recording of a valuation allowance on deferred tax assets and an inventory write down to market value of $55.9 million ($1.25 per basic and diluted share).

For 2007, Century reported a net loss of $101.2 million ($2.72 per basic and diluted share). Results for 2007 include a net after-tax charge of $328.3 million ($8.83 per basic share) for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting. 2007 results were also impacted by a tax benefit of $8.3 million ($0.22 per basic share) related to the increase in the carrying amount of deferred tax assets as a result of a state tax law change.

Sales for the fourth quarter of 2008 were $402.2 million compared with 10 $432.1 million for the fourth quarter of 2007. Shipments of primary aluminum for the 2008 fourth quarter were 202,259 tonnes, compared with 198,138 tonnes shipped in the year-ago quarter. Sales for 2008 were $1,971 million compared with $1,798 million for 2007, and total 2008 primary aluminum shipments of 803,771 tonnes compared with 766,951 tonnes shipped in 2007.

Press Release, Century Aluminum Co., Century Reports 2008 Financial Results (Feb. 19, 2009) (*available at* http://investor.shareholder.com/cenx/release) ("February 2009 Press Release").

91. Commenting on the Company's results, defendant Kruger on behalf of the Company on the Board stated:

"Century has taken aggressive action in response to the global economic crisis and its impact on commodity prices. . . In the United States, we have begun implementation of the difficult actions required to bridge the current environment and lay the groundwork for a stronger company when metal markets strengthen."

February 2009 Press Release.

92. The statements set forth in paragraphs, *supra*, 75-91 were false when made because Century Aluminum did not have $204 million in cash from operating activities and the Exchange Act Defendants lacked any reasonable basis for reporting that the Company had anything approaching that amount of cash from operating activities during the nine months ended September 2008. As reflected in the statement of cash flows above, shareholders and potential investors in Century Aluminum were being told that the Company was cash rich. Indeed, the Exchange Act Defendants knowingly and/or with deliberate recklessness informed shareholders and investors that Century Aluminum had enough cash coming in from its operations to 'weather

1    the economic storm' as it was.  *See* November 2008 Quarterly Report at \*36; *see also* January 2009

2    Registration Statement at \*S-2 ("Based upon . . . price forecasts, and ***taking into account our***

3    ***current balance of cash and short-term investments*** . . . we would expect to have sufficient

4    liquidity to fund our operations for approximately the next 18 months.").  However, the truth was

5    that Century Aluminum had less than $0 cash from operating activities, a truth which came out

6    shortly after millions of shares had been purchased on false pretenses.

7    **D.    The Truth About Century Aluminum's Cash Position is Revealed**

8    93.    The truth came to light on March 2, 2009. On that date, Century Aluminum filed an

9    Interim Report on Form 8-K with the SEC entitled "Non-Reliance on Previously Issued Financial

10   Statements or a Related Audit Report or Completed Interim Review."  In that 8-K, the Company

11   announced that it had:

12       [D]etermined that . . . previously issued financial statements for the nine months
         ended September 30, 2008 included in [the] periodic report on Form 10-Q for
13       that period should no longer be relied upon as a result of an error in the interim
         consolidated statement of cash flows.  A restatement of these previously issued
14       financial statements is necessary as the Company has determined that preferred
         stock issued in July 2008 was not presented on the consolidated statement of
15       cash flows in accordance with Statement of Financial Accounting Standards No.
         95.
16

17                                            * * *

18       The Company initially reported cash flows associated with the termination of
         forward financial sales contracts by issuing $929 million of Series A Convertible
19       Preferred Stock on a net basis as an operating activity.   Management has
         concluded the transaction should have been presented on a gross presentation
20       basis as both an operating activity and a financing activity to reflect the cash
         receipts and disbursements associated the transaction.
21

22   The Restatement at \*1.  In the March 2, 2009 Restatement, Century Aluminum informed investors

23   and the market alike that the January 2009 Registration Statement was false and misleading,

24   stating:

25       On February 27, 2009, Century Aluminum Company (the Company) determined
         that our previously issued financial statements for the nine months ended
26       September 30, 2008 included in our periodic report on Form 10-Q for that period
         should no longer be relied upon as a result of an error in the interim consolidated
27       statement of cash flows.  A restatement of these previously issued financial
         statements is necessary as the Company has determined that preferred stock issued
28       in July 2008 was not presented on the consolidated statement of cash flows in

accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

The Restatement, at *1.

94.     The result of the Restatement was a **$929,480,000** change to net operating cash, changing Century Aluminum's net operating cash from $230 million, as reported in the January 2009 Registration Statement, to -$698,721,000—the actual number. *See id*; *see supra* ¶¶ 72-73.

95.     Thus, the Interim Consolidated statement of cash flows contained in the January 2009 Registration Statement for the Offering and Century Aluminum's other SEC reports was false and misleading when made.

96.     There can be no doubt that had investors known that Century Aluminum had negative $698,721,000 in operating cash, they would have given serious consideration to not participating in purchasing—or selling immediately—their Century Aluminum stock.  Indeed, on March 2, 2009, Century Aluminum's stock plunged 24% or $0.55 per share on March 2, 2009 alone, to close at $1.67 compared to the previous trading day's close of $2.22, erasing more than $40.4 million in market capitalization in one day.  In fact, the price of the Company's shares fell to a low of $1.06, a 87% drop from the January 2009 Offering price of $8.00 slightly more than one month earlier.

97.     To illustrate the gravity of the situation, following the Restatement, Century Aluminum's stock reached its lowest price in the Company's history, *i.e.*, over fifteen (15) years.

//

//

//

//

//

//

//

//

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI



98.     As a result of the scheme to prop-up Century Aluminum's cash and financial position, Defendants committed a fraud against the Company's common shareholders in violation of sections 10(b) and 20 of Exchange Act, 15 U.S.C. §§ 78j(b) and 78t.  Throughout the Class Period, Defendants knowingly made statements which caused Century Aluminum's common stock to be artificially inflated.  The Exchange Act Defendants made, disseminated and approved statements which they knew to be false and misleading, and failed to disclose material information necessary to make those statements, in the light of the circumstances under which they were made, not false or misleading.

99.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Century Aluminum common stock.  Plaintiffs and the Class would not have purchased Century Aluminum common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

100.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Century Aluminum common stock during the Class Period

1

**E.    Scienter Allegation**

2      101.    During the Class Period, the Exchange Act Defendants had both the motive and

3  opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the

4  statements they made or acted in with deliberate and reckless disregard of the true information

5  known to them at the time.  In so doing, the Defendants participated in a scheme to defraud and

6  committed acts, practices and participated in a course of business that operated as a fraud or deceit

7  on purchasers of Century Aluminum common stock during the Class Period.

8      102.    As alleged herein, the Exchange Act Defendants acted with scienter, in that they

9  knew the Company's public documents and statements issued or disseminated by or in the name of

10  the Company were materially false and misleading; they knew or deliberately disregarded that such

11  statements or documents would be issued or disseminated to the investing public; and they

12  knowingly and substantially participated or acquiesced in the issuance or dissemination of such

13  statements or documents as primary violators of the federal securities laws.

14      103.    The Exchange Act Individual Defendants were involved in drafting, producing,

15  reviewing, approving and/or disseminating the materially false and misleading statements and

16  information alleged herein, were aware of or deliberately disregarded the fact that materially false

17  and misleading statements were being issued regarding the Company, and approved or ratified

18  these statements in violation of securities laws.

19      104.    As officers and controlling persons of a publicly-held company whose common

20  stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

21  NYSE, and governed by the provisions of the federal securities laws, the Exchange Act Individual

22  Defendants each had a duty to promptly disseminate accurate and truthful information with respect

23  to the Company's financial condition, especially cash flow from operations when the aluminum

24  market and Company was in crisis, and to correct any previously issued statements that had become

25  materially misleading or untrue, so that the market price of the Company's publicly-traded

26  securities would be based upon truthful and accurate information.  The Exchange Act Individual

27  Defendants' material misrepresentations and omissions during the Class Period violated these

28  specific requirements and obligations.

105. Exchange Act Defendants Kruger and Bless are the CEO and CFO of Century Aluminum, respectively. By virtue of their positions with the Company, they are required to certify that the information contained in Century Aluminum's SEC filings—including the January 2009 Registration Statement and the November 2008 Quarterly Report—have been "reviewed" by them personally, and to the "best of [their] knowledge . . . .[do] not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period covered by" the filing. Moreover, as the chief financial officers at Century Aluminum, Defendants Kruger and Bless were in a position to know that a $1 billion error concerning cash flows from operations in the 2009 Registration Statement and November 2008 Quarterly Report were false when they were made.

106. Moreover, as members of Century Aluminum's executive management, Defendants Kruger, Bless and Hale have the motive to save the Company from financial failure and mislead public shareholders and investors in order to get the necessary capital for the Company to continue, as evinced by their considerable salaries:

//
//
//
//
//
//
//
//
//
//
//
//
//

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

**2008 Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(a) | Option Awards ($)(a) | Non-Equity Incentive Plan Compensation ($)(b) | Change in Pension Value and Nonqualified Deferred Compensation ($) | All Other Compensation ($)(c) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Logan W. Kruger *President and Chief Executive Officer* | 2008 | 855,000 | 637,000 | 1,842,997 | 389,542 (d) | 92,625 | 1,511,827(e) | 14,435 | 5,343,426 |
| | 2007 | 815,000 | 1,115,000 | 1,105,627 | 493,402 | — | 2,514,868 | 178,630 | 6,222.527 |
| | 2006 | 750,000 | 562,500 | 783,332 | 428,479 | — | 3,755,628 | 65,035 | 6,344,974 |
| Michael A. Bless *Executive Vice President and Chief Financial Officer* | 2008 | 422,000 | 270,000 | 869,203 (g) | — | 26,375 | 27,513 | 915 | 1,616,006 |
| | 2007 | 405,000 | 345,000 | 421,283 | 186,163 | — | 13,427 | 915 | 1,371,788 |
| | 2006 | 352,397(f) | 262,500 | 278,012 | 378,100 | — | 68,615 | 425,698 | 1,765,322 |
| Wayne R. Hale *Executive Vice President and Chief Operating Officer* | 2008 | 472,000 | 278,000 | 963,191 (h) | 443,443 (i) | 43,267 | 58,978 | 14,332 | 2,273,211 |
| | 2007 | 375,000(f) | 650,000 | 502,979 | 886,912 | — | 339,823 | 107,056 | 2,861,770 |

Century Aluminum Co., Proxy Statement (Schedule 14-A (Rule 14a-101)), at *27 (April 13, 2009).

107.    In addition, Defendants Berntzen, Fishman, O'Brien, Jones and Manning are members of the Century Aluminum Board of Directors Audit Committee ("Audit Committee"). As the Audit Committee charter provides, those Defendants are charged with the following duties:

The Audit Committee Charter has been adopted by the Board of Directors. The Audit Committee shall review and reassess this charter annually and recommend any proposed changes to the Board of Directors for approval.

The membership of the Audit Committee shall consist of at least three directors, who shall meet the independence and financial literacy requirements for serving on audit committees as set forth in Section 10A(m)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the rules and regulations of the Securities and Exchange Commission (the "SEC Rules"), and the Marketplace Rules of Nasdaq. At least one member of the committee shall be an "audit committee financial expert" as defined in the SEC Rules.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

The members of the Audit Committee shall be elected annually, and one of its members shall be elected chairman by the Board.

The Audit Committee performs the function of monitoring the adequacy and effectiveness of the internal and external audit function, internal control systems, financial accounting and reporting, including the quality of the Company's accounting principles, the independent auditors' qualifications and independence, and adherence to applicable legal, ethical and regulatory requirements. The Committee's responsibilities include the following:

Independent Auditors:

Pre approve audit, audit-related, tax and permitted non audit services and related fees (subject to the de minimis exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act which are approved by the Audit Committee prior to the completion of the audit).

Review the performance of the independent auditors.

Sole authority to appoint or replace the independent auditors for the annual audit (appointment subject to stockholder ratification).

Meet with the independent auditors to review the adequacy of the Company's systems of disclosure controls and internal controls, critical accounting policies and procedures, and the internal audit function.

Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

Obtain assurance from the independent auditors that in the course of conducting the audit, there have been no acts detected or that have otherwise come to the attention of the audit firm that require disclosure to the Audit Committee under Section 10A(b) of the Exchange Act (regarding illegal acts detected by the audit firm in the course of conducting its audit).

Obtain from the independent auditors a formal written statement, consistent with Independence Standards Board Standard 1, delineating all relationships between the Company and the independent auditors, engage in a dialogue with the independent auditors regarding any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and take, or recommend that the Board of Directors take, appropriate action to oversee the independence of the independent auditors.

Review and discuss with management and the independent auditors the Company's quarterly and annual audited financial statements, including:

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

management's discussion and analysis of financial condition and results of operations; all critical accounting policies and practices to be used;all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

The independent auditors shall report directly to the Audit Committee.

Internal Audit and Internal Controls:

Review with management the adequacy of the Company's systems of internal control to provide reasonable assurance that assets are safeguarded, prescribed policies and procedures are followed and transactions are properly recorded and reported.

Review the internal audit plan and results.

Legal, Ethical Conduct and Conflicts of Interest:

Review current or pending litigation involving the Company with the General Counsel which may have a material financial impact on the Company.

Review the Company's policies and practices related to compliance with the law, ethical conduct and conflicts of interest, including establishment of procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submissions by employees of the Company of concerns regarding questionable accounting or auditing matters.

Other:

Review and approve all related party transactions pursuant to the Company's Statement of Policy Regarding Related Party Transactions (unless any such transaction is, pursuant to the Policy, to be approved by the Independent Directors of the Board acting as a separate body).

Recommend to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K. Issue annually a report to be included in the Company's proxy statement as required by the SEC Rules. Review disclosures, if any, made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

1   Century Aluminum Co., Audit Committee Charter (enacted March 25, 2003) (as amended on June

2   29, 2004; March 19, 2007; December 10, 2007), *available at*

3   http://investor.shareholder.com/cenx/documentdisplay.cfm?DocumentID=1836.   Due to their

4   positions as members of the Audit Committee, Defendants Berntzen, Fishman, O'Brien, Jones and

5   Manning either knowingly or deliberately approved the dissemination of the false statement

6   contained in the January 2009 Registration Statement and the November 2008 Quarterly Report.

7   Also, by virtue of their positions on the Audit Committee, they were in a position to, and did

8   know, that Century Aluminum's cash position was overstated in the January 2009 Registration

9   Statement and the November 2008 Quarterly Report.

10          108.   In addition to being a Director of Century Aluminum, Defendant Fontaine is a

11   member of the Compensation and Health, Safety & Sustainability Committees.   Also, Defendant

12   Thompson is a member of the Compensation, Governance & Nominating and Health, Safety &

13   Sustainability Committees.   For example, the Governance & Nominating Committee Charter

14   provides:

15          The Governance and Nominating Committee ("Committee") was established by
            the Board of Directors of the Company ("Board") to (i) assist the Board in
16          performing nominating functions with regard to the Board's membership, (ii)
            oversee the Company's corporate governance matters and (iii) to review and make
17          periodic recommendations concerning the Company's corporate governance
            policies and procedures.
18

19   Century Aluminum, Governance and Nominating Committee Charter, *available at*

20   http://investor.shareholder.com/cenx/documentdisplay.cfm?DocumentID=179.   Accordingly, as

21   members of those committees, as well as the Board of a public corporation such as Century

22   Aluminum, Defendants Thompson and Fontaine are required to be knowledgeable about

23   accounting and financial matters.   As such, they would be in a position to know that the statements

24   in the January 2009 Registration Statement and the November 2008 Quarterly Report were false

25   when made.

26          109.   All of the Exchange Act Individual Defendants, by virtue of their positions of

27   control and authority as officers and/or directors of Century Aluminum, were able to and did

28   control the content of the various SEC filings, press releases and other public statements pertaining

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

to the Company during the Class Period.  As such, the Exchange Act Individual Defendants were controlling persons of Century Aluminum within the meaning of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Further, the Exchange Act Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

110.    By virtue of their receipt of information reflecting the true facts regarding Century Aluminum and its business practices, their control over or receipt of Century Aluminum's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning Century Aluminum, the Exchange Act Defendants were active and culpable participants in the fraudulent scheme alleged herein.

111.    The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of Century Aluminum, including the Exchange Act Individual Defendants.

112.    In particular, Exchange Act Defendants Kruger, Fontaine, Thompson, Fishman, Jones, O'Brien, Strothotte, Manning, Hale, Bless, Schneider and Berntzen engaged in such a scheme to inflate the price of Century Aluminum securities in order to protect and enhance their executive positions, their own personal wealth in accumulated holdings of Century Aluminum stock, and the substantial compensation and prestige they obtained thereby, as demonstrated by the salary and bonuses they earned during the Exchange Act Class Period.

113.    The sheer magnitude of the fraud in this case—almost $1 billion—ensures that any reasonable person would have recognized the accounting error in the Statement of Cash Flows.

### F.    Undisclosed Material Adverse Facts

114.    The market for Century Aluminum's common stock was open, well-developed, and efficient at all relevant times.

115.    As a result of these materially false and misleading statements and failures to disclose, Century Aluminum's common stock traded at artificially inflated prices during the Class

1    Period.

2    116.    Plaintiffs and other members of the Class purchased or otherwise acquired Century

3    Aluminum common stock relying upon the integrity of the market price of Century Aluminum's

4    common stock and market information relating to Century Aluminum, and have been damaged

5    thereby.

6    117.    During the Class Period, Defendants materially misled the investing public, thereby

7    inflating the price of Century Aluminum's common stock, by publicly issuing false and misleading

8    statements and omitting to disclose material facts necessary to make Defendants' statements, as set

9    forth herein, not false and misleading.  Said statements and omissions were materially false and

10   misleading in that they failed to disclose material adverse information and misrepresented the truth

11   about the Company, its business and operations, as alleged herein.

12   118.    At all relevant times, the material misrepresentations and omissions particularized in

13   this Complaint directly or proximately caused or were a substantial contributing cause of the stock

14   purchases by Plaintiffs and other members of the Class.

15   119.    Each Defendant is liable for (i) making false statements, or (ii) failing to disclose

16   adverse facts known to him about Century Aluminum. Defendants' fraudulent scheme and course

17   of business that operated as a fraud or deceit on purchasers of Century Aluminum common stock

18   was a success, as it (i) deceived the investing public regarding Century Aluminum's prospects and

19   business; (ii) artificially inflated the prices of Century Aluminum common stock; and (iii) caused

20   Plaintiffs and other members of the Class to purchase Century Aluminum common stock at inflated

21   prices.

22   **G.    Applicability of Presumption of Reliance Under the Fraud-on-the-Market
            Doctrine**

23
24   120.    At all relevant times, the market for Century Aluminum securities was efficient for

     the following reasons, among others:

25
26   a.    Century Aluminum's stock met the requirements for listing, and was listed

     and actively traded on the NYSE, a highly efficient and automated market;

27
28   b.    As a regulated issuer, Century Aluminum filed periodic public reports with

     the SEC; and

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

c.      Century   Aluminum   and   the   Exchange   Act   Defendants   regularly communicated with public investors via established market communication mechanisms, as well as through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

121.    As a result of the foregoing, the market for Century Aluminum's securities promptly digested current information regarding Century Aluminum from all publicly available sources and reflected such information in Century Aluminum's stock price. Under these circumstances, all purchasers of Century Aluminum securities during the Class Period suffered similar injury through their purchase of Century Aluminum securities at artificially inflated prices and a presumption of reliance applies.

**H.      No Safe Harbor**

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Century Aluminum who knew that those statements were false when made.

## EXCHANGE ACT CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this separate action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class composed of all holders of Century Aluminum common stock from October 21, 2008 and March 2, 2009.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

124.   The members of the Exchange Act Class are so numerous that joinder of all members is impracticable.   At the time of the Offering, Century Aluminum's securities were actively traded on the NASDAQ.   While the exact number of Exchange Act Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class.   Record owners and other members of the Exchange Act Class may be identified from records maintained by Century Aluminum or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.   Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

126.   Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation.

127.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting Exchange Act members of the Exchange Act Class.   Among the questions of law and fact common to the Exchange Act Class are:

(a)   Whether the Exchange Act was violated by the Exchange Act Defendants' acts as alleged herein;

(b)   Whether statements made by Defendants to the investing public in connection with the omitted and/or misrepresented material facts disseminated during the Exchange Act Class Period about the operations and financial performance of Century Aluminum; and

(c)   To what extent the members of the Exchange Act Class have sustained damages and the proper measure of damages.

128.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by Exchange Act Class members may be relatively small, the expense and burden

1  of Exchange Act litigation make it impossible for members of the Class to individually redress the

2  wrongs done to them. There will be no difficulty in the management of this action as a class action.

3  ### THE SECURITIES ACT ACTION

4  129. Plaintiffs allege that the Securities Act Defendants (defined *supra*) are strictly liable

5  for violations of sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively,

6  in connection with the January 2009 Offering.

7  **A. Additional Securities Act Defendants**

8  130. **Defendant Credit Suisse Securities** (USA) LLC ("Credit Suisse") operates as an

9  investment bank in the United States, with its headquarters located at 11 Madison Avenue, New

10  York, New York, 10010-3629. Credit Suisse acted as an underwriter in connection with the

11  Offering.

12  131. **Defendant Morgan Stanley & Co.** Incorporated ("Morgan Stanley") provides

13  financial advisory and capital-raising services to corporate and other institutional clients globally,

14  as well as sales and trading activities worldwide, and provides related financing services on behalf

15  of institutional investors. Morgan Stanley acted as an underwriter in connection with the Offering.

16  Defendants Credit Suisse and Morgan Stanley are collectively referred to hereinafter as the

17  "Underwriter Defendants." The Underwriter Defendants served as financial advisors, and assisted

18  in the preparation and dissemination of Century Aluminum's Secondary Offering materials. The

19  Underwriter Defendants also marketed and solicited support for the Secondary Offering and sold

20  stock directly to Plaintiffs and other members of the Class.

21  132. Defendants Credit Suisse and Morgan Stanley are collectively referred to herein as

22  the "Underwriter Defendants."

23  133. Defendants Century Aluminum, Kruger, Fontaine, Fishman, Thompson, Jones,

24  O'Brien, Strothotte, Berntzen, Manning, Bless and Schneider (named herein *supra*) along with the

25  Underwriter Defendants are collectively referred to herein as the "**Securities Act Defendants**."

26  **B. Securities Act Standing Allegations**

27  134. Lead Plaintiff Stuart Wexler purchased Century Aluminum securities directly

28  traceable to Century Aluminum's Secondary Offering and was damaged thereby.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

135.   Upon information and belief, Lead Plaintiff Wexler purchased stock in the Secondary Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the Registration Statement (as defined *supra*).   Through his agent and broker, Lead Plaintiff Wexler consummated the following purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Stuart Wexler | CENX | 01/28/09 | 5000 | $4.56 |
| Stuart Wexler | CENX | 01/30/09 | 3000 | $3.56 |

To the best of Lead Plaintiff Wexler's knowledge, each of the purchases of common stock above were made pursuant to the Registration Statement and were satisfied through common stock authorized and issued in the Secondary Offering and distributed by the Underwriter Defendants or their intermediaries and/or designees.  Lead Plaintiff Wexler is unaware of any information which would suggest that the shares that his agent and broker purchased on his behalf were not either purchased directly—or through intermediaries—from the Underwriter Defendants under the terms of the Secondary Offering.  Therefore, on information and belief, Lead Plaintiff Wexler purchased shares of Century Aluminum common stock that are traceable to the Secondary Offering and governed by the terms of the Registration Statement and distributed by the Underwriter Defendants.

136.   Plaintiff Peter Abrams purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering and was damaged thereby.

137.   Upon information and belief, Plaintiff Abrams purchased stock in the Secondary Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the Registration Statement (as defined *supra*).  Through his agent and broker, Vanguard Brokerage Services ("Vanguard"), whom he directed to purchase shares in the Secondary Offering on his behalf, Plaintiff Abrams consummated the following purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Peter Abrams | CENX | 01/28/09 | 1000 | $5.00 |
| Peter Abrams | CENX | 01/30/09 | 300 | $3.99 |

It was, and remains, Plaintiff Abrams' understanding that the share purchases above were made pursuant to the Secondary Offering and under the terms of the Registration Statement.

138.   Plaintiff Abrams' agent and broker, Vanguard, purchased the above shares directly

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

through Citigroup.  At all times relevant to this Complaint, Vanguard did not function as a self-clearing broker dealer.  Instead, orders for shares by Vanguard customers were sent to a third-party broker dealer for fulfillment.  In Plaintiff Abrams' case, the above trades were sent to Citigroup for fulfillment.   Moreover, at all times relevant to this Complaint Morgan Stanley—one of the Underwriter Defendants—was involved in a joint venture with Citigroup, whereby the two entitles were indistinguishable.  Therefore, on information and belief, Plaintiff Abrams' purchase of stock on January 28, 2009 and January 30, 2009 were fulfilled by Morgan Stanley with stock directly issued in the Secondary Offering and pursuant to the Registration Statement.

139.   Plaintiff Chris McNulty purchased Century Aluminum securities directly traceable to Century Aluminum's Secondary Offering and was damaged thereby.

140.   Upon information and belief, Plaintiff McNulty purchased stock in the Secondary Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the Registration Statement (as defined *supra*).   Plaintiff McNulty consummated the following purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Chris McNulty | CENX | 01/28/09 | 800 | $4.61 |

141.   To the best of Plaintiff McNulty's knowledge, each of the purchases of common stock above were made pursuant to the Registration Statement and were satisfied through common stock authorized and issued in the Secondary Offering and distributed by the Underwriter Defendants or their intermediaries and/or designees.   Plaintiff McNulty is unaware of any information which would suggest that the shares he purchased were not either purchased directly—or through intermediaries—from the Underwriter Defendants under the terms of the Secondary Offering.   Therefore, on information and belief, Plaintiff McNulty purchased shares of Century Aluminum common stock that are traceable to the Secondary Offering and governed by the terms of the Registration Statement and distributed by the Underwriter Defendants.

142.   Plaintiff Cory McClellan purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering and was damaged thereby.

143.   Upon information and belief, Plaintiff McClellan purchased stock in the Secondary

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the Registration Statement (as defined *supra*). Through his agent and broker, Plaintiff McClellan consummated the following purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|-----------|-------|
| Cory McClellan | CENX | 01/28/09 | 40 | $4.10 |
| Cory McClellan | CENX | 01/30/09 | 665 | $4.10 |
| Cory McClellan | CENX | 01/30/09 | 505 | $4.05 |

To the best of Plaintiff McClellan's knowledge, each of the purchases of common stock above were made pursuant to the Registration Statement and were satisfied through common stock authorized and issued in the Secondary Offering and distributed by the Underwriter Defendants or their intermediaries and/or designees. Plaintiff McClellan is unaware of any information which would suggest that the shares that his agent and broker purchased on his behalf were not either purchased directly—or through intermediaries—from the Underwriter Defendants under the terms of the Secondary Offering. Therefore, on information and belief, Plaintiff McClellan purchased shares of Century Aluminum common stock that are traceable to the Secondary Offering and governed by the terms of the Registration Statement and distributed by Underwriter Defendants.

144. The Underwriter Defendants were statutory sellers, within the meaning of the Securities Act and distributed—both individually and through intermediaries—millions of shares issued pursuant to the Secondary Offering and the Registration Statement to Plaintiffs and the Class.

145. The Secondary Offering Registration Statement itself states that the underwriters were committed to sell at least "part" of the shares of common stock purchased in the Secondary Offering "***directly to the public***." Registration Statement, at *S-49.

146. Further, the Registration Statement anticipates Morgan Stanley and Credit Suisse's sale of shares directly to the public in a number of places. For example, the very ***first page*** of the prospectus reflects the stated intent of the Underwriter Defendants to sell shares to the public directly, listing the "Price to **Public**" as opposed to the price to Morgan Stanley and Credit Suisse:

**Proceeds to**

| **Underwriting** | **Century** |
|---|---|
| **Discounts and** | **Aluminum** |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

| | Price to Public | Commissions | Company |
|---|---|---|---|
| Per Share | $ 4.5 | $ 0.225 | $ 4.275 |
| Total | $ 110,250,000 | $ 5,512,500 | $ 104,737,500 |

Registration Statement, at *1 (emphasis added).

147.  Also, the historical trading records for the time period in question mean that the shares purchased by Plaintiffs and other members of the class could only have originated with the Underwriter Defendants.  Specifically, the volume of shares traded in Century Aluminum stock from the 28th to the 30th of January 2009 is far greater than the market could provide or sustain without a substantial influx of shares from Morgan Stanley and Credit Suisse.

| Date | Open | High | Low | Close/Last | Volume |
|---|---|---|---|---|---|
| 2/2/2009 | 3.55 | 3.81 | 3.3 | 3.7 | 6,473,872 |
| 1/30/2009 | 4.42 | 4.42 | 3.43 | 3.55 | 12,074,090 |
| 1/29/2009 | 4.61 | 4.78 | 4.11 | 4.28 | 15,424,990 |
| 1/28/2009 | 5.67 | 5.75 | 4.01 | 4.6 | 16,578,340 |
| 1/27/2009 | 7.53 | 7.81 | 7.25 | 7.35 | 547,904 |

As the above chart reflects, more than *44 million shares* of Century Aluminum stock changed hands in the span of three days; from January 28, 2009 to January 30, 2009.  Strikingly, this represents almost ***DOUBLE the amount of shares of Century Aluminum common stock that were traded in each of the previous thirty days combined***:

| Date | Open | High | Low | Close/Last | Volume |
|---|---|---|---|---|---|
| 1/27/2009 | 7.53 | 7.81 | 7.25 | 7.35 | 547,904 |
| 1/26/2009 | 7.73 | 8.09 | 7.29 | 7.41 | 547,574 |
| 1/23/2009 | 7.26 | 7.91 | 7.05 | 7.65 | 670,456 |
| 1/22/2009 | 7.78 | 7.84 | 7.29 | 7.37 | 878,893 |
| 1/21/2009 | 7.19 | 8 | 6.89 | 8 | 1,383,405 |
| 1/20/2009 | 8.34 | 8.35 | 7.4 | 7.41 | 976,440 |
| 1/16/2009 | 8.72 | 8.9 | 8.03 | 8.49 | 732,515 |
| 1/15/2009 | 8.14 | 8.71 | 7.51 | 8.49 | 1,172,584 |
| 1/14/2009 | 8.86 | 8.98 | 8.12 | 8.17 | 1,083,550 |
| 1/13/2009 | 9.46 | 9.59 | 8.7 | 9.16 | 1,731,792 |
| 1/12/2009 | 11.52 | 11.56 | 9.25 | 9.41 | 1,789,521 |
| 1/9/2009 | 12.05 | 12.1225 | 11.4724 | 11.62 | 711,173 |
| 1/8/2009 | 11.38 | 12.1 | 11.09 | 12.05 | 1,052,902 |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

| | | | | | |
|---|---|---|---|---|---|
| 1/7/2009 | 11.99 | 11.99 | 11.43 | 11.57 | 1,379,254 |
| 1/6/2009 | 12.35 | 12.8 | 12.08 | 12.55 | 1,816,909 |
| 1/5/2009 | 11.56 | 12.13 | 10.91 | 11.91 | 1,475,522 |
| 1/2/2009 | 10.1 | 11.8 | 10.1 | 11.72 | 1,434,668 |
| 12/31/2008 | 9.39 | 10.22 | 9.39 | 10 | 695,614 |
| 12/30/2008 | 8.9 | 9.46 | 8.71 | 9.45 | 480,091 |
| | | | | | **20,560,767** |

Indeed, the average volume of shares traded in Century Aluminum common stock in the year prior to the Secondary Offering was approximately 1.5 million shares per day, far less than the 44+ million shares traded on January 28, 2009 thru January 30, 2009. Accordingly, the only plausible conclusion is that beginning sometime on January 28, 2009 Morgan Stanley and Credit Suisse— either directly or through intermediaries—began flooding the market with Century Aluminum common stock that they had purchased in the Secondary Offering. It was this stock that Plaintiffs purchased, granting them standing under section 11 of the Securities Act.

148. Moreover, the change in price of Century Aluminum stock on January 28, 2009 is per se evidence that Morgan Stanley and Credit Suisse had begun flooding the market with shares gained directly through the Secondary Offering, which **actually began** on January 28, 2009, the date of the underwriting agreement between Century Aluminum and the Underwriter Defendants. *See* Century Aluminum, Current Report (Form 8-K), Ex. 1.1, at *13 (Feb. 3, 2009) (the "Underwriting Agreement"). Indeed, as the Underwriting Agreement sets forth:

> *3. Terms of Public Offering.* The Company is advised by you that the Underwriters propose to make a public offering of their respective portions of the Shares ***as soon after the Registration Statement and this Agreement have become effective as in your judgment is advisable***.

*Id.* at *13 (emphasis added).

149. The behavior of Century Aluminum's stock price demonstrates that the Underwriter Defendants began offering large amounts of Century Aluminum common stock for sale to the public on January 28, 2009, the precise date that the above-quoted Underwriting Agreement became effective. *See* Underwriting Agreement, at *13. Indeed, once the Secondary Offering was commenced on January 28, 2009, the average price of Century Aluminum shares ***immediately decreased*** a full two dollars and seventy-five cents ($2.75), from a close of $7.25 on January 27,

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

2009 to a close of $4.60 on January 28, 2009.  The reason for this drastic drop in price is that the Underwriter Defendants were contractually obligated to offer the shares to the public "initially" for no more than "$4.50 a share."  *Id.*  In fact, the only explanation for this major ($2.75) drop in price *is* that Morgan Stanley and Credit Suisse (or their agents, assignees or selected "dealers" see *infra*) had begun dumping *millions of shares of Century Aluminum shares on the market at an average price of $4.50*—the exact price outlined in the Registrations Statement and required by the Underwriting Agreement.  *See* Registration Statement, at 1; *see supra* ¶ 148.

150.    Moreover, the Underwriter Defendants were also obligated to ensure that the "dealers" that they selected to actually sell the stock to the public would abide by the terms of the Underwriting Agreement. *See id.*  As the Underwriting Agreement specifically states:

> The Company is further advised by you that the Shares are to be offered to the public initially at $4.50 a share (the "Public Offering Price") and **_to certain dealers selected by you_** **at a price that represents a concession not in excess of $0.135 a share under the Public Offering Price**.

*Id.* at *13 (emphasis added).  Therefore, not only does the Underwriting Agreement acknowledge that sales of Century Aluminum stock to the public under the Registration Statement would be accomplished—at least in part—through "dealers selected by" the Underwriter Defendants, but it also allows the Underwriter Defendants, their assignees and "dealers" to sell stock at a price higher or lower than $4.50 so long as the "concession [would] not [be] in excess of $0.35." *See id.*

151.    Accordingly, the fact that Plaintiffs did not purchase shares directly from the Underwriter Defendants or at a price different from the "initial" $4.50 Secondary Offering price, does not mean that those shares that they bought are not traceable to the Underwriter Defendants— as evinced by the Underwriting Agreement and the Registration Statement.

152.    Therefore, Plaintiffs—as well as numerous other members of the Class—have standing under section 11 of the Securities Act to pursue  claims against the Underwriter Defendants for the false and misleading statements contained therein.

**C.    False and Misleading Statements in the January 2009 Registration Statement**

153.    The January 2009 Registration Statement issued in connection with the January 2009 Offering was materially false and misleading because it included a statement of cash flows

which reported positive cash flows associated with the termination of forward financial sales contracts by issuing $929 million of Series A Convertible Preferred Stock. These funds were improperly reported "on a net basis as an operating activity" rather than "on a gross presentation basis as both an operating activity and a financing activity to reflect the cash receipts and disbursements associated the transaction," in violation of, *inter alia*, Financial Accounting Standards ("FAS") No. 95. As a result, Century Aluminum's net operating cash was **overstated by $929 million, a material amount of money under any reasonable definition of material**.

154. The following is the Statement of Cash flows as reported by Century Aluminum in the January 2009 Registration Statement:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2007 (In thousands) | 2006 | 2005 |
| Net cash provided by (used in) operating activities | $ 230,759 | $ (40,740) | $ (5,755) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| Adjusted net cash provided by operating activities | $ 204,875 | $217,987 | $274,414 | $185,353 | $134,936 |

Registration Statement, at *S-11.[7] As evinced by the above chart, the Registration Statement which proceeded the January 2009 Offering showed over $200,000,000 in "Adjusted net cash provided by operating activities," for the nine months ended September 30, 2008. *Id.* at *S-10 This number would lead investors in Century Aluminum's common stock to believe that the Company had sufficient resources to cover any shortfalls which may have befallen the Company, allowing Century Aluminum to easily weather the financial 'storm' which was ravaging the economy. In reality, however, this number was much, much lower—as would be demonstrated by the Restatement. *See infra.*

---

7       These numbers are cumulative totals of false and misleading results disclosed in Century Aluminum's Quarterly Reports. *See* Q1'08 10-Q, at *3; Q2'08 10-Q, at *3; Q3'08 10-Q, at *3.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

155.    In the January 2009 Registration Statement, the "Summary [of] Consolidated Financial Data," which features a non-GAAP calculation of EBITDA.[8]  One of the most important line items of the EBITDA calculation—and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash").   Indeed, Net Operating Cash in the November Quarterly Report and January 2009 Registration Statement represents an enormous percentage – *over 74%* – of the Company's total adjusted EBITDA as presented in that document.  ¶ 154 *supra*.

156.    The November Quarterly Report and January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740 ) | $(5,755 ) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884 ) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

157.    Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm.

158.    As expressed in the explanation above the table in the Secondary Offering:

We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

---

[8]    *See supra* n.6.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

January 2009 Registration Statement, at *S-11.  The presentation of adjusted net cash provided by operations is useful, however, *only* if it is accurate.

159.    In the March 2, 2009 Restatement, Century Aluminum informed investors and the market alike that the January 2009 Registration Statement was false and misleading, stating:

> On February 27, 2009, Century Aluminum Company (the Company) determined that our previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an error in the interim consolidated statement of cash flows.  A restatement of these previously issued financial statements is necessary as the Company has determined that preferred stock issued in July 2008 was not presented on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

Restatement, at *1.

**D.    The Truth is Revealed via the Restatement**

160.    In stark contrast, the following numbers were taken from the Restatement and reflect the true cash position of Century Aluminum at the time of the January 2009 Offering:

| CASH FLOWS FROM OPERATING ACTIVITIES: | As Reported | As Adjusted | Adjustment |
|---|---|---|---|
| Net loss | ($198,164) | (198,164 | — |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Unrealized net loss on forward contracts | $605,105 | $605,105 | — |
| Depreciation and amortization | $62,912 | $62,912 | — |
| Deferred income taxes | ($198,352) | ($198,352) | — |
| Pension and other postretirement benefits | $11,677 | $11,677 | — |
| Stock-based compensation | $12,034 | $12,034 | — |
| Excess tax benefits from share-based compensation | ($657) | ($657) | — |
| Loss on disposal of assets | $248 | $248 | — |
| Undistributed earnings of joint ventures | ($12,466) | ($12,466) | — |
| Change in operating assets and liabilities: | | | |
| Accounts receivable - net | ($22,403) | ($22,403) | — |
| Purchase of short-term trading securities | ($97,532) | ($97,532) | — |
| Sale of short-term trading securities | $348,416 | $348,416 | — |
| Due from affiliates | ($9,771) | ($9,771) | — |
| Inventories | ($36,119) | ($36,119) | — |
| Prepaid and other current assets | ($389) | ($389) | — |
| Accounts payable, trade | $15,266 | $15,266 | — |
| Due to affiliates | ($215,522) | ($1,145,002) | ($929,480) |
| Accrued and other current liabilities | ($28,523) | ($28,523) | — |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

| | | | |
|---|---|---|---|
| Other - net | ($5,001) | ($5,001) | — |
| Net cash provided by (used in) operating activities | $230,759 | ($698,721) | ($929,480) |

Restatement, at *2.[9]   As the above chart reflects, not only was Century Aluminum's cash from operating activates not as positive as had been reported to potential investors in the January 2009 Registration Statement, but was actually hundreds of millions of dollars in the red, in the red **$698,721,000 to be exact—*almost three quarters of a billion dollars*.**

### E.   Materiality of the False Statement

161.   Despite Century Aluminum's dismal performance and outlook at the end of 2008, investors were willing to invest in the Company's stock, believing that the Company was liquid, when—in reality—it was not.  Indeed, as the January 2009 Registration Statement stated: "Based upon . . . price forecasts, and ***taking into account our current balance of cash and short-term investments*** . . . we would expect to have sufficient liquidity to fund our operations for approximately the next 18 months."   January 2009 Registration Statement, at *S-2.   As such, Century Aluminum's access to cash, and cash-on-hand was the ***most important piece of information*** for investors and the primary selling point for the January 2009 Offering.  *See id.* However, as would be revealed subsequently, Century Aluminum had no cash flow to speak of, and the information concerning Century Aluminum's cash position, as stated in the January 2009 Registration Statement, was materially false and misleading.

162.   The materiality of that information is evinced by the fact that the Company's Form 8-K also reported that, as a result of this improper accounting, the financial statements reported in the Form 10-Q for three quarters in 2008 "should no longer be relied upon."

163.   The false and misleading statements in the January 2009 Registration Statement were regarded the most important criteria to investors in the January 2009 Offering—the liquidity of Century Aluminum and its ability to fund ongoing operations.  Century Aluminum was in the

---

[9]     These cumulative numbers include the restatement of false and misleading results reported by Century Aluminum for the previous two quarters, embodied in Q1'08 10-Q, Q2'08 10-Q, and Q3'08 10-Q.  *See supra* ¶ 154 n.7.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

midst of a dire financial situation at the time of the January 2009 Offering and was facing plant shutdowns, mounting losses and debts and possible bankruptcy. As such, there can be no doubt that investors would have found the fact that Century Aluminum had *negative $698,721,000* in operating cash, important in deciding whether or not to participate in the Secondary Offering.

164. On news of the Restatement, the price of the Company's shares traded on NASDAQ fell to $1.06, an 87% drop from the January 2009 Offering price of $8.00 slightly more than one month earlier. Indeed, the materiality of that information is also shown by the fact that, when the Form 8-K of March 2, 2009 disclosed the accounting error, the price of Century Aluminum's stock plunged by over 87%. Clearly, the market—and investors in general—looked upon the information contained in the Form 8-K as material.

165. As a result of the misrepresentation in the January 2009 Registration Statement, Plaintiffs and the Class purchased shares of Company stock, pursuant or traceable to the Secondary Offering, at inflated prices and were damaged, thereby, when the price of those shares declined precipitously. Accordingly, the Securities Act Defendants are strictly liable for the false and misleading statement included—and incorporated by reference—into the January 2009 Registration Statement.

## F. Failure of Internal Controls to Identify or Correct the False Statement of Cash Flows

166. The Securities Act Defendants each owed to the purchasers of Century Aluminum's securities in the Secondary Offering, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Documents at the time they became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein—including those concerning cash flows and cash from operations—were true, accurate and that there were no omissions of material fact required to be stated in order to make the statements contained in the Secondary Offering Documents not misleading. As herein alleged, each of the Securities Act Defendants failed to fulfill these specific duties and obligations. As a result of these failures, the offering prices of

Century Aluminum's securities offered in the Secondary Offering were artificially inflated, and when the truth began to emerge, the stock price fell, causing injury to Plaintiffs and the Class.

167. As noted above, the January 2009 Registration Statement falsely stated that: "Based upon . . . price forecasts, and *taking into account our current balance of cash and short-term investments* . . . we would expect to have sufficient liquidity to fund our operations for approximately the next 18 months." January 2009 Registration Statement, at \*S-2 (emphasis added). Thus, according to Century Aluminum itself, the Company's access to cash, especially cash-on-hand from operating activities was the *most important piece of information* for investors and the primary selling point for the January 2009 Offering. However, due to a complete failure of Century Aluminum's internal controls, this statement was disseminated to shareholders in conjunction with the Secondary Offering, despite the fact that it was patently false and misleading (and Century Aluminum actually had *negative* cash flow from operating activities).

168. At the time of the January 2009 Offering, Century Aluminum was in the midst of a dire financial situation and was facing plant shutdowns, mounting losses and debts, and possible bankruptcy. There can be no doubt that information concerning Century Aluminum's cash position was of the most valuable to investors and the market. As such, the Securities Act Defendants should have been *primarily and extraordinarily concerned* with the financial disclosures in the Secondary Offering documents which concerned operating cash and cash on hand. Indeed, extra scrutiny should have been in given to those accounting items in view of the Company's situation— not only with respect to outside auditors and underwriters—but also internally (*i.e.*, management, officers, underwriters and the Board). Had Century Aluminum implemented sufficient internal controls in view of these circumstances—including, *inter alia*, sufficient Board review of financial disclosures and the accounting treatment of cash items—the false and misleading statement in the Secondary Offering documents would have been discovered and could have been corrected. The failure to implement sufficient internal controls let to the false and misleading statements regarding cash from operating activities and cash on hand and, due to the market's focus on these items, proximately and directly caused damages to Plaintiff and the Class when Century Aluminum's share price dropped like a stone following the Restatement.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

## DUTIES OF UNDERWRITER DEFENDANTS

169.   As underwriters of the January 29, 2009 Offering, Defendant Credit Suisse and Morgan Stanley, who received substantial assistance from the Individual Defendants named in ¶ 47, *supra*, sold to the public 24.5 million shares of Century Aluminum stock.   As part of their duties as underwriters, Credit Suisse and Morgan Stanley, each supposedly conducted, before the January 2009 Offering, a due diligence investigation of Century Aluminum.   In the course of such investigation, Credit Suisse and Morgan Stanley became aware of the untrue statements and omissions of material facts required to be disclosed in the Registration Statement.   These included, among others, that, at the time of the Offering, Century Aluminum's interim consolidated statements of cash flows for the nine months ended September 30, 2008, were materially false and misleading because they treated cash flows associated with the termination of forward financial sales contracts by issuing $929 million of Series A Convertible Preferred Stock on a net basis as an operating activity, when, in fact, the transaction should have been presented on a gross presentation basis as both an operating activity and a financing activity to reflect the cash receipts and disbursements associated with the transaction.   Credit Suisse and Morgan Stanley received substantial fees in connection with the Offering.   Credit Suisse and Morgan Stanley also arranged and participated in road show presentations in major U.S. cities, during which very positive financial projections for Century Aluminum in 2008 and beyond were made by Credit Suisse and Morgan Stanley and the Individual Defendants.

170.   Credit Suisse and Morgan Stanley, and each of them, assisted Century Aluminum and the Individual Defendants in planning, marketing and soliciting the Offering, and conducted inquiries into the business, operations and financial, accounting and management controls of Century Aluminum, known as a "due diligence" investigation, required of them in order to engage in the Offering.   During the months immediately preceding the Offering, Credit Suisse and Morgan Stanley had virtually unfettered access to confidential corporate information concerning Century Aluminum's business, financial condition and results.   In the course of their investigation, Credit Suisse and Morgan Stanley met with representatives of Century Aluminum, its accountants and counsel, during the several weeks before the issuance of the January 29, 2009 Registration

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1  Statement.  During such meetings, including those known as "drafting sessions," representatives of

2  the participants met to discuss Century Aluminum's interim consolidated cash flows, the timing

3  and terms of the Offering, the contents of the Registration Statement, and further devised, agreed

4  upon and refined the actions necessary for the consummation of the Offering.  These parties, in part

5  through their agents, discussed and reached understandings as to the timing and strategy to best

6  accomplish the Offering, the terms of the Offering, the language to be used in the Registration

7  Statement, what disclosures about Century Aluminum would be made in the Registration

8  Statement, and what responses would be made to the SEC in connection with its review of the

9  Registration Statement.  Credit Suisse and Morgan Stanley caused the Registration Statement to be

10  delivered to potential and actual purchasers of Century Aluminum common stock in connection

11  with offers and sales thereto.

12      171.    From facts learned during their "due diligence" investigation of Century Aluminum

13  in connection with the Offering, Credit Suisse and Morgan Stanley were aware that the Registration

14  Statement was untrue and omitted material facts required to be stated in the Registration Statement,

15  including, but not limited to, the fact that Century Aluminum's interim consolidated statements of

16  cash flows were materially misstated and false and misleading when issued at the time of the

17  Offering.

18                    **SECURITIES ACT CLASS ACTION ALLEGATIONS**

19      172.    Plaintiffs brings this separate action as a class action pursuant to Federal Rule of

20  Civil Procedure 23(a) and (b)(3) on behalf of a Class composed of all those who purchased or

21  otherwise acquired Century Aluminum common stock pursuant and/or traceable to the Company's

22  January 2009 Secondary Offering, and who were damaged thereby (the "Securities Act Class").

23  Excluded from the Securities Act Class are Defendants, the Officers and Directors of the Company,

24  at all relevant times, members of their immediate families and their legal representatives, heirs,

25  successors or assigns and any entity in which Defendants have or had a controlling interest.

26      173.    The members of the Securities Act Class are so numerous that joinder of all

27  members is impracticable.  At the time of the Offering, Century Aluminum's securities were

28  actively traded on the NASDAQ.  While the exact number of Securities Act Class members is

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act Class.   Record owners and other members of the Securities Act Class may be identified from records maintained by Century Aluminum or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174.   Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175.   Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation.

176.   Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting Exchange Act members of the Securities Act Class.   Among the questions of law and fact common to the Securities Act Class are:

(a)   Whether the Securities Act was violated by the Securities Act Defendants' acts as alleged herein;

(b)   Whether statements made by the Securities Act Defendants to the investing public in connection with the Company's January 2009 Offering omitted and/or misrepresented material facts about the operations and financial performance of Century Aluminum; and

(c)   To what extent the members of the Class have sustained damages and the proper measure of damages.

177.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by Securities Act Class members may be relatively small, the expense and burden of Securities Act litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

## COUNT I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Exchange Act Defendants

178.   Plaintiffs incorporate ¶¶ 1, 2, 4-15, 22-24, 28-128 by reference.

179.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180.   Defendants violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Century Aluminum common stock during the Class Period.

181.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Century Aluminum common stock.  Plaintiffs and the Class would not have purchased Century Aluminum common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

182.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Century Aluminum common stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act Against All Exchange Act Defendants

183.   Plaintiffs incorporate ¶¶ 1, 2, 4-15, 22-24, 28-128 by reference.

184.   The Exchange Act Defendants acted as controlling persons of Century Aluminum within the meaning of section 20 of the Exchange Act.  By virtue of their positions and their power

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

to control public statements about Century Aluminum, the Exchange Act Defendants had the power and ability to control the actions of Century Aluminum and its employees. Century Aluminum controlled the Exchange Act Defendants and its other officers and employees. By reason of such conduct, Defendants are liable pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT III
### For Violation of Section 11
### of the Securities Act (Against All Defendants)

185.    Plaintiffs incorporate only ¶¶ 1, 3, 16-21, 25-45, 47, 49-52, 129-177 above by reference.

186.    This Cause of Action is brought pursuant to section 11 of the Securities Act, 15 U.S.C. 77k, on behalf of all persons or entities who acquired Century Aluminum securities pursuant to, or traceable to, the Secondary Offering. Plaintiff brings this claim against the Company, the Individual Defendants, and the Underwriter Defendants. This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Offering Documents.

187.    The Secondary Offering documents were materially false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

188.    The Securities Act Defendants are strictly liable to Plaintiff and the Class for making the false and misleading misstatements and omissions in issuing the stock in the Secondary Offering.

189.    The Underwriter Defendants each acted as an underwriter in the sale of stock in the Secondary Offering, directly and indirectly participated in the distribution of the stock in the Secondary Offering, and directly and indirectly participated in drafting and disseminating the Offering Documents for the stock in the Secondary Offering.

190.    The Securities Act Defendants owed the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

191.   All of the Securities Act Defendants: (i) signed the Secondary Offering documents; (ii) were directors of Century Aluminum at the time the Offering Documents were filed with the SEC; and/or (iii) served as underwriters for the Secondary Offering.  None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for believing that certain statements contained in the Secondary Offering documents were true, complete and devoid of any misstatements or omissions of material fact.  Therefore, each of the Securities Act Defendants named in this Claim for Relief is liable to Plaintiff and the other members of the Class who acquired Century Aluminum securities pursuant to or traceable to the Secondary Offering documents for the various misstatements and omissions contained therein under section 11 of the Securities Act.

192.   Each of the Securities Act Defendants negligently failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

193.   The Securities Act Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material misstatements to the investing public which were contained in the Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.  By reason of the conduct alleged herein, each of the Securities Act Defendants violated section 11 of the Securities Act, and is liable to Plaintiff and the Class.

194.   Plaintiff and other Class members acquired stock in Century Aluminum pursuant and/or traceable to the Secondary Offering.  At the time Plaintiff and Class members purchased their stock, they did so without knowledge of the facts constituting the misstatements and omissions alleged herein.

195.   Plaintiff and other Class members have sustained damages as a direct and proximate result of the wrongful conduct alleged and the violations of the Securities Act Defendants.

196.   By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Securities Act, as set forth in section 11 of the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    Securities Act.

2        197.    This action is brought within one year after the discovery of the untrue statements

3    and omissions contained in the Offering Documents and within three years of the Secondary

4    Offering.    Despite the exercise of reasonable diligence, Plaintiff could not have reasonably

5    discovered the untrue statements and omissions in the Offering Documents at an earlier time.

6                                      **COUNT IV**
                                 **Against All Defendants for**
7                    **Violations of Section 15 of the Securities Act**

8        198.    Plaintiffs incorporate ¶¶ 1, 3, 16-21, 25-45, 47, 49-52, 129-177 by reference.

9        199.    The Securities Act Defendants named in this Claim for Relief were each control

10   persons of Century Aluminum within the meaning of section 15 of the Securities Act, 15 U.S.C.

11   § 77o, by virtue of their executive and/or directorial positions and/or their ownership of a

12   significant percentage of the Company's outstanding stock.    The Securities Act Defendants named

13   in this Claim for Relief had the power, and exercised the same, to cause Century Aluminum to

14   engage in the violations of law complained of herein and were able to and did control the contents

15   of the January 2009 Offering documents.

16       200.    None of the Securities Act Defendants named in this Claim for Relief made a

17   reasonable or diligent investigation or possessed reasonable grounds for the belief that the

18   statements contained in the January 2009 Offering documents were true and devoid of any

19   omissions of material fact.    By reason of their top executive positions at Century Aluminum,

20   ownership of a significant percentage of the Company's stock and their actual control over the

21   Company's day-to-day operations, financial statements, public filings and their intimate

22   involvement and control over the January 2009 Offering documents, each of the Securities Act

23   Defendants named in this Claim for Relief is jointly and severally liable to Plaintiffs and the other

24   members of the Class as a result of the conduct alleged herein.

25       201.    By reason of their misconduct alleged more fully herein, all of the Securities Act

26   Defendants are liable to Plaintiffs and the members of the Class for the damages they suffered by

27   purchasing or otherwise acquiring Century Aluminum's common stock in the January 2009

28   Offering.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

a.    Declaring this action to be a Class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class, and certifying their counsel as Class Counsel;

b.    Awarding Plaintiffs and other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

c.    Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

d.    Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  June 24, 2010

Respectfully submitted,

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT

_____
BETSY C. MANIFOLD

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

Lead Counsel for Plaintiffs

CENTURYALUMINUM:17647

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

- 70 -

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Chris McNulty, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint with my counsel.

2.    I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a lead plaintiff and representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    Attached as **Exhibit 1** are my transactions during the Class Period in the securities of Century Aluminum Company.

5.    I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _06_ day of June, 2010.

_____
**CHRIS MCNULTY**

## EXHIBIT 1

## PURCHASES AND SALES OF CENTURY ALUMINUM COMPANY SECURITIES BETWEEN OCTOBER 21, 2008 AND MARCH 2, 2009

| DATE | PURCHASED OR SOLD? | NUMBER OF SHARES | PRICE |
|------|-------------------|------------------|-------|
| 1/28/09 | Purchased | 800 | $4.6080 |
| 3/2//09 | Purchased | 1,700 | $1.75 |

1

## **DECLARATION OF SERVICE**

2      I, Marta Stasik, the undersigned, declare:

3      1.      That declarant is and was, at all times herein mentioned, a citizen of the United

4   States and a resident of the County of San Diego, over the age of 18 years, and not a party to or

5   interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San

6   Diego, California 92101.

7      2.      That on June 24, 2010, declarant served:

8      **STIPULATION AND [PROPOSED] ORDER TO FILE THIRD AMENDED
       COMPLAINT AND REVISE BRIEFING SCHEDULE**

9

10  via CM/ECF to the parties listed on the attached service list.

11     I declare under penalty of perjury that the foregoing is true and correct.   Executed this

12  24th day of June 2010, at San Diego, California.

13      _____

14      MARTA STASIK

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIP AND [PROPOSED] ORDER TO FILE THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

- 6 -

CENTURY ALUMINUM CO.
SERVICE LIST – MAY 8, 2009
PAGE 1

COUNSEL FOR PLAINTIFFS

Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
Symphony Towers
750 B Street, Suite 2770
San Diego, CA 92101
      619/239-4599
      619/234-4599 (fax)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com

Attorneys for Plaintiffs Stuart Wexler,
Mark Panasuk, and Peter Abrams

Lionel Z. Glancy
Michael M. Goldberg
GLANCY & BINKOW LLP
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
      310/201-9150
      310/201-9160 (fax)
info@glancylaw.com

Attorneys for Plaintiff Eric Petzsche

Francis A. Bottini, Jr.
Derek James Wilson
JOHNSON BOTTINI, LLP
655 W. Broadway, Suite 1400
San Diego, CA 92101
      619/230-0063
      619/233-5535 (fax)
frankb@johnsonbottini.com
derekw@johnsonbottini.com

Attorneys for Plaintiff Cory McClellan

COUNSEL FOR DEFENDANTS

Bruce A. Ericson
PILLSBURY WINTHROP SHAW
 PITTMAN LLP
50 Fremont St.
Post Office Box 7880
San Francisco, CA 94120-7880
      415/983-1000
      415/983-1200 (fax)
bruce.ericson@pillsburylaw.com

Attorneys for Defendants Century Aluminum
Co., Logan W. Kruger, Michael A. Bless, Steve
Schneider, John C. Fontaine, Jack E. Thompson,
Peter C. Jones, John P. O'Brien, Willy R.
Strothotte, Jarl Berntzen and Wayne R. Hale

Robert P. Varian
Lily I. Becker
Stephen M. Knaster
M. Todd Scott
Erin H. Reding
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
      415/773-5700
      415/773-5759 (fax)
rvarian@orrick.com
lbecker@orrick.com
sknaster@orrick.com
tscott@orrick.com
ereding@orrick.com

Attorneys for Defendants Morgan Stanley
& Co., Inc. and Credit Suisse Securities (USA)
LLC

16796