1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS TO SECOND SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE

# EXHIBIT 66

1   FRANCIS M. GREGOREK (144785)
    gregorek@whafh.com
2   BETSY C. MANIFOLD (182450)
    manifold@whafh.com
3   RACHELE R. RICKERT (190634)
    rickert@whafh.com
4   WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
5   750 B Street, Suite 2770
    San Diego, CA 92101
6   Telephone: 619/239-4599
    Facsimile: 619/234-4599
7
    Lead Counsel for Plaintiffs
8

9

10

## UNITED STATES DISTRICT COURT

11

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

## SAN FRANCISCO DIVISION

13

14

15   In re CENTURY ALUMINUM              )   Case No. C 09-100 1 SI
     COMPANY SECURITIES LITIGATION       )   [Consolidate With Case Nos. C 09-1103 SI,
16   _____    )   C 09-1162 SI, C 09-1205 SI]
                                         )
17                                       )
                                         )
18   This document relates to all actions.   )   ~~FIRST~~THIRD AMENDED
                                         )   CONSOLIDATED
19                                       )   CLASS ACTION COMPLAINT FOR
                                         )   VIOLATION OF THE SECURITIES
20                                       )   ACT OF 1933, 15 U.S.C. § 77 *et seq.,* AND
                                         )   THE SECURITIES EXCHANGE ACT OF
21                                       )   1934, 15 U.S.C. § 78 *et seq.*
                                         )
22                                       )
                                         )   DEPT. 10, 19th Floor
23   _____    )   JUDGE: Hon. Susan Illston

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page
NATURE OF THE ACTION ........................................................................... 1
Summary of The Exchange Act Action ..................................................... 2
Summary of the Securities Act Action ...................................................... 6
JURISDICTION AND VENUE ..................................................................... 8
The Exchange Act Action ......................................................................... 8
The Securities Act Claim .......................................................................... 9
PARTIES ........................................................................................................ 9
The Exchange Act Defendants ............................................................ ~~10~~9
DUTIES OF INDIVIDUAL DEFENDANTS ............................................. 15

SUBSTANTIVE ALLEGATIONS .......................................................... ~~15~~16

THE EXCHANGE ACT ACTION ............................................................... 16
A.  General Background ....................................................................... 16
~~A~~B  Background to False Statements ................................................. ~~16~~18
~~B~~C.  False Statements During the Exchange Act Class Period .......... ~~23~~27
~~C~~D.  The Truth About Century Aluminum's Cash Position is Revealed ........... ~~31~~37
~~D~~E.  Scienter Allegation ..................................................................... ~~33~~40
~~E~~F.  Undisclosed Material Adverse Facts .......................................... ~~39~~46
~~F~~G.  Applicability of Presumption of Reliance Under the Fraud-on-the-Market Doctrine ~~40~~47
~~G.~~H  NoSafeHarbor…………………………………………………….~~41~~48

EXCHANGE ACT CLASS ACTION ALLEGATIONS ........................... ~~41~~48

THE SECURITIES ACT ACTION ............................................................. ~~43~~50
A.  Additional Securities Act Defendants .......................................... ~~43~~50
B.  Securities Act Standing Allegations ............................................. 50
~~B~~C.  False and Misleading Statements in the January 2009 Registration Statement ~~43~~56
~~C~~D  The Truth is Revealed via the Restatement ................................ ~~45~~59
~~D~~E  Materiality of the False Statement ............................................. ~~46~~60
~~E~~F  Failure of Internal Controls to Identify or
Correct the False Statement of Cash Flows ................................ ~~47~~61

DUTIES OF UNDERWRITER DEFENDANTS ....................................... ~~48~~63

SECURITIES ACT CLASS ACTION ALLEGATIONS ......................... ~~50~~64

COUNT I
For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Against All Exchange Act Defendants ...................................... ~~51~~66

COUNT II
For Violation of Section 20(a) of the Exchange Act
Against All Exchange Act Defendants ........................................................ ~~52~~66

COUNT III
For Violation of Section 11 of the Securities
Act (Against All Defendants) ..................................................................... ~~52~~67

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

COUNT IV

For Violation of Section 12(a)(2) of the Securities Act (Against All Defendants) ............................. 55

COUNT V

    Against the Exchange Act All Defendants for Violations of Section 15 of the Securities Act

    ............................................................................................................................ 5769

PRAYER FOR RELIEF ............................................................................................. 5870

JURY TRIAL DEMANDED ....................................................................................... 58

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Lead Plaintiff Stuart Wexler ("Lead Plaintiff"), and Plaintiffs Peter Abrams, Eric

2    Petzschke, Chris McNulty and Cory McClellan (collectively "Plaintiffs") on behalf of the classes

3    of all others similarly situated, allege the following based upon personal knowledge, and upon the

4    investigation of Plaintiffs' counsel as to all other matters. Plaintiffs' counsel conducted a

5    thorough investigation which included, among other things, a review of public documents

6    published or disseminated by or on behalf of, Century Aluminum Co. ("Century Aluminum" or

7    the "Company") and/or any of its competitors or peers, and any of the Defendants named

8    herein, including, but not limited to, the United States Securities and Exchange Commission

9    ("SEC") filings, wire and press releases and other announcements, transcripts or wire broadcasts

10   of conference calls, securities analysts' reports and advisories, and information readily available on

11   the Internet. Plaintiffs believe that substantial additional evidentiary support exists for the

12   allegations set forth herein after a reasonable opportunity for discovery.

13                                   **NATURE OF THE ACTION**

14        1.    This is a consolidated federal securities class action that separately sets forth claims

15   under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 *et seq.*, and under the

16   Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 *et seq.*

17        2.    As to the Exchange Act claims, Plaintiffs separately allege that the Exchange Act

18   Defendants (defined *infra*) acted knowingly or were deliberately reckless in issuing materially

19   false or misleading statements and/or failing to disclose material facts concerning the Company's

20   business and financial condition between October 21, 2008 and March 2, 2009, inclusive (the

21   "Exchange Act Class Period") and thus, are liable to purchasers of Century Aluminum common

22   stock during the Exchange Act Class Period, for violations of sections 10(b) and 20(a) of the

23   Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively (the "Exchange Act Action").

24        3.    The negligence-based Securities Act claims (the "Securities Act Action") are pled

25   separate and apart from the Exchange Act Action. Plaintiffs allege that the Securities Act

26   Defendants (defined *infra)* are strictly liable for issuing materially false and misleading

27   statements in the Offering Documents (defined *infra),* in violation of §§ 11, 12(a)(2) and 15 of the

28                                                                                              1548

1   Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. The Securities Act Action does not

2   incorporate by reference, or otherwise rely upon, any allegations pled in support of the Exchange

3   Act claims, except those non-fraud based allegations that are specifically incorporated. Plaintiffs'

4   non-fraud allegations in support of the Securities Act Action are pled as separate, stand-alone

5   claims under the notice-pleading standards of Fed. R. Civ. P. 8(a).

6   **Summary of The Exchange Act Action**

7       4.      The fraud-based Exchange Act Action arises out of a scheme orchestrated by

8   Century Aluminum and certain of its officers (defined *infra* as the "Exchange Act Defendants") to

9   create and/or maintain artificial inflation in the price of Century Aluminum common stock

10   throughout the Class Period, to the detriment of ordinary investors who were damaged when the

11   truth began to be revealed to the market.

12       5.      Founded in 1995 in Monterey, California, Century Aluminum is a holding company,

13   which through its subsidiaries, manufactures and produces aluminum and aluminum products.

14   Headquartered in Monterey, California, Century Aluminum was formed by Glencore International

15   of Switzerland, as a holding company for that corporation's aluminum producing assets. Until this

16   year, Century Aluminum's largest production facility was the Ravenswood plant in Ravenswood,

17   West Virginia.

18       6.      By mid-2008, the commodities markets were in peril, and the market for aluminum

19   in particular was being heavily compromised. At that time, Century Aluminum was facing the

20   combination punch of declining aluminum prices, in conjunction with rising raw material input

21   prices. In percentage terms, in the third fiscal quarter of 2008, the price of caustic soda and

22   calcined coke (both important inputs for the production of aluminum) had increased by 88% and

23   100%, respectively. The increased production costs drastically affected Century Aluminum's

24   earnings, forcing down margins and increasing production costs.

25       7.      In addition to increasing costs, the end markets for Century Aluminum's products

26   were also feeling the full brunt of the economic downturn. The auto, heavy truck and commercial

27   building industries were all either flat or declining. Accordingly, the market price for a ton of raw

28

1   aluminum fell from almost $3,217 per ton in July of 2008, to approximately $1,500 per ton as of

2   January 8, 2009. With such a dramatic decrease in the market price for their products, the major

3   aluminum producers-including Century Aluminum-were cutting all discretionary spending and

4   hunkering down for a long downturn in the market.

5       8.      To compound matters, the Exchange Act Defendants (defined *infra)* were facing the

6   loss of their positions, control and holdings in Century Aluminum due to their losses on the open

7   market. Specifically, in mid-2008 Century Aluminum was in debt to the tune of over **three**

8   **quarters of a billion dollars** to commodities trading conglomerate Glencore Ltd. ("Glencore")

9   as a result of certain risky derivatives or "forward financial sales contracts." As an owner of 28.5%

10  of Century Aluminum's shares at that time, Glencore held a huge bargaining chip over the heads of

11  the Exchange Act Defendants *(defined infra).* Indeed, if it had wished, Glencore could have either

12  forced Century Aluminum into bankruptcy and/or taken over the Company outright via a tender

13  offer or proxy contest. However, because Glencore would have simply sold the Company off in

14  pieces or attempted to consolidate it with its other aluminum companies,[1] Glencore was willing to

15  deal with Century Aluminum-which makes sense considering the leverage which they could exert.[2]

16      9.      By late 2008, Century Aluminum was incurring substantial monthly losses,

17  culminating in a net loss of $700.2 million (or $14.27 per share) for the Fourth Quarter of 2008.

18  Further, Century Aluminum was forced to take a $94.8 million charge for goodwill impairment

19  ($1.93 per share), a tax charge of $522.9 million ($10.66 per share) based on a "recording of a

20

21

22  _____

23  [1]  Glencore owns a controlling stake in RUSAL, one of the largest aluminum producers in the world.

24  [2]  In July, Century Aluminum announced that they had mollified Glencore, to their own benefit. In
25      exchange for agreeing to a "standstill," which precluded a hostile takeover until 2010, Century
        Aluminum agreed to: (1) pay Glencore no less than $730,200,000 in cash; and (2) issue Glencore
26      160,000 shares of a new class of convertible stock, valued at $6,115.00 per share (the "Standstill
        agreement"). Century Aluminum Co., Current Report (Form 8-K), at *1-*3 (July 8, 2008) ("July 8,
27      2008 Form 8-K"). The total cash outlay to Glencore under the agreement amounted to the equivalent
        of $1.65 billion. *See id.* In return, Glencore agreed to forgo a hostile takeover until 2010. *See id; see*
28      *also* Century Aluminum Co., Current Report (Form 8-K) (Jan. 27, 2009) ("January 27, 2009 8-K").

1550

1    valuation allowance on deferred tax assets," and a inventory write-down charge of $55.9 million

2    ($1.14 per share).[3]

3         10.    As a result of all of these economic pressures, Century Aluminum undertook a

4    fraudulent scheme to raise money by inflating the Company's stated ~~cash on hand in violation of~~

5    ~~Generally Accepted Accounting Principles ("GAAP")~~operating income. This was done by

6    improperly accounting for the paper 'proceeds' of a redemption of convertible stock as "cash flows

7    from operating activities," rather than as its proper classification, cash from financing activities. As

8    such, Century Aluminum falsely reported in its quarterly report (Form 10-Q) that the Company had

9    a surplus of $230,759,000 in free cash flows provided by operating activities in the third fiscal

10    quarter of 2008, when in reality Century Aluminum had a deficit of $698,721,000. *Compare*

11    Century Aluminum Co., Quarterly Report (Form 10-Q), at *3 (November 10, 2008) (the

12    "November Quarterly Report" or "November 2008 Quarterly Report"), *with* Century Aluminum

13    Co., Current Report (Form 8-K), at *2 (March 2, 2009) (the "Restatement").

14         11.    With the inflated statement of cash flows in place, Century was able to seek an

15    additional influx of cash from the only avenue remaining to the Company: a public offering of

16    stock. Accordingly, in ~~February~~late January 2009, pursuant to the a registration statement that the

17    Exchange Act Defendants knew or should have known to be false and misleading when made,

18    Exchange Act Defendants incorporated a false statement of cash flows identical to that reported in

19    the November Quarterly Report. By February of 2009, with the help of the false financial results,

20    Century Aluminum had completed a public offering of 24.5 million shares of its common stock,

21    raising approximately $104 million in cash (the "January 2009 Offering" or "Secondary Offering"

22    or the "Offering").

23

24

25    _____

26    [3]  As noted above, Century Aluminum's problems were not limited to the downturn in the global market for aluminum. Indeed, in Fiscal Year 2008, Century Aluminum lost almost $750

27    million on risky derivative investments, termed "forward contracts" by the Company. These losses, when added to the already increasing cost to produce aluminum and the declining

28    market for the commodity, put Century Aluminum in a particularly precarious position.

12.     The truth of the matter only came to light after the Exchange Act Defendants had succeeded in raising the $104 million. Indeed, it wasn't until March 2, 2009 that Century Aluminum filed the Restatement. Among other things, the Restatement informed shareholders and investors alike that the Company's "previously issued financial statements for the nine months ended September 30, 2008 . . . .should no longer be relied upon . . . ." Restatement at *2. **The Company attempted to explain the almost $1,000,000,000 false inflation of cash from operating activities simply as an "error."**

13.     Notwithstanding Century Aluminum's claim that the billion dollar inflation of the Company's cash flows was merely an "error," the Exchange Act Defendants—by virtue of their positions within the Company and access to inside information—knew that the statement of cash flows was misstated. Indeed, an "error" so large would appear unusual to even an untrained lay investor who ventured even a sideways glance at the SEC filings. Therefore, the Exchange Act Defendants, who are the duly elected and appointed directors and officers of a multi-billion-dollar corporation, through the Quarterly Results, stated that the Company had **$929,480,000 more in cash from operations than was actually in the Century Aluminum coffers**.[4] Moreover, there can be no doubt that had investors known that Century Aluminum had **negative $698,721,000 in** operating cash, they would have chosen not to purchase—or to sell immediately—their Century Aluminum shares. Indeed, on news of the Restatement, the price of the Company's shares traded on NASDAQ fell to $1.06, ~~a~~an 87% drop from the January 2009 Offering price of $8.00 slightly more than one month earlier.

14.     As a result of the Exchange Act Defendants' scheme to raise money by propping-up the Company's reported cash from operations, the Exchange Act Defendants committed a fraud on the Company's common shareholders in violation of sections 10(b) and 20 of the Exchange Act,

---

[4] The result of the Restatement was a $929,480,000 change to net operating cash, changing Century Aluminum's net operating cash from $230 million, as reported in the January 29, 2009 Registration Statement (defined *infra),* to -$698,721,000—the actual number. *See* Restatement at *2; see also* Century Aluminum Co., Prospectus Supplement to Prospectus Dated May 29, 2007 (Form 424(b)5) (Jan. 29, 2009) ("January 2009 Registration Statement" or "Registration Statement~~.~~").

1552

1   15 U.S.C. §§ 78j(b) and 78t. The false statements artificially inflated the price and market for

2   Century Aluminum's common stock, as evinced by the significant drop in price following the

3   disclosure of the truth on March 2, 2009. Indeed, on news of the Restatement, the price of the

4   Company's shares traded on NASDAQ fell 24% or $0.55 per share to close at $1.67, compared to

5   the previous day's close of $2.22, a loss of $40 million in market capitalization in one day. The

6   Exchange Act Defendants collectively made, disseminated and approved statements which they

7   knew to be false, and failed to disclose material information necessary to make those statements,

8   in the light of the circumstances under which they were made, not false or misleading.

9       15.   As a result, Plaintiffs and the Class have suffered damages in that, in reliance on the

10  integrity of the market, they paid artificially inflated prices for Century Aluminum common stock.

11  Plaintiffs and the Class would not have purchased Century Aluminum common stock at the prices

12  they paid, or at all, if they had been aware that the market prices had been artificially and falsely

13  inflated by the Exchange Act Defendants' misleading statements. Accordingly, as a direct and

14  proximate result of these wrongful acts, Plaintiffs and the other members of the Class suffered

15  damages in connection with their purchases of Century Aluminum common stock during the Class

16  Period.

17  **Summary of the Securities Act Action**

18      16.   As part of the Securities Act Action, Plaintiffs allege that the Securities Act

19  Defendants (defined *infra*) issued a false and misleading Registration Statement which induced

20  Plaintiffs and other parties to purchase shares of Century Aluminum common stock pursuant

21  and/or traceable to the January 2009 Offering (the "Securities Act Class"), causing Plaintiffs to

22  suffer damages in violation of §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k,

23  77l(a)(2) and 77o.

24      17.   On or about January 29, 2009, the Company completed its January 2009 Secondary

25  Offering in which it sold approximately 24.5 million shares, or $104.700,000 million worth of

26  Century Aluminum common stock. In order to facilitate the January 2009 Offering, the Securities

27  Act Defendants (defined *infra*) caused to be filed with the SEC a Registration Statement which

28

1553

1    misstated the Company's cash from operating activities. Considering Century Aluminum's dismal

2    financial performance and business outlook at the end of 2008, investors would not have been

3    willing to invest in an offering of common stock without some reassurance that the Company could

4    continue operations and weather the economic downturn. The false and misleading statement of

5    cash flows assisted in this purpose, and the negligent failure of internal controls, which would have

6    caused the discovery and correction of those errors, allowed investors to garner a 'false sense

7    of security' in their purchase of Century Aluminum stock.

8          18.    In particular, the Registration Statement, which incorporated false and misleading

9    statement of cash flows from the November Quarterly Report, assured investors that Century

10    Aluminum had a surplus of over $200 million in cash from operating activities—plenty to fund

11    any short-term downturn in the business. *See* January 2009 Registration Statement at *S-2. As

12    such, investors were willing to invest in the Company's stock, believing that the Company was

13    liquid and cash rich, when—in reality—it was not.

14          19.    The January 2009 Registration Statement falsely stated that: "Based upon . . . price

15    forecasts, and ***taking into account our current balance of cash and short-term investments*** . . .

16    we would expect to have sufficient liquidity to fund our operations for approximately the next 18

17    months." January 2009 Registration Statement at *S-2 (emphasis added). Therefore, according to

18    Century Aluminum itself, the Company's access to cash, especially cash-on-hand from operating

19    activities was the ***most important piece*** *of* ***information*** for investors and the primary selling point

20    for the January 2009 Offering. However, due to a complete failure of Century Aluminum's

21    internal controls, this statement was disseminated to shareholders in conjunction with the

22    Secondary Offering, despite the fact that it was ~~patently~~materially false and misleading (and

23    Century Aluminum actually had ***negative*** cash flow from operating activities).

24          20.    At the time of the January 2009 Offering, Century Aluminum was in the midst of a

25    dire financial situation and was facing plant shutdowns, mounting losses and debts, and possible

26    bankruptcy. Thus, there can be no doubt that information concerning Century Aluminum's cash

27    position was of the most valuable to investors and the market. As such, the Securities Act

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1     Defendants should have been primarily concerned with the accuracy of the disclosures in the

2     Secondary Offering Documents which concerned operating cash and cash-on-hand. Indeed, **extra**

3     scrutiny should have been in given to those accounting items in view of the Company's

4     situation—not only with respect to outside auditors and underwriters—but also internally (*i.e.*,

5     management, officers and the Board). Had Century Aluminum implemented sufficient and

6     functional internal controls in view of these circumstances—including *inter alia* thorough Board

7     review of financial disclosures and the accounting treatment of cash items—the false and

8     misleading statement in the Secondary Offering documents would have been discovered. The

9     failure to implement adequate internal controls led to the false and misleading statements

10    regarding cash from operating activities and cash-on-hand and, due to the market's

11    understandable focus on these items, proximately and directly caused damages to Plaintiffs and

12    the Class when Century Aluminum's share price dropped like a stone following the

13    Restatement.

14

15          21.     The negligence-based Securities Act claims (the "Securities Act Action") are pled

    separate and apart from the Exchange Act Action and are contained in ¶¶ ~~110~~129-~~125~~177.

16    Plaintiffs allege that the Securities Act Defendants (defined *infra*) are strictly liable for issuing

17    materially false and misleading statements in the January 2009 Registration Statement, in

18    violation of Sections 11~~, 12(a)(2)~~ and 15 of the Securities Act, 15 U.S.C. §§ 77k~~, 771(a)(2)~~ and

19    77o. The Securities Act Action does not incorporate by reference, or otherwise rely upon, any

20    allegations pled in support of the Exchange Act claims, except those non-fraud based

21    allegations that are specifically incorporated. Pursuant to decisions rendered by the United

22    States Court of Appeals for the Ninth Circuit, such as *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d

23    1097, 1105-06, 1108 (9th Cir. 2003), and recent decisions from this District, Plaintiffs' non-

24    fraud allegations in support of the Securities Act Action are pled as separate, stand-alone

25    claims under the notice-pleading standards of Fed. R. Civ. P. 8(a).

26

27

28

**JURISDICTION AND VENUE**

**The Exchange Act Action**

22.     These separate claims arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

23.     This Court has jurisdiction over the subject matter of this action pursuant to section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

24.     Venue is proper in this District pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Defendant Century Aluminum is headquartered in Monterey, California, and because many of the acts, transactions and omissions alleged herein, including the preparation and dissemination of materially false and misleading information, took place in substantial part within this District.

**The Securities Act Claim**

25.     The claims arise under and pursuant to ~~§§~~ sections 11, ~~12(a)(2),~~ and 15 of the Securities Act, 15 U.S.C. §§ 77k, ~~77l(a)(2)~~ and 77o. This Court has jurisdiction over the subject matter of this action pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

26.     Venue is proper in this District pursuant to ~~§~~ section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District.

27.     In connection with the acts and conduct alleged herein, the Securities Act Defendants (defined *infra)* directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

**PARTIES**

28.     Lead Plaintiff Stuart Wexler, ~~a resident of Philadelphia, Pennsylvania, purchased Century Aluminum securities pursuant and/or traceable to the Company's Secondary Offering, as set forth in the accompanying certification, and has been damaged thereby.   In addition, Lead~~

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   ~~Plaintiff transacted in~~ has at all times relevant to this Complaint been an owner of Century

2   Aluminum common stock ~~during the Exchange Act Class Period, and was damaged thereby~~.

3       29.   Plaintiff Peter Abrams~~, a resident of Memphis, Tennessee, purchased~~ has at all

4   times relevant to this Complaint been an owner of Century Aluminum ~~securities pursuant and/or~~

5   ~~traceable to the Company's Secondary Offering, as set forth in the accompanying certification, and~~

6   ~~has been damaged thereby~~ common stock.

7       30.   Plaintiff Eric Petzschke~~, as set forth in the accompanying certification, incorporated~~

8   ~~by reference herein, purchased~~ has at all times relevant to this Complaint been an owner of Century

9   Aluminum ~~securities pursuant and/or traceable to the Company's Secondary Offering, as set forth~~

10  ~~in the accompanying certification, and has been damaged thereby~~ common stock.

11      31.   Plaintiff Cory McClellan~~, as set forth in the accompanying certification incorporated~~

12  ~~by reference herein, purchased Century Aluminum securities pursuant and/or traceable to the~~

13  ~~Company's Secondary Offering, as set forth in the accompanying certification, and has been~~

14  ~~damaged thereby.~~ has at all times relevant to this Complaint been an owner of Century Aluminum

15  common stock.

16      32.   Plaintiff Chris McNulty has at all times relevant to this Complaint been an owner of

17  Century Aluminum common stock

18  **The Exchange Act Defendants**

19      ~~32~~33.   **Defendant Century Aluminum** is a Delaware corporation with its principal

20  executive offices located 2511 Garden Road, Building A, Suite 200, Monterey, California 93940.

21  Specifically, Century Aluminum functions as a holding company engaged in producing aluminum.

22  The Company's principal subsidiaries are Century Aluminum of West Virginia, Inc. ("Century of

23  West Virginia"), Berkeley Aluminum, Inc. ("Berkeley"), Century Kentucky, Inc. ("Century

24  Kentucky") and Nordural ehf ("Nordural"). Century of West Virginia operates a primary

25  aluminum reduction facility in Ravenswood, West Virginia ("Ravenswood"). Berkeley holds a

26  49.7% interest in a partnership, which operates a primary aluminum reduction facility in Mt.

27  Holly, South Carolina ("Mt. Holly") and a 49.7% undivided interest in the property, plant, and

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   equipment comprising Mt. Holly. The remaining interest in the partnership and the remaining

2   undivided interest in Mt. Holly are owned by Alumax of South Carolina, Inc., a subsidiary of

3   Alcoa ("ASC"). In addition to its primary aluminum assets, it has 50% joint venture interests in

4   the Gramercy Alumina Refinery, located in Gramercy, Louisiana ("Gramercy") and St. Ann

5   Bauxite, a related bauxite mining operation in Jamaica. During the relevant period, its primary

6   aluminum facilities includeincluded Grundartangi (Iceland), Hawesville (Kentucky, owned by

7   Century Aluminum subsidiary, Century Kentucky), Ravenswood (West Virginia) and Mt. Holly

8   (South Carolina).

9        3334. **Defendant Logan W. Kruger** ("Kruger") has served as President and Chief

10   Executive Officer ("CEO") of Century Aluminum since 2005. A director of Century Aluminum

11   Board of Directors ("Board"), Kruger received a salary and bonus in 2008 of $855,000 and

12   $637,000, respectively, in 2007, a salary and bonus of $815,000 and $1,115,000, respectively, and

13   in 2006, a salary and bonus of $750,000 and $562,500 respectively. The bonus component of

14   Kruger's annual compensation was based upon annual quantitative and qualitative performance

15   targets established by the Board. Kruger signed the Company's January 2009 Registration

16   Statement filed with the SEC and approved the issuance of false SEC reports. Kruger also

17   reviewed, approved and signed Century's Form 10-K for 2007 and 2008 filed with the SEC on

18   February 29, 2008 *(see* Century Aluminum Co., Annual Report (Form 10-K) (February 29, 2008)

19   ("2007 10-K")) and on March 2, 2009 *(see* Century Aluminum Co., Annual Report (Form 10-K)

20   (March 2, 2009) ("2008 10-K")), Century's Form 10-Q for the first, second and third quarter of

21   2008 filed with the SEC respectively on May 12, 2008, on August 11, 2008, and on November 10,

22   2008. Century Aluminum Co., Quarterly Report (Form l0-Q) (May 12, 2008) ("Q1'08 10-Q");

23   Century Aluminum Co., Quarterly Report (Form l0-Q) (Aug. 11, 2008) ("Q2'08 10-Q"); Century

24   Aluminum Co., Quarterly Report (Form l0-Q) (Nov. 10, 2008) ("Q3'08 10-Q"). Kruger is also a

25   Director of Cleco Corporation, and has held that position since October 2008. Previously, he

26   served as a President of Asia/Pacific Inco Limited from September 2005 to November 2005; and

27

28

                                                                                              1558

1   Executive Vice President, Technical Services for Inco Ltd. from September 2003 to September

2   2005.

3   ~~34~~35.  **Defendant John C. Fontaine** ("Fontaine") served as a member of the Board since

4   2005, and also served as a Lead Director of Century Aluminum Co. from 2005 to 2008. Defendant

5   Fontaine signed the Company's January 2009 Registration Statement filed with the SEC and

6   approved the issuance of false SEC reports. Fontaine also reviewed, approved and signed the 2007

7   10-K and the 2008 10-K. Fontaine is also Of Counsel to the law firm of Hughes Hubbard &

8   Reed LLP, a position he has held since January 2000, and was formerly a partner in that firm from

9   July 1997 to December 1999. Fontaine has also served as Chairman of the Samuel H. Kress

10  Foundation (1994 to 2006); Trustee of the National Gallery of Art (2003 to 2007) and Chairman of

11  the Board of Trustees (2006 to 2007).

12  ~~35~~36.  **Defendant Jack E. Thompson** ("Thompson") has been a member of the Board

13  since 2005. Thompson has also served as a Director of Tidewater Inc. since 2005; Director of

14  Rinker Group Ltd. from May 2006 to June 2007; Director of Phelps Dodge Corp. from January

15  2003 to March 2007; Director of Stillwater Mining Co. from 2002 to June 2006; Vice Chairman of

16  Barrick Gold Corporation from December 2001 to April 2005; and Member of the Advisory Board

17  of Resource Capital Funds III and IV, LLP from 2002 to January 2009; and Member of the

18  Industry Advisory Council for the College of Engineering at the University of Arizona since 2002.

19  Thompson signed the Company's January 2009 Registration Statement filed with the SEC and

20  approved the issuance of false SEC reports. Thompson also reviewed, approved and signed the

21  2007 10-K and the 2008 10-K.

22  ~~36~~37.  **Defendant Peter C. Jones** ("Jones") has been a member of the Board since 2007.

23  Defendant Jones is also Chairman of Lakota Resources Inc. since September 2008; Director of

24  Royal Nickel Corp. since December 2008; Director of Mizuho Corporate Bank (Canada) since

25  December 2006; Director IAMGOLD Corporation since May 2006; Director, President and Chief

26  Operating Officer of Inco Ltd. from April 2002 to November 2006; President Commissioner P.T.

27  Inco. Tbk from 1999 to 2006; Chairman Goro Nickel SAS from 2003 to February 2007; Member

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    of the Board and Executive Committee, Mining Association of Canada from 1997 to 2006; and

2    Member of the Board, Royal Ontario Museum from 2003 to 2006. Defendant Jones signed the

3    Company's January 2009 Registration Statement filed with the SEC and approved the issuance of

4    false SEC reports. Defendant Jones also reviewed, approved and signed the 2007 10-K and the

5    2008 10-K.

6        3738.   **Defendant Robert E. Fishman** ("Fishman") has been a member of the Board since

7    2007, and signed the Company's January 2009 Registration Statement filed with the SEC and

8    approved the issuance of false SEC reports. Defendant Fishman has also served as a President and

9    Chief Executive Officer of Ausra, Inc. since October 2007; Director of Range Fuels, Inc. since

10   November 2007; Executive Vice President, Power Operations of Calpine Corporation from 2006 to

11   2007; and Senior Vice President of Calpine Corporation from 2001 to 2005. Fishman also

12   reviewed, approved and signed the 2007 10-K and the 2008 10-K.

13       3839.   **Defendant John P. O'Brien** ("O'Brien") has served as Chairman of the Board

14   since 2008. O'Brien has served as a Managing Director of Inglewood Associates Inc. since 1990;

15   Chairman of Allied Construction Products since March 1993; Director of Preformed Line Products

16   Company from May 2004 to April 2008; Director of Globe Specialty Metals from May 2008 to

17   October 2008; Director of Oglebay Norton Company from April 2003 to February 2008; Member

18   of the Board of Trustees of Saint Luke's Foundation of Cleveland, Ohio since 2006; Trustee of

19   Cleveland Sight Center since 1990; Chairman, Chagrin Falls Board of Zoning Appeals since 2005;

20   and Trustee of Downtown Chagrin Falls from 2000 to 2008. Defendant O'Brien signed the

21   Company's January 2009 Registration Statement filed with the SEC and approved the issuance of

22   false SEC reports. O'Brien also reviewed, approved and signed the 2007 10-K and the 2008 10-K.

23       3940.   **Defendant Willy R. Strothotte** ("Strothotte") has been a member of the Board

24   since 1996. Strothotte is also the Chairman of the Board of Glencore International AG since 1994

25   and served as a Chief Executive Officer from 1993 to December 2001; Director of KKR Financial

26   Holdings LLC since January 2007; Director of Minara Resources Ltd. since 2000; and Chairman of

27   the Board of Xstrata AG (formerly Sudelektra Holding AG) since 1994. As Chairman of Glencore

28

1    and one of the original purchasers of stock in Glencore, Defendant Strothotte was familiar with the

2    forward sales contracts between Glencore and Century Aluminum, the unwinding of these

3    contracts in July 2008, and Glencore's subsequent increased stake in Century Aluminum through

4    the July 8, 2008 preferred stock purchase agreement of nearly $1 billion. Defendant Strothotte

5    signed the Company's January 2009 Registration Statement filed with the SEC and approved the

6    issuance of false SEC reports. Strothotte reviewed, approved and signed Century's Schedule

7    13D/A, filed with the SEC on July 18, 2009, the 2007 10-K and the 2008 10-K. During the

8    Relevant Period, Strothotte sold 1,500 shares of Century Aluminum stock for $109,110 in unlawful

9    insider trading proceeds.

10        ~~40~~41.   **Defendant Jarl Berntzen** ("Berntzen") has been a member of the Board since

11   2006. Defendant Berntzen signed the Company's January 2009 Registration Statement filed with

12   the SEC and approved issuance of Company's false SEC reports. Defendant Berntzen was also a

13   Managing Director and Portfolio Manager of Interlachen Capital Group from August 2008 through

14   February 2009; Partner-Head of Mergers and Acquisitions, ThinkEquity Partners LLC from March

15   2006 to August 2008; Director of Universal Safety Response, Inc. from October 2007 to April

16   2009; Senior Vice President, Barrington Associates, LLC from April 2005 to February 2006; and

17   Founder, Berntzen Capital Management, LLC from March 2003 to April 2005. Berntzen also

18   reviewed, approved and signed the 2007 10-K and the 2008 10-K.

19        ~~41~~42.   **Defendant Catherine Z. Manning** ("Manning") has been a member of the Board

20   since 2008. Prior to joining the Board, Manning was Partner, PricewaterhouseCoopers LLP from

21   July   1986   to   June   2008;   Finance   Effectiveness   and   Merger   Integration   leader   of

22   PricewaterhouseCoopers' Atlanta Advisory practice; Chairman, Atlanta Historical Society since

23   January 2007, member since January 2002; Member, Georgia Appleseed since January 2006;

24   Member, Museum of Contemporary Art of Georgia since February 2008. Manning reviewed,

25   approved and signed Century's Post-Effective Amendment No. 1 to Form S-3 field with the SEC

26   on March 2, 2009 and the 2008 10-K.

27

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1  ~~42~~43.  **Defendant Steve Schneider** ("Schneider") has served as Senior Vice President and

2  Chief Accounting Officer of Century Aluminum since 2006, and served as Vice President and

3  Corporate Controller from April 2002 through May 2006. Schneider signed the Company's

4  January 2009 Registration Statement filed with the SEC and approved the issuance of the

5  Company's false SEC reports. During the Relevant Period, Schneider sold 255 shares of Century

6  Aluminum stock for $3,722 in unlawful insider trading proceeds. Schneider also reviewed,

7  approved and signed the 2007 10-K and the 2008 10-K.

8  ~~43~~44.  **Defendant Michael A. Bless** ("Bless") has served as Executive Vice President and

9  Chief Financial Officer of Century Aluminum since January 2006. Bless received a salary and

10  bonus in 2008 of $422,000 and $270,000, respectively; in 2007, a salary and bonus of $405,000

11  and $345,000, respectively, and in 2006, a salary and bonus of $352,397 and 262,500, respectively.

12  The bonus component of Bless' annual compensation was based upon annual quantitative and

13  qualitative performance targets established by the Board of Directors. Bless signed the Company's

14  January 2009 Registration Statement filed with the SEC and approved the issuance of false SEC

15  reports. Bless reviewed, approved and signed the 2007 10-K, the Q1'08 10-Q, the July 8, 2008

16  Form 8-K, including exhibits 10.1, 10.2, 10.3 and 10.4 ("July 8, 2008 8-K"), Q2'08 10-Q, Q3'08

17  10-Q and the 2008 10-K. Thus, Defendant Bless was familiar with the forward sales contracts with

18  Glencore, the unwinding of these contracts and the July 8, 2008 preferred stock sale to Glencore.

19  Prior to joining Century, Bless served as Managing Director of M. Safra & Co., Inc., from

20  February 2005 to January 2006 and Executive Vice President and Chief Financial Officer of

21  Maxtor Corporation from August 2004 to October 2004. From August 1997 through January 2004,

22  Bless served in a number of senior executive positions with Rockwell Automation, Inc. (formerly

23  known as Rockwell International Corporation), a leading industrial automation hardware, software

24  and services company, including as Senior Vice President and Chief Financial Officer from June

25  2001 to January 2004.

26  ~~44~~45.  **Defendant Wayne R. Hale** ("Hale") has been the Chief Operating Officer and an

27  Executive Vice President of Century Aluminum since March 2007. Hale received a salary and

28

1562

1   bonus in 2008 of $472,000 and $345,000, respectively, and in 2007, a salary and bonus of

2   $375,000 and $650,000, respectively. The bonus component of Hale's annual compensation was

3   based upon annual quantitative and qualitative performance targets established by the Board of

4   Directors. Prior to joining Century, Defendant Hale served as Senior Vice President of Sual-

5   Holding from April 2004 to February 2007. Hale also held various senior management positions

6   with Kennecott Utah Copper Corporation from April 2000 to April 2004, including Chief

7   Operating Officer from April 2002 to April 2004.

8       4546. Defendants Century Aluminum, Kruger, Fontaine, Thompson, Fishman, Jones,

9   O'Brien, Strothotte, Manning, Hale, Bless, Schneider and Berntzen all are collectively referred to

10  hereinafter as the "**Exchange Act Defendants**."

11      4647. Defendants Kruger, Fontaine, Thompson, Fishman, Jones, O'Brien, Strothotte,

12  Manning, Hale, Bless, Schneider and Berntzen all are collectively referred to hereinafter as the

13  "**Individual Defendants**."

14      4748.  It is appropriate to treat the Exchange Act Individual Defendants collectively as a

15  group for pleading purposes and to presume that the materially false, misleading and incomplete

16  information conveyed in the Company's public filings, press releases and public statements, as

17  alleged herein was the result of the collective actions of the Exchange Act Individual Defendants

18  identified above. The Exchange Act Individual Defendants, by virtue of their high-level positions

19  within the Company, directly participated in the management of the Company, were directly

20  involved in the day-to-day operations of the Company at the highest levels and were privy to

21  confidential proprietary information concerning the Company involving the Company's liquidity

22  and cash flow, Glencore, the sale of the Company's preferred stock and its business, operations,

23  prospects, growth, finances, and financial condition, and cash flow from operations as alleged

24  herein.

25                      **DUTIES OF INDIVIDUAL DEFENDANTS**

26      4849.  The Individual Defendants, because of their positions of control and authority as

27  directors and/or officers of Century Aluminum, were able to and did, directly and/or indirectly,

28

1  exercise control over the wrongful acts complained of herein, as well as the contents of the various

2  public statements issued by the Company including the January 2009 Registration Statement.

3  Because of their executive, managerial and directorial positions with Century Aluminum, each

4  Defendant had access to adverse non-public information concerning the preferred stock issued in

5  July 2008 and its adverse material impact on the Company's interim consolidated statement of cash

6  flows.

7      ~~49~~50.   At all times relevant hereto, each of the Defendants was the agent of each of the~~.~~

8  other Defendants and was at all times acting within the course and scope of such agency.

9      ~~50~~51.   To discharge their duties, the officers and directors of Century Aluminum were]

10  required to exercise reasonable and prudent supervision over the management, policies, practices

11  and controls of the financial affairs of the Company. By virtue of such duties, the officers and

12  directors of Century Aluminum were required to, among other things, refrain from acting upon,

13  material inside corporate information to benefit themselves.

14                        **SUBSTANTIVE ALLEGATIONS**

15      ~~51~~52.   The Exchange Act claims are pled at *infra* ¶¶ ~~52~~53-~~109~~128, ~~135~~178-~~141~~184. The

16  Securities Act claims are pled separate and apart from the Exchange Act Action at *infra* ¶¶

17  ~~110~~129-~~134~~177, ~~142~~185-~~170~~201. Plaintiffs allege that the Securities Act Defendants (defined

18  *supra)* issued materially false and misleading statements in the Offering Documents (defined

19  *infra),* in violation of sections 11~~, 12(a)(2)~~ and 15 of the Securities Act, 15 U.S.C. §§ 77k~~,~~

20  ~~77l(a)(2)~~ and 77o. The Securities Act Action does not incorporate by reference, or otherwise rely

21  upon, any allegations pled in support of the Exchange Act claims, except those non-fraud based

22  allegations that are specifically incorporated. Plaintiffs' non-fraud allegations in support of the

23  Securities Act Action are pled as separate, stand-alone claims under the notice-pleading standards

24  of Rule 8(a) of the Federal Rules of Civil Procedure.

25                        **THE EXCHANGE ACT ACTION**

26      ~~52~~53.   The separate fraud-based Exchange Act Action arises out of a scheme orchestrated

27  by the "Exchange Act Defendants" to create and/or maintain artificial inflation in the price of

28

1   Century Aluminum common stock throughout the Class Period, to the detriment of ordinary

2   investors who were damaged when the truth was revealed to the market.

3   **A.      General Background**

4   54.      Century Aluminum was incorporated in 1995, when it was spun-off by Glencore

5   following a scandal involving Glencore's founder Marc Rich. Rich was indicted in the United

6   States Federal Court for the Southern District of New York on charges of tax evasion arising out of

7   his alleged violation of a United States oil embargo in place against Iran (the so-called "food-for-

8   oil" scandal) in the early 1980s. *See* Marcia Vickers, *The Rich Boys: An ultra-secretive network*

9   *rules independent oil trading. Its mentor: Marc Rich,* BusinessWeek, July 18, 2005, *available at*

10  http://www.businessweek.com (last visited March 10, 2010). Before he was tried, however, Rich

11  fled to Switzerland, where he remained a fugitive, until being pardoned by President Bill Clinton

12  on January 20, 2001. *See id.; see also* Timothy P. Carney, *The Story of Clinton 's Marc Rich*

13  *Pardon: Co-conspirators Serve Time While Multimillionaire Enjoys Clemency,* at *1, World Net

14  Daily, February 05, 2001, *available at* http://www.wnd.com (last visited March 10, 2010).

15  Century sought to protect itself against market volatility by entering into risk forward financial

16  sale contracts with Glencore. In November 2004 and June 2005, Century entered into two

17  forward financial sale contracts with Glencore.

18  55.      In 2006 and continuing through 2015, the forward financial sales contracts set a

19  minimum price and a maximum price, and specified two quantities of primary aluminum

20  (expressed in metric tons): "Tonnage 1" and "Tonnage 2." If the average spot price for aluminum

21  for the month was below the *minimum,* Glencore paid Century the difference between the spot

22  price and the minimum, multiplied by the quantity of Tonnage 1. If, however, the average

23  aluminum spot price for the month was above the *maximum,* Century paid Glencore the difference

24  between the aluminum spot and the maximum, multiplied by the sum of the quantities of Tonnage

25  1 + Tonnage 2.  If the average aluminum spot price for the month was between the *minimum* and

26  the *maximum,* neither party paid the other anything. All settlements were in cash. After the forward

27  contracts were signed, Century disclosed in its 10-Qs and 10-Ks the change in the market value of

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   the forward contracts. The change in market value (realized and unrealized) since the last quarter

2   was reflected on Century's books as an adjustment to "Net Income" ("Net loss on forward

3   contracts") on the statement of operations; and the non-cash (unrealized) portion was reflected as

4   an adjustment to "Cash Flows From Operating Activities" ("Unrealized net loss on forward

5   contracts") on the statement of cash flows.

6       56.   In early May 2008, Century held a conference call with analysts and Defendants

7   Kruger and Hale were quoted in the May 5, 2008 *Metal Week* by reporter Tina Petersen as follows:

8
9       "We had a good start to the year," said Kruger, calling the aluminum price "robust."
        He pointed out the average LME aluminum price was $2,729/mt in the first quarter,
10      well above Q4's $2,447. He said the aluminum price was receiving support "from
        the weak US dollar, ongoing rising costs and continued ongoing demand from
11      China."

12      Kruger said Century's US aluminum smelters were operating well and producing at
        or above capacity at all facilities. But he acknowledged that the US aluminum
        market "is subdued" and soft, except aerospace, which remained strong. He said
13      there was also supply-side risk, evidenced by the winter storms in China.

14      Wayne Hale, Century's chief operating officer, said despite a 2% reduction in metal
        demand, "we continue to see strong demand for our premium products."
15
16   Tina Petersen, *Global Market balanced or in slight surplus: Century,* 79 Platts Metals Week 9 (No.
     18), May 5, 2008, *available at* http://www.platts.com/searchResults.aspx.

17
     **A~~B.~~**   **Background to False Statements**
18
19   ~~53~~57.   As noted above, by mid-2008, the commodities markets were in peril, and the

20   market for aluminum in particular was being heavily compromised. At that time, vertically

21   integrated powerhouses like ALCOA Inc. ("Alcoa") and Century Aluminum were facing the

22   combination punch of declining aluminum prices, in conjunction with rising raw material input

23   prices. In percentage terms, in the third fiscal quarter of 2008, the price of caustic soda and

24   calcined coke (both important inputs for the production of aluminum) had increased by 88% and

25   100%, respectively. As reflected in the following table, margins on aluminum production were

26   declining dramatically as the price of raw materials was escalating geometrically:

27

28
                                                                                                    1566

1

2

3

4

5

6

| Raw Material Input | % Change 3Q 2007 to 3Q 2008 |
|---|---|
| Caustic Soda | 88% |
| Calcined Coke | 110% |
| Ocean Freight | -4% |
| Natural Gas | 47% |
| Fuel Oil | 77% |

7      Collectively, these increased costs amounted to a charge to earnings of approximately $294

8      million, just in the third quarter of 2008, for Alcoa. A similar charge to earnings was also

9      negatively impacting Century Aluminum, forcing down margins and increasing production costs.

10         5458.  In addition to increasing costs, the end markets for Century Aluminum's products

11     were also feeling the full brunt of the economic downturn. The auto, heavy truck and commercial

12     building industries were all either flat or declining. Accordingly, the market price for a ton of

13     raw aluminum fell from almost $3,217 per ton in July of 2008, to approximately $1,500 per ton

14     as of January 8, 2009. With such a dramatic decrease in the market price for their products, the

15     major aluminum producers—including Century Aluminum—were cutting all discretionary

16     spending and hunkering down for a long downturn in the market.

17         5559.  To compound matters, the Exchange Act Defendants were facing the loss of their

18     positions, control and holdings in Century Aluminum due to their losses on the open market.

19     Specifically, in mid-2008 Century Aluminum found itself in debt to the tune of over **three**

20     **quarters of a billion dollars** to commodities trading conglomerate Glencore as a result of certain

21     risky derivatives or "forward financial sales contracts." As an owner of 28.5% of Century

22     Aluminum's shares at that time, Glencore held a huge bargaining chip over the heads of the

23     Exchange Act Defendants. Indeed, if it had wished, Glencore could have either forced Century

24     Aluminum into bankruptcy and/or taken over the company outright via a tender offer or proxy

25     contest. However, because Glencore would have simply sold the Company off in pieces or

26

27

28

1  attempted to consolidate it with its other aluminum companies,[5] Glencore was willing to deal with

2  Century Aluminum-which makes sense considering the leverage which they could exert.

3  ~~56~~60.  In July, Century Aluminum announced that they had mollified Glencore, to their

4  own benefit. In exchange for agreeing to a "standstill," which precluded a hostile takeover until

5  2010, Century Aluminum agreed to: (1) pay Glencore no less than $730,200,000 in cash; and

6  (2) issue Glencore 160,000 shares of a new class of convertible stock, valued at $6,115.00 per

7  share. July 8, 2008 Form 8-K at *1-~~*~~3. ~~As the SEC filing describing the Standstill agreement set~~

8  ~~forth:~~

9  61.  On July 8, 2008, Century: (1) held a conference call with analysts and investors,

10  with a slideshow, to explain the transaction; (2) filed an 8-K announcing that it had agreed with

11  Glencore to terminate the Hedges via thee contemporaneous execution of four agreements; *each of*

12  *which were attached in their entirety to the 8-K, both the 8-K and agreements were signed by*

13  *Defendant Bless;* and (3) filed a 13D/A detailing Glencore's purchase of preferred stock from

14  Century, including all the cash that changed hands as part of this transaction. According to media

15  reports including *Market News Publishing,* Defendant Kruger stated that "[w]e are pleased to

16  have reached this agreement." Defendant Kruger also stated, "[w]e are very pleased with

17  Glencore's continuing support; by accepting the preferred stock and its terms, they have

18  reaffirmed their position as a long-term shareholder."

19  *Century Aluminum ("CENX-ABHDPQ') Unwinds Primary Aluminum Financial Forward Sales*

20  *Contracts,* Market News Publishing, July 8, 2008.

21

22  62.  The July 8-K described the Standstill agreement as follows:

23  **Item 1.01 Entry into a Material Definitive Agreement**
    On July 7, 2008, Century Aluminum Company ("Century") and Glencore Ltd.

24  agreed to terminate forward financial sales contracts for the years 2006 through
    2010 and 2008 through 2015, respectively ("Financial Sales Contracts") upon the

25  payment by Century to Glencore Ltd. of $730.2 million and upon the issuance by
    Century to Glencore Investment Pty Ltd of 160,000 shares of a non-voting Series

26  A Convertible Preferred Stock. Glencore Investment Pty Ltd is an affiliate of
    Glencore International AG, the beneficial owner of approximately 28.5% of our

27  _____

28  [5]  *See* n.1.

                                                                                        1568

issued and outstanding common stock. In connection with this transaction, Glencore has agreed to certain limitations on its ability to acquire additional shares of our common stock and may not increase its voting interest in Century above 28.5% until April 7, 2009 and above 49% of our voting power until January 7, 2010. Under the terms of this transaction, Glencore has also agreed to forego or restrict certain actions, including unsolicited business combination proposals, tender offers, proxy contests and sales of its preferred shares for a limited period of time. We have given Glencore registration rights whereby we have agreed from time to time, subject to certain restrictions, to register the offer and sale of the common stock into which its shares of Series A Convertible Preferred Stock are convertible with the SEC.

The termination of the Financial Sales Contracts with Glencore Ltd. is governed by the following principal agreements and documents, all of which are dated July 7, 2008.

**Termination Agreement**

This agreement provides for the termination of the Financial Sales Contracts with Glencore upon the payment by Century to Glencore of $730.2 million and upon the issuance by Century to an affiliate of Glencore of 160,000 shares of Series A Convertible Preferred Stock pursuant to the Stock Purchase Agreement. Of the cash payment, Century has deferred payment of $505.2 million until August 31, 2008. If Century fails to pay this deferred amount by such date, Century is required to make minimum monthly payments of $25 million, commencing September 1, 2008 and continuing until December 31, 2009. The deferred amount will accrue interest at the rate of LIBOR plus 2.50 percent per annum. In addition, Century must apply the net proceeds received from any public or private offering of debt or equity securities (other than issuances of securities in any business combination transaction or pursuant to employee benefit plans or arrangements, or to the extent that net proceeds are used to finance the acquisition of any plant, equipment or other property or to refinance existing indebtedness) to the prepayment of the unpaid deferred amount. Century may prepay the deferred amount at any time without penalty.

**Stock Purchase Agreement**

In partial consideration for the termination of the Financial Sales Contracts under the Termination Agreement, we have agreed to issue to an affiliate of Glencore 160,000 shares of our Series A Convertible Preferred Stock, a new class of preferred stock authorized by our Board of Directors. We valued the shares of Series A Convertible Preferred Stock at $6,115 per share, based on the closing price of our common stock into which the shares of Series A Convertible Preferred Stock are convertible on the date of purchase, as reported by the Nasdaq Global Select Market. The rights, preferences and privileges of the Series A Convertible Preferred Stock are described in Item 5.03 of this Current Report on Form 8-K, which is incorporated by reference herein.

**Standstill and Governance Agreement**

As a part of our issuance of the Series A Convertible Preferred Stock, Glencore has agreed to refrain from taking certain actions.

***Acquisition of Additional Voting Securities***. Except for limited circumstances set forth in the agreement, Glencore may not acquire more than 28.5% of our voting

securities for a period ending April 7, 2009. Between April 8, 2009 and January 7, 2010, Glencore may not acquire more than 49% of our voting securities.

***Restrictions on Certain Actions.*** For a period ending April 7, 2009, Glencore may not take the following actions, which restrictions will lapse upon a third party exchange or tender offer, as described above under the caption "Acquisition of Additional Voting Securities":

- seek to elect members of our board (other than one director nominated by Glencore under the agreement) or seek to remove any such member or withhold approval for such member;
- submit or cause others to submit stockholder proposals;
- other than as permitted under the agreement, submit business combination proposals or seek to control us or our board or encourage or support others to do so;
- except as permitted by the agreement, publicly announce any business combination proposal;
- solicit proxies in opposition or otherwise oppose any board recommendation;
- form or join any group relating to our securities; or
- take other similar actions.

***Business Combination Proposals.*** Until April 8, 2009, Glencore may not submit business combination proposals to our board unless in writing and delivered to a committee of independent directors in a manner which does not require public disclosure, or invited to do so by our committee of independent directors; thereafter, until termination of this agreement, Glencore may submit such proposals, provided that any such proposal has to be approved by our independent directors before it can be adopted.

***Board Nominees.*** Glencore may submit to our board one Class I nominee to stand for election to our board of directors. Inclusion of such nominee is subject to the consent of a majority of the members of our nominating committee, subject to the reasonable exercise of the fiduciary duties of such members.

***Voting.*** Other than with respect to its nominee, Glencore must vote its shares of our common stock for other nominees for election to our board of directors proportionally with our other stockholders until April 8, 2009. In all other matters, Glencore may vote its shares of our common stock in its sole discretion.

***Termination.*** The right of Glencore to nominate one nominee to our board of directors will terminate if Glencore holds less than 10% of our equity securities for a period of three continuous months. The restrictions on Glencore's ability to vote, acquire additional equity securities and take other actions prohibited by the Standstill and Governance Agreement will terminate at the earliest of the following: (A) Glencore holds less than 10% of our equity securities for a period of three continuous months, (B) the consummation of a business combination or tender or exchange offer, (C) January 7, 2010, and (D) a third party acquires 20% or more of our voting securities and we do not adopt a stockholder rights plan in response to such acquisition.

July 8, 2008 Form 8-K at *2-*3.

1570

1   ~~57~~63.   The total cash outlay to Glencore under the agreement amounted to the equivalent

2   of **$1.65 billion.** See July 8, 2008 Form 8-K. In return, Glencore agreed to forgo increasing its

3   voting interest in Century above 28.5% until April 7, 2009. *See* July 8, 2008 Form 8-K at *1.

4         64.     On July 8, 2008, Reuters reported on the costs of unwinding all of its primary

5   aluminum forward sales contracts with Glencore. Reuters quoted Century as stating "it will have

6   no further obligations under the forward contracts" and "sees greater value in open market

7   transactions for its aluminum." "We see favorable fundamentals for the global primary aluminum

8   market and believe our shareholders will benefit from our ability to realize market pricing on our

9   entire production capacity," said Chief Executive Officer Logan Kruger. Kruger added that

10  Century has "an attractive pipeline of growth opportunities which can be funded with the additional

11  cash flow we will unlock through this transaction."

12  Carole Vaporean, *Century to Pay Glencore to Cancel Aluminum Deal,* REUTERS, July 8, 2008,

13  *available at* http://reuters.com/article/idUSN0819324920080708.

14        65.     On July 8, 2008, the *American Metal Market* also quoted Defendant Kruger's

15  statements from the July 8, 2008 conference call:

16

17        Logan W. Kruger Century's president and chief executive officer said during a
          conference call Tuesday that it has been difficult to watch a third of Century's
          production end up being sold for about half of the current marketprice.

18

19        "We are living in a very different world today (than in 2004 and 2005)," Logan said.
          "We see favorable fundamentals for the global primary aluminum market and
          believe our shareholders will benefit from our ability to realize market pricing on

20        our entire production capacity. We have an attractive pipeline of growth
          opportunities that can be funded with the *additional cash flow* we will unlock

21        through this transaction."

22  Tom Jennemann, *Century Inks $1.7B Deal with Glencore to Unwind Hedge,* American Metal
    Market, July 8, 2008, *available at* 2008 WLNR 27744004 (emphasis added).

23

24        66.     On July 25, 2008, *American Metal Market* reported that "Century pares loss despite

    hedge bite." *American Metal Market* quoted Defendant Kruger as follows:

25

26        "Century made important progress during the quarter," Logan W. Kruger, president
          and chief executive officer, said. "The unwind of our entire aluminum hedge book

27        provides our investors with full exposure to the commodity. We continue to believe
          firmly that metal markets, while volatile, will demonstrate long-term upward

28

1571

pressure consistent with ongoing cost increases and supply constraints, as well as increasing metal demand from emerging economies. Kruger also said that construction is accelerating at the 250,000-tonne-per-year primary aluminum smelter in Helguvik, Iceland. The company expects to begin pouring concrete by the fourth quarter."

*Century Pares Loss Despite Hedge Bite,* American Metal Market, July 25, 2008, *available at* 2008 WLNR 27747023.

~~58~~67.   With falling aluminum prices, many looked to any recovery in commodity prices as a possible harbinger of a forthcoming recovery. However, by late 2008, it became clear that things—at least in the aluminum sector—might get worse before they would get any better. As Christopher Barker, a columnist for *The Motley Fool* wrote of the continuing downturn:

> Bellwether sectors like steel and aluminum may provide the earliest snapshots of how global industry is responding to the financial crisis, but the view is far better from the outside looking in.
>
> Kaiser Aluminum (Nasdaq: KALU) became the latest bellwether to report earnings this week, marching an abrupt about-face from a $24.8 million gain a year earlier to a $22.1 million loss for the third quarter of 2008. Declining metal prices forced the company to log $43.8 million in mark-to-market losses from derivative positions, erasing similar gains posted through the first half of the year. On the operational side, the lost production time from a transformer failure and resulting fire at the company's Anglesey smelter in Wales set Kaiser back a further $20 million. Excluding these items and adjusting for taxes, Kaiser said it would have earned $15.7 million -- still well short of the prior-year result.
>
> Despite all these troubles, the company reported continuing strong demand for its fabricated products, particularly from the aerospace and defense industries. Prices for such products remained above prior-year levels in the third quarter. Kaiser considers such fabricated products to be its core competency, and revealed that the company is considering a possible decommissioning of the Anglesey smelter sometime after September 2009.
>
> With much larger competitors like Aluminum Corporation of China (NYSE: ACH) and Alcoa (NYSE: AA) scaling back production, and warnings of softening demand emanating from the likes of Rio Tinto (NYSE: RTP) and POSCO (NYSE: PKX), the near-term outlook for aluminum producers is more threatening than a rising thundercloud.
>
> **Even Century Aluminum (Nasdaq: CENX), which disappointed analysts this week despite a fivefold earnings increase, is hunkering down for difficult times ahead by cutting all discretionary spending.** The near-term trend doesn't look much better for steel, with ArcelorMittal (NYSE: MT) announcing its own production cuts.
>
> While I urge considerable caution on these sectors in the near term, I also remind Fools to keep their eyes on the long-term prize. Alcoa still expects 15% demand growth from China this year, and Russia's UC Rusal sees a supply shortfall looming

1    no matter how the chips may fall. Kaiser may not be the wiser choice just now, but
2    by following the aluminum sector closely, Fools are conducting recommended due
     diligence on the global economy.

3

4    Christopher Barker, *Avoid Getting Crushed Like a Can,* The Motley Fool, Nov. 7, 2008, *available*

5    *at*  http://www.fool.com/investing/  general/2008/  11  /07/avoid-getting-crushed-like-a-can.aspx

6    (emphasis added).

7         68.      Thus, in late 2008, the Company was under increasing pressure due to a significant

8    degradation in the market price for aluminum and starkly increased operating and fuel costs.

9    According to a report issued by the United States Geological Survey ("USGS"), Aluminum prices

10   declined significantly at the end of 2008. As the USGS stated in a report issued in January of 2009:

11       The price of primary aluminum generally rose through July 2008 before declining
         significantly. In January, the average monthly U.S. market price for primary ingot
12       quoted by Platts Metals Week was $1.136 per pound; it reached a high of $1.426 per
         pound in July, but in September, the price was $1.192 per pound. Prices on the
13       London Metal Exchange (LME) followed the trend of U.S. market prices. The
         monthly average LME cash price for September was $1.138 per pound.
14

15   USGS, *Mineral Commodity Summaries: Aluminum,* at *19 (January 2009), *available at*

16   http://minerals.usgs.gov/minerals/pubs/commodity/aluminum/mcs-2009-alumi.pdf  (last  visited

17   March 9, 2010). *See, also,* Leia Michele Toovey, *Aluminum's Path to the Bottom, Are We There*

18   *Yet?,*   Aluminum   Investing   News,   Oct. 28,   2008,   at   *1,   *available   at*

19   http://aluminuminvestingnews.com/aluminum-articles/55/aluminum%E2%80%99s-path-to-the-

20   bottom-are-we-there-yet (last visited March 9, 2010) ("The precipitous drop in commodity prices

21   is putting companies under pressure. Particularly feeling the squeeze are oil and metal mining

22   companies. The current prices of certain commodities are rendering some operations

23   unprofitable. Aluminum companies are taking the brunt of the hit with the metal at a three-year

24   low at around 87 cents per pound.").

25   ~~59~~69. During late 2008, things got even worse. Century Aluminum was incurring

26   substantial monthly losses, culminating in a net loss of $700.2 million (or $14.27 per share) for the

27   Fourth Quarter of 2008. Further, Century Aluminum was forced to take a $94.8 million charge for

28

                                                                                              1573

1   goodwill impairment ($1.93 per share), a tax charge of $522.9 million ($10.66 per share) based on

2   a "recording of a valuation allowance on deferred tax assets," and a inventory write-down charge

3   of $55.9 million ($1.14 per share).

4   6070.   As Eric Fox observed in a January 9, 2009 article entitled *Aluminum Prepares for a*

5   *Downturn:*

6

7     Although the market has punished Alcoa (NYSE:AA) for the recently announced layoffs and capacity cuts, the actions it is taking are necessary to rebalance supply and demand and allow the company to survive the cyclical

8   downturn. Alcoa announced that it is reducing capacity in aluminum production by 135,000 metric tons per year (MTPY), bringing the total announced capacity cuts to

9   750,000 MTPY (18%) of total. The company is planning on cutting 13,500 employees (13%) of its workforce by the end of 2009. Alcoa didn't stop with just

10   layoffs and capacity cuts. The company said it would stop "all non-critical capital investment" and projected that capital expenditures in 2009 would be $1.8 billion,

11   half of what was spent in 2008. (Make an informed decision about your investments with the easy equations in Analyze Investments Quickly With Ratios.) During the

12   conference call held in early October to discuss third quarter earnings, the company painted a pessimistic view of the fundamentals in the aluminum market, with prices

13   for aluminum peaking at $3,217 per ton in July and falling to $2,377 by September 30. As of January 8, 2009 it sells for approximately $1,500 per ton.

14

15                 ***

16     These cost increases hit earnings by $294 million in the quarter. Almost all of these cost trends have reversed and will positively impact earnings in 2009. The company also acknowledged this in the press release stating that it has "accelerated

17   procurement actions to address major input costs, such as energy, coke, caustic soda, and aluminum fluoride that will provide significant short-term cash benefits,

18   generating savings of greater than 20% in each of the materials. Lower market oil and gas prices also are having a positive impact."

19

20     The end markets that consume aluminum are also weakening with auto, heavy truck, and commercial building and construction declining or flat in North America and Europe.

21

22     More Capacity Cuts To Come. Investors should expect to see more capacity cuts to come in 2009 as demand weakens. Alcoa said that approximately 1/3 of global capacity is cash flow negative at an aluminum price of $2,200 per metric ton. This

23   percentage is certainly higher now using current prices for aluminum. (For more on the importance of analyzing cash flow, read The Essentials Of Cash Flow.) Century

24   Aluminum Company (Nasdaq:CENX) recently reduced capacity at its plant in Ravenswood, WV, and laid off salaried workers to cope with the downturn.

25   Eric Fox, *Aluminum Prepares for a Downturn,* Investopedia, January 9, 2009, *available at*

26   http://stocks.investopedia.com.

27

28

1     61̶71.   Nonetheless, Century Aluminum's problems were not limited to the downturn in the

2     global market for aluminum. ̶I̶n̶d̶e̶e̶d̶,̶ ̶i̶n̶ ̶F̶i̶s̶c̶a̶l̶ ̶Y̶e̶a̶r̶ ̶2̶0̶0̶8̶,̶ because Century Aluminum also lost

3     almost $750 million on the risky ̶d̶e̶r̶i̶v̶a̶t̶i̶v̶e̶ ̶i̶n̶v̶e̶s̶t̶m̶e̶n̶t̶s̶,̶ ̶t̶e̶r̶m̶e̶d̶ "forward contracts" ̶b̶y̶ ̶t̶h̶e̶

4     ̶C̶o̶m̶p̶a̶n̶y̶with Glencore. These losses, when added to the already increasing cost to produce

5     aluminum and the declining market for the commodity, put Century Aluminum in a particularly

6     precarious position.

7     62̶72.   Under such dismal circumstances, Century Aluminum was not able to maintain

8     profitability simply by cutting discretionary spending and putting off capital improvements. As

9     such, the Company was forced to take a number of drastic actions, including:

10    •     granting Glencore more voting shares and allowing Glencore to vote its

11    shares before the expiration of the Standstill Agreement, *see* ̶C̶e̶n̶t̶u̶r̶y̶ ̶A̶l̶u̶m̶i̶n̶u̶m̶ ̶C̶o̶.̶,̶ ̶C̶u̶r̶r̶e̶n̶t̶

12    ̶R̶e̶p̶o̶r̶t̶ ̶(̶F̶o̶r̶m̶ ̶8̶-̶K̶)̶,̶ ̶a̶t̶ ̶*̶1̶ ̶(̶J̶a̶n̶.̶January 27, 2009̶)̶ 8-K;

13    •     shutting down the Company's Ravenswood aluminum smelting plant,

14    resulting in the lay-off of more than 120 employees;

15    •     reducing overall staffing by 13 percent; and

16    •     curtailing production and development of facilities at the Company's

17    greenfield smelter project at Helguvik, Iceland.

18    63̶73.   As a result of all of these economic pressures, Century Aluminum was forced to

19    seek an additional influx of cash from the only avenue remaining to the Company: a public offering

20    of stock. Accordingly, Century Aluminum completed a public offering of 24.5 million shares of its

21    common stock in early February 2009, raising the Company approximately $104 million in cash

22    under the January 2009 Offering.

23    **B̶C.**    **False Statements During the Exchange Act Class Period**

24    64̶74.   Despite Century Aluminum's dismal performance and outlook at the end of 2008,

25    investors were willing to invest in the Company's stock, believing that the company was liquid,

26    when—in reality—it was not.

27

28
                                                                                              1575

1    6575.  On October 21, 2008, the Individual Defendants caused the Company to issue a

2   press release announcing its "strong" results for the third quarter of 2008. The Company

3   summarized its performance in the third quarter and the first nine months of 2008 as follows:

4

5        Century Aluminum Company reported net income of $37.0 million ($0.59 per basic
         and $0.57 per diluted common share) for the third quarter of 2008. The reported
         earnings per share data reflect, as prescribed by [Generally Accepted Accounting
6        Principles ("GAAP")], net income allocable to common shareholders without effect
         for the July 2008 issuance of preferred shares. These results were negatively
7        impacted by a net after-tax charge of $50.4 million for mark-to-market adjustments
         on forward contracts that do not qualify for cash flow hedge accounting. Quarterly
8        results were positively impacted by a $3.3 million tax benefit related to the release
         of tax reserves no longer required. For a full reconciliation of earnings per share
9        allocable to common and preferred shareholders, see the attached Exhibit A.

10            In the third quarter of 2007, the company reported net income of $7.5
         million ($0.18 per basic and $0.17 per diluted common share), which included an
11       after-tax charge of $46.2 million for mark-to-market adjustments on forward
         contracts that do not qualify for cash flow hedge accounting.
12
         Recent highlights included:
13
         — Operating performance was strong at all primary aluminum facilities.
14
         — Direct and toll shipments of primary aluminum totaled a record 203,618 tonnes,
15       up nearly three percent from the previous quarter.

16       — Construction continues at the company's greenfield smelter project at Helguvik,
         Iceland. The company is closely monitoring and evaluating the project in light of the
17       disruptions in global financial markets.

18       — In early July, Century settled all of its remaining fixed price aluminum financial
         sales contracts. The company made the final payment under the deferred settlement
19       amount on October 1.

20            Sales in the third quarter of 2008 were $552.2 million, compared with
         $454.4 million in the third quarter of 2007. Shipments of primary aluminum for the
21       quarter totaled 203,618 tonnes compared with 195,540 tonnes in the year-ago
         quarter, reflecting the impact of the Grundartangi expansion to 260,000 tonnes,
22       which was completed in the fourth quarter of 2007.

23            For the first nine months of 2008, the company reported a net loss of $198.2
         million ($4.57 per basic and diluted common share). The reported earnings per share
24       data reflect, as prescribed by GAAP, net loss allocable to common shareholders
         without effect for the July 2008 issuance of preferred shares. These results were
25       negatively impacted by a net after-tax charge of $466.2 million for mark-to-market
         adjustments on forward contracts that do not qualify for cash flow hedge
26       accounting. Results for the nine month period were positively impacted by net tax
         benefits of $15.9 million for various non-recurring items. For a full reconciliation of
27       earnings per share allocable to common and preferred shareholders, see the attached
         Exhibit A.

28

1    　　　Net income for the first nine months of 2007 was $11.1 million ($0.31 per
     basic and $0.29 per diluted common share), which included an after-tax charge of
2    $172.1 million for mark-to-market adjustments on forward contracts that do not
     qualify for cash flow hedge accounting.

3
     　　　Sales in the first nine months of 2008 were $1,568.6 million compared with
4    $1,366.0 million in the same period of 2007. Shipments of primary aluminum for
     the first nine months of 2008 were 601,511 tonnes compared with 568,812 tonnes
5    for the comparable 2007 period.

6    Press Release, Century Aluminum Co., Century Aluminum Reports Third Quarter 2008 Earnings
     (Oct. 21, 2008) *(available at* http://investor.shareholder.com/cenx/releases) ("October 21, 2008
7    Press Release").

8    ~~66~~76.   Commenting on the Company's third quarter 2008 results, Defendant Kruger, on

9    behalf of the Company and the Board, stated:

10
     "We had a busy and productive quarter . . . Our operations continue to turn in sound
11   performance, with our plants in Iceland and in the U.S. shipping well above their
     rated capacities. We made good progress on the new, fifteen-year, market-based
12   power contract for our Hawesville smelter; this process is in its final stages. The
     team leading the construction at Helguvik has maintained the project on time and on
13   budget.

14   October 21, 2008 Press Release.

15   ~~67~~77.   On November 10, 2008, the Individual Defendants caused Century Aluminum to

16   file the November 2008 Quarterly Report. The November 2008 Quarterly Report reiterated the

17   financial information contained in the October 21, 2008, press release and was signed by

18   Defendants Kruger and Bless and approved by Defendants Berntzen, Fishman, Fontaine, Hale,

19   Jones, Manning, O'Brien, Schneider, Strothotte and Thompson.

20   ~~68~~78.   The November 2008 Quarterly Report included certifications signed by Defendants

21   Kruger and Bless, which stated:

22
     I [Logan W. Kruger/Michael A. Bless], certify that:
23
     1)    I have reviewed this quarterly report on Form 10-Q of Century Aluminum
24   Company;

25   2)    Based on my knowledge, this report does not contain any untrue statement
     of a material fact or omit to state a material fact necessary to make the statements
26   made, in light of the circumstances under which such statements were made, not
     misleading with respect to the period covered by this report;

27

28
                                                                                        1577

3)      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of and for, the periods presented in this report;

4)      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the Company's conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)      The registrant's other certifying officer and I have disclosed, based on the Company's most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2008

/s/ [LOGAN W. KRUGER/MICHAEL A. BLESS]

1    *Id.* November 2008 Quarterly Report, at Ex-31.1-Ex-31.2.

2    6979. In the November 2008 Quarterly Report, Defendants misrepresented that the

3    financial information contained therein fairly presented the Company's results, stating as follows:

4

5    The accompanying unaudited interim consolidated financial statements of Century Aluminum Company should be read in conjunction with the audited consolidated financial statements for the year ended December 31, 2007. In management's opinion, the unaudited interim consolidated financial statements reflect all adjustments, which are of a normal and recurring nature, that are necessary for a fair presentation of financial results for the interim periods presented.

6

7

8    November 2008 Quarterly Report, at *4.

9    7080. Century Aluminum stated in its November 2008 Quarterly Report as follows: "Net

10   cash provided by operating activities in the first nine months of 2008 was $230.8 million primarily

11   due to cash from operations . . . ." November 2008 Quarterly Report at *37. This led the Company

12   to conclude that: "We have not determined the sources of funding for our long-term capital and

13   debt repayment requirements; however, we believe that our cash flow from operations, available

14   borrowings under our revolving credit facility and, to the extent necessary and/or economically

15   attractive, future financial market activities, will be adequate to address our long-term liquidity

16   requirements." *Id.* at *38. These statements were false when made, along with the false financial

17   statement of cash flows, that formed the basis for those statements. Century Aluminum had no cash

18   flow to speak of, and information concerning Century Aluminum's cash, as stated in the November

19   2008 Quarterly report was materially false and misleading.

20   7181. The false and misleading statement of cash flows in the November 2008 Quarterly

21   Report was reported as follows:

22   //

23   //

24   //

25   //

26   //

27   //

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1

**CENTURY ALUMINUM COMPANY**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

2

(Dollars in thousands)
(Unaudited)

3

4

|  | Nine months ended September 30, | |
|  | 2008 | 2007 |

5

| | | |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income (loss) | **$(198,164)** | $11,054 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Unrealized net loss on forward contracts | **605,105** | 201,999 |
| Depreciation and amortization | **62,912** | 57,735 |
| Deferred income taxes | **(198,352)** | (38,822) |
| Pension and other postretirement benefits | **11,677** | 6,499 |
| Stock-based compensation | **12,034** | 3,765 |
| Excess tax benefits from share-based compensation | **(657)** | (516) |
| (Gain) loss on disposal of assets | **248** | (49) |
| Non-cash loss on early extinguishment of debt | **—** | 2,461 |
| Purchase of short-term trading securities | **97,532** | 645,909 |
| Sale of short-term trading securities | **348,416** | 387,182 |
| Undistributed earnings of joint ventures | **(12,466)** | (11,351) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable — net | **(22,403)** | 13,244 |
| Due from affiliates | **(9,771)** | 9,849 |
| Inventories | **(36,119)** | (20,990) |
| Prepaid and other current assets | **(389)** | (1,988) |
| Accounts payable — trade | **15,266** | 11,849 |
| Due to affiliates | **(215,522)** | 12,018 |
| Accrued and other current liabilities | **(28,523)** | (52,289) |
| Other — net | **(5,001)** | 13,519 |
| | | |
| **Net cash provided by (used in) operating activities** | **230,759** | **(40,740)** |

6
7
8
9
10
11
12
13
14
15
16
17
18
19

20

21      *Id.* at *3.

22          82.      According to the January 26, 2009 *Metal Bulletin Weekly,* Century Aluminum,

23   "reeling from its ill-timed decision to close its hedge book in June last year, needs an immediate

24   monthly cash bridge of $6-7 million to keep its Ravenwood smelter open." Citing a US-based

25   trader, *Metal Bulletin Weekly* stated that "Century has been hardest hit of all US producers by the

26   pricing fall." *Century Will Close Ravenswood if it Cannot Stem Losses,* Metal Bulletin Weekly,

27

28

1    January 26, 2009, *available at* http://www.metalbulletin.com. An immediate influx of cash was

2    critical to the Company.

3    ~~72~~83.   On or about January 29, 2009, Century Aluminum completed a secondary offering

4    of its stock. In connection with the Offering, Defendants represented in the Registration Statement

5    filed with the SEC that "[w]e incorporate by reference... [o]ur Quarterly Report on Form 10-Q for

6    the fiscal quarters ended March 31, 2008, June 30, 2008 and September 30, 2008 . . ." January

7    2009 Registration Statement at *S-54.

8    ~~The~~84.  Quoted in the February 2, 2009 *Metals Week,* FBR Capital Markets viewed the

9    Secondary Offering ~~was~~as "a ~~financial success~~necessity" for the Company because the proceeds

10   would "provide the company with a longer life of 12 to 18+ months." *Century Needs $100 Million*

11   *- FBR,* 80 Metals Week, Issue 5, February 2, 2009, *available at* 2009 WLNR 2874032. The

12   Offering, which closed on February 3, 2009, essentially saved Century Aluminum, as it was able to

13   raise net proceeds of approximately $104 million by selling approximately 24.5 million shares of

14   stock to the public at a price of $4.50 per share.

15   ~~73~~85.   The January 2009 Registration Statement contained a similar misstated statement of

16   cash flows. *See* January 2009 Registration Statement, at *S-10 (stating that "Adjusted net cash

17   provided by operating activities" was $204,875,000 for the nine months ended September 30,

18   2008). The January 2009 Registration Statement stated: "Based upon . . . price forecasts, and

19   ***taking into account our current balance of cash and short-term investments*** . . . we would expect

20   to have sufficient liquidity to fund our operations for approximately the next 18 months." January

21   2009 Registration Statement at *S-2. These statements were false when made, along with the false

22   financial statement of cash flows that formed the basis for those statements. Century Aluminum

23   had no cash flow to speak of, and the information concerning Century Aluminum's cash position,

24   as stated in the January 2009 Registration Statement, was materially false and misleading.

25   86.    In the January 2009 Registration Statement, the "Summary [of] Consolidated

26   Financial Data," which features a non-GAAP calculation of Earnings before Interest, Taxes,

27

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

Depreciation and Amortization ("EBITDA").[6] One of the most important line items of the EBITDA calculation—and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash"). Indeed, Net Operating Cash in the November Quarterly Report and January 2009 Registration Statement represents an enormous percentage - *over 74%* - of the Company's total adjusted EBITDA as presented in that document. ¶ 154 *infra*.

87.     The November Quarterly Report and January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure as follows:

| | **Nine Months Ended September 30,** | | **Year Ended December 31,** | | |
| --- | --- | --- | --- | --- | --- |
| | **2008** | **2007** | **2007** | **2006** | **2005** |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740) | $(5,755) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

88.     Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm.

89.     As expressed in the explanation above the table in the Secondary Offering:

> We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

---

[6] Defined by Century Aluminum as "income (loss) before income taxes and equity in earnings of joint ventures adjusted to exclude: (i) interest expense, net; (ii) depreciation and amortization; and (iii) net loss on forward contracts." January 2009 Registration Statement, at S-11.

1583

January 2009 Registration Statement, at S-11. The presentation of adjusted net cash provided by operations is useful, however, ***only*** if it is accurate.

74~~90.~~   On February 19, 2009, the Individual Defendants caused the Company to issue a press release announcing its results for the fourth quarter and year ended December 31, 2008. The Company summarized its performance as follows:

> Century Aluminum Company today reported a net loss of $700.2 million ($14.27 per basic and diluted share) for the fourth quarter of 2008. Reported fourth quarter results were impacted by a charge for goodwill impairment of $94.8 million ($1.93 per basic and diluted share), a tax charge of $522.9 million ($10.66 per basic and 1. diluted share) related to the recording of a valuation allowance on deferred tax assets and an inventory write down to market value of $55.9 million ($1.14 per basic and diluted share).
>
> For the fourth quarter of 2007, the company reported a net loss of $112.3 million ($2.74 per basic and diluted share). Reported results for this quarter were impacted by an alter-tax charge of $147.7 million ($3.61 per basic share) for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting and by a tax benefit of $4.0 million ($0.10 per basic share) related to the increase in the carrying amount of deferred tax assets as a result of a state tax law change. The dilutive effect of the options, convertible notes and service-based awards would reduce basic EPS by $0.05 per share
>
> Recent highlights include
>
> — 2008 direct and toll shipment volumes totaled a record 803,771 metric tons, a 5 percent increase from 2007. During the fourth quarter, the Grundartangi smelter shipped at an annualized rate of more than 276,000 metric tons.
>
> — All primary aluminum facilities operated safely at or above available potline capacity during 2008.
>
> — In December the company issued a WARN notice and implemented the immediate curtailment of one potline at the Ravenswood, West Virginia smelter. Pursuant to the WARN notice, an orderly curtailment of the entire smelter was essentially completed by mid February.
>
> — The company completed a public offering of 24.5 million shares of its common stock in early February. Net proceeds were approximately $104 million.
>
> — Salaried staff reductions of approximately 13 percent were implemented at the Hawesville, KY smelter and Monterey, CA headquarters.
>
> — The company's greenfield smelter project near Helguvik, Iceland, remains under review Site activity is continuing at a minimal level.
>
> For 2008, Century reported a net loss of $898.3 million ($20.07 per basic and diluted share). Included in these results is a net after tax charge of $742.1 million ($16.58 per basic and diluted share) for mark-to-market adjustments on

forward contracts that do not qualify for cash flow hedge accounting. Full year results were also impacted by a charge for goodwill impairment of $94.8 million ($2.12 per basic and diluted share), a tax charge of $522.9 million ($11.68 per basic and diluted share) related to the recording of a valuation allowance on deferred tax assets and an inventory write down to market value of $55.9 million ($1.25 per basic and diluted share).

For 2007, Century reported a net loss of $101.2 million ($2.72 per basic and diluted share). Results for 2007 include a net after-tax charge of $328.3 million ($8.83 per basic share) for mark-to-market adjustments on forward contracts that do not qualify for cash flow hedge accounting. 2007 results were also impacted by a tax benefit of $8.3 million ($0.22 per basic share) related to the increase in the carrying amount of deferred tax assets as a result of a state tax law change.

Sales for the fourth quarter of 2008 were $402.2 million compared with $432.1 million for the fourth quarter of 2007. Shipments of primary aluminum for the 2008 fourth quarter were 202,259 tonnes, compared with 198,138 tonnes shipped in the year-ago quarter. Sales for 2008 were $1,971 million compared with $1,798 million for 2007, and total 2008 primary aluminum shipments of 803,771 tonnes compared with 766,951 tonnes shipped in 2007.

Press Release, Century Aluminum Co., Century Reports 2008 Financial Results (Feb. 19, 2009) *(available at* http://investor.shareholder.com/cenx/release) ("February 2009 Press Release").

~~75~~91.   Commenting on the Company's results, defendant Kruger on behalf of the Company on the Board stated:

"Century has taken aggressive action in response to the global economic crisis and its impact on commodity prices... In the United States, we have begun implementation of the difficult actions required to bridge the current environment and lay the groundwork for a stronger company when metal markets strengthen."

February 2009 Press Release.

~~76~~92.   The statements set forth in paragraphs, *supra,* ~~65~~-75-91 were false when made because Century Aluminum did not have $204 million in cash from operating activities and the Exchange Act Defendants lacked any reasonable basis for reporting that the Company had anything approaching that amount of cash from operating activities during the nine months ended September 2008. As reflected in the statement of cash flows above, shareholders and potential investors in Century Aluminum were being told that the Company was cash rich. Indeed, the Exchange Act Defendants knowingly and/or with deliberate recklessness informed shareholders and investors that Century Aluminum had enough cash coming in from its operations to 'weather the economic storm' as it was. *See* November 2008 Quarterly Report at *36; *see also* January

1  2009 Registration Statement at *S-2 ("Based upon . . . price forecasts, and **taking into account**

2  **our current balance of cash and short-term investments** . . . we would expect to have sufficient

3  liquidity to fund our operations for approximately the next 18 months."). However, the truth was

4  that Century Aluminum had less than $0 cash from operating activities, a truth which came out

5  shortly after millions of shares had been purchased on false pretenses.

6  **C̶D.**    **The Truth About Century Aluminum's Cash Position is Revealed**

7  ~~77~~93.    The truth came to light on March 2, 2009. On that date, Century Aluminum filed an

8  Interim Report on Form 8-K with the SEC entitled "Non-Reliance on Previously Issued Financial

9  Statements or a Related Audit Report or Completed Interim Review." In that 8-K, the Company

10  announced that it had:

11

12  [D]etermined that . . . previously issued financial statements for the nine
    months ended September 30, 2008 included in [the] periodic report on Form
13  10-Q for that period should no longer be relied upon as a result of an error in
    the interim consolidated statement of cash flows. A restatement of these
14  previously issued financial statements is necessary as the Company has
    determined that preferred stock issued in July 2008 was not presented on the
15  consolidated statement of cash flows in accordance with Statement of Financial
    Accounting Standards No. 95.
16
                                    ***
17
    The Company initially reported cash flows associated with the termination of
18  forward financial sales contracts by issuing $929 million of Series A
    Convertible Preferred Stock on a net basis as an operating activity.
19  Management has concluded the transaction should have been presented on a
    gross presentation basis as both an operating activity and a financing activity to
20  reflect the cash receipts and disbursements associated the transaction.

21  The Restatement at *1. In the March 2, 2009 Restatement, Century Aluminum informed investors

22  and the market alike that the January 2009 Registration Statement was false and misleading,

23  stating:

24

25      On February 27, 2009, Century Aluminum Company (the Company) determined
        that our previously issued financial statements for the nine months ended
26      September 30, 2008 included in our periodic report on Form 10-Q for that period
        should no longer be relied upon as a result of an error in the interim consolidated
27      statement of cash flows. A restatement of these previously issued financial
        statements is necessary as the Company has determined that preferred stock issued
28

1586

1  in July 2008 was not presented on the consolidated statement of cash flows in
2  accordance with Statement of Financial Accounting Standards No. 95 "Statement
   of Cash Flows".

3  The Restatement, at *1.

4      94.    The result of the Restatement was a **$929,480,000** change to net operating cash,

5  changing Century Aluminum's net operating cash from $230 million, as reported in the January

6  2009 Registration Statement, to -$698,721,000—the actual number. *See id; see ~~infra~~supra*

7  *¶¶* ~~62~~72-~~63~~73.

8      ~~78~~95.  Thus, the Interim Consolidated statement of cash flows contained in the January

9  2009 Registration Statement for the Offering and Century Aluminum's other SEC reports was

10 false and misleading when made.

11     ~~79~~96.  There can be no doubt that had investors known that Century Aluminum had

12 negative $698,721,000 in operating cash, they would have given serious consideration to not

13 participating in purchasing—or selling immediately—their Century Aluminum stock. Indeed, on

14 March 2, 2009, Century Aluminum's stock plunged 24% or $0.55 per share on March 2, 2009

15 alone, to close at $1.67 compared to the previous trading day's close of $2.22, erasing more than

16 $40.4 million in market capitalization in one day. In fact, the price of the Company's shares fell

17 to a low of $1.06, a 87% drop from the January 2009 Offering price of $8.00 slightly more than

18 one month earlier.

19     97.    To illustrate the gravity of the situation, following the Restatement, Century

20 Aluminum's stock reached its lowest price in the Company's history, *i.e.*, over fifteen (15) years.

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28

1587

1   (Added)



15   80~~98~~. As a result of the scheme to prop-up Century Aluminum's cash and financial

16   position, Defendants committed a fraud against the Company's common shareholders in violation

17   of sections 10(b) and 20 of Exchange Act, 15 U.S.C. §§ 78j(b) and 78t. Throughout the Class

18   Period, Defendants knowingly made statements which caused Century Aluminum's common stock

19   to be artificially inflated. The Exchange Act Defendants made, disseminated and approved

20   statements which they knew to be false and misleading, and failed to disclose material information

21   necessary to make those statements, in the light of the circumstances under which they were made,

22   not false or misleading.

23   81~~99~~. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

24   the market, they paid artificially inflated prices for Century Aluminum common stock. Plaintiffs

25   and the Class would not have purchased Century Aluminum common stock at the prices they paid,

26   or at all, if they had been aware that the market prices had been artificially and falsely inflated by

27   Defendants' misleading statements.

28

1    ~~82~~100. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs

2    and the other members of the Class suffered damages in connection with their purchases of

3    Century Aluminum common stock during the Class Period

4    **~~D~~E.**    **Scienter Allegation**

5    ~~83~~101. During the Class Period, the Exchange Act Defendants had both the motive and

6    opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the

7    statements they made or acted in with deliberate and reckless disregard of the true information

8    known to them at the time. In so doing, the Defendants participated in a scheme to defraud and

9    committed acts, practices and participated in a course of business that operated as a fraud or deceit

10    on purchasers of Century Aluminum common stock during the Class Period.

11    ~~84~~102. As alleged herein, the Exchange Act Defendants acted with scienter, in that they

12    knew the Company's public documents and statements issued or disseminated by or in the name

13    of~~-~~ the Company were materially false and misleading; they knew or deliberately disregarded that

14    such statements or documents would be issued or disseminated to the investing public; and they

15    knowingly and substantially participated or acquiesced in the issuance or dissemination of such

16    statements or documents as primary violators of the federal securities laws.

17    ~~85~~103. The Exchange Act Individual Defendants were involved in drafting, producing,

18    reviewing, approving and/or disseminating the materially false and misleading statements and

19    information alleged herein, were aware of or deliberately disregarded the fact that materially false

20    and misleading statements were being issued regarding the Company, and approved or ratified

21    these statements in violation of securities laws.

22    ~~86~~104. As officers and controlling persons of a publicly-held company whose common

23    stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

24    NYSE, and governed by the provisions of the federal securities laws, the Exchange Act Individual

25    Defendants each had a duty to promptly disseminate accurate and truthful information with respect

26    to the Company's financial condition ~~and performance, growth, operations, financial statements,~~

27    ~~business, markets, management, earnings, present and future business prospects~~, especially cash

28

1589

1   flow from operations when the aluminum market and Company was in crisis, and to correct any

2   previously issued statements that had become materially misleading or untrue, so that the market

3   price of the Company's publicly-traded securities would be based upon truthful and accurate

4   information. The Exchange Act Individual Defendants' material misrepresentations and omissions

5   during the Class Period violated these specific requirements and obligations.

6        87105. Exchange Act Defendants Kruger and Bless are the CEO and CFO of Century

7   Aluminum, respectively. By virtue of their positions with the Company, they are required to

8   certify that the information contained in Century Aluminum's SEC filings—including the

9   January 2009 Registration Statement and the November 2008 Quarterly Report—have been

10  "reviewed" by them personally, and to the "best of [their] knowledge ....[do] not contain any

11  untrue statements of material fact or omit to state a material fact necessary to make the

12  statements made, in the light of the circumstances under which such statements were made, not

13  misleading with respect to the period covered by" the filing. Moreover, as the chief financial

14  officers at Century Aluminum, Defendants Kruger and Bless were in a position to know that

15  the statementsa $1 billion error concerning cash flows from operations in the 2009 Registration

16  Statement and November 2008 Quarterly Report were false when they were made.

17       88106. Moreover, as members of Century Aluminum's executive management, Defendants

18  Kruger, Bless and Hale have the motive to save the Company from financial failure and mislead

19  public shareholders and investors in order to get the necessary capital for the Company to

20  continue, as evinced by their considerable salaries:

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

1590

**2008 Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(a) | Option Awards ($)(a) | Non-Equity Incentive Plan Compensation ($)(b) | Change in Pension Value and Nonqualified Deferred Compensation ($) | All Other Compensation ($)(c) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Logan W. Kruger | 2008 | 855,000 | 637,000 | 1,842,997 | 389,542 (d) | 92,625 | 1,511,827(e) | 14,435 | 5,343,426 |
| *President* and *Chief* | 2007 | 815,000 | 1,115,000 | 1,105,627 | 493,402 | —— | 2,514,868 | 178,630 | 6,222,527 |
| *Executive Officer* | 2006 | 750,000 | 562,500 | 783,332 | 428,479 | —— | 3,755,628 | 65,035 | 6,344,974 |
| Michael A. Bless | 2008 | 422,000 | 270,000 | 869,203 (g) | —— | 26,375 | 27,513 | 915 | 1,616,006 |
| *Executive* *Vice* | 2007 | 405,000 | 345,000 | 421,283 | 186,163 | —— | 13,427 | 915 | 1,371,788 |
| *President and Chief Financial Officer* | 2006 | 352,397(f) | 262,500 | 278,012 | 378,100 | —— | 68,615 | 425,698 | 1,765,322 |
| Wayne R. Hale | 2008 | 472,000 | 278,000 | 963,191 (h) | 443,443 (i) | 43,267 | 58,978 | 14,332 | 2,273,211 |
| *Executive* *Vice President and Chief Operating Officer* | 2007 | 375,000(f) | 650,000 | 502,979 | 886,912 | —— | 339,823 | 107,056 | 2,861,770 |

Century Aluminum Co., Proxy Statement (Schedule 14-A (Rule 14a-101)), at *27 (April 13, 2009).

~~89~~107. In addition, Defendants Berntzen, Fishman, O'Brien, Jones and Manning are members of the Century Aluminum Board of Directors Audit Committee ("Audit Committee"). As the Audit Committee charter provides, those Defendants are charged with the following duties:

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   The Audit Committee Charter has been adopted by the Board of Directors. The
    Audit Committee shall review and reassess this charter annually and recommend
2   any proposed changes to the Board of Directors for approval.

3   The membership of the Audit Committee shall consist of at least three directors,
    who shall meet the independence and financial literacy requirements for serving on
4   audit committees as set forth in Section 10A(m)(3) of the Securities Exchange Act
    of 1934, as amended (the "Exchange Act"), the rules and regulations of the
5   Securities and Exchange Commission (the "SEC Rules"), and the Marketplace
    Rules of Nasdaq. At least one member of the committee shall be an "audit
6   committee financial expert" as defined in the SEC Rules.

7   The members of the Audit Committee shall be elected annually, and one of its
    members shall be elected chairman by the Board.
8
    The Audit Committee performs the function of monitoring the adequacy and
9   effectiveness of the internal and external audit function, internal control systems,
    financial accounting and reporting, including the quality of the Company's
10  accounting principles, the independent auditors' qualifications and independence,
    and adherence to applicable legal, ethical and regulatory requirements. The
11  Committee's responsibilities include the following:

12  Independent Auditors:

13  Pre approve audit, audit-related, tax and permitted non audit services and related
    fees (subject to the de minimis exceptions for non-audit services described in
14  Section 10A(i)(1)(B) of the Exchange Act which are approved by the Audit
    Committee prior to the completion of the audit).
15
    Review the performance of the independent auditors.
16
    Sole authority to appoint or replace the independent auditors for the annual audit
17  (appointment subject to stockholder ratification).

18  Meet with the independent auditors to review the adequacy of the Company's
    systems of disclosure controls and internal controls, critical accounting policies and
19  procedures, and the internal audit function.

20  Discuss with the independent auditors the matters required to be discussed by
    Statement on Auditing Standards No. 114 relating to the conduct of the audit,
21  including any difficulties encountered in the course of the audit work, any
    restrictions on the scope of activities or access to requested information, and any
22  significant disagreements with management.

23  Obtain assurance from the independent auditors that in the course of conducting the
    audit, there have been no acts detected or that have otherwise come to the attention
24  of the audit firm that require disclosure to the Audit Committee under Section
    10A(b) of the Exchange Act (regarding illegal acts detected by the audit firm in the
25  course of conducting its audit).

26  Obtain from the independent auditors a formal written statement, consistent with
    Independence Standards Board Standard 1, delineating all relationships between the
27  Company and the independent auditors, engage in a dialogue with the independent
    auditors regarding any disclosed relationships or services that may impact the
28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

objectivity and independence of the independent auditors, and take, or recommend that the Board of Directors take, appropriate action to oversee the independence of the independent auditors.

Review and discuss with management and the independent auditors the Company's quarterly and annual audited financial statements, including:

management's discussion and analysis of financial condition and results of operations; all critical accounting policies and practices to be used;all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

The independent auditors shall report directly to the Audit Committee.

Internal Audit and Internal Controls:

Review with management the adequacy of the Company's systems of internal control to provide reasonable assurance that assets are safeguarded, prescribed policies and procedures are followed and transactions are properly recorded and reported.

Review the internal audit plan and results.

Legal, Ethical Conduct and Conflicts of Interest:

Review current or pending litigation involving the Company with the General Counsel which may have a material financial impact on the Company.

Review the Company's policies and practices related to compliance with the law, ethical conduct and conflicts of interest, including establishment of procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submissions by employees of the Company of concerns regarding questionable accounting or auditing matters.

Other:

Review and approve all related party transactions pursuant to the Company's Statement of Policy Regarding Related Party Transactions (unless any such transaction is, pursuant to the Policy, to be approved by the Independent Directors of the Board acting as a separate body).

Recommend to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K. Issue annually a report to be included in the Company's proxy statement as required by the SEC Rules. Review disclosures, if any, made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1   Century Aluminum Co., Audit Committee Charter (enacted March 25, 2003) (as amended on

2   June 29, 2004; March 19, 2007; December 10, 2007), *available at*

3   http://investor.shareholder.com/cenx/documentdisplay.cfm?DocumentID=1836.     Due to their

4   positions as members of the Audit Committee, Defendants Berntzen, Fishman, O'Brien, Jones and

5   Manning either knowingly or deliberately approved the dissemination of the false statement

6   contained in the January 2009 Registration Statement and the November 2008 Quarterly Report.

7   Also, by virtue of their positions on the Audit Committee, they were in a position to, and did know,

8   that Century Aluminum's cash position was overstated in the January 2009 Registration Statement

9   and the November 2008 Quarterly Report.

10      ~~90~~108. In addition to being a Director of Century Aluminum, Defendant Fontaine is a

11   member of the Compensation and Health, Safety & Sustainability Committees. Also, Defendant

12   Thompson is a member of the Compensation, Governance & Nominating and Health, Safety &

13   Sustainability Committees. For example, the Governance & Nominating Committee Charter

14   provides:

15

16      The Governance and Nominating Committee ("Committee") was established by the
        Board of Directors of the Company ("Board") to (i) assist the Board in performing
        nominating functions with regard to the Board's membership, (ii) oversee the
17      Company's corporate governance matters and (iii) to review and make periodic
        recommendations concerning the Company's corporate governance policies and
18      procedures.

19   Century Aluminum, Governance and Nominating Committee Charter, *available at*

20   http://investor.shareholder.com/cenx/documentdisplay.cfm?DocumentID=179.   Accordingly,   as

21   members of those committees, as well as the Board of a public corporation such as Century

22   Aluminum, Defendants Thompson and Fontaine are required to be knowledgeable about

23   accounting and financial matters. As such, they would be in a position to know that the statements

24   in the January 2009 Registration Statement and the November 2008 Quarterly Report were false

25   when made.

26      ~~91~~109. All of the Exchange Act Individual Defendants, by virtue of their positions of

27   control and authority as officers and/or directors of Century Aluminum, were able to and did

28

                                                                                          1594

1   control the content of the various SEC filings, press releases and other public statements pertaining

2   to the Company during the Class Period. As such, the Exchange Act Individual Defendants were

3   controlling persons of Century Aluminum within the meaning of section 20(a) of the Exchange

4   Act, 15 U.S.C. § 78t(a). Further, the Exchange Act Defendants were provided with copies of the

5   documents alleged herein to be misleading prior to or shortly after their issuance and/or had the

6   ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly,

7   they are responsible for the accuracy of the public reports and releases detailed herein.

8       ~~92~~110. By virtue of their receipt of information reflecting the true facts regarding Century

9   Aluminum and its business practices, their control over or receipt of Century Aluminum's

10  materially false and misleading statements, or their associations with the Company which made

11  them privy to confidential proprietary information concerning Century Aluminum, the Exchange

12  Act Defendants were active and culpable participants in the fraudulent scheme alleged herein.

13      ~~93~~111. The ongoing fraudulent scheme described in this Complaint could not have been

14  perpetrated over a substantial period of time, as has occurred, without the knowledge and

15  complicity of the personnel at the highest level of Century Aluminum, including the Exchange Act

16  Individual Defendants.

17      ~~94~~112. In particular, Exchange Act Defendants Kruger, Fontaine, Thompson, Fishman,

18  Jones, O'Brien, Strothotte, Manning, Hale, Bless, Schneider and Berntzen engaged in such a

19  scheme to inflate the price of Century Aluminum securities in order to protect and enhance their

20  executive positions, their own personal wealth in accumulated holdings of Century Aluminum

21  stock, and the substantial compensation and prestige they obtained thereby, as demonstrated by the

22  salary and bonuses they earned during the Exchange Act Class Period.

23      ~~95~~113. The sheer magnitude of the fraud in this case—almost $1 billion—ensures that any

24  reasonable person would have recognized the accounting error in the Statement of Cash Flows.

25      **~~E~~F.    Undisclosed Material Adverse Facts**

26      ~~96~~114. The market for Century Aluminum's common stock was open, well-developed, and

27  efficient at all relevant times.

28

1595

1    ~~97~~115. As a result of these materially false and misleading statements and failures to

2    disclose, Century Aluminum's common stock traded at artificially inflated prices during the Class

3    Period.

4    ~~98~~116. Plaintiffs and other members of the Class purchased or otherwise acquired Century

5    Aluminum common stock relying upon the integrity of the market price of Century Aluminum's

6    common stock and market information relating to Century Aluminum, and have been damaged

7    thereby.

8    ~~99~~117. During the Class Period, Defendants materially misled the investing public, thereby

9    inflating the price of Century Aluminum's common stock, by publicly issuing false and misleading

10   statements and omitting to disclose material facts necessary to make Defendants' statements, as set

11   forth herein, not false and misleading. Said statements and omissions were materially false and

12   misleading in that they failed to disclose material adverse information and misrepresented the truth

13   about the Company, its business and operations, as alleged herein.

14   ~~100~~118.     At all relevant times, the material misrepresentations and omissions

15   particularized in this Complaint directly or proximately caused or were a substantial contributing

16   cause of the stock purchases by Plaintiffs and other members of the Class.

17   ~~101~~119.     Each Defendant is liable for (i) making false statements, or (ii) failing to

18   disclose adverse facts known to him about Century Aluminum. Defendants' fraudulent scheme and

19   course of business that operated as a fraud or deceit on purchasers of Century Aluminum common

20   stock was a success, as it (i) deceived the investing public regarding Century Aluminum's

21   prospects and business; (ii) artificially inflated the prices of Century Aluminum common stock;

22   and (iii) caused Plaintiffs and other members of the Class to purchase Century Aluminum common

23   stock at inflated prices.

24
25       ~~F~~G.    **Applicability of Presumption of Reliance Under the Fraud-on-the-Market**
           **Doctrine**

26

27

28
                                                                                          1596

1    ~~102~~120.    At all relevant times, the market for Century Aluminum securities was

2    efficient for the following reasons, among others:

3              a.    Century Aluminum's stock met the requirements for listing, and was listed

4    and actively traded on the NYSE, a highly efficient and automated market;

5              b.    As a regulated issuer, Century Aluminum filed periodic public reports with

6    the SEC; and

7              c.    Century Aluminum and the Exchange Act Defendants regularly

8    communicated with public investors via established market communication mechanisms, as well

9    as through regular disseminations of press releases on the national circuits of major newswire

10   services and through other wide-ranging public disclosures, such as communications with the

11   financial press and other similar reporting services.

12   ~~103~~121.    As a result of the foregoing, the market for Century Aluminum's securities

13   promptly digested current information regarding Century Aluminum from all publicly available

14   sources and reflected such information in Century Aluminum's stock price. Under these

15   circumstances, all purchasers of Century Aluminum securities during the Class Period suffered

16   similar injury through their purchase of Century Aluminum securities at artificially inflated prices

17   and a presumption of reliance applies.

18   **~~G~~H.   No Safe Harbor**

19   ~~104~~122.    The statutory safe harbor provided for forward-looking statements under

20   certain circumstances does not apply to any of the alleged false statements pleaded in this

21   Complaint. The specific statements pleaded herein were not identified as "forward-looking

22   statements" when made. To the extent there were any forward-looking statements, there were no

23   meaningful cautionary statements identifying important factors that could cause actual results to

24   differ materially from those in the purportedly forward-looking statements. Alternatively, to the

25   extent that the statutory safe harbor does apply to any forward-looking statements pleaded

26   herein, Defendants are liable for those false forward-looking statements because at the time each

27   of those forward-looking statements were made, the particular speaker knew that the particular

28   forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Century Aluminum who knew that those statements were false when made.

## EXCHANGE ACT CLASS ACTION ALLEGATIONS

~~105~~123.        Plaintiffs bring this separate action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class composed of all holders of Century Aluminum common stock from October 21, 2008 and March 2, 2009.

~~106~~124.        The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. At the time of the Offering, Century Aluminum's securities were actively traded on the NASDAQ. While the exact number of Exchange Act Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by Century Aluminum or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

~~107~~125.        Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~108~~126.        Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation.

~~109~~127.        Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting Exchange Act members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

(a)        Whether the Exchange Act was violated by the Exchange Act Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public in connection with the omitted and/or misrepresented material facts disseminated during the Exchange Act Class Period about the operations and financial performance of Century Aluminum; and

(c)     To what extent the members of the Exchange Act Class have sustained damages and the proper measure of damages.

128.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by Exchange Act Class members may be relatively small, the expense and burden of Exchange Act litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### THE SECURITIES ACT ACTION

110129.     Plaintiffs allege that the Securities Act Defendants (defined *supra*) are strictly liable for violations of sections 11, 12 (a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, and 77l(a)(2), and 77o, respectively, in connection with the January 2009 Offering.

**A.     Additional Securities Act Defendants**

111130. **Defendant Credit Suisse Securities** (USA) LLC ("Credit Suisse") operates as an investment bank in the United States, with its headquarters located at 11 Madison Avenue, New York, New York, 10010-3629. Credit Suisse acted as an underwriter in connection with the Offering.

112131.     **Defendant Morgan Stanley & Co.** Incorporated ("Morgan Stanley") provides financial advisory and capital-raising services to corporate and other institutional clients globally, as well as sales and trading activities worldwide, and provides related financing services on behalf of institutional investors. Morgan Stanley acted as an underwriter in connection with the Offering. Defendants Credit Suisse and Morgan Stanley are collectively referred to hereinafter as

1   the "Underwriter Defendants." The Underwriter Defendants served as financial advisors, and

2   assisted in the preparation and dissemination of Century Aluminum's Secondary Offering

3   materials. The Underwriter Defendants also marketed and solicited support for the Secondary

4   Offering and sold stock directly to Plaintiffs and other members of the Class.

5       113132.       Defendants Credit Suisse and Morgan Stanley are collectively referred to

6   herein as the "Underwriter Defendants."

7       114133.       Defendants Century Aluminum, Kruger, Fontaine, Fishman, Thompson,

8   Jones, O'Brien, Strothotte, Berntzen, Manning, Bless and Schneider (named herein *supra*) along

9   with the Underwriter Defendants are collectively referred to herein as the "**Securities Act**

10  **Defendants**."

11      **B.       Securities Act Standing Allegations**

12      134.   Lead Plaintiff Stuart Wexler purchased Century Aluminum securities directly

13  traceable to Century Aluminum's Secondary Offering and was damaged thereby.

14      135.   Upon information and belief, Lead Plaintiff Wexler purchased stock in the

15  Secondary Offering—either directly or indirectly from the Underwriter Defendants—and pursuant

16  to the Registration Statement (as defined *supra*). Through his agent and broker, Lead Plaintiff

17  Wexler consummated the following purchases of Century Aluminum common stock:

18

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Stuart Wexler | CENX | 01/28/09 | 5000 | $4.56 |
| Stuart Wexler | CENX | 01/30/09 | 3000 | $3.56 |

21  To the best of Lead Plaintiff Wexler's knowledge, each of the purchases of common stock above

22  were made pursuant to the Registration Statement and were satisfied through common stock

23  authorized and issued in the Secondary Offering and distributed by the Underwriter Defendants

24  or their intermediaries and/or designees. Lead Plaintiff Wexler is unaware of any information

25  which would suggest that the shares that his agent and broker purchased on his behalf were not

26  either purchased directly—or through intermediaries—from the Underwriter Defendants under the

27  terms of the Secondary Offering. Therefore, on information and belief, Lead Plaintiff Wexler

28

1    purchased shares of Century Aluminum common stock that are traceable to the Secondary Offering

2    and governed by the terms of the Registration Statement and distributed by the Underwriter

3    Defendants.

4        136.    Plaintiff Peter Abrams purchased Century Aluminum common stock directly

5    traceable to the Company's Secondary Offering and was damaged thereby.

6        137.    Upon information and belief, Plaintiff Abrams purchased stock in the Secondary

7    Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the

8    Registration Statement (as defined *supra*). Through his agent and broker, Vanguard Brokerage

9    Services ("Vanguard"), whom he directed to purchase shares in the Secondary Offering on his

10    behalf, Plaintiff Abrams consummated the following purchases of Century Aluminum common

11    stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Peter Abrams | CENX | 01/28/09 | 1000 | $5.00 |
| Peter Abrams | CENX | 01/30/09 | 300 | $3.99 |

15    It was, and remains, Plaintiff Abrams' understanding that the share purchases above were made

16    pursuant to the Secondary Offering and under the terms of the Registration Statement.

17        138.    Plaintiff Abrams' agent and broker, Vanguard, purchased the above shares directly

18    through Citigroup. At all times relevant to this Complaint, Vanguard did not function as a self-

19    clearing broker dealer. Instead, orders for shares by Vanguard customers were sent to a third-party

20    broker dealer for fulfillment. In Plaintiff Abrams' case, the above trades were sent to Citigroup for

21    fulfillment. Moreover, at all times relevant to this Complaint Morgan Stanley—one of the

22    Underwriter Defendants—was involved in a joint venture with Citigroup, whereby the two entitles

23    were indistinguishable. Therefore, on information and belief, Plaintiff Abrams' purchase of stock

24    on January 28, 2009 and January 30, 2009 were fulfilled by Morgan Stanley with stock directly

25    issued in the Secondary Offering and pursuant to the Registration Statement.

26        139.    Plaintiff Chris McNulty purchased Century Aluminum securities directly traceable

27    to Century Aluminum's Secondary Offering and was damaged thereby.

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    140.    Upon information and belief, Plaintiff McNulty purchased stock in the Secondary

2    Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the

3    Registration Statement (as defined *supra*). Plaintiff McNulty consummated the following

4    purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Chris McNulty | CENX | 01/2928/09 | 800 | $4.61 |

7    141.    To the best of Plaintiff McNulty's knowledge, each of the purchases of common

8    stock above were made pursuant to the Registration Statement and were satisfied through common

9    stock authorized and issued in the Secondary Offering and distributed by the Underwriter

10   Defendants or their intermediaries and/or designees. Plaintiff McNulty is unaware of any

11   information which would suggest that the shares he purchased were not either purchased

12   directly—or through intermediaries—from the Underwriter Defendants under the terms of the

13   Secondary Offering. Therefore, on information and belief, Plaintiff McNulty purchased shares of

14   Century Aluminum common stock that are traceable to the Secondary Offering and governed by

15   the terms of the Registration Statement and distributed by the Underwriter Defendants.

16   142.    Plaintiff Cory McClellan purchased Century Aluminum common stock directly

17   traceable to the Company's Secondary Offering and was damaged thereby.

18   143.    Upon information and belief, Plaintiff McClellan purchased stock in the Secondary

19   Offering—either directly or indirectly from the Underwriter Defendants—and pursuant to the

20   Registration Statement (as defined *supra*). Through his agent and broker, Plaintiff McClellan

21   consummated the following purchases of Century Aluminum common stock:

| Name | Security | Purchased | No. Shares | Price |
|------|----------|-----------|------------|-------|
| Cory McClellan | CENX | 01/28/09 | 40 | $4.10 |
| Cory McClellan | CENX | 01/30/09 | 665 | $4.10 |
| Cory McClellan | CENX | 01/30/09 | 505 | $4.05 |

26   To the best of Plaintiff McClellan's knowledge, each of the purchases of common stock above

27   were made pursuant to the Registration Statement and were satisfied through common stock

28

1602

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1  authorized and issued in the Secondary Offering and distributed by the Underwriter Defendants

2  or their intermediaries and/or designees. Plaintiff McClellan is unaware of any information which

3  would suggest that the shares that his agent and broker purchased on his behalf were not either

4  purchased directly—or through intermediaries—from the Underwriter Defendants under the terms

5  of the Secondary Offering. Therefore, on information and belief, Plaintiff McClellan purchased

6  shares of Century Aluminum common stock that are traceable to the Secondary Offering and

7  governed by the terms of the Registration Statement and distributed by Underwriter Defendants.

8       144.   The Underwriter Defendants were statutory sellers, within the meaning of the

9  Securities Act and distributed—both individually and through intermediaries—millions of shares

10 issued pursuant to the Secondary Offering and the Registration Statement to Plaintiffs and the

11 Class.

12      145.   The Secondary Offering Registration Statement itself states that the underwriters

13 were committed to sell at least "part" of the shares of common stock purchased in the Secondary

14 Offering **"directly to the public."**  Registration Statement, at *S-49.

15      146.   Further, the Registration Statement anticipates Morgan Stanley and Credit Suisse's

16 sale of shares directly to the public in a number of places. For example, the very ***first page*** of the

17 prospectus reflects the stated intent of the Underwriter Defendants to sell shares to the public

18 directly, listing the "Price to **Public**" as opposed to the price to Morgan Stanley and Credit

19 Suisse:

| Proceed to | Price to Public | Underwiritng Discounts and Commissions | Century Aluminum Company |
|---|---|---|---|
| Per Share | $        4.5 | $        0.225 | $        4.275 |
| Total | $  110,250,000 | $  5,512,500 | $  104,737,500 |

Registration Statement, at *1 (emphasis added).

      147.   Also, the historical trading records for the time period in question mean that the

shares purchased by Plaintiffs and other members of the class could only have originated with the

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

Underwriter Defendants. Specifically, the volume of shares traded in Century Aluminum stock from the 28th to the 30th of January 2009 is far greater than the market could provide or sustain without a substantial influx of shares from Morgan Stanley and Credit Suisse.

| Date | Open | High | Low | Close/Last | Volume |
|------|------|------|-----|------------|--------|
| 2/2/2009 | 3.55 | 3.81 | 3.3 | 3.7 | 6,473,872 |
| 1/30/2009 | 4.42 | 4.42 | 3.43 | 3.55 | 12,074,090 |
| 1/29/2009 | 4.61 | 4.78 | 4.11 | 4.28 | 15,424,990 |
| 1/28/2009 | 5.67 | 5.75 | 4.01 | 4.6 | 16,578,340 |
| 1/27/2009 | 7.53 | 7.81 | 7.25 | 7.35 | 547,904 |

As the above chart reflects, more than *44 million shares* of Century Aluminum stock changed hands in the span of three days; from January 28, 2009 to January 30, 2009. Strikingly, this represents almost ***DOUBLE the amount of shares of Century Aluminum common stock that were traded in each of the previous thirty days combined:***

| Date | Open | High | Low | Close/Last | Volume |
|------|------|------|-----|------------|--------|
| 1/27/2009 | 7.53 | 7.81 | 7.25 | 7.35 | 547,904 |
| 1/26/2009 | 7.73 | 8.09 | 7.29 | 7.41 | 547,574 |
| 1/23/2009 | 7.26 | 7.91 | 7.05 | 7.65 | 670,456 |
| 1/22/2009 | 7.78 | 7.84 | 7.29 | 7.37 | 878,893 |
| 1/21/2009 | 7.19 | 8 | 6.89 | 8 | 1,383,405 |
| 1/20/2009 | 8.34 | 8.35 | 7.4 | 7.41 | 976,440 |
| 1/16/2009 | 8.72 | 8.9 | 8.03 | 8.49 | 732,515 |
| 1/15/2009 | 8.14 | 8.71 | 7.51 | 8.49 | 1,172,584 |
| 1/14/2009 | 8.86 | 8.98 | 8.12 | 8.17 | 1,083,550 |
| 1/13/2009 | 9.46 | 9.59 | 8.7 | 9.16 | 1,731,792 |
| 1/12/2009 | 11.52 | 11.56 | 9.25 | 9.41 | 1,789,521 |
| 1/9/2009 | 12.05 | 12.1225 | 11,4724 | 11.62 | 711,173 |
| 1/8/2009 | 11.38 | 12.1 | 11.09 | 12.05 | 1,052,902 |
| 1/7/2009 | 11.99 | 11.99 | 11.43 | 11.57 | 1,379,254 |
| 1/6/2009 | 12.35 | 12.8 | 12.08 | 12.55 | 1,816,909 |
| 1/5/2009 | 11.56 | 12.13 | 10.91 | 11.91 | 1,475,522 |
| 1/2/2009 | 10.1 | 11.8 | 10.1 | 11.72 | 1,434.668 |
| 12/31/2008 | 9.39 | 10.22 | 9.39 | 10 | 695,614 |
| 12/30/2008 | 8.9 | 9.46 | 8.71 | 9.45 | 480,091 |
| | | | | | **20,560,767** |

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    Indeed, the average volume of shares traded in Century Aluminum common stock in the year

2    prior to the Secondary Offering was approximately 1.5 million shares per day, far less than the 44+

3    million shares traded on January 28, 2009 thru January 30, 2009. Accordingly, the only plausible

4    conclusion is that beginning sometime on January 28, 2009 Morgan Stanley and Credit

5    Suisse—either directly or through intermediaries—began flooding the market with Century

6    Aluminum common stock that they had purchased in the Secondary Offering. It was this stock that

7    Plaintiffs purchased, granting them standing under section 11 of the Securities Act.

8           148.    Moreover, the change in price of Century Aluminum stock on January 28, 2009 is

9    per se evidence that Morgan Stanley and Credit Suisse had begun flooding the market with

10   shares gained directly through the Secondary Offering, which ***actually began*** on January 28, 2009,

11   the date of the underwriting agreement between Century Aluminum and the Underwriter

12   Defendants. *See* Century Aluminum, Current Report (Form 8-K), Ex. 1.1, at *13 (Feb. 3, 2009)

13   (the "Underwriting Agreement"). Indeed, as the Underwriting Agreement sets forth:

14

15          *3. Terms of Public Offering.* The Company is advised by you that the
             Underwriters propose to make a public offering of their respective portions of the
             Shares ***as soon after the Registration Statement and this Agreement have become***

16          ***effective as in your Judgment is advisable.***

17   *Id.* at *13 (emphasis added).

18          149.    The behavior of Century Aluminum's stock price demonstrates that the Underwriter

19   Defendants began offering large amounts of Century Aluminum common stock for sale to the

20   public on January 28, 2009, the precise date that the above-quoted Underwriting Agreement

21   became effective. *See* Underwriting Agreement, at *13. Indeed, once the Secondary Offering was

22   commenced on January 28, 2009, the average price of Century Aluminum shares ***immediately***

23   ***decreased*** a full two dollars and seventy-five cents ($2.75), from a close of $7.25 on January 27,

24   2009 to a close of $4.60 on January 28, 2009. The reason for this drastic drop in price is that

25   the Underwriter Defendants were contractually obligated to offer the shares to the public

26   "initially" for no more than "$4.50 a share." *Id.* In fact, the only explanation for this major

27   ($2.75) drop in price ***is*** that Morgan Stanley and Credit Suisse (or their agents, assignees or

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1  selected "dealers" see *infra)* had begun dumping *millions of shares of Century Aluminum shares*

2  *on the market at an average price of $4.50*—the exact price outlined in the Registrations

3  Statement and required by the Underwriting Agreement. *See* Registration Statement, at 1; *see*

4  *supra ¶ 148.*

5      150.    Moreover, the Underwriter Defendants were also obligated to ensure that the

6  "dealers" that they selected to actually sell the stock to the public would abide by the terms of the

7  Underwriting Agreement. *See id.* As the Underwriting Agreement specifically states:

8

9      The Company is further advised by you that the Shares are to be offered to the
        public initially at $4.50 a share (the "Public Offering Price") and **to certain dealers
        selected by you at a price that represents a concession not in excess of $0.135 a**

10      **share under the Public Offering Price.**

11  *Id.* at *13 (emphasis added). Therefore, not only does the Underwriting Agreement acknowledge

12  that sales of Century Aluminum stock to the public under the Registration Statement would be

13  accomplished—at least in part—through "dealers selected by" the Underwriter Defendants, but it

14  also allows the Underwriter Defendants, their assignees and "dealers" to sell stock at a price

15  higher or lower than $4.50 so long as the "concession [would] not [be] in excess of $0.35." *See id.*

16      151.    Accordingly, the fact that Plaintiffs did not purchase shares directly from the

17  Underwriter Defendants or at a price different from the "initial" $4.50 Secondary Offering price,

18  does not mean that those shares that they bought are not traceable to the Underwriter

19  Defendants—as evinced by the Underwriting Agreement and the Registration Statement.

20      152.    Therefore, Plaintiffs—as well as numerous other members of the Class—have

21  standing under section 11 of the Securities Act to pursue claims against the Underwriter

22  Defendants for the false and misleading statements contained therein.

23      ~~B~~C.    **False and Misleading Statements in the January 2009 Registration Statement**

24      ~~115~~153.    The January 2009 Registration Statement issued in connection with the

25  January 2009 Offering was materially false and misleading because it included a statement of cash

26  flows which reported positive cash flows associated with the termination of forward financial

27  sales contracts by issuing $929 million of Series A Convertible Preferred Stock. These funds

28

1   were improperly reported "on a net basis as an operating activity" rather than "on a gross

2   presentation basis as both an operating activity and a financing activity to reflect the cash

3   receipts and disbursements associated the transaction," in violation of, *inter alia,* Financial

4   Accounting Standards ("FAS") No. 95. As a result, Century Aluminum's net operating cash

5   was **overstated by $929 million, a material amount of money under any reasonable**

6   **definition of material.**

7           ~~116~~154.      The following is the Statement of Cash flows as reported by Century

8   Aluminum in the January 2009 Registration Statement:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | | | (in thousands) | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740) | $(5,755) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| Adjusted net cash provided by operating activities | $204,875 | $217,987 | $274,414 | $185,353 | $134,936 |

17   Registration Statement, at *S-11.[67]  As evinced by the above chart, the Registration Statement

18   which proceeded the January 2009 Offering showed over $200,000,000 in "Adjusted net cash

19   provided by operating activities," for the nine months ended September 30, 2008. *Id.* at *S-10

20   This number would lead investors in Century Aluminum's common stock to believe that the

21   Company had sufficient resources to cover any shortfalls which may have befallen the

22   Company, allowing Century Aluminum to easily weather the financial 'storm' which was

23   ravaging the economy. In reality, however, this number was much, much lower—as would be

24   demonstrated by the Restatement. *See infra.*

---

25   [67]    These These numbers are cumulative totals of false and misleading results disclosed in Century Aluminum's Quarterly Reports ~~(Form.~~ *See* Q1'08 10-Q~~) filed with the SEC on May 12, 2008, August 11, 2008 and November 10, 2008. See Century Aluminum Co., Quarterly Report (Form 10-Q), at *3 (May 12, 2008); Century Aluminum Co., Quarterly Report (Form 10-Q)~~; Q2'08 10-Q, at *3 ~~(August 11, 2008); Century Aluminum Co., Quarterly Report (Form~~; Q3'08 10-Q~~)~~, at *3 ~~(November 10, 2008)~~.

155.   In the January 2009 Registration Statement, the "Summary [of] Consolidated Financial Data," which features a non-GAAP calculation of EBITDA.[8] One of the most important line items of the EBITDA calculation-and the most valuable for investors, shareholders and analysts alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net Operating Cash"). Indeed, Net Operating Cash in the November Quarterly Report and January 2009 Registration Statement represents an enormous percentage - *over 74%* - of the Company's total adjusted EBITDA as presented in that document. ¶ 154 *supra*.

156.   The November Quarterly Report and January 2009 Registration Statement adds detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash flows and cash from operations following the EBITDA disclosure as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2007 | 2006 | 2005 |
| | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740) | $(5,755) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884) | 258,727 | 280,169 | — | — |
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

157.   Reading the table above, potential investors in Century Aluminum would not only conclude that the Company was liquid, but that there was a surplus of cash on hand sufficient to satisfy short-term debts and weather the economic storm.

158.   As expressed in the explanation above the table in the Secondary Offering:

We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating

---

[8] *See supra* n.6.

requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

January 2009 Registration Statement, at *S-11. The presentation of adjusted net cash provided by operations is useful, however, *only* if it is accurate.

159.   In the March 2, 2009 Restatement, Century Aluminum informed investors and the market alike that the January 2009 Registration Statement was false and misleading, stating:

On February 27, 2009, Century Aluminum Company (the Company) determined that our previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an error in the interim consolidated statement of cash flows. A restatement of these previously issued financial statements is necessary as the Company has determined that preferred stock issued in July 2008 was not presented on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

Restatement, at *1.

~~C~~D.     **The Truth is Revealed via the Restatement**

~~117~~160.       In stark contrast, the following numbers were taken from the Restatement and reflect the true cash position of Century Aluminum at the time of the January 2009 Offering:

| CASH FLOWS FROM OPERATING ACTIVITIES: | As Reported | As Adjusted | Adjustment |
|---|---|---|---|
| Net Loss | ($198,164) | (198,164 | — |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Unrealized net loss on forward contracts | $605,105 | **$605,105** | — |
| Depreciation and amortization | $62,912 | **$62,912** | — |
| Deferred income taxes | ($198,352) | **($198,352)** | — |
| Pension and other postretirement benefits | $11,677 | **$11,677** | — |
| Stock-based compensation | $12,034 | **$12,034** | — |
| Excess tax benefits from share-based compensation | ($657) | **($657)** | — |
| Loss on disposal of assets | $248 | **$248** | — |
| Undistributed earnings of joint ventures | ($12,466) | **($12,466)** | — |
| Change in operating assets and liabilities: | | | |
| Accounts receivable - net | ($22,403) | **($22,403)** | — |
| Purchase of short-term trading securities | ($97,532) | **($97,532)** | — |

| | | | |
|---|---|---|---|
| Sale of short-term trading securities | $348,416 | **$348,416** | — |
| Due from affiliates | ($9,771) | **($9,771)** | — |
| Inventories | ($36,119) | **($36,119)** | — |
| Prepaid and other current assets | ($389) | **($389)** | — |
| Accounts payable, trade | $15,266 | **$15,266** | — |
| Due to affiliates | $(215,522) | **($1,145,002)** | ($929,480) |
| Accrued and other current liabilities | ($28,523) | **($28,523)** | — |
| Other - net | ($5,001) | **($5,001)** | — |
| Net cash provided by (used in) operating activities | $230,759 | **($698,721)** | ($929,480) |

Restatement, at *2.[79]  As the above chart reflects, not only was Century Aluminum's cash from operating activates not as positive as had been reported to potential investors in the January 2009 Registration Statement, but was actually hundreds of millions of dollars in the red, in the red **$698,721,000 to be exact—*almost three quarters of a billion dollars.***

### ~~D~~E.    Materiality of the False Statement

~~118~~161.        Despite Century Aluminum's dismal performance and outlook at the end of 2008, investors were willing to invest in the Company's stock, believing that the Company was liquid, when—in reality—it was not. Indeed, as the January 2009 Registration Statement stated: "Based upon . . . price forecasts, and ***taking into account our current balance*** *of cash and short-term investments* . . . we would expect to have sufficient liquidity to fund our operations for approximately the next 18 months." January 2009 Registration Statement, at *S-2. As such, Century Aluminum's access to cash, and cash-on-hand was the ***most important piece of information*** for investors and the primary selling point for the January 2009 Offering. *See id.* However, as would be revealed subsequently, Century Aluminum had no cash flow to speak of, and the information concerning Century Aluminum's cash position, as stated in the January 2009 Registration Statement, was materially false and misleading.

---

[~~7~~ 9]     These cumulative numbers include the restatement of false and misleading results reported by Century Aluminum for the previous two quarters, embodied in ~~Quarterly Reports (Form 10-Q), filed on March 12, 2008, August 11, 2008 and November 10, 2008~~ Q1'08 10-Q, Q2'08 10-Q, and Q3'08 10-Q. *See supra* ¶ ~~116~~154 n. ~~67~~.

1610

119162.          The materiality of that information is evinced by the fact that the Company's Form 8-K also reported that, as a result of this improper accounting, the financial statements reported in the Form 10-Q for three quarters in 2008 "should no longer be relied upon."

120163.          The false and misleading statements in the January 2009 Registration Statement were regarded the most important criteria to investors in the January 2009 Offering—the liquidity of Century Aluminum and its ability to fund ongoing operations. Century Aluminum was in the midst of a dire financial situation at the time of the January 2009 Offering and was facing plant shutdowns, mounting losses and debts and possible bankruptcy. As such, there can be no doubt that investors would have found the fact that Century Aluminum had ***negative $698,721,000*** in operating cash, important in deciding whether or not to participate in the Secondary Offering.

121164.          On news of the Restatement, the price of the Company's shares traded on NASDAQ fell to $1.06, a~~an~~ 87% drop from the January 2009 Offering price of $8.00 slightly more than one month earlier. Indeed, the materiality of that information is also shown by the fact that, when the Form 8-K of March 2, 2009 disclosed the accounting error, the price of Century Aluminum's stock plunged by over 87%. Clearly, the market—and investors in general—looked upon the information contained in the Form 8-K as material.

122165.          As a result of the misrepresentation in the January 2009 Registration Statement, Plaintiffs and the Class purchased shares of Company stock, pursuant or traceable to the Secondary Offering, at inflated prices and were damaged, thereby, when the price of those shares declined precipitously. Accordingly, the Securities Act Defendants are strictly liable for the false and misleading statement included—and incorporated by reference—into the January 2009 Registration Statement.

## **E**F.    **Failure of Internal Controls to Identify or Correct the False Statement of Cash Flows**

123166.          The Securities Act Defendants each owed to the purchasers of Century Aluminum's securities in the Secondary Offering, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in

1611

1   the Secondary Offering Documents at the time they became effective. This duty included

2   performing an appropriate investigation to ensure that the statements contained

3   therein—including those concerning cash flows and cash from operations—were true, accurate

4   and that there were no omissions of material fact required to be stated in order to make the

5   statements contained in the Secondary Offering Documents not misleading. As herein alleged,

6   each of the Securities Act Defendants failed to fulfill these specific duties and obligations. As a

7   result of these failures, the offering prices of Century Aluminum's securities offered in the

8   Secondary Offering were artificially inflated, and when the truth began to emerge, the stock

9   price fell, causing injury to Plaintiffs and the Class.

10   ~~124~~167.   As noted above, the January 2009 Registration Statement falsely stated that:

11   "Based upon . . . price forecasts, and ***taking into account our current balance*** of ***cash and short-***

12   ***term investments*** . . . we would expect to have sufficient liquidity to fund our operations for

13   approximately the next 18 months." January 2009 Registration Statement, at *S-2 (emphasis

14   added). Thus, according to Century Aluminum itself, the Company's access to cash, especially

15   cash-on-hand from operating activities was the ***most important piece*** of ***information*** for investors

16   and the primary selling point for the January 2009 Offering. However, due to a complete failure

17   of Century Aluminum's internal controls, this statement was disseminated to shareholders in

18   conjunction with the Secondary Offering, despite the fact that it was patently false and

19   misleading (and Century Aluminum actually had ***negative*** cash flow from operating activities).

20   ~~125~~168.   At the time of the January 2009 Offering, Century Aluminum was in the

21   midst of a dire financial situation and was facing plant shutdowns, mounting losses and debts, and

22   possible bankruptcy. There can be no doubt that information concerning Century Aluminum's

23   cash position was of the most valuable to investors and the market. As such, the Securities Act

24   Defendants should have been ***primarily and extraordinarily concerned*** with the financial

25   disclosures in the Secondary Offering documents which concerned operating cash and cash on

26   hand. Indeed, extra scrutiny should have been in given to those accounting items in view of the

27   Company's situation-not only with respect to outside auditors and underwriters-but also internally

28

1    (i.e., management, officers, underwriters and the Board). Had Century Aluminum implemented

2    sufficient internal controls in view of these circumstances—including, *inter alia,* sufficient Board

3    review of financial disclosures and the accounting treatment of cash items—the false and

4    misleading statement in the Secondary Offering documents would have been discovered and could

5    have been corrected. The failure to implement sufficient internal controls let to the false and

6    misleading statements regarding cash from operating activities and cash on hand and, due to the

7    market's focus on these items, proximately and directly caused damages to Plaintiff and the Class

8    when Century Aluminum's share price dropped like a stone following the Restatement.

9                          **DUTIES OF UNDERWRITER DEFENDANTS**

10    ~~126~~169.        As underwriters of the January 29, 2009 Offering, Defendant Credit Suisse

11    and Morgan Stanley, who received substantial assistance from the Individual Defendants named in

12    ¶ ~~46~~47, *supra,* sold to the public 24.5 million shares of Century Aluminum stock. As part of their

13    duties as underwriters, Credit Suisse and Morgan Stanley, each supposedly conducted, before the

14    January 2009 Offering, a due diligence investigation of Century Aluminum. In the course of such

15    investigation, Credit Suisse and Morgan Stanley became aware of the untrue statements and

16    omissions of material facts required to be disclosed in the Registration Statement. These included,

17    among others, that, at the time of the Offering, Century Aluminum's interim consolidated

18    statements of cash flows for the nine months ended September 30, 2008, were materially false and

19    misleading because they treated cash flows associated with the termination of forward financial

20    sales contracts by issuing $929 million of Series A Convertible Preferred Stock on a net basis as an

21    operating activity, when, in fact, the transaction should have been presented on a gross presentation

22    basis as both an operating activity and a financing activity to reflect the cash receipts and

23    disbursements associated with the transaction. Credit Suisse and Morgan Stanley received

24    substantial fees in connection with the Offering. Credit Suisse and Morgan Stanley also arranged

25    and participated in road show presentations in major U.S. cities, during which very positive

26    financial projections for Century Aluminum in 2008 and beyond were made by Credit Suisse and

27    Morgan Stanley and the Individual Defendants.

28

                                                                                    1613

1    ~~127~~170.       Credit Suisse and Morgan Stanley, and each of them, assisted Century

2    Aluminum and the Individual Defendants in planning, marketing and soliciting the Offering, and

3    conducted inquiries into the business, operations and financial, accounting and management

4    controls of Century Aluminum, known as a "due diligence" investigation, required of them in order

5    to engage in the Offering. During the months immediately preceding the Offering, Credit Suisse

6    and Morgan Stanley had virtually unfettered access to confidential corporate information

7    concerning Century Aluminum's business, financial condition and results. In the course of their

8    investigation, Credit Suisse and Morgan Stanley met with representatives of Century Aluminum,

9    its accountants and counsel, during the several weeks before the issuance of the January 29, 2009

10   Registration Statement. During such meetings, including those known as "drafting sessions,"

11   representatives of the participants met to discuss Century Aluminum's interim consolidated cash

12   flows, the timing and terms of the Offering, the contents of the Registration Statement, and

13   further devised, agreed upon and refined the actions necessary for the consummation of the

14   Offering. These parties, in part through their agents, discussed and reached understandings as to

15   the timing and strategy to best accomplish the Offering, the terms of the Offering, the language

16   to be used in the Registration Statement, what disclosures about Century Aluminum would be

17   made in the Registration Statement, and what responses would be made to the SEC in connection

18   with its review of the Registration Statement. Credit Suisse and Morgan Stanley caused the

19   Registration Statement to be delivered to potential and actual purchasers of Century Aluminum

20   common stock in connection with offers and sales thereto.

21   ~~128~~171.       From facts learned during their "due diligence" investigation of Century

22   Aluminum in connection with the Offering, Credit Suisse and Morgan Stanley were aware that the

23   Registration Statement was untrue and omitted material facts required to be stated in the

24   Registration Statement, including, but not limited to, the fact that Century Aluminum's interim

25   consolidated statements of cash flows were materially misstated and false and misleading when

26   issued at the time of the Offering.

27                        **SECURITIES ACT CLASS ACTION ALLEGATIONS**

28

1    129172.        Plaintiffs brings this separate action as a class action pursuant to Federal

2    Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class composed of all those who purchased

3    or otherwise acquired Century Aluminum common stock pursuant and/or traceable to the

4    Company's January 2009 Secondary Offering, and who were damaged thereby (the "Securities Act

5    Class"). Excluded from the Securities Act Class are Defendants, the Officers and Directors of the

6    Company, at all relevant times, members of their immediate families and their legal

7    representatives, heirs, successors or assigns and any entity in which Defendants have or had a

8    controlling interest.

9    130173.        The members of the Securities Act Class are so numerous that joinder of all

10   members is impracticable. At the time of the Offering, Century Aluminum's securities were

11   actively traded on the NASDAQ. While the exact number of Securities Act Class members is

12   unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery,

13   Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act

14   Class. Record owners and other members of the Securities Act Class may be identified from

15   records maintained by Century Aluminum or, its transfer agent and may be notified of the

16   pendency of this action by mail, using the form of notice similar to that customarily used in

17   securities class actions.

18   131174.        Plaintiffs' claims are typical of the claims of the members of the Securities

19   Act Class as all members of the Securities Act Class are similarly affected by Defendants'

20   wrongful conduct in violation of federal law that is complained of herein.

21   132175.        Plaintiffs will fairly and adequately protect the interests of the members of

22   the Securities Act Class and have retained counsel competent and experienced in class and

23   securities litigation.

24   133176.        Common questions of law and fact exist as to all members of the Securities

25   Act Class and predominate over any questions solely affecting Exchange Act members of the

26   Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

27

28

                                                                                              1615

1    (a)    Whether the Securities Act was violated by the Securities Act Defendants'

2    acts as alleged herein;

3    (b)    Whether statements made by the Securities Act Defendants to the investing

4    public in connection with the Company's January 2009 Offering omitted and/or misrepresented

5    material facts about the operations and financial performance of Century Aluminum; and

6    (c)    To what extent the members of the Class have sustained damages and the

7    proper measure of damages.

8    ~~134~~177.    A class action is superior to all other available methods for the fair and

9    efficient adjudication of this controversy since joinder of all members is impracticable.

10   Furthermore, as the damages suffered by Securities Act Class members may be relatively small, the

11   expense and burden of Securities Act litigation make it impossible for members of the Class to

12   individually redress the wrongs done to them. There will be no difficulty in the management of this

13   action as a class action.

14                                    **COUNT I**
                       **For Violation of Section 10(b) of the Exchange Act**
15                   **and Rule 10b-5 Against All Exchange Act Defendants**

16   ~~135~~178.    Plaintiffs incorporate ¶¶ 1, 2, 4-15, 22-24, 28-~~109~~128 by reference.

17   ~~136~~179.    During the Class Period, Defendants disseminated or approved the false

18   statements specified above, which they knew or deliberately disregarded were misleading in that

19   they contained misrepresentations and failed to disclose material facts necessary in order to make

20   the statements made, in light of the circumstances under which they were made, not misleading.

21   ~~137~~180.    Defendants violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

22   and Rule 10b-5 in that they:

23   (a)    Employed devices, schemes, and artifices to defraud;

24   (b)    Made untrue statements of material facts or omitted to state material facts

25   necessary in order to make the statements made, in light of the circumstances under which they

26   were made, not misleading; or

27

28

                                                                                    1616

1          (c)     Engaged in acts, practices, and a course of business that operated as a fraud

2  or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Century

3  Aluminum common stock during the Class Period.

4        ~~138~~181.     Plaintiffs and the Class have suffered damages in that, in reliance on the

5  integrity of the market, they paid artificially inflated prices for Century Aluminum common stock.

6  Plaintiffs and the Class would not have purchased Century Aluminum common stock at the prices

7  they paid, or at all, if they had been aware that the market prices had been artificially and falsely

8  inflated by Defendants' misleading statements.

9        ~~139~~182.     As a direct and proximate result of these Defendants' wrongful conduct,

10  Plaintiffs and the other members of the Class suffered damages in connection with their purchases

11  of Century Aluminum common stock during the Class Period.

12

13                              **COUNT II**

**For Violation of Section 20(a) of the Exchange Act Against All Exchange Act Defendants**

14        ~~140~~183.     Plaintiffs incorporate ¶¶ 1, 2, 4-15, 22-24, 28-~~109~~128 by reference.

15        ~~141~~184.     The Exchange Act Defendants acted as controlling persons of Century

16  Aluminum within the meaning of section 20 of the Exchange Act. By virtue of their positions and

17  their power to control public statements about Century Aluminum, the Exchange Act Defendants

18  had the power and ability to control the actions of Century Aluminum and its employees. Century

19  Aluminum controlled the Exchange Act Defendants and its other officers and employees. By

20  reason of such conduct, Defendants are liable pursuant to section 20(a) of the Exchange Act,

21  15 U.S.C. § 78t(a).

22

23                              **COUNT III**

**For Violation of Section 11**

24                  **of the Securities Act (Against All Defendants)**

25        ~~142~~185.     Plaintiffs incorporate only ¶¶ 1, 3, 16-21, 25-~~44~~45, ~~46~~47, ~~48~~49-~~51~~52,

~~110~~129-~~134~~177 above by reference.

26

27

28

                                                      1617

1      143186.        This Cause of Action is brought pursuant to section 11 of the Securities Act,

2   15 U.S.C. 77k, on behalf of all persons or entities who acquired Century Aluminum securities

3   pursuant to, or traceable to, the Secondary Offering. Plaintiff brings this claim against the

4   Company, the Individual Defendants, and the Underwriter Defendants. This Cause of Action is

5   predicated upon Defendants' strict liability for making false and misleading statements in the

6   Offering Documents.

7      144187.        The Secondary Offering documents were materially false and misleading,

8   contained untrue statements of material fact, omitted to state other facts necessary to make the

9   statements not misleading, and omitted to state material facts required to be stated therein.

10     145188.        The Securities Act Defendants are strictly liable to Plaintiff and the Class for

11  making the false and misleading misstatements and omissions in issuing the stock in the Secondary

12  Offering.

13     146189.        The Underwriter Defendants each acted as an underwriter in the sale of stock

14  in the Secondary Offering, directly and indirectly participated in the distribution of the stock in the

15  Secondary Offering, and directly and indirectly participated in drafting and disseminating the

16  Offering Documents for the stock in the Secondary Offering.

17     147190.        The Securities Act Defendants owed the Plaintiff and other Class members

18  the duty to make a reasonable and diligent investigation of the statements contained in the Offering

19  Documents at the time they became effective to ensure that such statements were true and correct

20  and that there was no omission of material facts required to be stated in order to make the

21  statements contained therein not misleading.

22     148191.        All of the Securities Act Defendants: (i) signed the Secondary Offering

23  documents; (ii) were directors of Century Aluminum at the time the Offering Documents were filed

24  with the SEC; and/or (iii) served as underwriters for the Secondary Offering. None of the Securities

25  Act Defendants made a reasonable investigation or possessed reasonable grounds for believing that

26  certain statements contained in the Secondary Offering documents were true, complete and devoid

27  of any misstatements or omissions of material fact. Therefore, each of the Securities Act

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1    Defendants named in this Claim for Relief is liable to Plaintiff and the other members of the Class

2    who acquired Century Aluminum securities pursuant to or traceable to the Secondary Offering

3    documents for the various misstatements and omissions contained therein under section 11 of the

4    Securities Act.

5    ~~149~~192.        Each of the Securities Act Defendants negligently failed to possess a

6    reasonable basis for believing, and failed to make a reasonable investigation to ensure, that

7    statements contained in the Offering Documents were true and/or that there was no omission of

8    material facts necessary to make the statements contained therein not misleading.

9    ~~150~~193.        The Securities Act Defendants issued and disseminated, caused to be issued

10   or disseminated, and participated in the issuance and dissemination of material misstatements to the

11   investing public which were contained in the Prospectuses, which made false and misleading

12   statements and/or misrepresented or failed to disclose material facts, as set forth above. By reason

13   of the conduct alleged herein, each of the Securities Act Defendants violated ~~§~~section 11 of the

14   Securities Act, and is liable to Plaintiff and the Class.

15   ~~151~~194.        Plaintiff and other Class members acquired stock in Century Aluminum

16   pursuant and/or traceable to the Secondary Offering. At the time Plaintiff and Class members

17   purchased their stock, they did so without knowledge of the facts constituting the misstatements

18   and omissions alleged herein.

19   ~~152~~195.        Plaintiff and other Class members have sustained damages as a direct and

20   proximate result of the wrongful conduct alleged and the violations of the Securities Act

21   Defendants.

22   ~~153~~196.        By virtue of the foregoing, Plaintiff and other Class members are entitled to

23   damages, jointly and severally from each of the Securities Act, as set forth in ~~S~~section 11 of the

24   Securities Act.

25   ~~154~~197.        This action is brought within one year after the discovery of the untrue

26   statements and omissions contained in the Offering Documents and within three years of the

27   Secondary Offering. Despite the exercise of reasonable diligence, Plaintiff could not have

28

1619

1   reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier

2   time.

3                                          **COUNT IV**
4                              ~~For Violation of Section 12(a)(2)~~
                             ~~of the Securities Act (Against All Defendants)~~
5
6       ~~155.    Plaintiffs incorporate ¶¶ 1, 3, 16-2 1, 25-44, 46, 48-5 1, 110-134 by reference.~~

7       ~~156.    This Cause of Action is brought pursuant to section 12(a)(2) of the Securities Act,~~

    ~~15 US.C. § 771(a)(2), on behalf of Plaintiffs and the Class, against all Defendants.~~
8
9       ~~157.    Each of the Securities Act Defendants was an offeror, seller or solicitor of a security~~

    ~~in the Secondary Offering.~~
10
11      ~~158.    On information and belief, the Plaintiffs—as well as other members of the Class—~~

    ~~purchased stock directly from the Underwriter Defendants as part of the Secondary Offering.~~
12
13      ~~159.    By means of the January 2009 Offering documents, the Exchange Act Defendants~~

    ~~and Underwriter Defendants promoted and sold stock in the Secondary Offering pursuant to the~~
14
    ~~defective Prospectuses. The Prospectuses contained untrue statements of material fact, omitted to~~
15
    ~~state facts necessary to make statements not misleading, and concealed and failed to disclose~~
16
    ~~material facts.~~
17
18      ~~160.    The actions of solicitations taken by the Securities Act Defendants included~~

    ~~participation in the preparation and dissemination of the false and misleading statements in the~~
19
    ~~Secondary Offering documents. Additionally, one or more of the Securities Act Defendants named~~
20
    ~~herein participated in the acts detailed as follows:~~
21
22          ~~(a)    They made the decision to conduct the January 2009 Offering, to do it at the~~

    ~~selected offering price and to make the sale in the United States. They actively and jointly drafted,~~
23
    ~~revised, and approved the Secondary Offering documents and other written selling materials by~~
24
    ~~which the Secondary Offering was made to the investing public. These written materials were~~
25
    ~~"selling documents" and caused the Securities Act Defendants to create interest in the securities~~
26
    ~~offered and were widely distributed by the Securities Act Defendants for that purpose;~~
27

28
                                                                                                1620

1          (b)      They finalized the Secondary Offering document and/or caused them to

2   become effective. But for the Securities Act Defendants having signed and/or drafted the

3   Secondary Offering documents, the January 2009 Offering could not have been made; and

4          (c)      They conceived and planned the January 2009 Offering and together, jointly

5   orchestrated all activities necessary to effect the sale of these securities to the investing public by

6   issuing the securities, promoting the securities, and supervising their distribution and ultimate sale

7   to the investing public.

8          161.     The Century Aluminum securities sold in the Secondary Offering by the Securities

9   Act Defendants named in this Claim for Relief were offered and sold through the use of interstate

10  communication, the use of interstate commerce, and the use of the mails.

11         162.     The Securities Act Defendants owed to Plaintiffs and the other Class members, who

12  purchased stock in the Secondary Offering pursuant to the Registration Statement, a duty to make a

13  reasonable and diligent investigation of the statements contained in the Registration Statement, to

14  ensure that such statements were true and that there was no omission of material fact necessary to

15  make the statements contained therein not misleading. The Securities Act Defendants knew of, or

16  in the exercise of reasonable care should have known of, the misstatements and omissions

17  contained in the Prospectuses, as set forth herein.

18         163.     Plaintiffs and other Class members purchased or otherwise acquired stock in the

19  Secondary Offering pursuant to and/or traceable to the defective Prospectuses. Plaintiffs did not

20  know, and in the exercise of reasonable diligence could not have known, of the misrepresentations

21  and omissions contained in the Prospectuses.

22         164.     By reason of the conduct alleged herein, the Securities Act Defendants violated

23  section 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who

24  purchased stock in the Secondary Offering pursuant to and/or traceable to the Registration

25  Statement.

26         165.     Plaintiffs and other Class members were damaged by the Securities Act Defendants'

27  and Underwriter Defendants' wrongful conduct. Those Class members who have retained their

28

1621

1  stock from the Secondary Offering have the right to rescind and recover the consideration paid for

2  their stock, as set forth in section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). Those Class

3  members who have sold their stock are entitled to rescissory damages, as set forth in section

4  12(a)(2) of the Securities Act. These Plaintiffs hereby tender their stock from the January 2009

5  Offering, or proceeds from the sale thereof, to Securities Act Defendants named in this Cause of

6  Action in exchange for the value of the consideration paid for such stock, plus interest. In the

7  alternative, these Plaintiffs seek recovery of damages in an amount to be proven at trial.

8  166. This action is brought within one year after the discovery of the untrue statements

9  and omissions contained in the Prospectuses and within three years of the January 2009 Offering.

10  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the

11  untrue statements and omissions in the Offering Documents at an earlier time.

12  **COUNT V**

13  **Against ~~the Exchange Act~~All Defendants for**
     **Violations of Section 15 of the Securities Act**

14  ~~167~~198. Plaintiffs incorporate ¶¶ 1, 3, 16-21, 25-~~44~~45, 46~~47~~, 48~~49-51~~52, ~~110~~129-

15  ~~134~~177 by reference.

16  ~~168~~199. The Securities Act Defendants named in this Claim for Relief were each

17  control persons of Century Aluminum within the meaning of section 15 of the Securities Act,

18  15 U.S.C. § 77o, by virtue of their executive and/or directorial positions and/or their ownership of a

19  significant percentage of the Company's outstanding stock. The Securities Act Defendants named

20  in this Claim for Relief had the power, and exercised the same, to cause Century Aluminum to

21  engage in the violations of law complained of herein and were able to and did control the contents

22  of the January 2009 Offering documents.

23  ~~169~~200. None of the Securities Act Defendants named in this Claim for Relief made

24  a reasonable or diligent investigation or possessed reasonable grounds for the belief that the

25  statements contained in the January 2009 Offering documents were true and devoid of any

26  omissions of material fact. By reason of their top executive positions at Century Aluminum,

27  ownership of a significant percentage of the Company's stock and their actual control over the

28

1622

1    Company's day-to-day operations, financial statements, public filings and their intimate

2    involvement and control over the January 2009 Offering documents, each of the Securities Act

3    Defendants named in this Claim for Relief is jointly and severally liable to Plaintiffs and the other

4    members of the Class as a result of the conduct alleged herein.

5    170201.    By reason of their misconduct alleged more fully herein, all of the Securities

6    Act Defendants are liable to Plaintiffs and the members of the Class for the damages they suffered

7    by purchasing or otherwise acquiring Century Aluminum's common stock in the January 2009

8    Offering.

9                              **PRAYER FOR RELIEF**

10        WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as

11   follows:

12        a.    Declaring this action to be a Class action properly maintained pursuant to the

13   Federal Rules of Civil. Procedure, certifying the Class, and certifying their counsel as Class

14   Counsel;

15        b.    Awarding Plaintiffs and other members of the Class damages against Defendants,

16   jointly and severally, together with interest thereon;

17        c.    Awarding Plaintiffs and other members of the Class their costs and expenses of this

18   litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs

19   and disbursements; and

20        d.    Awarding Plaintiffs and the Class such other and further relief as may be just and

21   proper under the circumstances.

22

23

24

25

26

27

28

1623

1          **JURY TRIAL DEMANDED**

2          Plaintiffs hereby demand a trial by jury.

3     DATED: ~~January 28~~June 24, 2010                    Respectfully submitted,

4                                                       WOLF HALDENSTEIN ADLER
                                                          FREEMAN & HERZ LLP
5                                                     FRANCIS M. GREGOREK
                                                      BETSY C. MANIFOLD
6                                                     RACHELE R. RICKERT

7                                                     _____

8                                                     BETSY C. MANIFOLD

9                                                     750 B Street, Suite 2770
                                                      San Diego, CA 92101
                                                      Telephone: 619/239-4599
10                                                    Facsimile: 619/234-4599

11                                                    Lead Counsel for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD AMENDED** CONSOLIDATED CLASS ACTION COMPLAINT – CASE NO. C 09-1001 SI

1

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT
TO THE FEDERAL SECURITIES LAWS**

2

I, Chris McNulty, declare the following as to the claims asserted, or to be asserted,

3

under al securities laws:

4

1.      I have reviewed the complaint with my counsel.

5

2.      I did not acquire the securities that are the subject of this action at the

6

direction of s counsel or in order to participate in any private action or any other litigation

7

under the federal securities laws.

8

3.      I am willing to serve as a lead plaintiff and representative party on behalf of

9

the class, including testifying at deposition or trial, if necessary.

10

4.      Attached as **Exhibit 1** are my transactions during the Class Period in the

11

securities of Century Aluminum Company.

12

5.      I will not accept any payment for serving as a representative party beyond my

13

share of any recovery, except reasonable costs and expenses – such as lost wages and travel

14

expenses – directly related to the class representation, as ordered or approved by the Court

15

to law.

16

6.      I have not sought to serve or served as a representative party for a class in an

17

action under the federal securities laws within the past three years.

18

I declare under penalty of perjury under the laws of the United States of America

19

that the foregoing is true and correct.

20

Executed this 6th day of June, 2010.

21

22

CHRIS MCNULTY

23

24

25

26

27

28

1625

**EXHIBIT 1**

**PURCHASES AND SALES OF CENTURY ALUMINUM COMPANY SECURITIES
BETWEEN OCTOBER 21, 2008 AND MARCH 2, 2009**

| DATE | PURCHASED OR SOLD? | NUMBER OF SHARES | PRICE |
|------|--------------------|------------------|-------|
| 1/28/09 | Purchased | 800 | $4.6080 |
| 3/2/09 | Puchased | 1,700 | $1.75 |