1    ROBERT P. VARIAN (SBN 107459)
     STEPHEN M. KNASTER (SBN 146236)
2    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
3    405 Howard Street
     San Francisco, CA  94105-2669
4    Telephone:  (415) 773-5700
     Facsimile:   (415) 773-5759
5    Emails:   rvarian@orrick.com
               sknaster@orrick.com
6
     Counsel For Defendants
7    Morgan Stanley & Co. Incorporated and
     Credit Suisse Securities (USA) LLC
8

9                      UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11   In re CENTURY ALUMINUM COMPANY        Lead Case No.  3:09-cv-01001-SI
     SECURITIES LITIGATION
12

13                                         CLASS ACTION

14                                         UNDERWRITERS' NOTICE OF
                                           MOTION AND MOTION TO DISMISS
15                                         PLAINTIFFS' THIRD AMENDED
                                           CONSOLIDATED CLASS ACTION
16                                         COMPLAINT; MEMORANDUM OF
                                           POINTS AND AUTHORITIES IN
17                                         SUPPORT THEREOF

18                                         Date:         Friday, September 3, 2010
                                           Time:         9:00 a.m.
19                                         Court:        10, 19th Floor
                                           Judge:        Honorable Susan Illston
20

21

22

23

24

25

26

27

28

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
                                           DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
                                           CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................ vii

ISSUES TO BE DECIDED (CIVIL LOCAL RULE 7-4(A)(3)) ............................ vii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND ............................................................................ 3

ARGUMENT .................................................................................................... 4

I.    PLAINTIFFS' SECTION 11 CLAIM MUST BE DISMISSED UNDER
RULE 12(B)(1) FOR LACK OF STANDING AND SUBJECT MATTER
JURISDICTION ........................................................................................... 4

     A.    Plaintiffs' Failure To Establish Standing And Subject Matter Jurisdiction Is
Illuminated By Prior Proceedings ................................................... 4

         1.    The Order .................................................................................. 4

         2.    The April 23 Hearing ............................................................... 5

     B.    The TAC Implicitly Concedes That Plaintiffs Cannot  Demonstrate
Standing Or Subject Matter Jurisdiction ........................................ 5

     C.    The Allegations Added To The TAC Do Not Come Close To  Satisfying
Plaintiffs' Burden On Standing Or Subject Matter Jurisdiction ...... 6

         1.    The Standing Allegations Are Based On The Absence Of Facts ......... 6

         2.    Purchases Prior To January 29, 2009 Cannot Possibly Be  Traced
To The Offering .................................................................... 8

         3.    Plaintiffs Fail To Trace Their Aftermarket Purchases To The
Offering ............................................................................... 9

             a.    Plaintiffs' Stock Was Purchased From Brokers  And Is Held
In Street Name ............................................................... 9

             b.    Plaintiff Abrams' Shares Cleared Through Citigroup And
Cannot Be Traced To The Offering ................................ 10

     D.    Plaintiffs Cannot Discharge Their Burden Under Rule 12(b)(1) ........ 11

     E.    Plaintiffs' Section 15 Claim For "Control Person" Liability Must Be
Dismissed For Lack Of Standing And Subject Matter Jurisdiction ...... 13

II.    PLAINTIFFS' SECTION 11 CLAIM SHOULD ALSO BE DISMISSED UNDER
RULE 12(B)(6) ON SEVERAL ADDITIONAL GROUNDS ........................ 14

     A.    Plaintiffs Fail To Allege Specific And Plausible Facts That Demonstrate
Tracing ........................................................................................ 14

     B.    The TAC Fails To Plead Facts To Support The Conclusion That  The
Underwriters Breached A Duty Of Due Diligence ............................ 17

**TABLE OF CONTENTS**
**(continued)**

Page

C.   Plaintiffs' Allegations Are Based On A False Premise And Fail To Comply
     With Governing Pleading Standards   ................................................................. 19

D.   Plaintiffs Cannot Plead A Section 15 Claim For "Control Person" Liability
     Against The Underwriters   .................................................................................. 22

CONCLUSION.................................................................................................................. 23

OHS West:260938958.2

# TABLE OF AUTHORITIES

**Pag(s)**

## <u>CASES</u>

*Abbey v. Computer Memories, Inc.*,
   634 F. Supp. 870 (N.D. Cal. 1986) ................................................................................ 7, 12

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .............................................................................................. 15, 19

*Barnes v. Osofsky*,
   373 F.2d 269 (2d Cir. 1967)...................................................................................... 11, 12

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 15, 19, 22

*Belodoff v. Netlist, Inc.*,
   2008 WL 2356699 (C.D. Cal. May 30, 2008) .................................................................. 15

*Brody v. Homestore, Inc.*,
   2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) .................................................................. 13

*Colwell v. Dept. of Human Services*,
   558 F.3d 1112 (9th Cir. 2009)............................................................................................ 7

*Grand Lodge of Pa. v. Peters*,
   550 F. Supp. 2d 1363 (M.D. Fla. 2008) ................................................................ 8, 11, 14

*Guenther v. Cooper Life Sciences, Inc.*,
   759 F. Supp. 1437 (N.D. Cal. 1990) ................................................................................... 7

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990)........................................................................................... 23

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000)........................................................................................... 23

*In re Calpine Corp. Sec. Litig.*,
   288 F. Supp. 2d 1054 (N.D. Cal. 2003) ............................................................................ 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008)............................................................................ 18

*In re Exodus Cmmc'n, Inc. Sec. Litig.*,
   2006 WL 2355071 (N.D. Cal. Aug. 14, 2006) ................................................................. 13

*In re Exodus Commc'n, Inc. Sec. Litig.*,
   2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) ................................................................... 23

*In re Exodus Commc'n, Inc. Sec. Litig.*,
   2006 WL 1530081 (N.D. Cal. June 2, 2006) ................................................................... 13

*In re Iasia Works, Inc. Sec. Litig.*,
   2002 WL 1034041 (N.D. Cal. May 15, 2002) ................................................................. 18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Infonet Servs. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003)........................................................................ 20

*In re Late Fee and Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................................. 17, 19

*In re MusicMaker.com Sec. Litig.*,
2001 WL 34062431 (C.D. Cal. June 4, 2001) ........................................................... 13

*In re Quarterdeck Office Systems*,
1993 WL 623310 (C.D. Cal. Sept. 30, 1993).......................................................... 12, 13

*In re Shoretell Ins. Sec. Litig.*,
2009 WL 2588881 (N.D. Cal. Aug. 19, 2009)............................................................ 15

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........................................................................................ 8

*In re Stac Elec. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)................................................................................. 18, 20

In re Stratosphere Corp. Sec. Litig.,
1 F. Supp. 2d 1096 (D. Nev. 1998) .............................................................................. 23

*In re Worlds of Wonder Sec.Litig.*,
35 F.3d 1407 (9th Cir. 1994)........................................................................................ 17

*In re WRT Energy Sec. Litig.*,
1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) .............................................................. 19

*Kirkwood v. Taylor*,
590 F. Supp. 1375 (D. Minn. 1984),
*aff'd*, 760 F.2d 272 (8th Cir. 1985) ............................................................................ 12

*Krim v. PcOrder.com*,
402 F.3d 489 (5th Cir. 2005)...................................................................... 11, 12, 13, 16

*Krim v. PcOrder.com, Inc.*,
210 F.R.D. 581 (W.D. Tex. 2002) ......................................................................... 11, 12

*Lee v. Ernst & Young, LLP*,
294 F.3d 969 (8th Cir. 2002)........................................................................................ 14

*Lilley v. Charren*,
936 F. Supp. 708 (N.D. Cal. 1996) ........................................................................ 14, 23

*Lorber v. Beebe*,
407 F. Supp. 279 (S.D.N.Y. 1976).............................................................................. 12

*Moss v. U.S. Secret Service*,
572 F.3d 962 (9th Cir. 2009)................................................................................... 15, 22

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008)...................................................................................... 19

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996)................................................................... 23

*Port Dock & Stone Co. v. Old Castle Northeast, Inc.*,
    507 F.3d 117 (2d. Cir. 2007)................................................................... 15

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009)..................................................... 15

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006),
    *aff'd*, 551 F.3d 1156 (9th Cir. 2009) ..................................................... 13

*Sherman v. Network Commerce Inc.*,
    346 F. App'x 211 (9th Cir. 2009) ........................................................... 15

*Sprewell v. Golden State Warriors*,
    266 F.3d 976 (9th Cir. 2001)........................................................... 17, 19

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998)................................................................. 20

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003)................................................................. 20

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ..................................................... 18

**STATUTES**

8 Del. C.
    Section 141(a) ......................................................................................... 23

Securitie Act of 1933
    Section 11................................................................................... 13, 15
    Section 12..................................................................................... 6, 9
    Section 12(a)(2)................................................................................. 15
    Section 15................................................................................... 13, 23

Securities Act of 1934
    Section 20(a) ........................................................................................... 23

**OTHER AUTHORITIES**

2 Fletcher Cyc. Corp.
    Section 495............................................................................................... 23

5A Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* § 1357 (3d ed. 2009) ....................... 19

H. Sale, *Disappearing Without A Trace: Sections 11 and 12(a)(2)*
    *Of The 1933 Securities Act*, 75 Wash. L. Rev. 429, 466 (2000)...................... 11, 12

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

## <u>RULES</u>

Federal Rules of Civil Procedure
    Rule 9(b)...................................................................................................... 18
    Rules 8............................................................................................................ vii
    Rule 12(b)(1)............................................................................................ *passim*
    Rule 12(b)(6)............................................................................................ *passim*

Federal Rules of Evidence
    Rule 201 ........................................................................................................ 8

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on Friday, September 3, 2010 at 9:00 a.m. or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Susan Illston, United States District Judge, at Courtroom 10, 450 Golden Gate Avenue, San Francisco, California, 94102, defendants Morgan Stanley & Co. Incorporated ("Morgan Stanley") and Credit Suisse Securities (USA) LLC ("Credit Suisse") (collectively, the "Underwriters"), will and hereby do move this Court for an order granting their motion to dismiss plaintiffs' Third Amended Consolidated Class Action Complaint dated June 24, 2010 (the "TAC"). The Underwriters' motion seeks dismissal of all claims against them and is brought pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and pursuant to Rule 12(b)(1) for lack of standing and subject matter jurisdiction.

This motion is based upon this Notice and the accompanying Memorandum of Points and Authorities; the Request for Judicial Notice ("RJN") and the Declarations of Ryan E. Fitzpatrick ("Fitzpatrick Decl."), Jill Ford ("Ford Decl.") and Scott A. Gregory ("Gregory Decl.") filed herewith; the papers on file in the action; the argument of counsel at the hearing; and other such matters as may be considered by the Court.

## ISSUES TO BE DECIDED (CIVIL LOCAL RULE 7-4(a)(3))

1.     Whether plaintiffs' claim under Section 11 of the Securities Act of 1933 ("Securities Act") should be dismissed pursuant to Rule 12(b)(1) for lack of standing and subject matter jurisdiction because plaintiffs cannot trace their shares to the Offering.

2.     Whether plaintiffs' claim under Section 15 of the Securities Act should be dismissed pursuant to Rule 12(b)(1) because absent a primary violation of the federal securities laws plaintiffs lack standing and subject matter jurisdiction to assert a claim for control person liability.

3.     Whether plaintiffs' claim under Section 11 of the Securities Act should be dismissed pursuant to Rule 12(b)(6) for failure to plead facts in support of the essential element of tracing.

OHS West:260938958.2

vii

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE No. 3:09-CV-01001-SI)

1    4.    Whether plaintiffs' claim under Section 11 of the Securities Act should be

2    dismissed pursuant to Rule 12(b)(6) because plaintiffs fail to allege facts sufficient to state a

3    claim that the Underwriters breached their duty to conduct a reasonable due diligence

4    investigation.

5    5.    Whether plaintiffs' claim under Section 11 of the Securities Act should be

6    dismissed pursuant to Rule 12(b)(6) because the TAC is based on a false premise that is

7    contradicted by the documents upon which it purports to be based.

8    6.    Whether plaintiffs' claim under Section 15 of the Securities Act should be

9    dismissed pursuant to Rule 12(b)(6) because the TAC fails to plead a primary violation and facts

10   demonstrating that the Underwriters were control persons.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs have had a full and fair opportunity to try to establish the standing and subject matter jurisdiction necessary to prosecute the only claim asserted against the Underwriters, but have again fallen far short of the mark.  The Court's April 27, 2010 order dismissing their last complaint (the "Order") provided specific guidance regarding the things plaintiffs must do to survive a second motion to dismiss, and granted them leave to find new class representatives.  As a review of the TAC amply demonstrates, plaintiffs have come up with nothing that might resuscitate their Section 11 claim.

The Section 11 claim cannot be maintained unless plaintiffs can show that they purchased stock that is "traceable" to Century Aluminum's January 29, 2009 Secondary Offering (the "Offering").  Absent such a showing, plaintiffs have no standing, and the Court lacks subject matter jurisdiction under Article III.  Rather than improving their position on those pivotal issues, plaintiffs have taken a giant step <u>backward</u>.

At the April 23, 2010 hearing on the prior motions to dismiss, plaintiffs attempted to evade the declarations submitted by the Underwriters pursuant to Rule 12(b)(1) by arguing that they were entitled to a pass at the pleading stage, based on conclusory allegations that they had purchased stock in or traceable to the Offering.  The Order unequivocally rejected that argument, made clear that plaintiffs bear an affirmative burden on this motion, and set standards that plaintiffs have utterly failed to meet.  Two points in particular are now determinative.

<u>First</u>, the Court held that the declarations submitted by the Underwriters under Rule 12(b)(1) and the certifications filed pursuant to the Reform Act demonstrate that plaintiffs did not purchase stock <u>in</u> the Offering.  <u>Second</u>, the Order emphasized that plaintiffs were unable to show how -- absent a purchase in the Offering -- they could trace the stock they acquired in the aftermarket to the Offering, and that there was no point in prolonging the litigation if they cannot do so.

1

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE No. 3:09-CV-01001-SI)

1    Having dropped their Section 12 claim because they cannot show a purchase in the

2  Offering, plaintiffs confront the nearly impossible task of tracing aftermarket purchases of shares

3  held by brokers in street name to a secondary offering.  Instead of articulating facts demonstrating

4  that the fungible shares purchased in an aftermarket pool of 75 million shares can be traced to the

5  Offering, plaintiffs have demonstrated that they cannot do so.  Plaintiffs were forced to abandon

6  the tracing plan recited to the Court at the April 23 hearing, and fall back on allegations that

7  merely underscore their wholesale inability to discharge their burden on tracing, standing and

8  subject matter jurisdiction.

9    Moreover, although plaintiffs' failure to establish standing or subject matter jurisdiction

10  makes it unnecessary to examine the TAC under Rule 12(b)(6), plaintiffs fail there as well.  The

11  Order did not address the Underwriter's 12(b)(6) arguments because the Court dismissed the

12  complaint on threshold issues.  The TAC makes no meaningful effort to address the pleading

13  deficiencies that existed in the First Amended Complaint, which are beyond repair.

14    Even when examined solely as a matter of pleading, the TAC fails to allege the tracing

15  element of the Section 11 claim with the requisite facts.  Accordingly, the Section 11 claim must

16  be dismissed under Rule 12(b)(6), as well as under 12(b)(1).

17    Dismissal under Rule 12(b)(6) is further required because plaintiffs' Section 11 claim fails

18  to satisfy fundamental pleading standards articulated by the Ninth Circuit and the Supreme Court.

19  Indeed, the premise underlying the claim is directly refuted by the very documents upon which it

20  purports to be based.  Contrary to the TAC's conclusory assertions, the offering documents did

21  not portray Century Aluminum as a "cash rich company" that had ample liquidity and was well

22  positioned to weather any financial storm.  As a review of the documents themselves quickly

23  demonstrates, they did precisely the opposite.  Nor did the reclassification of the source of cash

24  within the statement of cash flows work any change (at all) in Century Aluminum's reported cash

25  position.

26    Nor does the TAC plead a single fact that might support the conclusory assertion that the

27  Underwriters breached their "due diligence duty" in failing to identify the GAAP error that led to

28  the reclassification within the statement of cash flows in Century Aluminum's financial

1  statements.  As the cases recognize, underwriters are not accounting experts, and the TAC makes

2  no effort whatsoever to allege why it would have been unreasonable for the Underwriters to rely

3  on the Company's auditors with respect to Century Aluminum's accounting.

4      For these many reasons, the TAC must be dismissed.  Because further amendment would

5  be futile, and plaintiffs have now had four bites of the apple, the dismissal should be with

6  prejudice.

7  ## FACTUAL BACKGROUND

8

9      The facts relevant to this motion are recounted in the Order and the separate motion filed

10  by the Century Aluminum[1] defendants, and need not be repeated here.  It is worth emphasizing,

11  however, that the TAC is plaintiffs' third amendment and fourth consolidated complaint,[2] and that

12  the TAC adds little of substance to plaintiffs' prior pleadings.  *See* Century Aluminum

13  Defendants' Motion To Dismiss Third Amended Consolidated Complaint at 5-6.  In addition to

14  the guidance provided by the Court in the Order, plaintiffs have had the benefit of two sets of

15  motions to dismiss filed by the Underwriters and the Century Aluminum Defendants.

16      Although the TAC contains a new plaintiff, Chris McNulty, he did not purchase in the

17  Offering, on the date of the Offering, or at the Offering price.  TAC ¶ 140.  Mr. McNulty was

18  added to the mix in the Second Amended Complaint filed on May 28, 2010, which stated (¶ 140)

19  that he purchased stock on January 29, 2009.  Plaintiffs were forced to correct that allegation in

20

21

22  ___
   [1] The Underwriters hereby join in the Century Aluminum Defendants' Motion To Dismiss Third Amended Complaint and incorporate it by reference.

23  [2] Plaintiffs filed their Consolidated Class Action Complaint on November 17, 2009.

24  Defendants moved to dismiss the complaint, but the motions were rendered moot upon plaintiffs' filing of their First Amended Consolidated Class Action Complaint ("First Amended Complaint") on January 28, 2010.  Defendants moved to dismiss the First Amended Complaint, which motion

25  was granted with leave to amend by the Court on April 27, 2010.  *See* Order at 1.  Plaintiffs next filed their Second Amended Consolidated Class Action Complaint ("Second Amended

26  Complaint") on May 28, 2010.  At the request of plaintiffs, the parties stipulated to a further amendment and plaintiffs submitted their TAC to the Court on June 24, 2010.  The TAC was

27  deemed filed as of June 29, 2010, which pleading is the subject of this motion.  *See* Order dated June 29, 2010.  It is clear from this procedural history that plaintiffs have already had numerous

28  opportunities to plead a viable claim, and have failed to do so.

the TAC, which now alleges that McNulty purchased on January 28, 2009 -- the day <u>before</u> the

Offering.

# <u>ARGUMENT</u>

I.   **PLAINTIFFS' SECTION 11 CLAIM MUST BE DISMISSED UNDER RULE 12(b)(1) FOR LACK OF STANDING AND SUBJECT MATTER JURISDICTION**

    A.   **Plaintiffs' Failure To Establish Standing And Subject Matter <u>Jurisdiction Is Illuminated By Prior Proceedings</u>**

The Order and April 23 hearing that preceded it bring the standing and subject matter

jurisdiction issues into sharp focus.  The Order rejects plaintiffs' attempt to evade dismissal by

relying on conclusory allegations in the pleadings, sets out the ground rules for this motion, and

articulates the standards plaintiffs must meet in attempting to discharge their affirmative burden.

Statements by plaintiffs' counsel at the hearing underscore the reasons plaintiffs' attempt to meet

those standards fail.

    1.   **<u>The Order</u>**

Before proceeding to a substantive analysis of plaintiffs' Section 11 claim, the Court

addressed and rejected plaintiffs' contention that the Underwriters' arguments regarding standing

and subject matter jurisdiction were "premature," and that an analysis of those issues must be

confined to the face of the pleadings.  Order at 18.  Rather, "[b]ecause plaintiffs' lack of standing

implicates subject matter jurisdiction," the Court held that consideration of evidence pursuant to

Rule 12(b)(1) was appropriate.  *Id*. at 16-17 & n.11.  The Order further emphasized that "standing

and subject matter jurisdiction present a 'threshold inquiry' that is 'particularly important in

securities litigation,'" and that "the burden of tracing shares to a particular public offering rests

with plaintiffs."  *Id*. at 17 (citations omitted).

After outlining the specific obstacles to discharging plaintiffs' burden in this case, the

Order put plaintiffs on notice that defendants had "raised serious questions about the named

plaintiffs' standing."  Order at 18.  Plaintiffs' certifications and the declarations submitted by

Credit Suisse and Morgan Stanley demonstrated "that the named plaintiffs did not purchase in the secondary offering." Order at 18. Nor had plaintiffs pled any facts that might demonstrate that they could "trace any particular shares in the 75 million share pool that existed after the secondary offering to show that those shares came from the secondary offering." *Id*. at 18.

The Court then gave fair warning that plaintiffs would not get a pass if they were unable to fill the void identified in the Order: "If plaintiffs can never meet their burden of tracing their shares to the secondary offering, there is no reason to defer this question to a later stage." *Id*. at 18.

### 2.    The April 23 Hearing

The April 23, 2010 hearing on the prior motions to dismiss shines a spotlight on plaintiffs' inability to trace shares to the Offering. Plaintiffs could not rebut the evidentiary showing made in the declarations submitted by the Underwriters pursuant to Rule 12(b)(1). Accordingly, plaintiffs argued that they should not have to do so at the pleading stage, and focused their efforts on the now-abandoned assertions that they purchased stock in the Offering.

When pressed for an explanation of how plaintiffs might be able to meet their burden on Section 11 tracing, counsel advised that plaintiffs would do so by pursuing a course that the TAC has now exposed as a dead end: "You can ask for the original certificate and because all the stock is held [in] street name, so you have to trace back through street name and trace back through the broker." Transcript of April 23, 2010 hearing ("Tr.") at 25.

When the Court inquired whether that effort had been undertaken in this case, counsel advised that plaintiffs were "in the process of requesting," and that she had spoken to "a couple of brokers" who had the "understanding" that "their firms got the stock from Morgan Stanley and Credit Suisse." *Id*. According to plaintiffs, the brokers "had reason to believe" that they had acquired stock issued in the Offering, but that "the only way" to be sure was "to trace back and get those certificates and it's not easy to do." *Id*. at 25-26.

### B.    The TAC Implicitly Concedes That Plaintiffs Cannot Demonstrate Standing Or Subject Matter Jurisdiction

It is apparent from the TAC that plaintiffs' efforts to trace their stock to the January 29,

1   2009 Offering proved futile.  Plaintiffs acknowledge that they did not purchase stock in the

2   Offering by abandoning their Section 12 claim altogether, and there is no hint that any plaintiff

3   was able to trace stock back to the Offering in what counsel stated was "the only way" to do so.

4   Tr. at 25-26.

5       In sharp contrast to counsel's recitation at the April 23 hearing, the TAC does not <u>so much</u>

6   <u>as mention</u> any stock certificate, much less attempt to show how or why a stock certificate might

7   enable plaintiffs to trace any of their stock to the Offering.  Nor is there any allegation regarding

8   any statement or investigation by any broker concerning plaintiffs' attempts to "trace back

9   through the street name and trace back through the broker."  *Id*. at 25.  The best the TAC can do

10  in that regard is a convoluted assertion that one individual purchased stock through a broker who

11  cleared trades through Citigroup, which purportedly was "indistinguishable from" Morgan

12  Stanley as a result of a joint venture.  TAC ¶ 138.  Plaintiffs' conspicuous inability to follow

13  through on the statements made at the April 23 hearing is an implicit concession that they cannot

14  meet the burdens they must satisfy in order to prosecute this lawsuit.

15  **C.      The Allegations Added To The TAC Do Not Come Close To**
16  **Satisfying Plaintiffs' Burden On Standing Or Subject Matter**
    **Jurisdiction**

17      Having hit an obvious wall on the tracing plan outlined at the April 23 hearing, plaintiffs

18  are forced to fall back on allegations that go nowhere.  Rather than attempting to allege

19  affirmative facts, the TAC relies on empty assertions based primarily on information and belief

20  and the absence of facts.  Four of the eight purchases that provide the "basis" for plaintiffs'

21  claims were made before the Offering and hence could not possibly be traced to it under any

22  circumstances.  Because the stock purchased in the aftermarket following the Offering was

23  obtained through brokers and held in street name, the TAC is unable to marshal a single

24  allegation that might suggest a means of tracing the stock to the Offering.

25      **1.      The Standing Allegations Are Based On The *Absence* Of Facts**

26

27      As a review of the "Securities Act Standing Allegations" set forth in paragraphs 134-43

28  indicates, the "substantive" allegations regarding the ability of the individual plaintiffs to trace

1   their purchases to the Offering are made on information and belief and the absence of knowledge

2   or facts.  Despite counsel's efforts before and after the April 23 hearing, plaintiffs are unable to

3   make <u>any</u> meaningful affirmative statement that might discharge their affirmative burden.

4          Indeed, plaintiffs Wexler, McNulty and McClellan are reduced to alleging that each "is

5   <u>unaware of</u> any information which would indicate that the shares his agent and broker purchased

6   on his behalf were <u>not</u> either purchased directly -- or through intermediaries -- from the

7   Underwriter Defendants under the terms of the Secondary Offering," and that he is "therefore"

8   informed and believes that his shares "are traceable to the Offering."  TAC ¶¶ 135, 141, 143

9   (emphasis added).  Plaintiff Petzschke makes no standing allegations at all, even on information

10  and belief.

11         Although these vacuous statements add words to plaintiffs' standing assertions, they do

12  not add substance.  For that reason <u>alone</u>, they are patently insufficient to satisfy the legal burden

13  that plaintiffs bear on this motion.  *See* Order at 17; *Guenther v. Cooper Life Sciences, Inc.*, 759

14  F. Supp. 1437, 1439 (N.D. Cal. 1990); *Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870,

15  875-76 (N.D. Cal. 1986); *Colwell v. Dept. of Human Services*, 558 F.3d 1112, 1121 (9th Cir.

16  2009) (burden of standing rests with the plaintiff and it is evidentiary).

17         Moreover, to the extent plaintiffs are attempting to claim that their shares were somehow

18  purchased in the Offering, the evidence submitted via the declarations of Ryan Fitzpatrick, Jill

19  Ford and Scott Gregory refute the suggestion.  As the Court has previously held, "plaintiffs'

20  certifications and the Fitzpatrick and Gregory declarations show as a factual matter that the

21  named plaintiffs did not purchase in the January 29, 2009 secondary offering."  Order at 17.

22         The Court's holding is decisive, and the TAC does nothing to challenge it.  To the

23  contrary, plaintiffs drop the Section 12 claim because they cannot challenge the Order, or the

24  declarations, or the dates and prices of the underlying purchases.  The shares issued in the

25  Offering indisputably were sold on January 29, 2009 at $4.50 per share.  Fitzpatrick Decl. ¶ 2;

26  Gregory Decl. ¶¶ 2-4; Ford Decl. ¶ 2; TAC ¶¶ 17, 83, 84.  As the TAC itself makes clear, none of

27  the plaintiffs (including newly added Chris McNulty) purchased on January 29 <u>or</u> at $4.50 per

28  share.  TAC ¶¶ 135, 137, 140, 143.

2.      **Purchases Prior To January 29, 2009 Cannot Possibly Be Traced To The Offering**

Plaintiffs Wexler, Abrams, McNulty and McClellan all allege that they made purchases on January 28, 2009 -- the day before the Offering -- at prices ranging from $4.10 to $5.00, but not at the offering price of $4.50. TAC ¶¶ 135, 137, 140, 143.[3] For obvious reasons, stock purchased before an offering cannot be traced to that offering. *See, e.g., Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008) (noting that if stock is purchased before an offering "then no relief may be had as the pre-registration purchaser falls outside the scope of Section 11") (*citing Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967)).

Although the TAC (¶¶ 147-49) cites trading data in an apparent attempt to suggest that the Offering occurred on January 28th (the point of the allegation is unclear), any suggestion to that effect would be wholly unavailing. Again, the TAC itself alleges that the Offering occurred on January 29, 2009 (TAC ¶¶ 17, 83), and the declarations of individuals with personal knowledge confirm that fact. Fitzpatrick Decl. ¶ 2; Gregory Decl. ¶¶ 2-4; Ford Decl. ¶ 2.

The Offering was not even priced until after the market closed on January 28, 2009. Gregory Decl. ¶ 4. That is why the face of the Prospectus Supplement filed with the SEC on January 29th states that the closing price on January 28th was $4.60. RJN Ex. A.[4] Purchases from brokers on the 28th necessarily occurred before the close of the market, and before the pricing decision that was made after the close. The fact that the underwriting agreement with the Company was signed on January 28th (TAC ¶¶ 148, 149) does not imply, much less establish, that the Offering occurred on that date.

Nor would it matter if the Offering had occurred a day earlier. None of the plaintiffs who purchased stock on January 28 has come forward with anything to suggest that the shares could

---

[3] Plaintiffs Wexler, Abrams and McClellan also allege purchases on January 30. Petzschke does not allege any purchase at any price.

[4] Documents referenced in the TAC, or filed with the SEC, may be judicially noticed by the Court and considered on a motion to dismiss. *See* Fed. R. Evid. 201; *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (holding it was proper for district court to consider SEC filings incorporated by reference into the complaint). The Underwriters have filed a Request for Judicial Notice ("RJN") contemporaneously with this motion.

1    be traced to the Offering in any way, shape or form.  Indeed, as explained at pages 11-13 below,

2    plaintiffs cannot do so in this case.

3              **3.      Plaintiffs Fail To Trace Their Aftermarket Purchases
                         To The Offering**

4

5              The four purchases by plaintiffs Wexler, Abrams and McClellan on January 30, 2009

6    (TAC ¶¶ 135, 137, 143) are alleged to have occurred after the Offering, but they do nothing to

7    advance plaintiffs' efforts to establish standing and subject matter jurisdiction.  As the Court

8    noted at page 18 of the Order, the 24,500,000 shares issued in the January 29, 2009 Offering were

9    part of a 75 million share pool of fungible common stock trading in the aftermarket after the

10   Offering.[5]

11             Moreover, the majority of the shares issued in the Offering -- more than 13 million -- went

12   to Glencore International A.G., Century Aluminum's affiliate and major shareholder, and were

13   not available for purchase by plaintiffs after the Offering.  That reduces the new shares entering

14   the pool to about 11 million.  Because plaintiffs did not purchase in the Offering, it is not

15   surprising that they cannot trace their purchases to the Offering under those circumstances.

16             **a.      Plaintiffs' Stock Was Purchased From Brokers
                         And Is Held In Street Name**

17

18             As plaintiffs' counsel noted at the April 23 hearing, the stock at issue was purchased

19   through brokers and is held in street name.  Tr. at 25-26.  The TAC reinforces that fact by:

20   (1) dropping the Section 12 claim that requires a purchase in the Offering from the Underwriters;

21   (2) explicitly conceding that "Plaintiffs did not purchase shares from the Underwriter

22   Defendants" (¶ 151); and (3) alleging that plaintiffs purchased their shares through brokers

23   (¶¶ 135, 137, 138, 143).[6]

24

25   _____

26       [5] There were 49,052,692 shares outstanding immediately prior to the Offering.  RJN Ex. A at
     S-8.

27       [6] Although there is no explicit allegation that plaintiff McNulty purchased stock through a
     broker, paragraph 141 refers to an "indirect" purchase through "intermediaries," and states that
28   his purchase occurred before the January 29, 2009 Offering.

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
                                                                                                  DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
                                                                                                  CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

1    The fact that none of plaintiffs' stock was purchased from the Underwriters in the

2    Offering,[7] was purchased through a broker and, as plaintiffs' counsel noted at the April 23

3    hearing, is held in street name erects barriers that plaintiffs cannot surmount. Although counsel

4    suggested that tracing might nevertheless be established by consulting the brokers who sold

5    plaintiffs their stock and examining stock certificates (Tr. at 25-26), that purported avenue has

6    fallen completely off the table. With one exception, plaintiffs do not even <u>identify</u> such brokers,

7    and the TAC has nothing whatsoever to say about stock certificates. The single exception relates

8    to a purchase by plaintiff Abrams, and is significant only for its multiple deficiencies.

9    **b.     Plaintiff Abrams' Shares Cleared Through Citigroup**
         **And Cannot Be Traced To The Offering**

10

11   The TAC (¶¶ 137-38) alleges that plaintiff Abrams purchased shares from Vanguard

12   Brokerage Services, which executed the trade through Citigroup. According to plaintiffs, the fact

13   that Citigroup cleared the trade permits Abrams to trace his stock to the Offering because Morgan

14   Stanley purportedly was "involved in a joint venture with Citigroup, whereby the two entities

15   were indistinguishable." TAC ¶ 138. That attempt to connect Abrams' purchase to the Offering

16   bespeaks desperation.

17   First, Morgan Stanley and Citigroup had not completed a joint venture at the time Mr.

18   Abrams purchased his stock in January of 2009. The venture, Morgan Stanley Smith Barney,

19   closed on May 31, 2009, more than <u>four months after</u> Abrams' purchases. RJN Ex. B at 2;

20   Gregory Decl. ¶¶ 7-8 & Ex. A. Nor would Citigroup and Morgan Stanley have been

21   "indistinguishable" if the joint venture had closed in January of 2009.

22   Moreover, Citigroup did not receive Century Aluminum stock in the Offering. Gregory

23   Decl. ¶ 5; Ford Decl. ¶ 4. Accordingly, a purchase of Century Aluminum stock cleared through

24   Citigroup provides no indication whatsoever that the stock came from the January 29, 2009

25   Offering. Even if Abrams' broker had purchased stock directly from Morgan Stanley, however,

26   there would still be no basis for tracing the stock to the Offering because the shares could have

27

28   [7] *See* Order at 17; Fitzpatrick Decl. ¶¶ 5-6; Gregory Decl. ¶¶ 5-6.

1   come from the (much larger) pool of 49 million shares trading in the market from the Company's

2   initial public offering.

3       **D.      Plaintiffs _Can_not Discharge Their Burden Under Rule 12(b)(1)**

4         The problem confronting plaintiffs on this motion is not just that they have failed to come

5   forward with facts that might meet their burden of establishing subject matter jurisdiction; it is

6   that they <u>can</u>not do so.  The reasons plaintiffs are unable to connect their stock to the Offering are

7   woven into the fabric of the securities markets.

8         In explaining what the author referred to as "the impossibility of the tracing requirement"

9   after a secondary offering, a leading law review article stated the essence of the problem as

10  follows:  "Brokers hold shares in general accounts … neither the brokers nor the shareholders

11  know which issue of a particular security is being transferred."  Accordingly, "[s]hareholders who

12  buy securities after the second offering will be <u>unable</u> to trace their shares to either offering . . . ."

13  H. Sale, _Disappearing Without A Trace: Sections 11 and 12(a)(2) Of The 1933 Securities Act_, 75

14  Wash. L. Rev. 429, 466 (2000) (footnotes omitted) (emphasis added).

15        Plaintiffs' assertions that they directed brokers to purchase in the Offering and/or believe

16  their brokers got stock issued in the Offering (TAC ¶¶ 135, 137, 138, 143; Tr. at 25-26), add

17  nothing to the analysis.  It is no accident that plaintiffs are unable to allege any facts to support

18  such assertions.  Even when acting on directions to purchase stock from a secondary offering,

19  brokers cannot ensure that the stock actually came from the offering, or know after the fact

20  whether it did.  As the Sale article explains:  "Brokers <u>cannot</u> promise to provide only Offering

21  Shares because of the fungibility of shares in brokerage accounts.  Accordingly, the shares

22  received may or may not be Offering Shares.  And no matter what they receive, the purchasers

23  <u>cannot prove</u> what type of shares they own."  75 Wash. L. Rev. at 467 (footnotes omitted)

24  (emphasis added).

25        Courts have consistently dismissed Section 11 claims based on these fundamental market

26  realities at all stages of litigation.  _See, e.g., Krim v. PcOrder.com_, 402 F.3d 489 (5th Cir. 2005);

27  _Krim v. PcOrder.com, Inc_., 210 F.R.D. 581, 584-87 (W.D. Tex. 2002); _Barnes v. Osofsky_, 373

28  F.2d 269 (2d Cir. 1967); _Peters_, 550 F. Supp. 2d at 1373-77; _In re Quarterdeck Office Systems_,

1   1993 WL 623310 (C.D. Cal. Sept. 30, 1993); *Abbey*, 634 F. Supp. 870; *Kirkwood v. Taylor*, 590

2   F. Supp. 1375 (D. Minn. 1984), *aff'd*, 760 F.2d 272 (8th Cir. 1985); *Lorber v. Beebe*, 407 F.

3   Supp. 279, 285-87 (S.D.N.Y. 1976), *amended by*, 1976 WL 768 (S.D.N.Y. Feb. 11, 1976).

4           As the Second Circuit emphasized in 1967 -- even before the advent of fully electronic

5   data entries that credit and debit undivided interests in massive accumulations of stock held by

6   Depository Trust Corporation[8] -- it was "often impossible to determine whether previously traded

7   shares are old or new" because "brokerage houses do not identify specific shares with particular

8   accounts but instead treat the account as having an undivided interest in the house's position."

9   *Barnes*, 373 F.2d at 272.  Brokers "neither know nor care" whether their customers "are getting

10  newly registered or old shares."  *Id.*

11          The reasons that transactions through brokers make tracing extraordinarily difficult, if not

12  impossible, after a secondary offering were further elucidated in *Kirkwood*:

13              Participating brokers deposit the securities they hold in street name
                with DTC [Depository Trust Corp.] Purchases and sales are
14              accomplished <u>by book entries crediting or debiting the brokerage
                firm's account,</u> facilitating the transfer of securities without
15              requiring physical movement of any certificates.

16              . . . The DTC holds all certificates, <u>both old and new,</u> in its nominee
                name <u>as pooled shares in a fungible mass for the benefit of all of its
17              members</u>.

18
    590 F. Supp. at 1378-79 (emphasis added).
19

20          In short, a purchase of stock held in street name after a secondary offering is nothing more

21  than an electronic credit against a fungible account that "contains" shares from multiple offerings.

22  *See, e.g., id.* at 1380; *Krim*, 402 F.3d at 498, 499; *Krim*, 210 F.R.D. at 586-87; *Abbey*, 634 F.

23  Supp. at 875-76.  Looking at stock certificates thus provides no basis for determining whether the

24  purchase was of stock issued in an initial offering, or a subsequent offering of the same class of

25  stock.

26

27
    _____
28          [8] *See* Sale, 75 Wash. L. Rev. 429 at note 236.

1    Moreover, even when the vast majority of the "fungible mass" is attributable to the

2    offering at issue, a plaintiff even cannot satisfy Section 11's tracing requirement, or establish

3    standing or subject matter jurisdiction, based on probabilities. *See, e.g., Krim*, 402 F.3d at 492-99

4    (shares from offering comprising 99.85% of the certificate pool insufficient); *In re Quarterdeck*,

5    1993 WL 623310 at *2-*3 (97% probability insufficient). In this case, the probabilities run

6    sharply in the <u>other</u> direction. Only about 11 million of the 24.5 million shares issued in the

7    Offering were available for trading in the aftermarket (more than 13 million went to Glencore),

8    and more than 49 million shares were in circulation prior to the Offering.

9    The bottom line is that under the facts of this case plaintiffs cannot possibly trace their

10   shares to the January 29, 2009 Offering. Nothing in the TAC suggests anything to the contrary,

11   or provides any basis for disputing the evidence submitted by the Underwriters. Plaintiffs'

12   Section 11 claim should therefore be dismissed with prejudice for lack of standing and subject

13   matter jurisdiction.

14   **E.      Plaintiffs' Section 15 Claim For "Control Person" Liability Must Be
            Dismissed For Lack Of Standing And Subject Matter Jurisdiction**

15

16   Absent a primary violation of Section 11, a Section 15 claim must be dismissed. *E.g.,*

17   *Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1151 (N.D. Cal. 2006), *aff'd,* 551 F.3d

18   1156 (9th Cir. 2009) (dismissing Section 15 claim for failure to plead primary violation).

19   Because plaintiffs lack standing to assert a primary violation of the securities laws against

20   the Underwriters, they have no standing to assert a claim for secondary liability under Section 15.

21   *In re Exodus Commc'n, Inc. Sec. Litig.*, 2006 WL 1530081, at *2 n.2 (N.D. Cal. June 2, 2006)

22   (noting that if a plaintiff "lacks standing to assert a § 11 claim, he likewise lacks standing to assert

23   his § 15 claim."). *See also In re MusicMaker.com Sec. Litig.*, 2001 WL 34062431 at *15 (C.D.

24   Cal. June 4, 2001); *Brody v. Homestore, Inc.*, 2003 WL 22127108, at *4 (C.D. Cal. Aug. 8,

25   2003). Absent standing plaintiffs cannot demonstrate subject matter jurisdiction. *See In re*

26   *Exodus Cmmc'n, Inc. Sec. Litig.*, 2006 WL 2355071, at *2 (N.D. Cal. Aug. 14, 2006).

27

28

1

**II.   PLAINTIFFS' SECTION 11 CLAIM SHOULD ALSO BE DISMISSED
UNDER RULE 12(b)(6) ON SEVERAL ADDITIONAL GROUNDS**

2

3            Although further analysis is unnecessary because under Rule 12(b)(1) plaintiffs lack

4    standing and subject matter jurisdiction to assert any claim under Sections 11 or 15, the TAC

5    should also be dismissed because it fails to satisfy the applicable pleading requirements under

6    Rule 12(b)(6).  Even without reference to the evidence submitted by the Underwriters pursuant to

7    Rule 12(b)(1), the TAC fails because it does not allege specific and plausible facts on the

8    essential element of tracing.  The Section 11 claim is also fatally defective under Rule 12(b)(6)

9    because plaintiffs' "substantive" allegations are based on a false premise that is directly

10   contradicted by the documents on which plaintiffs purport to rely, and contravene established

11   Ninth Circuit and Supreme Court pleading requirements.  Plaintiffs also plead no facts to support

12   the conclusion that the Underwriters breached a duty of due diligence by failing to correct an

13   error in GAAP accounting that was reviewed by expert accountants.

14       **A.    Plaintiffs Fail To Allege Specific And Plausible Facts That
                Demonstrate Tracing**

15           This Court has made clear that to survive a motion under Rule 12(b)(6) plaintiffs must

16   plead "facts" showing an ability to trace their shares to the Offering in order to allege a viable

17   Section 11 claim.  Order at 19.  *Accord Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996)

18   (Illston, J.) (granting motion to dismiss Section 11 claim where plaintiff failed to plead sufficient

19   facts demonstrating tracing).

20           Other courts have emphasized the same point.  *See, e.g., Peters*, 550 F. Supp. 2d at 1376

21   (granting motion to dismiss Section 11 claim where plaintiffs failed to proffer "evidence"

22   demonstrating that the shares could be traced to the secondary offering); *Lee v. Ernst & Young,*

23   *LLP*, 294 F.3d 969, 978 (8th Cir. 2002) (Section 11 claim could proceed only if plaintiffs make "a

24   *prima facie* showing" that the shares they purchased are traceable to the challenged registration

25   statement) (emphasis added).

26           The Supreme Court amplified the requirement of pleading facts in *Bell Atlantic Corp. v.*

27   *Twombly* , 550 U.S. 544, 555, 570 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-51 (2009),

28

1   by instructing courts to reject at the pleading stage conclusory allegations which do not rise above

2   the "speculative" level and do not state a claim which is "plausible on its face."  See Order at 6;

3   *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).  Legal conclusions couched as

4   factual allegations are disregarded.  *Iqbal*, 129 S. Ct. at 1949-50; *Moss*, 572 F.3d at 969.  Courts

5   in the Ninth Circuit have relied on these rules in dismissing Section 11 claims.

6          The Ninth Circuit has held, for example, that a Section 11 claim that is supported by

7   "mere conclusory statements" is not "facially plausible" and fails to state a claim under *Iqbal* and

8   Rule 8.  *Sherman v. Network Commerce Inc.*, 346 F. App'x 211, 213 (9th Cir. 2009) (affirming

9   dismissal of Section 11 claim based on "unadorned allegations" that Company did not disclose a

10  general plan to pay senior executives additional compensation because allegations were not

11  "facially plausible") (citing *Iqbal*, 129 S. Ct. at 1949).  *See also In re Shoretell Ins. Sec. Litig.*,

12  2009 WL 2588881, at *4, *7 (N.D. Cal. Aug. 19, 2009) (dismissing Section 11 claim alleging

13  misstatements and omissions relating to the monitoring of key financial metrics and

14  demonstration products); *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *11-12 (C.D. Cal.

15  May 30, 2008) (dismissing Section 11 claim based on channel stuffing allegations under *Twombly*

16  because "[w]ithout more allegations to flesh out how stuffing rendered the prospectus misleading,

17  plaintiff's right to relief cannot rise above the speculative").

18         To survive the pleading stage under *Twombly* and *Iqbal*, plaintiffs must allege facts that

19  "actively and plausibly suggest" the conclusion urged in the complaint.  *Twombly*, 550 U.S. at

20  557.  *See, e.g., Port Dock & Stone Co. v. Old Castle Northeast, Inc.*, 507 F.3d 117, 121 (2d. Cir.

21  2007) (citing *Twombly*); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 469-70 (S.D.N.Y. 2009)

22  (applying *Twombly* and *Iqbal* in dismissing Section 11 and 12(a)(2) claims).  The TAC does not

23  come close to pleading facts showing that plaintiffs' tracing allegations are "plausible on their

24  face."

25         Plaintiffs attempt to rely on conclusory assertions that they "purchased Century

26  Aluminum stock directly traceable to the Company's Offering . . . ."  TAC ¶¶ 134, 136, 139 ,

27  142.[9]  Piling one conclusory assertion on top of another, the TAC asserts that plaintiffs' shares

28  _____

[9] Plaintiffs do not even attempt to plead facts showing that plaintiff Eric Petzschke can trace

1   were purchased through unnamed brokers, who, on information and belief, satisfied their orders

2   with stock that came from the Offering.  *See, e.g.,* TAC ¶¶ 135, 137, 140, 143.  Rather than

3   alleging facts, plaintiffs attempt to rely on the <u>absence</u> of facts, including by offering the

4   irrelevant observation that they are "unaware of any information" suggesting  that they cannot

5   trace their shares back to the Underwriters "under the terms" of the Offering.  TAC ¶¶ 135, 141,

6   143.

7       Although plaintiff Abrams identifies Vanguard Brokerage Services as his broker, he

8   admits that he can only trace his shares back to Citibank, which allegedly cleared the trade -- not

9   to the Offering or the Underwriters.  Judicially noticeable facts demonstrate that (as noted above)

10  the joint venture between Citibank and Morgan Stanley did not close until May 31, 2009, over

11  four months after plaintiff Abrams made his January 2009 purchases.  RJN Exs. B at 2 and C.

12  Moreover, the TAC does not -- and plainly cannot -- plead facts that might (1) support the

13  remarkable assertion that Morgan Stanley and Citigroup would have been "indistinguishable" <u>if</u>

14  there <u>had been</u> a joint venture when Abrams purchased his stock, or (2) demonstrate how the

15  existence of a joint venture might enable him to trace shares to the Offering.

16      Plaintiffs' allegations regarding the volume of trading in the January 28-30, 2009

17  timeframe plainly do not allege tracing.  TAC ¶ 147.  Even assuming that a greater number of

18  shares from the Offering traded on high volume days, the only point one might abstract from that

19  fact is that it was somewhat more probable -- though still unlikely -- that plaintiffs acquired

20  shares traceable to the Offering.  That fact would be unavailing as a matter of law.  Attempts to

21  demonstrate tracing via probabilities or statistical analysis are uniformly rejected.  *See, e.g., Krim*,

22  402 F.3d at 492, 496-98, 502 (holding that 99.85% statistical likelihood of tracing shares to

23  offering is insufficient).

24

25

26

27

28  his shares.  *See* TAC ¶¶ 134-152.

UNDERWRITERS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFFS' THIRD AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT - (CASE NO. 3:09-CV-01001-SI)

**B.    The TAC Fails To Plead Facts To Support The Conclusion That The Underwriters Breached A Duty Of Due Diligence**

Plaintiffs fail to remedy their prior pleading defects by repeating the bald assertion that the Underwriters breached "a duty to make a reasonable and diligent investigation" of the truth of the statements in the Prospectus Supplement (TAC ¶ 190).  Once again, plaintiffs make no attempt to plead any facts to support that conclusion, which is contradicted by the TAC and the documents from which it purportedly is derived, and insufficient as a matter of law.  *See, e.g., In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 957 (N.D. Cal. 2007) ("[c]onclusory allegations of law … are insufficient to defeat a motion to dismiss"); *Sprewell v. Golden State Warriors*, 266 F.3d 976, 988 (9th Cir. 2001).

The misstatement alleged in the TAC is based on a GAAP interpretation far outside the expertise or role of underwriters.  Underwriters are not accounting experts, and do not audit, review or "certify" financial statements for compliance with GAAP.  Such analysis is the province of accountants and outside auditors.

As the Prospectus Supplement makes clear, the financial statements used in the Offering, and the internal controls used to generate them, were audited and/or reviewed by Deloitte & Touche LLP, which consented to use of its name as an expert in connection with the Offering.  RJN Ex. A at S-53, B-6.  The fact that expert accountants could not identify the fact that GAAP required a reclassification within the statement of cash flows demonstrates that the correction required under the applicable accounting rules was well beyond the scope and expertise of underwriters.

As the Ninth Circuit noted in *In re Worlds of Wonder Sec.Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994): "It is absurd…for Plaintiffs to suggest that the other defendants, who are not accountants possibly could have known of any mistake by [the auditors].  Therefore, even if there are errors in the financial statements, no defendant except [the auditors] can be liable under Section 11 on that basis."  As before, plaintiffs make no attempt whatsoever to plead how or why the Underwriters "possibly could have known of any mistake" by the auditors, how or why they

1   purportedly breached their duties, or why it was not reasonable for them to have relied on Deloitte

2   & Touche.[10]

3       Furthermore, the TAC's assertion (¶¶ 169, 171) that the Underwriters knew the financial

4   statements in the Prospectus Supplement were false, but hid the truth and went forward with the

5   Offering anyway, triggers another layer of pleading standards that plaintiffs fail to meet.  Because

6   such allegations "sound in fraud" they must be pled in accordance with Rule 9(b).  *See, e.g., In re*

7   *Iasia Works, Inc. Sec. Litig.*, 2002 WL 1034041, at *5 (N.D. Cal. May 15, 2002) (Illston, J.)

8   (allegations that defendants deliberately hid the truth and failed to correct misleading prospectus

9   sound in fraud under 9(b)); *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405-06 (9th Cir. 1996)

10  (Rule 9(b) applies to a Securities Act claim where it is "grounded in fraud").

11      Although plaintiffs are willing to level baseless accusations, they are wholly unable to

12  plead facts that might support them, and make no attempt to satisfy Rule 9(b).  The TAC says

13  nothing at all regarding who supposedly knew that the financial statements contained an error, or

14  how or when such knowledge supposedly was obtained.  Moreover, plaintiffs do not allege with

15  particularity -- or at all -- how the Underwriters could have possibly detected the accounting

16  error, why they would have second-guessed Century Aluminum's accounting professionals and

17  outside auditors, or why the Underwriters could possibly have wanted to conceal the mistake.

18      An inference that the Underwriters would risk damage to their reputations by deliberately

19  disregarding a known accounting error cannot pass muster under any standard -- particularly

20  when the inference is "based" solely on an unadorned conclusion.  *See, e.g., Wenger v. Lumisys,*

21  *Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998) (rejecting argument that underwriters were

22  motivated to commit fraud in order to "get the underwriting business" for the IPO and "pocket

23

24      [10] Even if the Court were to disregard plaintiffs' allegations that the Underwriters are liable
    because they breached a duty to conduct reasonable due diligence, and treated due diligence
    solely as an affirmative defense, dismissal would still be appropriate under Rule 12(b)(6).  As a
25  matter of law, the Underwriters were entitled to rely on the accountants' review of the financial
    statements used in the Offering.  *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp.
26  2d 1132 1174-75, 1182 (C.D. Cal. 2008) ("Underwriter Defendants have a due diligence defense
    on the face of the [Complaint] as a matter of law.  The defense only covers <u>accounting-related</u>
27  allegations in one year.  This is because underwriters may reasonably rely on auditors'
    statements, absent red flags that the underwriters were in a position to see.") (emphasis in
28  original).

1   millions from the IPO proceeds as the lead underwriters"); *In re WRT Energy Sec. Litig.*, 1999

2   WL 178749, at *9 (S.D.N.Y. Mar. 31, 1999) (noting "it would be unlikely for the Underwriter

3   Defendants to risk their reputations in order to generate fees likely amounting to only a small

4   percentage of their annual revenues") (internal punctuation omitted).  Nor do such allegations rise

5   above the speculative level, or state a plausible claim under *Twombly* and *Iqbal*.

### C.    Plaintiffs' Allegations Are Based On A False Premise And Fail To Comply With Governing Pleading Standards

8       Plaintiffs' Section 11 claim further fails to pass muster under Rule 12(b)(6) because it is

9   based on a false, conclusory and implausible premise that is directly contradicted by the

10   documents upon which plaintiffs purport to rely.  The gravamen of plaintiffs' substantive

11   assertions is that the accounting restatement they seek to exploit effected a dramatic revision to

12   the Company's financial position, cash and liquidity, and that it turned a company that was "cash

13   rich" into one that was cash poor. TAC ¶¶ 10, 12, 18, 92; Order at 2.  That assertion is directly

14   refuted on the face of the Prospectus Supplement and the March 2, 2009 8-K (RJN Ex. D)

15   referenced in the TAC, and which are properly before the Court on this motion.  As shown below,

16   these allegations fail to comply with fundamental pleading standards required by the Ninth

17   Circuit and the Supreme Court.

18       The law is clear that "conclusory allegations of law, unwarranted deductions of fact, or

19   unreasonable inferences are insufficient to defeat a motion to dismiss."  *In re Late Fee*, 528 F.

20   Supp. 2d at 957; *Sprewell*, 266 F.3d at 988; Order at 6.  While factual allegations are generally

21   taken as true, that is not a license to rely on allegations or inferences that are unreasonable.[11]  *See,*

22   *e.g., Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

23       Nor can plaintiffs evade dismissal under Rule 12(b)(6) by mischaracterizing the

24   documents cited in the TAC.  It is the documents, not the TAC's characterization of them, that

---

[11] *See also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2009) (noting that courts, when examining 12(b)(6) motions, have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations").

19

control; allegations that contradict the documents are disregarded.  *See, e.g., Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); *In re Infonet Servs. Sec. Litig.*, 310 F. Supp. 2d 1080, 1087-88 (C.D. Cal. 2003).  Because the TAC paints a picture that collides head-on with the documents upon which it purports to be based, the conflicting allegations must be disregarded.  *See, e.g., In re Stac Elec.*, 89 F.3d at 1405.

Plaintiffs' claims are founded upon the two-pronged premise that (1) the Prospectus Supplement and the financial statements it incorporated portrayed Century Aluminum as a "cash rich" company with excellent liquidity that was well-positioned to weather a difficult business environment, and (2) there was a dramatic revision of the Company's financial position, cash and liquidity after the Offering.  The Prospectus Supplement and the 8-K from which those assertions are derived demonstrate that both prongs are false.  Neither passes muster under the controlling pleading rules.

The TAC repeatedly attempts to portray the restatement as working a $924 million reduction in the cash reflected on Century Aluminum's balance sheet statement of in cash flows.  *See, e.g.,* TAC ¶¶ 10, 12-13, 18, 80, 85, 92, 161.  In fact, the March 2, 2009 8-K that describes the restatement, and quantifies the differences between the financial statements as originally reported, and as restated, shows that cash at the end of the reporting period, and net change in cash, were <u>exactly the same</u> before and after the restatement -- to the penny.  RJN Ex. D.  The only change to the statement of cash flows was a recharacterization regarding "operating activities" and "financing activities."  *Id.*  Furthermore, the details of the transaction being reported were fully disclosed in the Prospectus Supplement.  *See, e.g.,* RJN Ex. A, at S-5 - S-6, S-37 - S-39, S-41 - S-44.

Plaintiffs' assertions that Century Aluminum's financial statements "inflated" the Company's statement of cash flows and "cash position" (*e.g.,* TAC ¶¶ 10, 13, 20), that investors "were being told" that the Company was "cash rich" (*e.g.,* ¶¶ 10, 12, 18, 92), and that the Company later "revealed" that Century Aluminum's, "access to cash, and cash on hand" had been dramatically overstated (*e.g.,* ¶ 161), are baseless -- not merely unsupported and implausible.  The

20

1   restatement reclassified an amount reported on the operating activity line to the financing activity

2   line.  That is all.  RJN Ex. D; TAC ¶ 153.  Again, the total cash flows -- and the ending cash

3   number and the cash on the balance sheet -- were the same before and after the restatement.

4         The allegations upon which plaintiffs' Section 11 claim is founded are thus refuted by the

5   very SEC filings from which they purportedly are derived.  Accordingly, they should be given no

6   consideration in assessing the viability of the TAC.  See, e.g., In re Calpine Corp. Sec. Litig., 288

7   F. Supp. 2d 1054, 1078 (N.D. Cal. 2003).

8         The TAC's pronouncements that the Company "inflated" its statement of cash flows in

9   connection with the January 2009 Offering (TAC ¶ 153) in order to "lead investors . . . to believe

10  that the Company had sufficient resources to cover any shortfalls" and "easily weather the

11  financial 'storm' which was ravaging the economy" (¶ 154) are also directly contradicted by the

12  Prospectus Supplement,[12] and can be disregarded for that reason  The Supplement repeatedly

13  emphasized the material adverse effects that declining aluminum prices and the global financial

14  crisis were having on the Company's cash flows, liquidity and financial position.  RJN Ex. A at

15  S-2, S-4, S-13, S-14.  It specifically warned that actions to reduce costs would be necessary in

16  order to generate the liquidity required to operate through 2009, and that there could be no

17  assurance such reductions would be sufficient.  Id. at S-2, S-14, S-23, S-35.  In addition to

18  reporting large losses and pointedly emphasizing liquidity concerns, the document warned that

19  the global financial crisis was taking a serious toll on Century Aluminum's access to credit, and

20  further cautioned that the Company's credit rating had been reduced by two credit rating

21  agencies.  RJN Ex. A, at S-14, S-18.[13]

22

23  [12] See, e.g., RJN Ex. A at S-2 ("If prices remain at current levels or continue to decline, we
    will have to take additional action to reduce costs, including significant curtailment of our
24  operations, in order to have the liquidity required to operate through 2009, and there can be no
    assurance that these actions will be sufficient."); at S-13 ("Recent declines in aluminum prices
25  have adversely affected our financial position and results of operations and could result in a
    curtailment of operations"); S-18 ("A continued downturn in primary aluminum prices may force
    further curtailment of all or a portion of our operations at one or more facilities.").

26  [13] In statements that are diametrically opposed to the central theme of the TAC, the Offering
    document specifically warned:  (1)  that the downturn in aluminum prices "significantly reduced
27  the amount of cash available to meet [the Company's] current obligations and fund [its] long-term
    business strategies" (id., at S-18), and (2) "[b]ecause our U.S. operations are not cash flow
28  positive … the Company will need sources of liquidity other than from its operations to fund

Such pointed warnings and disclosures demolish the foundation upon which plaintiffs attempt to erect their Section 11 claim.  Indeed, it is difficult to imagine what more the Prospectus Supplement could have said to make clear that the Company was <u>not</u> cash rich, did <u>not</u> have ample liquidity, and was <u>not</u> comfortably positioned to ride out any financial storm. [14]

Under Ninth Circuit law, conclusory allegations that are contradicted by the underlying documents cannot withstand a motion to dismiss.  Nor can they rise above the speculative level, or allege a claim that is plausible on its face as required by recent Supreme Court decisions.  *See Twombly*, 550 U.S. at 570; *Moss*, 572 F.3d at 969.  *See* Order at 6.[15]

### D.  Plaintiffs Cannot Plead A Section 15 Claim For "Control Person" Liability Against The Underwriters

To state a claim for control person liability, a plaintiff must allege:  (1) a primary violation of the securities laws; (2) that the defendant exercised actual power or control over the primary violator; and (3) that the defendant possessed the power to directly or indirectly control the

---

operations and investments." *Id.* at S-2.

[14] Moreover, the allegations in the TAC contradict themselves.  Parts of the TAC include allegations that investors believed the Company was "cash rich," yet other parts discuss the Company's difficulties due to the downturn in the economy.  *Compare* ¶ 18 (alleging investors invested "believing that the Company was liquid and cash rich") and ¶ 92 ("shareholders and potential investors in Century Aluminum were being told that the Company was cash rich") *with* ¶ 59 ("in mid-2008 Century Aluminum found itself in debt to the tune of over three quarters of a billion dollars" to Glencore) and ¶¶ 69, 71 (allegations relating to the Company's losses).  Thus, not only do the judicially noticeable documents undermine plaintiffs' baseless theory of the case, their own complaint refutes their central claim that the Company was somehow telling investors it was "cash rich."

[15] The Underwriters demonstrated in the prior round of briefing that a single forward-looking statement in the Prospectus Supplement regarding the Company's "expectations" for liquidity in the coming 18 months was neither false nor actionable because it was protected under the bespeaks caution doctrine and by the PSLRA's safe harbor.  Plaintiffs conceded in their Opposition during that round of briefing (Doc. No. 76 at pp. 17:14-17 and 18:1-2) that they were not alleging the forward-looking liquidity statement was false.  Because plaintiffs have already conceded that the liquidity statement -- repeated in the TAC -- does not form a basis for liability, the Underwriters do not address that allegation here.  *See* TAC ¶¶ 19, 85, 161, 167.  To the extent plaintiffs attempt to reverse course and contradict their prior pleadings, the Underwriters reserve the right to address this matter on reply.  *See also* Underwriter Defendants' Memorandum of Points and Authorities In Support of Motion To Dismiss Plaintiffs' First Consolidated Amended Complaint (Doc. No. 73) at pp. 19-22 and Underwriter Defendants' Reply Memorandum of Points and Authorities In Support of Motion To Dismiss First Amended Consolidated Complaint (Doc. No. 84) at pp. 14-15.

1 specific transaction that is the focus of the primary violation.[16] *Howard v. Everex Sys., Inc.*, 228

2 F.3d 1057, 1065 (9th Cir. 2000); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151

3 (9th Cir. 1996). As shown above, absent primary liability there can be no secondary or "control

4 Person" liability. *See* Section I.E.

5       Even if plaintiffs could show a primary violation, the Section 15 claim still fails as a

6 matter of law because the TAC does not (and cannot possibly) plead <u>facts</u> demonstrating that the

7 Underwriters were control persons as defined under the other elements of the statute. *Lilley*, 936

8 F. Supp. at 716-17 (dismissing control person allegations where plaintiffs failed to allege "facts"

9 showing that each defendant "possessed the actual power to control the person primarily liable.")

10 *See also Howard*, 228 F.3d at 1065; *In re Exodus Commc'n, Inc. Sec. Litig.*, 2005 WL 1869289,

11 at *45 (N.D. Cal. Aug. 5, 2005).

12       It is axiomatic that underwriters do not control issuers. *See, e.g., In re Stratosphere Corp.*

13 *Sec. Litig.*, 1 F. Supp. 2d 1096, 1122 (D. Nev. 1998). Rather, the management of the Company

14 and its officers and directors control the affairs of the corporation. *See, e.g.*, 8 Del. C. § 141(a); 2

15 Fletcher Cyc. Corp. § 495. Accordingly, because the TAC is devoid of any facts showing that the

16 Underwriters possessed the actual power to control any of the Company-affiliated individual

17 defendants or the transaction itself, the Section 15 claim fails on these grounds as well.

18 
19 ## CONCLUSION

20       For all of the reasons stated above, the TAC should be dismissed as to Credit Suisse and

21 Morgan Stanley, with prejudice and in its entirety. As the Court noted in dismissing the First

22 Amended Complaint, the Section 11 claim must be dismissed under Rule 12(b)(1) if plaintiffs

23 cannot discharge their affirmative burden on tracing, standing and subject matter jurisdiction. It

24 is now crystal clear they cannot do so, and the TAC is fatally defective under Rule 12(b)(6) as

25 well.

26
27     [16] Controlling person analysis is the same under Section 15 of the 1933 Act and under Section

28 20(a) of the 1934 Act. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990).

1   Dated:  July 9, 2010                    ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                           By:  _____/s/ Robert P. Varian_____

4                                                      Robert P. Varian

5                                           Attorneys for Defendants
                                            MORGAN STANLEY & CO. INCORPORATED
6                                           AND CREDIT SUISSE SECURITIES (USA) LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28