1  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
2  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
3  RACHELE R. RICKERT (190634)
   rickert@whafh.com
4  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
5  750 B Street, Suite 2770
   San Diego, CA 92101
6  Telephone: 619/239-4599
   Facsimile:  619/234-4599
7

8  Lead Counsel for Plaintiffs

9

10

11                 UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                     SAN FRANCISCO DIVISION

14

15  *In re* CENTURY ALUMINUM            )  Case No.  C 09-1001 SI
    COMPANY SECURITIES LITIGATION       )  [Consolidate With Case Nos. C 09-1103 SI,
16  _____ )  C 09-1162 SI, C 09-1205 SI]
                                        )
17  This document relates to all actions. )
                                        )  **PLAINTIFFS' OPPOSITION TO THE**
18                                      )  **CENTURY DEFENDANTS' MOTION**
                                        )  **TO DISMISS THIRD AMENDED**
19                                      )  **CONSOLIDATED CLASS ACTION**
                                        )  **COMPLAINT (DKT NO. 99)**
20                                      )  **(SECURITIES AND EXCHANGE**
                                        )  **ACT OF 1934, 15 U.S.C. § 78** *et seq.***)**
21                                      )
                                        )
22                                      )  DATE:      September 3, 2010
                                        )  TIME:      9:00 A.M.
23                                      )  DEPT.      10, 19th Floor
                                        )  JUDGE:     Hon. Susan Illston
24  _____ )

25

26

27

28

PLNTFFS' OPP TO DEFS' MOT TO DISMISS THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii-iii

I.      INTRODUCTION ........................................................................................1

II.     PLAINTIFFS' ALLEGATIONS IN THE THIRD AMENDED COMPLAINT.....................3

        A.   Century Faced Falling Aluminum Prices..........................................3

        B.   Century's False Financial Statements...............................................4

        C.   Scienter Allegations Against the Century Defendants.......................6

III.    LEGAL STANDARDS..................................................................................7

IV.     SCIENTER IS ADEQUATELY ALLEGED ......................................................8

        A.   The TAC Adequately Alleges that the Century Defendants Knew
             That the Third Quarter Cash Flow Statement was Manipulated.........9

        B.   The TAC Allegations Raise a Strong Inference
             of Scienter Under Applicable Law...................................................10

             1.   Allegations of Significant Direct and Circumstantial
                  Evidence of Scienter is Sufficient...........................................10

             2.   The Officer Defendants, Given Their Day-to-Day Responsibility
                  for Monitoring Century's "Core" Operations, Knew or
                  Recklessly Disregarded the Facts Contradicting
                  the Public Statements of Cash Flow From Operations .............12

             3.   Plaintiffs' Allegations, Taken Collectively, Give
                  Rise to a Strong Inference of Scienter .....................................15

        C.   Plaintiffs Have Sufficiently Pled Control Person Liability.............17

V.      LEAVE TO AMEND SHOULD BE FREELY GRANTED .................................17

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                                                   **PAGE**

3

*Atlas v. Accredited Home Lenders Holding Co.*,

4

   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ....................................................................................12

*Bernson v. Applied Signal Tech.*,

5

   527 F.3d 982 (9th Cir. 2008) ...............................................................................8, 9, 13, 14

6

*Burrrit v. NutraCea*,
   No. CV-09-00406-PHX-FJM,

7

   2010 U.S. Dist. LEXIS 17544 (D. Az. February 24, 2010) ..........................................16

8

*Eminence Capital, LLC v. Aspeon, Inc.*,

9

   316 F.3d 1048 (9th Cir. 2003) ...................................................................................17

*Foman v. Davis*,

10

   371 U.S. 178,

11

   83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ........................................................................17

12

*Glazer Capital Mgmt. v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ................................................................................14, 15

13

*Hodges v. Akeena Solar, Inc.*,

14

   No. C 09-02147 JW,
   2010 U.S. Dist. LEXIS 68320 (N.D. Cal. May 20, 2010) ...........................................16

15

*Howard v. Everex Sys., Inc.*,

16

   228 F.3d 1057 (9th Cir. 2000) ...................................................................................17

17

*In re Cadence Design Systems, Inc. Securities Litig.*,
   No. 08-4966 SC,

18

   2010 WL 726515 (N.D. Cal. March 2, 2010) ............................................................15

19

*In re Century Aluminum Co.*,
   No. C 09-1001 SI,

20

   2010 U.S. Dist. LEXIS 41062 (N.D. Cal. April 27, 2010) ....................................6, 8, 9

21

*In re Connectics Corporation Securities Litig.*,
   No. C07-02940 SI,

22

   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)...........................................................11

23

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................12, 14

24

*In re Lattice Semiconductor Corp. Sec. Litig.*,

25

   No. CV 04-1255 AA, 2006 WL 538756 (D. Or. Jan. 3, 2006)...................................13

26

*In re PMI Group, Inc. Securities Litig.*,
   Nos. C-08-1405 SI, C-08-1406 SI,

27

   2009 WL 1916934 (N.D. Cal. July 1, 2009)..............................................................7

28

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007) ................................................................13

*In re Verifone Holdings, Inc. Sec. Litig.*,
    No. C-07-06140 MHP,
    2009 WL 1458211 (N.D. Cal. May 26, 2009) .................................................. 14-15

*McCasland v. Formfactor, Inc.*,
    No. C 07-5545 SI,
    2009 Wl 2086168 (N.D. Cal. July 14, 2009) ......................................................15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................................................8

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) .................................................................................14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*,
    320 F.3d 920 (9th Cir. 2008) ........................................................................14, 17

*Nursing Home Pension Fund, Local 144 v. Oracle*,
    380 F.3d 1226 (9th Cir. 2004) .............................................................................12

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ...............................................................................17

*Plumbers Union Local No. 12 v. Ambassador's Group*,
    No. CV-09-00214-JLQ,
    2010 U.S. Dist. LEXIS 53754 (E.D Wash. June 2, 2010) .................................16

*South Ferry LP #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................8, 9, 10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308,
    127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ...............................................1, 7, 8, 11

**STATUTES**

15 U.S.C.
    *§ 77 et seq* ..........................................................................................................1
    *§ 78 et seq.* .........................................................................................................1
    *§ 78u-4(b)(2)* ......................................................................................................7

**RULES**

Federal Rules of Civil Procedure (Fed. R. Civ. P.)
    Rule 12(b)(6) .........................................................................................................7
    Rule 15(a)(2) .........................................................................................................17

## I.   INTRODUCTION

This is a consolidated federal securities class action that separately sets forth claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 *et seq*., and under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 *et seq*.  This Memorandum addresses *only* the Century Defendants' Motion to Dismiss as it relates to Plaintiffs' Exchange Act claims.[1] Plaintiffs' opposition to the Century Defendants' Motion to Dismiss as it relates to the Securities Act claims is contained in Plaintiffs' Omnibus Opposition to the Century Defendants' and the Underwriter Defendants' Motion.

Plaintiffs' allegations (and the fraudulent scheme that they describe) are straight-forward, primarily relate to a single key accounting precept, and stem from a misstatement of cash flows from operations in the November 2008 Quarterly Report [Century Aluminum Co., Quarterly Report (Form 10-Q) (November 10, 2008) ("November 2008 Quarterly Report")] and January 2009 Registration Statement [Century Aluminum Co., Prospectus Supplement to Prospectus Dated May 29, 2007 (Form 424(b)5) (Jan. 29, 2009) ("January 2009 Registration Statement")], both filed with the Securities and Exchange Commission ("SEC").  ¶¶ 74-92.[2]  The Century Defendants have conceded that the Company's SEC filings falsely reported that Century had a positive cash flow of $230 million from operations, when in reality Century had a deficit of $698 million – *a misstatement of $928 million in cash flows from operations in a Company in the midst of a liquidity crisis*.  ¶ 93.

Here, the Century Defendants challenge only the adequacy of Plaintiffs' allegations as to scienter.  Plaintiffs have met the *Tellabs* standard and adequately alleged a strong inference of scienter which is "at least as likely as any plausible opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 311, 328, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).  As the

---

[1]   The Century Defendants are Century Aluminum Company ("Century" or the "Company"), Logan W. Kruger, Michael A. Bless, Steve Schneider, John C. Fontaine, Jack E. Thompson, Peter C. Jones, John P. O'Brien, Willy R. Strothotte, Jarl Berntzen, Wayne R. Hale, Robert E. Fishman and Catherine Z. Manning.

[2]   All references to "¶" refer to the paragraph numbers in the Third Amended Consolidated Class Action Complaint for Violation of the Securities Act of 1933, 15 U.S.C. § 77 *et seq*., and the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq*. ("Third Amended Complaint" or "TAC") (Dkt. No. 99).

PLNTFFS' OPP TO DEFS' MOT TO DISMISS THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

Century Defendants knew, the Company was under extreme and unprecedented economic pressures including: the cancellation of its forward sales contracts; a worldwide financial crisis; the crash in aluminum prices; and an admitted liquidity crisis at the Company.[3] All of these factors known to the Century Defendants created a desperate and immediate need for cash if the Company were to survive. To address this unprecedented need for cash, Plaintiffs allege that the Century Defendants undertook a fraudulent scheme to raise the necessary and critical funding through a secondary offering in January 2009. Defendants' reporting of a positive cash flow from operations in the November 2008 Quarterly Report and January 2009 Registration Statement by recognizing a one time sale of preferred stock as "cash flow from operations," in contravention of applicable Financial Accounting Standards was key to this plan, and it probably would not have succeeded otherwise. With the help of the overstated cash flow from "operations," Century raised $104 million in January 2009 and survived. These allegations, when considered in their entirety, give rise to a strong inference of scienter.

Despite the Century Defendants' argument to the contrary, an almost billion dollar discrepancy in cash flow from operations is ***not*** a mere technical error 'of no substance' in the presentation of Century's financials and the error was ***not*** somehow 'missed' by the Century Defendants in their review of the third quarter financial statements. *See* Century Defendants' Motion to Dismiss Third Amended Consolidated Class Action Complaint ("Century Mem.") [Dkt No. 102] at 8:1-12 and 9:17-23. Instead, it is a critically timed false statement made when the Century Defendants knew that the Company was losing millions on a monthly basis from its operations and that the positive cash flow came, not from operations, but from financing activities, *i.e.*, the sale of preferred shares to Glencore. The timing of the false statement is critical because prices for aluminum were crashing, Century Aluminum faced a liquidity crisis and the Company needed an influx of capital. Knowing that investors give greater weigh to a company's positive

---

[3]     The "forward sales contracts" are 'hedging' contracts between Century and Glencore Ltd. ("Glencore") For years 2006 through 2010 and 2008 through 2015. ¶¶ 54-55. The contracts set a minimum and maximum price for aluminum and specified two quantities of primary aluminum which allowed Century to protect itself against market volatility. *Id.*

1   cash flow from operations in making an investment decision (especially when a company is facing

2   liquidity issues) and not wanting to disclose a $698 million cash deficit to potential investors, the

3   Century Defendants did not 'miss' this error but deliberately incorporated this false statement into

4   its Consolidated Statement of Cash Flows.

5   **II.   PLAINTIFFS' ALLEGATIONS IN THE THIRD AMENDED COMPLAINT**

6       **A.   Century Faced Falling Aluminum Prices**

7           In late 2008, Century was under increasing pressure due to a significant degradation in the

8   market price for aluminum and starkly increased operating and fuel costs.  ¶¶ 57-73.  In addition to

9   general market forces and increased costs, Century was also facing mounting debts, liquidity

10   problems and excess operating capacity.  *Id.* Indeed, Century—like other aluminum producers—

11   was feeling the crunch of ever dwindling margins, leading to large and mounting losses and

12   declining cash flows.

13           As a result of these growing economic pressures, disaster was on the horizon for Century,

14   including, but not limited to, plant shutdowns, sale of assets and even bankruptcy.[4]  *See* ¶¶ 20, 72;

15   *See* Century Mem. at 2-3.  As such, investors and commentators alike were raising serious doubts

16   about Century's ability to fund ongoing operations, much less capital improvements such as the

17   Company's newly initiated endeavor to construct a smelter in Iceland.  *See* ¶¶ 58-60, 66-73.

18           Moreover, Century was facing pressure, not only from external forces, but also internal

19   forces.  Specifically, Century was under pressure from its former parent company, Glencore, to

20   make good on margin calls under its forward sales contracts.  ¶¶ 54-55, 59.  In order to mollify

21   Glencore, Century advised analysts and investors that Century and Glencore had agreed to

22   terminate the forward sales contracts and that Glencore had agreed to pay $730.2 million for

23   160,000 shares of Century non-voting Series A Convertible Preferred Stock.  ¶¶ 61-63.  On July 8,

24   2008, Century advised the market that it would have a new business model with no further

25   obligations under the forward sales contracts and with "greater value in open market transactions

26

27   _____

   [4]     Indeed, on February 19, 2009, Century announced that it would be implementing immediate

28   "curtailment" of operations (later close) in its Ravenswood, West Virginia aluminum smelter.  ¶¶ 72, 90.

1    for its aluminum." ¶ 64.  According to Defendant Kruger, Century shareholders "w[ould] benefit

2    from [Century's] ability to realize market pricing on [Century's] entire production capacity." *Id.*

3        **B.    Century's False Financial Statements**

4        In the midst of announcing its new business model based on market pricing, while facing

5    uncertainty in the aluminum markets, Century issued its November 2008 Quarterly Report and

6    launched the January 2009 Registration Statement.  ¶¶ 10-11.  Featured in the Consolidated

7    Statement of Cash Flows in the November 2008 Quarterly Report was the statement that net cash

8    provided by operating activities was $230,759,000. ¶ 81.  No footnote, note or other explanatory

9    notation tells investors that this calculation includes a one time sale of preferred stock to Glencore,

10   and that without this influx of cash, $698 million in cash was used by operating activities –

11   creating a nearly ***billion dollar difference in the statement of cash flows from operations***.

12       Also, featured prominently in both the November 2008 Quarterly Report and the January

13   2009 Registration Statement is a "Summary [of] Consolidated Financial Data," which features a

14   non-Generally Accepted Accounting Principles ("GAAP") calculation of Earnings before Interest,

15   Taxes, Depreciation and Amortization ("EBITDA").  ¶ 86.  One of the most important line items

16   of the EBITDA calculation—and the most valuable for investors, shareholders and analysts

17   alike—is the item identified as "Adjusted net cash provided by operating activities" ("Net

18   Operating Cash").   Indeed, Net Operating Cash in the November 2008 Quarterly Report and

19   January 2009 Registration Statement represents an enormous percentage – ***over 74%*** – of the

20   Company's total adjusted EBITDA as presented in that document. ¶ 86.

21       In addition, the November 2008 Quarterly Report and January 2009 Registration Statement

22   add detail to the non-GAAP EBITDA numbers, specifically and individually breaking out cash

23   flows and cash from operations following the EBITDA disclosure as follows:

|  | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
|  | 2008 | 2007 | 2007 | 2006 | 2005 |
|  | (In thousands) | | | | |
| Net cash provided by (used in) operating activities | $230,759 | $(40,740 ) | $(5,755 ) | $185,353 | $134,936 |
| Change in short-term investments — net | (250,884 ) | 258,727 | 280,169 | — | — |

| | | | | | |
|---|---|---|---|---|---|
| Cash used for termination transaction at closing | 225,000 | — | — | — | — |
| **Adjusted net cash provided by operating activities** | **$204,875** | **$217,987** | **$274,414** | **$185,353** | **$134,936** |

¶ 87.  Reading the table above, potential investors in Century would not only conclude that the Company was liquid, but that a positive cash flow from operations under the new market model would satisfy short-term debts and weather the economic storm.  *Id.*

> Indeed, as expressed in the explanation above the table in the Secondary Offering:

> We believe the presentation of adjusted net cash provided by operations is a useful measure that helps investors evaluate our capacity to fund ongoing cash operating requirements, including capital expenditures and debt service obligations, and to make acquisitions or other investments.

¶ 89.  The presentation of adjusted net cash provided by operations is useful, however, ***only*** if it is accurate, and not false and misleading (*i.e.*, representing cash actually generated (or used) by operations).

> Just a few weeks later—after Century had sold over 24 million shares of the Company's common stock—the Company announced that the statement of cash flows reproduced above was materially misstated and needed to be restated.  ¶¶ 11-12.  In the March 2, 2009 Restatement, Century informed investors and the market alike that the November 2008 Quarterly Report and January 2009 Registration Statement were false and misleading, stating:

> On February 27, 2009, Century Aluminum Company (the Company) determined that our previously issued financial statements for the nine months ended September 30, 2008 included in our periodic report on Form 10-Q for that period should no longer be relied upon as a result of an error in the interim consolidated statement of cash flows.  A restatement of these previously issued financial statements is necessary as the Company has determined that preferred stock issued in July 2008 was not presented on the consolidated statement of cash flows in accordance with Statement of Financial Accounting Standards No. 95 "Statement of Cash Flows".

¶ 93.

> In the same filing Century presented an "adjusted" statement of cash flows, illustrating the material negative impact of the Restatement on the Company's cash position.  ¶¶ 85-87.  Among

1    other things, the Restatement had a cumulative impact of $989,480,000, resulting in a Net

2    Operating Cash balance *of negative $698,721,000*. ¶ 94.

3         **C.**      **Scienter Allegations Against the Century Defendants**

4        The TAC sufficiently alleges that Century undertook a fraudulent scheme to raise money

5    by inflating the Company's stated cash-on-hand.[5]  ¶¶ 4, 10-15, 17-20, 53, 92, 98.  This was done

6    by improperly accounting for the paper 'proceeds' of the sale of preferred stock to Glencore as

7    "cash flows from operating activities," rather than as its proper classification, cash from financing

8    activities.  *Id.*  Century then falsely reported in its November 2008 Quarterly Report that the

9    Company had a surplus of $230,759,000 in free cash flows provided by operating activities in the

10    third fiscal quarter, when in reality Century had a deficit of $698,721,000.  ¶¶ 10, 13, 81, 94, 96.

11    No matter how it is characterized by the parties, no one disputes that the Company reported

12    **$929,480,000 more in cash from operations than was actually in the Century coffers and that**

13    **this statement was false when made**.  ¶¶ 13, 93-94.

14        With the inflated statement of cash flows in place, Century was able to seek, as the

15    Century Defendants concede, a desperately needed additional influx of $100 million through a

16    public offering of stock ("January 2009 Offering").  ¶¶ 11-12, 73, 83-89.  Therefore, pursuant to a

17    January 2009 Registration Statement, the Century Defendants again incorporated the false

18    statement of cash flows identical to that reported in the November 2008 Quarterly Report.  ¶¶ 11,

19    83, 85.  The Century Defendants knew, based on their own knowledge relating to the Company's

20    unprofitable operations, the cancellation of the forward sales contracts, sale of preferred stock to

21

---

22   [5]  Both the Court and counsel for the Century Defendants refer to the $689 million accounting error as a

23   "touch pass."  *In re Century Aluminum Co. Secs. Litig.*, No. C 09-1001 SI, 2010 U.S. Dist. LEXIS 41062, at *8 n.5 (N.D. Cal. April 27, 2010); Century Mem. at 8:2.  This analogy is incorrect as a 'touch pass' is a

24   basketball drill which passes a ball to another player without taking a step.  Here the analogy assumes a proper accounting of funds was a quick pass of the funds through the cash flow from operations to the cash

25   flow from the financing activities.  However, the sale of the preferred shares to Glencore should not have been reported in the cash from operations at all.  A better analogy is when a mortgage company makes a

26   determination of whether to lend money to potential home purchaser and inquires as to the source of the down payment and income to be used to pay the mortgage over the life of the loan.  The decision whether

27   to make the loan varies on whether the down payment was a one time gift from parents or earned by the borrower.  Similarly, the decision to invest in Century would differ whether the cash came from a one-time

28   financing activity or was from an on-going business activity.

PLNTFFS' OPP TO DEFS' MOT TO DISMISS THIRD AMENDED COMPLAINT - CASE NO.  C 09-1001 SI

Glencore and the Company's critical liquidity situation, that cash flow from operations was not positive, substantially overstated and false and misleading when made. ¶¶ 11, 13-14, 83, 85, 92, 98. With the help of the overstated cash flow from operations, Century raised $104 million by completing the January 2009 Offering of 24.5 million shares. ¶¶ 11, 17, 73, 84, 90. The truth only came to light *after* the Century Defendants had successfully completed the January 2009 Registration Statement when, on March 2, 2009, Century filed a restatement informing shareholders that the Company's "previously issued financial statements for the nine months ended September 30, 2008 . . . should no longer be relied upon . . . " ¶¶ 12, 93.

The Century Defendants, with access to inside information about the Company's mounting billion dollar cash loss from operations due to falling aluminum prices and the Company's desperate need for capital, knew or were deliberately reckless in not knowing that the statement of cash flows from operations was misstated. ¶¶ 2, 11, 13-14, 98, 102, 122, 179.

## III.   LEGAL STANDARDS

In undertaking a review of a complaint under Federal Rules of Civil Procedure 12(b)(6), a district court "will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that's plausible on its face." *In re PMI Group, Inc. Securities Litig.*, Nos. C-08-1405 SI, C-08-1406 SI, 2009 WL 1916934, at *6 (N.D. Cal. July 1, 2009) (internal quotation and citation omitted).

To meet the scienter requirement, plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs*, 551 U.S. at 313-14 (emphasis added). To qualify as "strong" within the meaning of the statute, an inference of scienter must be more than merely plausible or reasonable – it must, accept the allegations as true and take them collectively, be cogent and at least as compelling to the reasonable person as any opposing inference of non-fraudulent intent. *Id.* at 313-18, 323-26. When assessing a complaint for compliance with this standard, "courts must consider the complaint in its entirety and inquire whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

1    that standard." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir.

2    2008) (emphasis in original) (citation and internal quotation omitted).  Plaintiffs have met the

3    *Tellabs* standard.  *Tellabs*, 551 U.S. at 324; ¶¶ 98, 101-113.

4    **IV.**     **SCIENTER IS ADEQUATELY ALLEGED**

5        Century was in the midst of a liquidity crisis, a fact which was well known by the Century

6    Defendants – also conceded to in nearly all of the approximately 65 exhibits (over 1,000 pages)

7    attached to the Century Defendants' Request for Judicial Notice in Support of Century

8    Defendants' Motion to Dismiss Consolidated Class Action Complaint ("RJN") (Dkt No. 61) and

9    Supplemental RJN (Dkt No. 70). *See* Century RJN, Exhibits ("Exs.") 1-3, 17, 30-32.  In response

10    to this crisis, the Century Defendants undertook a fraudulent scheme to raise the necessary and

11    critical funding by inflating the Company's cash generated by operating activities by nearly $928

12    million.  The amount of cash generated by operating activities (especially when Century had just

13    announced a new business model) was critical to potential investors and vital to the Century

14    Defendants in the midst of the Company's liquidity crisis.  So, it is absurd to suggest that Century

15    Defendants were unaware of a negative cash balance of $698 million (used in operating activities)

16    when compared to a publicly reported positive cash balance of $204 million (generated by

17    operating activities).  Therefore, the Century Defendants knew or were deliberately reckless in not

18    knowing that these misstatements were false and misleading. *See* ¶¶ 2, 11, 13-14, 98, 102, 122,

19    179.

20        As the Court noted in its April 27, 2010 Order, Plaintiffs' allegations are adequate if they

21    fit, as alleged here in the TAC, within the narrow conditions articulated in *Bernson v. Applied*

22    *Signal Tech.*, 527 F.3d 982 (9th Cir. 2008) or *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th

23    Cir. 2008). *In re Century Aluminum Co.*, 2010 U.S. Dist LEXIS 41062, at *20.  The first

24    exception under *South Ferry* permits allegations about the management's role in the corporate

25    structure and the importance of corporate information about which management made false and

26    misleading statements to create a strong inference of scienter if the allegations are buttressed with

27    "detailed and specific allegations about management's exposure to factual information within the

28    company." *In re Century Aluminum Co.*, 2010 U.S. Dist. LEXIS 41062, at *21 (citing *South*

*Ferry*, 542 F.3d at 785).   The second exception under *Applied Signal* permits an inference of scienter "where the information misrepresented is readily apparent to the defendants corporation's senior management."  *In re Century Aluminum Co.*, 2010 U.S. Dist. LEXIS 41062, at *21 (citing *Applied Signal Tech.*, 527 F.3d 987-89).  As described in further detail below, the TAC meets both exceptions.

### A.    The TAC Adequately Alleges that the Century Defendants Knew That the Third Quarter Cash Flow Statement was Manipulated

In addition to the detailed allegations in the Second Amended Complaint, the TAC adds several new allegations that, when viewed in their entirety, raise a strong inference of scienter.

First, the Century Defendants signed both 2007 and 2008 10-Ks, the 10-Qs for 2008 as well as the January 2009 Registration Statement (¶¶ 34-45), which made them not simply aware of but knowledgeable about their contents.  For example, the accounting for the forward sales contracts in the 2007 10-K (before the contracts were terminated) disclosed the change in market value on Century's books as an adjustment to "Net Income" on the statement of operations and the non-cash portion was realized as an adjustment to the "Cash Flows From Operating Activities." ¶ 55.  So when Century terminated the forward sales contracts as of June 2008 and announced Glencore's concurrent purchase of 160,000 shares of preferred stock, the cash flow from this transaction was no longer cash received from an operating activity but cash from a financing activity.  In essence, with the sales contracts terminated, there was no cash from an operating activity to report.  Also, even absent this prior accounting knowledge, the one time sale of preferred stock is clearly *not* cash flow from operations.  ¶¶ 55, 59-61, 64-65, 72-73, 81, 86-89.

Next, prior to November 2008 Quarterly Report, Defendant Logan explained the benefit of Century's new business model – "shareholders will benefit from our ability to realize market pricing on our entire production capacity" and "an attractive pipeline of growth opportunities which can be funded with the additional cash flow we will unlock through this transaction." ¶¶ 64-65.     However, concurrent with these announcements, the price of aluminum began to decline and the Century Defendants knew that the price pressures in the aluminum market had created substantial monthly operative losses in the third quarter.   ¶¶ 68, 69.   Therefore, the

Century Defendants knew that the only substantial influx of cash during the third quarter was from the sale of preferred stock to Glencore, and *not* its new business operations.  ¶¶ 55, 59-61, 64-65, 72-73.

So, when the Century Defendants reviewed and approved the reported positive cash flow in the November 2008 Quarterly Report and January 2009 Registration Statement – $230 million in cash from operating activities – they knew that it was due to the sale of preferred stock to Glencore, not cash generated by on-going operations under its new business model.  The Century Defendants also knew that the forward sales contracts had been cancelled and should no longer be reported (as previously) as cash from operations.  ¶¶ 55, 61-62.

The Century Defendants also knew that there was no explanation, note or footnote in the Consolidated Statement of Cash Flows explaining the positive impact of this one time sale of the preferred stock to Glencore on cash flow from operations.  This lack of explanation is critical in light of the Company's positive statements during the third quarter about its new business model because investors looking at a positive $200 million in cash flow from operations would reach the false conclusion that the positive cash flow came from Century's new business model and not a one time sale of stock.  ¶¶ 10, 18-19, 55, 80-81, 85, 88, 92, 95.  As a result, the Consolidated Cash Flow Statement fails to advise investors that that Century had used $698 million in cash from operations – *a difference of nearly one billion dollars*.  The Century Defendants either knew, or were deliberately reckless in not knowing, that Century could not report a positive cash flow from operations.  ¶¶ 2, 11, 13-14, 98, 102, 122, 179.

## B.   The TAC Allegations Raise a Strong Inference of Scienter Under Applicable Law

### 1.   Allegations of Significant Direct and Circumstantial Evidence of Scienter is Sufficient

Defendants act with the requisite scienter when they act either intentionally or with deliberate recklessness. *South Ferry,* 542 F.3d at 782. Falsity may itself be indicative of scienter where it is combined with allegations regarding a manager's role in that company that are particular and suggest that defendant had actual access to the disputed information and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that

1    management was without knowledge of the matter. *Id.* at 785-86. The inquiry "is whether all of

2    the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

3    individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 310, 323.

4    An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely* as any

5    plausible opposing inference." *Id.* at 324, 328 (emphasis in original). The inference of scienter

6    need not be more likely than a plausible opposing inference: a tie goes to the plaintiff in that

7    instance. *Id.* at 324. Also "[t]he inference that the defendant acted with scienter need not be

8    irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

9    inferences.'" *Id.* (citation omitted).

10          Having signed the relevant SEC filings, the Century Defendants knew the salient aspects

11   of the accounting for the forward sales contracts in prior years, approved the termination of the

12   same contracts in June 2008, authorized the sale of preferred stock to Glencore, and recognized

13   the only source of the Company's positive cash flow was the sale of preferred stock and was

14   aware that based on market conditions the Company had a substantial cash deficit from operations.

15   *See* ¶¶ 55, 59-61, 64-65, 72-73, 81, 86-89. Therefore, at a minimum, the Century Defendants

16   knew that the reported positive cash flow was from the proceeds of the sale of preferred stock to

17   Glencore, or financing activities, and ***not*** operations. Aware of these facts, they, nonetheless,

18   approved the Company's financial statements, filed with the SEC and reported a positive $204

19   million in cash flow ***from operations*** and knew, or were deliberately reckless in not knowing, that

20   the Company made a critical $928 million misstatement in its statement of cash flow from

21   operations.

22          Therefore, knowing the impossible situation facing the Century Defendants and knowing

23   that Century could ***not*** have generated $204 million in cash from operations, the only ***plausible***

24   inference is that the Century Defendants deliberately made a $928 million misstatement in

25   reporting the Company's cash flow from operations in order to complete a desperately needed

26   Secondary Offering. Based on these allegations of direct knowledge, the TAC easily meets the

27   *Tellabs* pleading standards. *See also In re Connectics Corporation Securities Litig.*, No. C07-

28   02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (scienter adequately alleged

1 | because Defendants knew specific facts at the time that rendered their accounting determinations

2 | fraudulent).

3 |

### 2. The Officer Defendants, Given Their Day-to-Day Responsibility for Monitoring Century's "Core" Operations, Knew or Recklessly Disregarded the Facts Contradicting the Public Statements of Cash Flow From Operations

Plaintiffs plead scienter by, among other means, alleging *in detail* that Century's cash flow from operations was critical to the Company during the Class Period and that the Century Defendants with the Company on the verge of bankruptcy closely monitored the Company's liquidity. ¶¶ 101-113; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1066 (C.D. Cal. 2008) (found scienter was alleged as to key executives because they "were involved in the day-to-day operation of the company and would have been even more aware of a 'culture' of undisciplined loan origination"). Based on the numerous public disclosures made by the Century Defendants relating to the forward financial sales contracts, the termination of same, the sale of preferred stock to Glencore and the Company's liquidity status along with monitoring prices on the aluminum market, the Century Defendants knew about each of these events and closely monitored the Company's cash position during the Class Period. ¶¶ 55-58, 60-69, 75-80, 82. Therefore, the Individual Defendants conducted active oversight of, and were necessarily made aware of, issues concerning the Company's cash flow, liquidity, and internal controls during the Class Period.[6] ¶¶ 101-113.

Under any reasonable standard, the false statements by the Century Defendants in this case is critical corporate information. The following are just a few metrics with which to analyze the

---

[6]     Plaintiffs also allege that the Century Aluminum Defendants had access to basic financial information, and regularly received certain internal information concerning cash flow. ¶¶ 48-51; *see Countrywide*, 554 F. Supp. 2d at 1066 ("[T]he executive Defendants were privy to the company's risk management systems on an ongoing basis. . . . [T]hey also had access to the data contained in the Exception Processing System [("EPS")].");  *id.* at 1063 (noting allegation, also found here, that EPS was "designed to route highly risky loans to a central underwriting group for evaluation"); *see* ¶¶ 169-171; *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.") (quoting *Nursing Home Pension Fund, Local 144 v. Oracle*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Restatement:

| Restatement Amount: $929,480,000 |
| --- |
| Century's Net Sales for 2007: $1,798,163,000 |
| Restatement Percentage of Net Sales for FY 2007: **51.7%** |
| Century's Net Income for FY 2006: $1,558,566 |

The Restatement accounted for over 50% of Century's Net Sales for the entire fiscal years of 2006 and 2007, and it is disingenuous and antithetical to consider such an enormous mistake as not known by the Century Defendants. Century Mem. at 6-10. Further, the context of misstatements is also important. Century reports a positive cash balance of over $200 million from operations while the Company makes 'a make or break' public offering of common stock to avoid bankruptcy. *Id.* In addition, knowledge of the Company's substantial liquidity issues (a $1 billion operating loss) should have been a red flag to the Century Defendants that a positive statement of cash flows from operations created an impression of a state of affairs that differs in a material way from the one that actually exists. In fact, it was absurdly clear to the Company's insiders that Century did not have $204 million in cash from operations and it would be absurd to suggest that the Defendants Kruger and Bless, as CEO and CFO, would *not* have unfettered access to such information related to the fraud and the financial reporting related to cash from operations.[7] *See* ¶ 105, 110.

The Ninth Circuit has endorsed this means of pleading scienter. *See Applied Signal Tech.*, 527 F.3d at 988 (finding it "hard to believe" that executives directly responsible for day-to-day

---

[7] Courts have held that where, as here, other indicia of scienter are pleaded, Sarbanes-Oxley certifications will support an inference that Defendants Kruger and Bless knew or recklessly disregarded that the financial statements were false and misleading. ¶¶ 78, 105 (signing November 2008 Quarterly Report). *See, e.g., In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of [the signer's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV 04-1255 AA, 2006 WL 538756, at *20-21 (D. Or. Jan. 3, 2006).

operations would not have known about "stop-work order" that disrupted company's business);[8] *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("absurd to suggest" that directors of airline would not have discussed major operations problems). In fact, Plaintiffs' scienter allegations are *at least* as compelling as *Applied Signal* because Plaintiffs allege particularized facts, such as the termination of forward sales contracts, sale of preferred stock, falling aluminum prices, significant liquidity issues and the relationship between Glencore and Century, indicating that the Century Defendants had *actual* knowledge of the Company's lack of cash from operations or were deliberately reckless in not knowing the truth.[9]  ¶¶ 55, 59-61, 64-65, 72-73, 81, 86-89, 101-113.  *See also Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) ("It is fair to infer the company has highly effective information systems . . . Defendants are in a highly regulated industry and the company, it can be inferred, constantly monitors reports . . . and looks for prompt solutions to such problems.") (finding scienter under *Tellabs* standard).

The facts of the cases cited by the Century Defendants are quite different. Century Mem. at 8.  *See Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 747-48 (9th Cir. 2008) (alleged misstatements about a discrete set of illegal payments by InVision's foreign sales agents operating in China are surreptitious in nature and create a strong inference that payments would have been deliberately kept secret within the Company) and *In re Verifone Holdings, Inc. Sec. Litig.*, No. C-

---

[8]     In *Applied Signal*, shareholders filed a securities class action against Applied Signal and two of its officers after the company announced an unexpected 25% drop in revenue. *Applied Signal*, 527 F.3d at 984. At issue were certain "stop orders" received from Applied Signal's customers, which the company failed to report accurately to investors. *Id.* Although plaintiffs did not allege any specific facts showing that the individually named officers actually *knew* about the stop-work orders, the Ninth Circuit held that plaintiffs had adequately demonstrated a 'strong inference' of scienter, based on the officers' positions and the nature of misstatements. *Id.* at 988-89. In particular, the Ninth Circuit concluded that that the named officers 'were directly responsible for Applied Signal's day-to-day operations" and that the stop-work orders "were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* (citing *No. 84 Employer-Teamster*, 320 F.3d at 943 n.21).

[9]     *See Countrywide*, 554 F. Supp. 2d at 1065, 1066 ("[T]he idea that a Company-wide culture that encouraged unchecked deviations from underwriting standards in a way which would fatally affect the Company's continued financial performance went unnoticed by a Board of Directors simply does not square with the specific and comprehensive monitoring duties assigned to the members of the Board;" and inference "even stronger" as to executives, including all Officer Defendants).

PLNTFFS' OPP TO DEFS' MOT TO DISMISS THIRD AMENDED COMPLAINT - CASE NO. C 09-1001 SI

07-06140 MHP, 2009 WL 1458211, at *8 (N.D. Cal. May 26, 2009) (inventory accounting errors related to the valuation of in-transit inventory do not appear to be something about which Verifone senior management "must have known"). In fact, the Ninth Circuit in *Glazer Capital* recognized that "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer*, 549 F.3d at 744 (citations omitted) (emphasis in original).[10]

### 3. Plaintiffs' Allegations, Taken Collectively, Give Rise to a Strong Inference of Scienter

Scienter has been inferred based on very similar allegations to the allegations here – where the facts pled supported an inference that could 'bridge the gap' between key details of an agreement and the improper accounting treatment of the agreements. *In re Cadence Design Systems, Inc. Securities Litig.*, 692 F. Supp. 2d 1181 (N.D. Cal. 2010).

Similarly, as in *Cadence, NutraCea* and *Ambassador's Group* (described in detail below), Century was in the midst of a liquidity crisis that was sufficiently severe that the Company might not survive in 2009 absent an immediate influx of capital, so it is absurd to suggest that the Century Defendants were unaware of this crisis and could reasonably believe that the Company instead generated a positive $204 million in cash flow from operations. There is also no reasonable argument that the Century Defendants were not aware that the positive cash flow statement included the one time sale of preferred stock to Glencore – cash generated from financing activities, not operations.

In *Cadence*, plaintiffs alleged that certain earnings statements were false because Cadence had improperly accounted for two major agreements and a restatement was issued to correct the false representation. *Cadence,* 692 F. Supp. 2d at 1185. The Court concluded that individual

[10] The financial fraud allegations in *McCasland v. Formfactor, Inc.*, No. C 07-5545 SI, 2009 WL 2086168, at *7 (N.D. Cal. July 14, 2009) are also very different. *See* Century Mem. at 9-10, 12. In *McCasland*, this court concluded that because "the numbers in the financial restatement run directly counter to the Plaintiffs' theory of fraud, the inference of scienter is not plausible." *McCasland*, 2009 WL 2086168, at *7. Here, the restatement is the basis of Plaintiffs' fraud allegations.

defendants' knowledge of the facts relating to the agreements – the largest deals in the quarter, not routine deals – and knowledge that the mistreatment of these deals made the difference between Cadence missing or meeting projections, created an inference of scienter since the individual defendants either knew or were deliberately reckless in not knowing that the accounting treatment was improper. *Id*. at 1191-92.

Similarly, in *Burritt v. NutraCea*, the case turned on "what defendants knew about the proper accounting of four transactions when they represented that NutraCea's accounting was correct." *Burrrit v. NutraCea*, No. CV-09-00406-PHX-FJM, 2010 U.S. Dist. LEXIS 17544, at *11-12 (D. Az. February 24, 2010). After reviewing the allegations as a whole as to each transaction, the District Court determined that allegations that the CEO negotiated one transaction, monitored NutraCea's revenue recognition and had a profit motive combined with the general allegations created a strong inference of scienter and that this inference "is cogent and at least as compelling as an inference that [the CEO] was merely reckless or negligent." *Id*. at *22.

In *Plumbers Union Local No. 12 v. Ambassador's Group*, No. CV-09-00214-JLQ, 2010 U.S. Dist. LEXIS 53754, at *18-20 (E.D Wash. June 2, 2010), the District Court determined that the core operations inference was sufficient when made in conjunction with allegations concerning the management's exposure to the factual information. In *Ambassador's Group*, the company, who markets its student-travel trips via informational brochures mailed to prospective student-travelers, failed to disclose the loss of its contract with a company who supplied its Middle School list. The court concluded that the entirety of the complaint gives rise to a strong inference of scienter because Ambassadors is a small corporation and there is "no reasonable argument that the Defendants were not aware of the mailing list issue." *Id*. at *21. (Middle School names list accounted for 45% of marketing leads for Ambassadors.) *See also Hodges v. Akeena Solar, Inc.*, No. C 09-02147 JW, 2010 U.S. Dist. LEXIS 68320, at *14-17 (N.D. Cal. May 20, 2010) (Sufficient facts pled to establish scienter including allegations showing defendant's intimate knowledge of Akeena's core business operations and financial statements and projections).

C.    **Plaintiffs Have Sufficiently Pled Control Person Liability**

To allege a prima facie case under Section 20(a), a plaintiff must allege: "(1) 'a primary violation of federal securities law' and (2) 'that the defendant exercised actual power or control over the primary violator.'"  *No. 84 Employer-Teamster*, 320 F.3d at 945 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161-62 (9th Cir. 1996).  Here, as demonstrated above, Plaintiffs have adequately pled a primary violation against the Century Defendants under Section 10(b) and plead that Defendants exercised actual power.  ¶¶ 49-51, 101-113.

V.    **LEAVE TO AMEND SHOULD BE FREELY GRANTED**

Should the Court conclude that the Third Amended Complaint does not sufficiently plead a Section 10(b) claim (which it does), Plaintiffs respectfully request leave to amend.  Rule 15(a)(2) of the Federal Rules of Civil Procedure provides: "leave shall be freely given when justice so requires."  In the Ninth Circuit, "[t]his policy is 'to be applied with extreme liberality.'"  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (reversing district court's denial of leave to amend) (internal quotations and citation omitted); *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).  Plaintiffs should therefore be given an opportunity to correct any pleading defects that may be identified by the Court in the Third Amended Complaint.

DATED: July 29, 2010

Respectfully submitted,

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT

*Betsy C. Manifold*

BETSY C. MANIFOLD

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

Lead Counsel for Plaintiffs

CENTURYALUMINUM:17684v2